**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHEMIMAGE CORPORATION<br><br>       Plaintiff,<br><br>    v.<br><br>JOHNSON & JOHNSON and ETHICON, INC.<br><br>       Defendants. | No.: 1:24-CV-2646 (JMF)<br><br>**AMENDED COMPLAINT** |

Plaintiff ChemImage Corporation ("ChemImage" or "Plaintiff"), by and through its undersigned counsel, brings this action against Defendants Johnson & Johnson ("J&J") and its wholly owned subsidiary, Ethicon, Inc. ("Ethicon" and collectively, "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1.  This is a case about J&J's decision to retreat from its failed play in surgical robotics, breaking the promises it made to ChemImage to develop its life-saving imaging technology. J&J's decision ultimately killed this family-founded company and its technology that could have vastly improved surgical outcomes for millions of people.

2.  In 2019, J&J and its wholly-owned subsidiary, Ethicon, set out to strengthen its surgical robotics program. Competitors were making strides in this cutting-edge space, and J&J was desperate to catch up. That year, J&J set its sights on Auris Health—acquiring it for $3.4 billion.

3.  Then, J&J pursued ChemImage, a company pioneering AI-based light imaging technology. ChemImage's technology would allow surgeons to identify tumors, critical structures, and distinguish between a patient's healthy and diseased tissue, in real-time. This enhanced imaging technology had the potential to revolutionize the medical industry and vastly improve

surgical outcomes.  This technology could also enhance the patient experience.  With real-time images, patients would no longer have to await biopsy or pathology reports, a process that can add as much as a week to an operating procedure.

4.      ChemImage's technology offered J&J an advantage over its competitors in the surgical robotics space as they raced to catch up to the competition.  J&J excitedly told ChemImage that it had been searching for this type of technology for a decade.  ChemImage was also looking to partner with a much larger medical device company, like J&J, to help bring its cutting-edge technology to market.

5.      In late 2019, Ethicon, at the direction of J&J, entered into an agreement with ChemImage to jointly develop ChemImage's technology (the "Agreement").  Ex. 1, December 27, 2019 Agreement.  Under the Agreement, Ethicon paid ChemImage ▉▉▉▉ upfront, with ▉▉▉▉ ▉▉▉ in anticipated milestone payments as the project progressed.  Ethicon also agreed to pay ChemImage royalties once the technology was commercialized.  These royalties were estimated to exceed $1.5 billion.

6.      In the first year of the project—despite the disruption of the global COVID-19 pandemic—ChemImage achieved remarkable success, meeting its first milestone.

7.      Then, J&J's corporate priorities shifted.  J&J's play to catch up in the surgical robotics space had failed, for reasons having nothing to do with ChemImage, and J&J tried to silently retreat from its earlier acquisitions.  J&J underfunded Auris and eventually instructed Ethicon to abandon ChemImage pretextually and in knowing violation of their duties under the Agreement.

8.      In fact, three days after Ethicon sent its March 2023 termination letter to ChemImage, J&J announced it was laying off 350 employees from its robotics program.  ChemImage was another casualty of J&J's cut-throat decision to abandon its existing obligations.

9.      Under Section 10.4 of the Agreement, Ethicon could have walked away from the partnership, but if—and only if—it paid ChemImage a ▉▉▉▉ termination fee and complied with the 120-day notice period.  This fee and extended notice would have sustained ChemImage's

continued operations long enough to find another partner. But rather than honor its contractual obligations to ChemImage, Ethicon and J&J invoked *a different clause* in terminating the Agreement, Section 10.3, to prevent ChemImage from partnering with a competitor.

10. In March 2023, Ethicon, at J&J's direction, sent ChemImage a termination notice, baselessly invoking Section 10.3 and falsely claiming that ChemImage had failed to meet a development milestone.

11. Upon information and belief, J&J instructed Ethicon to terminate the Agreement under Section 10.3 not only to avoid Section 10.4's ███████ termination fee, but also to prevent ChemImage from pairing its technology with a competitor's device. J&J knew that termination under Section 10.3 would tie up ChemImage's core intellectual property and J&J saw that as an opportunity to give its "pet project"—Verb—a head start.

12. But Ethicon's purported justification under Section 10.3 (failure to meet a Milestone), even if true, violated the Agreement because there were *no* prescribed deadlines to achieve milestones. Further, the Agreement *required* a specific committee (the Joint Steering Committee or "<u>JSC</u>") to determine whether a milestone had been met. Tellingly, Ethicon did *not* obtain a determination from the JSC to support its termination—in fact, Defendants refused to even attend a JSC meeting to discuss the matter. The Agreement also prescribed a cure period, which Ethicon refused to honor. Ethicon terminated *before* the end of the cure period, without allowing ChemImage the required opportunity to cure any purported deficiency.

13. Defendants never invoked Section 10.4, which would have allowed them to terminate without cause for the ███████ termination fee. Unsurprisingly, J&J and Ethicon also never paid ChemImage the required ███████ termination fee required by Section 10.4, despite walking away from their partnership without cause.

14. In doing so, J&J and Ethicon forced ChemImage to close its doors. ChemImage was directly damaged by at least the ███████ termination fee and $1.5 billion in lost milestone

and royalty payments. Worse still, ChemImage was forced to lay off 75 employees and halt development of its life-saving technology.

**A.    The Plaintiff**

15.    ChemImage is a Pennsylvania corporation with its principal place of business at 7325 Penn Avenue, Suite 200, Pittsburgh, PA 15208.

**B.    The Defendants**

**1.    J&J**

16.    J&J is a New Jersey Corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, NJ 08933.

17.    J&J conducts business throughout the United States, including in New York.

18.    Since 2022, J&J's medical devices and technology business segment has been referred to as MedTech.

**2.    Ethicon**

19.    Ethicon is a New Jersey corporation with its principal place of business at U.S. Highway 22 West, Somerville, NJ 08876.

20.    Ethicon is a wholly-owned operating subsidiary of J&J within the MedTech business segment. Ethicon is responsible for the development and commercialization of J&J's surgical intervention technologies.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states.

22.    This Court has personal jurisdiction over Ethicon. Pursuant to the Agreement, any dispute arising from the Agreement "shall be submitted [] for resolution by a judge sitting without a jury in the United States District Court for the Southern District of New York, if that court has subject matter jurisdiction[.]" Agreement, App. C at 21.

23.     This Court has personal jurisdiction over J&J.  Specifically, Appendix C to the Agreement provides that any "Disputes that may involve *Affiliates* of [Ethicon or ChemImage], shall be resolved in accordance with [Appendix C to the Agreement]."  Agreement, App. C at 20 (emphasis added).

24.     Pursuant to the Agreement, J&J is an "Affiliate" of Ethicon because it has the "power to direct or cause the direction of the management and policies of [Ethicon]" and because J&J "owns . . . more than fifty percent (50%) of [Ethicon's] voting stock."  Agreement § 1. Accordingly, J&J is bound by the Agreement's jurisdiction and venue provisions.

25.     Further, due to the close relationship between J&J and Ethicon, and J&J's involvement in negotiating and approving the Agreement, it was foreseeable to J&J that it would be bound by the Agreement's jurisdiction and venue provisions.

26.     Pursuant to 28 U.S.C. § 1391(b), this Court is the proper venue for this action.  The Agreement provides that any dispute arising thereunder "shall be submitted [] for resolution by a judge sitting without a jury in the United States District Court for the Southern District of New York, if that court has subject matter jurisdiction[.]"  Agreement, App. C at 21.

## CASE SCHEDULE

27.     The Agreement provides that any disputes that arise between Ethicon, ChemImage, and their Affiliates (*i.e.*, J&J) "shall be resolved in accordance with [Appendix C to the Agreement]."  Agreement, App. C at 20.

28.     Appendix C, titled "Expedited Litigation," includes agreed-upon provisions in the event Ethicon or ChemImage "desires to pursue resolution of the Dispute" in Court.  *Id*. at 21.

29.     The Agreement expressly requires Ethicon, ChemImage, and J&J to "make all filings required by the court on a schedule that will assure trial ready status *eight months after the service of the first complaint* and further agree to make all motions, including motions for summary judgment, on a schedule that will allow them to be fully considered by the court *less than eight months after the service of the first complaint*."  *Id.* (emphasis added).

## CHOICE OF LAW

30.     New York law controls this action.  The Agreement provides that disputes arising thereunder "shall be governed by and construed in accordance with the internal laws of the State of New York without reference to conflict of laws principles."  Agreement § 12.1.

## FACTUAL ALLEGATIONS

**I.      In 2019, J&J Pursues ChemImage To Advance Its Surgical Robotics Program**

31.     J&J and its subsidiaries operate as a global company engaged in the research, development, manufacture, and sale of a range of healthcare products.  J&J's operations are organized into different business segments, one of which is medical devices and technology or "MedTech."  Ethicon is one of J&J's wholly-owned subsidiaries in the MedTech space.

32.     Being at the cutting edge of medical technology is critical to J&J.  For J&J and its competitors, surgical robotics is particularly important because it provides access into hospitals and medical facilities.  This materially enhances a company like J&J's ability to sell its core medical products, including sutures and bandages.

33.     In 2015, J&J entered into a joint venture with Verb Surgical, Inc. ("Verb") to develop a large-scale general surgery robot.

34.     By 2019, however, J&J was still behind its competitors in the surgical robotics space.  That year, revenues in J&J's Advanced Surgery division dropped from single digit to negative growth.  Determined to close the gap, J&J began to invest more aggressively in surgical robotics.

35.     In February 2019, J&J acquired Auris Health, Inc. ("Auris"), a medical robotics company, for $3.4 billion, with additional potential contingent payments of $2.35 billion.  Later that year, J&J acquired the remaining majority stake in Verb.  With both acquisitions, J&J

announced that it had "accelerated [its] entry into digital surgery" and was "kicking off a strong cadence of launches that will take place over the next several years."[1]

36.    By that same time, ChemImage, a Pittsburgh-based company founded in 2002 and operated by leading scientists and doctors, had developed and patented a breakthrough imaging technology.  These images could assist with the detection of tumor lesions and margins, key anatomic structures, and tissue perfusion during surgical procedures.  ChemImage's cutting-edge technology ran on proprietary, artificial intelligence software that it spent over 15 years developing.  ChemImage's software leveraged molecular spectroscopy, digital imaging, and machine learning to achieve real-time detection of biological materials.  Once fully developed, ChemImage's technology could create night-vision type capabilities for surgeons, enhancing their view of the surgical field in real time.  By incorporating years of medical training and apprentice-based learning into a light-based signal, surgeons would have a simpler way to identify critical structures and abnormal areas during surgery.  This technology would revolutionize healthcare.

37.    And while J&J and Ethicon expressed an interest in ChemImage because the technology fit into its then-current goal of bringing a surgical robotic device to market with differentiating technology, ChemImage's technology showed promise across a variety of applications not limited to surgical robotics, such as non-robotic laparoscopic procedures.

38.    In furtherance of J&J's corporate strategy to enhance its surgical robotics division, J&J and Ethicon sought to partner with ChemImage and gain access to its groundbreaking technology in 2019.  Pitch materials sent to ChemImage by J&J and Ethicon touted how ChemImage would serve a complimentary role alongside Auris and Verb within J&J's surgical robotics division.

---

[1]  "Johnson & Johnson Announces Agreement to Acquire Remaining Stake in Verb Surgical Inc.," J&J Press Release (Dec. 20, 2019), *available at* https://www.jnj.com/media-center/press-releases/johnson-johnson-announces-agreement-to-acquire-remaining-stake-in-verb-surgical-inc.

**II.      ChemImage, Ethicon, and J&J Negotiate The Agreement**

39.      ChemImage, Ethicon, and J&J negotiated the Agreement, which would govern the development and commercialization of the ChemImage technology (the "Project").

40.      A number of high-level J&J employees were involved in negotiating and approving the Agreement.  For example, Paul Ritchie (J&J's then-Director, Technology Assessment)[2] and Peter Shen (J&J's then-Global Head of Research & Development)[3] helped drive the negotiations on behalf of J&J.

41.      Other senior J&J executives were also involved in overseeing negotiation and approval of the Agreement.  For example, ChemImage directly presented its technology to Ashley McEvoy, J&J's then-Worldwide Executive Vice President, MedTech division, and ChemImage's technology and business plan were presented in a closed session to Alex Gorsky, J&J's then-Chief Executive Officer and Chairman.  Upon information and belief, both Ashley McEvoy and Alex Gorsky were involved in negotiations and gave final approval over the Agreement.

42.      During the negotiations, Ethicon and ChemImage retained external valuation experts to develop a model for projecting anticipated royalty revenues from the commercialization of ChemImage's technology.  The model prepared by Trinity Consultants projected the Project to generate between $1.3 billion to $1.7 billion in royalties to ChemImage.  ChemImage's decision to move forward with the J&J partnership was based on these projections, which set its expectations for the Agreement.

43.      Since Ethicon is J&J's wholly-owned subsidiary, J&J had ultimate decision-making authority over Ethicon and approved the Agreement.

---

[2]      ChemImage notes that Mr. Ritchie, an "Authorized Person" under the Agreement, is listed alongside an @jnj.com email address in the Agreement's Notices Table, and his publicly available LinkedIn page declares that he is "Retired from Johnson & Johnson." *See* https://www.linkedin.com/in/paul-ritchie-pe-08530312/.

[3]      Mr. Shen was the Global Head of Research & Development at J&J during the drafting and negotiation of the Agreement. *See* https://www.linkedin.com/in/shenpeter/.

44.    J&J not only approved the agreement on behalf of Ethicon, it also intended to bind itself in the partnership with ChemImage.  Indeed, J&J would directly benefit from the Agreement by enhancing its position in the surgical robotics space, which was a priority for J&J in 2019.

45.    To that end, J&J sought to immediately capitalize on the announcement of its partnership with ChemImage.  The press release attached to the Agreement included the headline, "ChemImage Partners *with Johnson and Johnson* to Progress the Development of ChemImage Advanced Visualization Tools in Surgery."  Agreement, Ex. E (emphasis added).

46.    Similarly, on October 14, 2020, J&J's Head of Innovation, Michal Preminger, publicly stated that J&J was "very excited about [the] collaboration" with ChemImage and explained that J&J had "facilitated the collaboration with [its] Ethicon surgery business to develop the company's visualization and awareness of things, AOT platform for healthcare applications."[4]

47.    J&J's intended involvement in the partnership was also directly reflected in the Agreement's Notice provision, which required that "*[a]ll communications* between the Parties with respect to *any of the provisions of this Agreement*" be sent by ChemImage to *J&J's* legal department.  Agreement § 12.12 (emphasis added).

### III.    The December 27, 2019 Agreement

48.    On December 27, 2019, ChemImage and Ethicon, at J&J's direction, entered into the Agreement.

49.    The Agreement outlined the parameters of the Project, detailed the parties' relative rights with respect to intellectual property, and set forth the allocation of proceeds from any successful commercialization of the technology.

### A.    The Agreement Provides For ▮▮▮▮▮ In Milestone Payments

50.    The Agreement reflects the parties' mutual understanding that the Project's Development Timeline and parameters would evolve over time.  The Agreement was designed to

---

[4]  "J&J Innovation - Michal Preminger and Stephen Pitt," Agile Giants Podcast (Oct. 14, 2020), *available at* https://agilegiants.seanammirati.com/jj-healthcare-innovation.

accommodate an iterative development process and required the parties to address Project parameters collaboratively.

51.    The parties agreed to mark their progress through six development milestones and six regulatory milestones (the "Milestones").  *See* Agreement, Ex. B.  However, the Agreement prescribed no fixed deadline by which ChemImage was required to achieve any of the Milestones. *Id.*  Instead, the Agreement set out a range of "target dates" for certain research and development tasks associated with the Project and "anticipated invoice date[s]" to be paid by Ethicon for "Major R&D tasks;" it did not include specific dates by which *any* Milestone had to be met.  Agreement, Ex. B at 2-3.

52.    Likewise, the Agreement did not mandate the technical requirements or data protocols required to meet each Milestone.

**B.    Section 2.4:  The Agreement Requires The Joint Steering Committee To Determine Whether A Milestone Had Been Met**

53.    The Agreement required that the parties work together to develop assessment protocols and success parameters for the Project.  This was to be accomplished through the formation of the Joint Steering Committee ("JSC").

54.    Pursuant to Section 2.4.1 of the Agreement, the JSC was to consist of "two [ChemImage] members and two [Ethicon] members, each of whom shall be senior employees authorized to make the decisions *for its respective Party* allocated to the JSC."  Agreement § 2.4.1 (emphasis added).  At all times, the JSC was to include two senior employees each from ChemImage and Ethicon with decision-making authority.  *Id.*

55.    Notably, J&J also operated as a "Party" to the Agreement under Section 2.4.1 by appointing several members to the JSC.  At different times, J&J's JSC members or meeting attendees included Sarah Moore (J&J's then-Business Unit Lead, Advanced Imaging),[5] Marco

---

[5]    Ms. Moore was a J&J employee during the time that she attended JSC meetings.  *See* https://www.linkedin.com/in/sarah-moore-2a62251/.

Kristensen (J&J's Senior Engineering Manager and Technical Lead),[6] Paul Ritchie (J&J's then-Director, Technology Assessment) and Tamara Lanier (J&J's then-Global Marketing Innovation & Pipeline Leader, Digital Surgery and Robotics).[7]

56.     The JSC was required to meet at least once every six months, with a minimum of one ChemImage and one Ethicon/J&J member required for a quorum.  Agreement § 2.4.2.

57.     The JSC was responsible for making decisions around key processes and deliverables that would move the Project forward, including: (1) adjusting the Development Plan and Timelines, (2) adjusting parameters for the Milestones, (3) determining whether Milestones had been met, (4) making recommendations for any potential budget adjustments, (5) making recommendations to the plan for developing the proposed technology, and (6) providing marketing advice to Ethicon.  *Id.* § 2.4.1.

58.     All of the JSC's decisions, including the critical task of determining whether ChemImage achieved a Milestone, required the JSC's unanimous vote, with Ethicon/J&J and ChemImage each receiving one vote.  *Id.* § 2.4.3.  In the event the JSC was unable to reach a unanimous decision, the Agreement outlined an alternative dispute resolution process.  *Id.*

**C.     Section 5:  Defendants Determine That ChemImage's Technology Is Highly Valuable**

59.     Based on ChemImage's pioneering technology, Ethicon agreed to pay ChemImage an upfront payment of ███████.  Agreement § 5.2.

60.     Ethicon also agreed to pay ChemImage ███████████ in Development and Regulatory Milestones.  *Id.* § 5.3; *id.*, Ex. B at 2-3.

---

[6]   Mr. Kristensen was a J&J employee during the time that he attended JSC meetings.  *See* https://www.linkedin.com/in/marcodalfarrakristensen/.

[7]   ChemImage notes that Ms. Lanier, while listed in the Agreement as an Ethicon representative, publicizes that she has been employed by J&J for 20 years and that, during the time when the Parties were drafting and negotiating the Agreement, she served as J&J's Global Marketing Innovation & Pipeline Leader, Digital Surgery and Robotics.  *See* https://www.linkedin.com/in/tamara-kearney-lanier-6a0217/.

61.    The Agreement also contemplated royalty payments to ChemImage upon commercialization. *Id.* § 5.4.  At the outset of the partnership, the parties projected the potential royalty payments to be valued at more than $1.5 billion to ChemImage.

### D.    Section 8 Provides That Milestone Payments And Royalty Payments Are Direct Damages

62.    Section 8 of the Agreement contains a "Limitation of Liability" provision that defines certain liabilities and obligations of the Parties in the event of a breach of the Agreement, carving out certain categories of indirect damages.

63.    Critically, the Agreement provides that "[f]or the avoidance of doubt, the Parties agree that liability for lost Development Payments, Milestone Payments or Patent Royalties payable hereunder ***shall not be deemed anything other than direct damages***." *Id.* § 8.4 (emphasis added).

64.    The "Limitation of Liability" provision does not reference the ▮▮▮▮▮ termination fee, let alone cast it as an upper limit on damages for any breaches of the Agreement.

### E.    Section 10 Provides For Two Unambiguous Termination Provisions

65.    Section 10 of the Agreement sets forth two unambiguous and fiercely negotiated termination provisions.  The Agreement permits Ethicon to terminate the Agreement ***either*** (a) for cause or (b) without cause, triggering a ▮▮▮▮▮ termination fee.  Ethicon's pretextual termination attempts to evade the plain language of these obligations.

#### 1.    Termination For Cause

66.    Under Section 10.3.1, Ethicon was permitted to terminate the Agreement "for Cause" if ChemImage "materially breached or defaulted in the performance of any of its obligations" under the Agreement and if the breach "continued for thirty (30) days" after receiving Ethicon's written notice.  Agreement § 10.3.1.

67.    Section 10.3 contains only ***one*** definition of a material breach by ChemImage. Specifically, ChemImage would materially breach the Agreement if it "fail[ed] . . . to achieve a Development Milestone as described in Exhibit B." *Id.* § 10.3.2.

68.    Critically, the Agreement requires that the *JSC* "shall . . . determine whether the Milestones specified in Exhibit B have been met." *Id.* § 2.4.1(b).  Neither Ethicon nor J&J could make this determination unilaterally.  *Id.*  Indeed, the Agreement did not provide any means outside of the JSC by which a Milestone could be deemed met (or not met).  *Id; see also id.* Ex. B (explaining Ethicon's obligation to remit Milestone Payments within 60 days after the Milestone has been meet, "which determination is a function of the JSC").

69.    In the event Ethicon terminated the Agreement for cause under Section 10.3, it was required to provide ChemImage with a written notice that "*specifies in reasonable detail the nature of the breach or default, [and] states that [ChemImage] is required to cure such breach or default and states that failure to cure such breach or default will result in termination of this Agreement.*"  *Id.* § 10.3.1 (emphasis added).

70.    Section 10.3 permitted ChemImage at least 30 days to cure a material breach and stated that "if the breach or default is not reasonably capable of being cured within such 30-day period, termination shall not be effective" so long as ChemImage "commences cure of the breach or default within such 30-day period and thereafter diligently prosecutes such cure to completion." *Id.*

71.    If Ethicon terminated for cause under Section 10.3, "all licenses and sublicenses . . . shall automatically terminate and such licenses revert to the owner of the applicable Intellectual Property," and ChemImage would grant Ethicon limited intellectual property rights.  Agreement § 10.3.3 ("[ChemImage] hereby grants to [Ethicon] an exclusive, assignable (consistent with Section 12.8) and sublicensable license to the [ChemImage] Core IP, and a non-exclusive, assignable (consistent with Section 12.8) and sublicensable license to the [ChemImage] Developed Lightsphere[.]").

72.    Notably, while the Agreement imposed other obligations on ChemImage, such as the obligation to use commercially reasonable efforts to develop the technology, *id.* § 2.2.1, and to comply with applicable laws, *id.* § 12.20, the Agreement was clear that termination for cause

under Section 10.3 was warranted only upon "failure … to achieve a Development Milestone." *Id.* § 10.3.2.

73.    The Agreement imposed no termination fee in the event of proper termination "for Cause" under Section 10.3.

        **2.    Termination Without Cause Requires A ██████ Termination Fee**

74.    Under Section 10.4.1, Ethicon was also permitted to terminate the Agreement "without Cause."  Agreement § 10.4.1.

75.    However, Ethicon's termination without cause under Section 10.4 was "effective ***only if***, within one hundred twenty (120) days of its provision of written notice," Ethicon paid ChemImage "a non-refundable sum equal to ███████████"  *Id.* § 10.4.1(a) (emphasis added).

76.    If Ethicon terminated without cause under Section 10.4, Ethicon would relinquish all rights to ChemImage's Intellectual Property, and Ethicon would grant ChemImage a non-exclusive license to any jointly developed intellectual property so it could continue to develop its life-saving technology.  Agreement § 10.4.4 ("[Ethicon] grants to [ChemImage] a royalty-free, non-exclusive license, with the right to grant sublicenses, to the Collaboration IP and [ChemImage] Developed EndoVere IP in the Territory.").

77.    ChemImage specifically negotiated the ████ payment with Ethicon and J&J as protection in the event of a termination without cause under Section 10.4.  Because ChemImage was required to redirect resources to fulfill its new obligations to Ethicon and J&J under the Agreement, this fee would provide ChemImage necessary protection and funds if J&J decided to pull the plug on this bet-the-company partnership.  Section 10.4 would also give ChemImage the required intellectual property releases to pursue its technology with a new partner.

## IV.    ChemImage Makes Progress Under The Agreement And Achieves Milestone 1A Despite Ethicon's Delays

78.    Less than a year into the Project, ChemImage achieved remarkable success.  In October 2020, the JSC determined that ChemImage achieved Milestone 1A.

79.     ChemImage was able to achieve Milestone 1A notwithstanding delays caused by the COVID-19 pandemic which, among other things, forced the shutdown of the J&J testing facility at Blue Ash, where J&J insisted all Project research be done.

80.     Tellingly, the activities necessary to achieve Milestone 1A were largely within ChemImage's control.   In contrast, the activities necessary to achieve later Milestones were dependent on Ethicon and J&J providing the necessary hardware to pair ChemImage's technology with an appropriate device.

81.     Future development efforts were delayed by Defendants' failure to timely provide the necessary equipment, facilities, testing support, and materials to continue development.

82.     Ethicon also unilaterally pushed for extensions of the relevant deadlines.   In early May 2021, Ethicon proposed revising the Agreement to extend the date by which Ethicon was obligated to make its first commercial sale (the "Launch Deadline") by *eighteen months*.

83.     Around the same time, J&J's robotics program was struggling, including facing major developmental delays.   Upon information and belief, these issues were due, at least in part, to J&J's failure to properly fund the development of its surgical robotics program following a flood of expensive acquisitions.   In the second half of 2020, Ashley McEvoy, J&J's then-Worldwide Executive Vice President, MedTech division, was informed that J&J was underspending on the research and development funding necessary to make its robotics surgery ventures successful.[8] J&J's former Senior Financial Director, Jill McManus, even stated, "When will JNJ learn that our acquisitions fail *because we never properly fund them*?"[9]

84.     After its fumbled surgical robotics play, J&J changed its corporate strategy and quietly tried to retreat from its partnership with ChemImage.   ChemImage struggled to get

---

[8]   *See Fortis Advisors LLC, solely in its capacity as representative of former stockholders of Auris Health Inc. v. Johnson & Johnson, et al.*, C.A. No. 2020-0881-LWW (hereinafter, "*Fortis Advisors v. Johnson & Johnson*"), Plaintiff Fortis Advisors' Timeline of Key Events (filed Feb. 23, 2024) at 44.

[9]   *Fortis Advisors v. Johnson & Johnson*, Plaintiff Fortis Advisors' Timeline of Key Events at 42 (emphasis added).

engagement and cooperation from Ethicon's and J&J's JSC members.  There was frequent turnover of Ethicon's and J&J's designated members of the JSC, and new appointees were unfamiliar with the technology.  Ethicon and J&J's JSC members also deliberately avoided discussing the technical details of the Project.

85.    In a deliberate effort to thwart progress, Ethicon and J&J also pressured ChemImage to remove its most technically knowledgeable member—ChemImage founder, Dr. Patrick Treado—from the JSC, arguing that he presented *too detailed* information.  Upon information and belief, J&J also pressured ChemImage to remove other, technical members from the JSC in a deliberate effort to delay the Project and pave the way for a "for Cause" termination. Tellingly, the details Defendants took pains to *avoid* discussing at the JSC would later form the basis of their pretextual termination of the Agreement.

86.    Despite these issues, ChemImage forged ahead.

87.    When the JSC was able to convene (at ChemImage's insistence), it discussed the Development Plan and modified the timeline to reflect the then-current state of the Project.  Early JSC meeting minutes reflect the parties' expectation that "[d]eadlines are considered to be targets."

88.    Once the Project had progressed enough to require decisions involving study design, research methodology, and data analysis and integrity, ChemImage and Ethicon formed the Data Review Board (or "DRB").

89.    The DRB was established to "[i]mprove the data catalog used for deep learning training, testing, and validation through systematic review of questionable data and processing strategies" and was responsible for reviewing data quality, data processing strategies, and assessment methods.  The DRB included eight Ethicon/J&J members and eleven ChemImage members, with five voting members allocated to each party.

90.    Employees from both Ethicon and J&J participated in DRB meetings.  Murat Aksoy, an employee of J&J MedTech,[10] was one of Ethicon's five voting members on the DRB.

---

[10]    Mr. Aksoy was a J&J employee during his tenure on the DRB.  *See* https://www.linkedin.com/in/murat-aksoy/.

91.     J&J also retained a third-party consultant, Cambridge Consultants, to assist with its evaluation of the algorithm and data framework.  Cambridge Consultants actively participated in DRB meetings.

92.     The DRB agreed that it would endeavor to reach consensus on all decisions, including on the "inclusion or exclusion" of data.

93.     The DRB recognized that, due to the machine learning on which ChemImage's technology is predicated, the inclusion of imperfect information in data sets used to train the algorithm could result in mislabeling critical structures in future scans.  Accordingly, one technical issue decided by the DRB was whether and how to ensure that only confirmed accurate data was included in validation sets.

94.     To avoid errors caused by training ChemImage's technology with inaccurate data, the DRB determined that "ignore labels" should be applied to any object in a data set that was not affirmatively identified with certainty by a trained human so that the image would be excluded from the calculations for evaluation.  The DRB's approved process embodied the maxim, "good data in, good data out"—which is essential to machine learning.

95.     The DRB further determined that the agreed protocol for applying ignore labels did not require further review.  ChemImage implemented the DRB's ignore-label process.

## V.     ChemImage Achieves Milestone 1B

96.     Achieving Milestone 1B required ChemImage software to be paired with Ethicon-designed hardware.  Agreement, Ex. B.  In mid-2022, the JSC convened and, at Ethicon's encouragement, narrowed the scope of Milestone 1B to focus only on veins, arteries, and bile ducts ("VAB"), postponing work on ureters and nerves.

97.     With the narrowed VAB scope in place, ChemImage prepared an interim report on its progress toward Milestone 1B for the JSC's review at the October 14, 2022 JSC meeting. Following this review, the JSC finalized the Acceptance Protocol for Milestone 1B.

98.     At that meeting, Ethicon noted that ChemImage had met its Q3 goals and that "Q3 Interim results are marked as good performance[.]"  The JSC noted no upcoming urgent business or red flags that would indicate the partnership was at risk.

99.     After multiple collaborative rounds of testing and review, and in compliance with the JSC-mandated Acceptance Protocol, ChemImage submitted the Milestone 1B Final Report on December 16, 2022 (the "Final Report").  The Final Report incorporated the DRB's specified use of ignore labels and demonstrated that the criteria for Milestone 1B had been achieved.  The Final Report demonstrated "[s]uccessful in-vivo demonstration with a prototype . . ." in VAB, consistent with the parameters outlined in the Agreement and as agreed-upon by the JSC.  *See* Agreement, Ex. B.

100.    ChemImage was not required to submit the Milestone 1B Final Report on December 16, *or on any other date*, since the Agreement did not prescribe *any* deadlines for the Milestones.  *See* Agreement, Ex. B.

101.    Indeed, while the Agreement provided that *Ethicon* would be in material breach if they "fail[ed] to otherwise reasonably adhere to the Development Timeline for any reason other than a Safety or Regulatory Failure," the same obligation was *not* imposed on ChemImage.  *Id.* § 10.2.2.   The Development Timeline further referred to anticipated R&D tasks and associated payments to be made *by Ethicon*.  *Id.*

102.    ChemImage therefore submitted the Milestone 1B Final Report and awaited the JSC's determination.  Despite the fact that the Agreement expressly requires that the JSC "shall … determine whether the Milestones … have been met" (Agreement, § 2.4.1), the JSC *never* determined whether Milestone 1B had been achieved.

103.    For months, ChemImage insisted that the JSC make its required determination but Ethicon and J&J refused.  In fact, to thwart this critical determination, Ethicon and J&J refused even to attend further JSC meetings, without any explanation.

**VI.    Ethicon And J&J Terminate the Agreement Without Cause**

104.    On March 6, 2023, Ethicon sent ChemImage a one-page letter advising of Ethicon's intention to terminate the Agreement "***[p]ursuant to Section 10.3.2(a)*** . . . for cause for failure to achieve a Development Milestone, which constitutes a Material Breach" (the "Termination Letter"). Ethicon claimed that the Final Report for Milestone 1B was "not evaluable" and did not address Ethicon's concerns regarding data collection, ignore labels, and processing practices.

105.    The Termination Letter did not allege a material breach by ChemImage beyond the baseless assertion that ChemImage violated the Agreement by failing to achieve a Development Milestone, and did not cite any other basis for the alleged "for cause" termination.

106.    The Termination Letter also cited to Ethicon's purported statement in June 2022 that the Project was "at risk of termination" if ChemImage did not demonstrate technical feasibility by year-end. Tellingly, the letter did not reference the more recent October 14, 2022 meeting where the JSC reviewed the Milestone 1B interim report, finalized the Milestone 1B Acceptance Criteria, and noted "good performance" by ChemImage.

107.    Moreover, the Agreement itself did not require technical feasibility by December 2022, or any other date. *See* Agreement Ex. A ("Development Plan") (identifying no date for "technical feasibility" and noting that "[t]his is not a final development plan" and that "[j]oint planning is required between Ethicon and [ChemImage] to ensure the creation of a comprehensive plan"). No such deadline was ever established by the JSC.

108.    In addition, rather than provide ChemImage with the "reasonable detail" necessary to cure any alleged breach, as required by the Agreement, Ethicon simply stated that it was "terminating [the Agreement] effective thirty (30) days from the date [of the Termination Letter]."

109.    ChemImage responded to the Termination Letter stating that it was prepared to cure any identified deficiency or purported breach consistent with the Agreement but that, given the nature of the Project and lack of reasonable detail in the Termination Letter, it could not proceed to cure without additional information and cooperation from Ethicon. Ethicon refused to cooperate or provide the requested information.

110.    ChemImage then informed Ethicon that it was commencing the dispute resolution process, which suspends the running of the cure period "until the date such proceeding has been concluded." Agreement § 10.3.1. As required by the Agreement, ChemImage also requested an in-person meeting of senior executives within 10 days. Agreement § 12.2.

111.    On April 7, 2023, Ethicon and ChemImage met in-person but made no progress toward resolving the dispute. Ethicon simply reiterated its unilateral determination that there had been an incurable material breach and asserted that the Agreement would terminate on April 26, 2023.

112.    On April 17, 2023, ChemImage provided Ethicon with a Notice of Mediation in accordance with the dispute resolution procedure in the Agreement. Agreement, App. C at 1.

113.    Ethicon then unilaterally terminated the Agreement, under Section 10.3, effective April 26, 2023, ***before the cure period ended.***

114.    Ethicon's purported termination of the Agreement was nothing more than a pretextual attempt by Defendants to avoid their contractual obligations, including payment of Milestone 1B and the ▇▇▇▇▇▇ termination fee that was required in the event of a "without Cause" termination under Section 10.4 of the Agreement.

115.    Upon information and belief, Ethicon's pretextual termination was done at J&J's direction not only to avoid its obligations under Section 10.4 of the Agreement, but to mire ChemImage's valuable intellectual property. At some point prior to termination, J&J made the strategic decision to retreat from aspects of its failed surgical robotics play and redirect resources to Verb, notwithstanding contractual obligations to ChemImage.

116.    By purporting to terminate "for cause" pursuant to Section 10.3 of the Agreement, Defendants were able to sideline ChemImage and prevent it from continuing to develop its technology with a competitor. With this interference, J&J bought valuable time for the Verb program to regain its footing. *See* Plaintiff's Opening Post-Trial Br., *Fortis Advisors v. Johnson & Johnson*, at 111-12 (explaining how J&J prioritized Verb in 2020 at the expense of Auris's iPlatform robot). *See also* Plaintiff's Reply Post-Trial Br., *Fortis Advisors v. Johnson & Johnson*,

at 8, 16, 25-26, 29 (referring to Verb as J&J's then-CEO Alex Gorsky's "multi-billion-dollar pet project").

117.    Notably, on March 9, 2023, *three days* after Ethicon sent ChemImage the Termination Letter, J&J announced it was laying off 350 people in its robotics unit.[11]

118.    This shift in J&J's corporate priorities has resulted in years of litigation related to its acquisition of Auris.  In that litigation, filed in the Delaware Court of Chancery, former Auris stockholders have alleged that J&J, Ethicon, and various J&J executives defrauded former Auris shareholders out of millions of dollars in developmental and commercial milestones when it sidelined its project.  *See Fortis Advisors v. Johnson & Johnson* (complaint filed Oct. 12, 2020). They also allege that J&J failed to use commercially reasonable efforts to develop Auris' robotics surgery technology.  *Id.*

119.    Like here, J&J was panicked about a competitor landing the Auris technology (even though the project was sidelined), in what J&J executive Peter Shen referred to as a "doomsday scenario," and fought to string Auris along long enough so that its technology would present less of a threat.  Plaintiff's Reply Post-Trial Br., *Fortis Advisors v. Johnson & Johnson*, at 8-11.

120.    J&J and Ethicon's Agreement with ChemImage was a casualty of the same shift in J&J's corporate priorities.  Upon information and belief, J&J knowingly and intentionally caused Ethicon to breach the Agreement not only to avoid its ████████ obligation under Section 10.4 of the Agreement, but also to hamstring ChemImage's valuable intellectual property and prevent it from going to a competitor.

**VII.    ChemImage Has Suffered Significant Harm As A Result of Defendants' Breaches**

---

[11]   Nick Paul Taylor, *J&J lays off 350 people at robotics units, says 'we have to get better' with Ottava*, MedTech Dive (published Mar. 9, 2023, updated Mar. 10, 2023), *available at* https://www.medtechdive.com/news/jnj-layoffs-auris-california-robotic/644544/#:~:text=Since%20then%2C%20the%20company%20has,anticipated%20launch%20by%20two%20years.

121.    Like the other termination provisions, the ███████ termination fee for a "without Cause" termination under Section 10.4.2(a) was fiercely negotiated, in part, to ensure that ChemImage would have funding to continue its operations and find another partner if Defendants reneged on the Agreement.

122.    By purporting to terminate "for Cause" pursuant to Section 10.3, and not paying Section 10.4's ███████ termination fee, Defendants knowingly and improperly caused ChemImage to suffer damages far in excess of ███████.

123.    Without the ███████ and unimpeded rights to its core intellectual property, ChemImage lost the full value of its technology, as well as all Milestone and Royalty Payments payable under the Agreement.  These direct damages are in excess of $1.5 billion.

124.    As a result of Defendants' pretextual breach, ChemImage initially furloughed virtually all of its employees, optimistic that it might reach a resolution.  Once it was clear J&J had long-ago decided to terminate the Project, ChemImage was forced to lay off all of its employees and eventually close its doors.  As a result of Ethicon and J&J's actions, 75 people lost their jobs, and ChemImage could no longer pursue development of its transformative technology.

## COUNT I
### Breach of Contract
### (Against Ethicon and J&J)

125.    Plaintiff incorporates and realleges each and every allegation above as if fully set forth herein.

126.    Plaintiff and Ethicon are parties to the Agreement, which is a valid and binding contract.

127.    J&J manifested its intent to be bound by the Agreement, including because (1) the Agreement was negotiated by, presented to, and approved by senior J&J employees; (2) J&J contracted for express notice rights in the Agreement, securing its continued participation in the Agreement under Section 12.12; (3) J&J is an "Affiliate" of Ethicon under the "Expedited Litigation" provision in Appendix C to the Agreement; (4) J&J participated *as a Party* to the

Agreement under Section 2.4.1, by appointing members to the JSC; and (5) senior J&J employees participated in the JSC and DRB.

128.    As evidenced by J&J's public statements on its strategic partnership with ChemImage, J&J directly benefited from the Agreement by enhancing its position in the surgical robotics space.  This was a business priority for J&J in 2019.

129.    ChemImage performed its obligations under the Agreement, including by working to advance the Project (in spite of Defendants' delays) and by adhering to the dispute resolution procedures outlined in the Agreement (even when Defendants did not).

130.    Defendants breached the Agreement in no fewer than four, independent ways.

131.    First, Defendants breached the Agreement when they terminated and invoked a pretextual justification.  ChemImage's purported failure to meet Milestone 1B—even if true—fails because there was *no* deadline for ChemImage to meet *any* Milestone.  *See* Agreement, Ex. B.

132.    Second, Defendants breached the Agreement when they purported to unilaterally terminate the Agreement for cause, even though the JSC had not determined whether Milestone 1B had been met.  The Agreement expressly requires that the JSC (not Ethicon or J&J) make that critical determination.  *Id.* § 2.4.1(b).

133.    Third, Defendants breached the Agreement when they terminated before the cure period ended.  *Id.* § 10.3.1.

134.    Fourth, Defendants' pretextual Termination Letter also breached the Agreement by failing to "specif[y] in reasonable detail the nature of the breach or default," thus denying ChemImage the opportunity to cure any alleged deficiencies.  *Id*. § 10.3.1.

135.    As a result of Defendants' breaches, ChemImage suffered direct damages, including but not limited to at least $1.5 billion in lost Development Milestone Payments, Regulatory Milestone Payments, and Patent Royalties.  *Id.* at Ex. B.

136.    The Agreement expressly provides "that liability for lost Development Payments, Milestone Payments or Patent Royalties payable hereunder shall not be deemed anything other than *direct damages*." *Id.* § 8.4 (emphasis added).

## COUNT II
### Breach of Contract,
### (Against Ethicon and J&J)

137.    *In the alternative* to Count I (Breach of Contract), Plaintiff pleads the following:

138.    Plaintiff incorporates and realleges each and every allegation above as if fully set forth herein.

139.    Plaintiff and Ethicon are parties to the Agreement, which is a valid and binding contract.

140.    J&J manifested its intent to be bound by the Agreement, including because (1) the Agreement was negotiated by, presented to, and approved by senior J&J employees; (2) J&J contracted for express notice rights in the Agreement, securing its continued participation in the Agreement under Section 12.12; (3) J&J is an "Affiliate" of Ethicon under the "Expedited Litigation" provision in Appendix C to the Agreement; (4) J&J participated *as a Party* to the Agreement under Section 2.4.1, by appointing members to the JSC; and (5) senior J&J employees participated in the JSC and DRB.

141.    As evidenced by J&J's public statements on its strategic partnership with ChemImage, J&J directly benefited from the Agreement by enhancing its position in the surgical robotics space. This was a business priority for J&J in 2019.

142.    ChemImage performed its obligations under the Agreement, including by working to advance the Project (in spite of Defendants' delays) and by adhering to the dispute resolution procedures outlined in the Agreement (even when Defendants did not).

143.    Defendants breached the Agreement in no fewer than four, independent ways.

144.    First, Defendants breached the Agreement when they terminated and invoked a pretextual justification. ChemImage's purported failure to meet Milestone 1B—even if true—fails because there was *no* deadline for ChemImage to meet *any* Milestone. *See* Agreement, Ex. B.

145.    Second, Defendants breached the Agreement when they purported to unilaterally terminate the Agreement for cause, even though the JSC had not determined whether Milestone 1B had been met. The Agreement expressly requires that the JSC (not Ethicon or J&J) make that critical determination. *Id.* § 2.4.1(b).

146.    Third, Defendants breached the Agreement when they terminated before the cure period ended. *Id.* § 10.3.1.

147.    Fourth, Defendants' pretextual Termination Letter also breached the Agreement by failing to "specif[y] in reasonable detail the nature of the breach or default," thus denying ChemImage the opportunity to cure any alleged deficiencies. *Id.* § 10.3.1.

148.    Defendants' breaches of the Agreement amount to a termination *without cause*.

149.    As a result of Defendants' breaches, ChemImage was damaged by—at minimum— the          termination fee that Defendants would have been required to pay under Section 10.4.

## COUNT III
### Tortious Interference With Contract
### (Against J&J)

150.    Plaintiff incorporates and realleges each and every allegation above as if fully set forth herein.

151.    Plaintiff and Ethicon are signatories to the Agreement, which is a valid and binding contract.

152.    J&J had knowledge of the Agreement. Ethicon is a wholly-owned subsidiary of J&J. The Agreement was negotiated, presented to, and approved by J&J executives. At all times during the Agreement's operation, J&J was aware of the Agreement and the obligations imposed on Ethicon.

153.    Upon information and belief, due to J&J's decision to retreat from its failed surgical robotics play and desire to keep ChemImage's valuable technology off the market, J&J knowingly and maliciously caused Ethicon to terminate the Agreement "for Cause" when both J&J and Ethicon knew that no justification existed.  Specifically, the Agreement did *not* prescribe any deadlines for Milestones and the JSC had *not* made any determination on Milestone 1B.

154.    J&J knowingly and maliciously caused and directed Ethicon to breach the Agreement anyway.

155.    But for J&J's directive, Ethicon would not have purported to terminate the Agreement "for Cause" under Section 10.3.

156.    As late as October 2022, Ethicon approved the Acceptance Criteria for Milestone 1B and represented to ChemImage that its performance was "good."  Despite this progress, J&J willfully caused Ethicon to violate its obligations under the Agreement not only to avoid the ███ ███ termination fee, but to tie up ChemImage's intellectual property and prevent the technology from falling into the hands of a competitor.  Based on years of delay in the robotics space, Ethicon needed breathing room to catch up with its competitors and J&J was willing to sacrifice ChemImage for it.

157.    By causing Ethicon to pretextually terminate the Agreement "for Cause" under Section 10.3, J&J rendered millions of dollars of existing investment in ChemImage worthless, as the company lost clear title to its own, core intellectual property.  As a result, ChemImage had no conceivable path to continued operation and was forced to shut down and lay off its entire staff.

158.    To date, ChemImage continues to receive solicitations from interested investors and business partners, but is unable to pursue these offers as a direct result of J&J's unjustified directive to Ethicon to terminate the Agreement.

159.    As a result of J&J's tortious interference with the Agreement, ChemImage suffered damages, including but not limited to lost opportunities from J&J's pretextual impairment of ChemImage's intellectual property, the total impairment of the value of ChemImage, and at least

$1.5 billion in lost Development Milestone Payments, Regulatory Milestone Payments, and Patent Royalties. *Id.* at Ex. B.

## COUNT IV
### Declaratory Judgment
### (Against Ethicon)

160.    Plaintiff incorporates and realleges each and every allegation set forth above as if fully set forth herein.

161.    The Agreement provides that, in the case of termination without cause, "all licenses and sublicenses granted under Sections 4.1 and 4.2 shall automatically terminate and such license rights shall revert to the owner of the applicable Intellectual Property." Agreement, § 10.4.4.(a).

162.    Because Defendants pretextually terminated the Agreement "for Cause" under Section 10.3 when no cause existed, ChemImage is entitled to a declaration clearing all patents and other intellectual property developed pursuant to the Agreement for unfettered use and development by ChemImage.

## COUNT V
### Attorneys' Fees and Expenses
### (Against Ethicon and J&J)

163.    Plaintiff incorporates and realleges each and every allegation set forth above as if fully set forth herein.

164.    The Agreement provides that "the prevailing Party in any action commenced under this [Agreement] shall be entitled to receive reasonable attorneys' fees and court costs as determined by the court hearing the Dispute." Agreement, App. C.

165.    ChemImage is entitled to reimbursement of attorneys' fees and expenses if it recovers any quantum of damages prayed for.

**PRAYER FOR RELIEF**

166.    WHEREFORE, Plaintiff prays for relief and demands judgment against Defendants, jointly and severally, as follows:

      A.    A joint-and-severable award of damages from Defendants, including but not limited to:

          i.    not less than ███████ for failure to pay the required fee for a "without Cause" termination;

          ii.    ███████ in lost Development Milestone Payments;

          iii.    ███████ in lost Regulatory Milestone Payments; and

          iv.    $1.5 billion in lost Patent Royalties;

      B.    Monetary relief from Defendant J&J for damages caused by its tortious interference, including but not limited to lost opportunities from J&J's pretextual impairment of ChemImage's intellectual property and the total impairment of the value of ChemImage;

      C.    Declaratory relief clearing all patents and other intellectual property developed pursuant to the Agreement for unfettered use and development by ChemImage;

      D.    An award of Plaintiff's attorneys' fees, costs, expenses, and disbursements in this action;

      E.    Pre-judgment and post-judgment interest;

      F.    For the Court to enter a case schedule consistent with the "Expedited Litigation" provisions in Appendix C to the Agreement, requiring the parties to be trial ready in eight months; and

G.    Such other and further relief as the Court deems just and proper.

DATED:        May 24, 2024

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By:  /s/            *Alex Spiro*            

Alex Spiro
Andrew J. Rossman
Courtney C. Whang
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
Telephone: (212) 849-7000
Fax: (212) 849-7100
alexspiro@quinnemanuel.com
andrewrossman@quinnemanuel.com
courtneywhang@quinnemanuel.com