EXECUTION VERSION
Confidential

**RESEARCH, DEVELOPMENT, LICENSE AND COMMERCIALIZATION AGREEMENT**

**by and between**

**ChemImage Corporation**

**and**

**Ethicon, Inc.**

**Research, Development, License and Commercialization Agreement**

**TABLE OF CONTENTS**

Page

1. — DEFINITIONS ................................................................................................................1

2. — DEVELOPMENT PROGRAM ......................................................................................10

    2.1.   Development Plan ......................................................................................................10

    2.2.   Responsibilities ........................................................................................................11

    2.3.   Duration of the Development Program ....................................................................11

    2.4.   Joint Steering Committee.........................................................................................11

    2.5.   Termination of JSC .................................................................................................13

3. — DEVELOPMENT FUNDING; RECORDS .....................................................................14

    3.1.   Development Funding...............................................................................................14

    3.2.   Records; Reporting Obligations; Audits. .................................................................15

4. — LICENSES, SOURCE CODE ESCROW, AND MAINTENANCE ...................................16

    4.1.   License to Company. ................................................................................................16

    4.2.   License to CI .............................................................................................................16

    4.3.   Sublicensing .............................................................................................................17

    4.4.   No Implied Rights ....................................................................................................17

    4.5.   CI Source Code Escrow. ..........................................................................................17

    4.6.   Software Maintenance Support. ...............................................................................19

5. — COMMERCIALIZATION; ROYALTIES .......................................................................19

    5.1.   Development and Commercialization of a Licensed Product...............................19

    5.2.   Upfront Payment .....................................................................................................19

    5.3.   Development Payments; Milestone Payments ........................................................19

    5.4.   Royalties. .................................................................................................................20

    5.5.   Sales Reports............................................................................................................20

    5.6.   Software Maintenance and Upgrade Fees................................................................21

6. — CONFIDENTIALITY .....................................................................................................22

    6.1.   Confidentiality. ........................................................................................................22

    6.2.   Publicity; Use of Name............................................................................................24

7. — PUBLICATION ...................................................................................................25

8. — INDEMNIFICATION............................................................................................25

    8.1.    Indemnification by Company .......................................................................25

    8.2.    Indemnification by CI .................................................................................26

    8.3.    Claims Procedures ......................................................................................26

    8.4.    Limitation of Liability.................................................................................27

    8.5.    Insurance ....................................................................................................27

9. — Intellectual Property ..............................................................................................28

    9.1.    Intellectual Property Ownership .................................................................28

    9.2.    Patent Preparation and Maintenance..........................................................29

    9.3.    Enforcement and Defense of Patents..........................................................31

    9.4.    Third Party Infringement Suit.....................................................................31

    9.5.    Trade Secrets. .............................................................................................31

10. — TERM AND TERMINATION ..............................................................................32

    10.1.    Term ...........................................................................................................32

    10.2.    Termination by CI for Cause. .....................................................................32

    10.3.    Termination by Company for Cause............................................................33

    10.4.    Termination by Company without Cause ....................................................34

    10.5.    Termination for Safety or Regulatory Failure ............................................35

    10.6.    Termination for Intellectual Property Dispute............................................36

    10.7.    Termination for Bankruptcy and Insolvency ..............................................36

    10.8.    Effect of Termination; Survival..................................................................36

11. — CONDITIONS, REPRESENTATIONS AND WARRANTIES ...............................37

    11.1.    Mutual Representations ...............................................................................37

    11.2.    CI Representations. .....................................................................................38

    11.3.    Company Representations. ...........................................................................39

    11.4.    Covenants....................................................................................................40

    11.5.    Disclaimer ..................................................................................................40

12. — MISCELLANEOUS PROVISIONS ......................................................................40

    12.1.    Governing Law ...........................................................................................40

    12.2.    Dispute Resolution......................................................................................40

    12.3.    Jurisdiction .................................................................................................41

    12.4.    Taxes. .........................................................................................................41

12.5.    Waiver .................................................................................................41

12.6.    Force Majeure ......................................................................................41

12.7.    Severability .........................................................................................41

12.8.    Assignment .........................................................................................42

12.9.    Arbitration Upon JSC Impasse ............................................................42

12.10.   Counterparts ........................................................................................43

12.11.   No Agency ..........................................................................................43

12.12.   Notice .................................................................................................43

12.13.   Headings .............................................................................................44

12.14.   Entire Agreement ................................................................................44

12.15.   Notice of Adverse Events ....................................................................44

12.16.   Expenses .............................................................................................44

12.17.   Licenses and Permits ...........................................................................44

12.18.   Amendment .........................................................................................44

12.19.   Further Acts ........................................................................................44

12.20.   Compliance with Laws ........................................................................45

12.21.   No Third Party Rights or Obligations ..................................................45

12.22.   Remedies Cumulative ..........................................................................45

12.23.   Construction; Interpretation .................................................................45

RESEARCH, DEVELOPMENT, LICENSE AND COMMERCIALIZATION AGREEMENT

This Agreement (this "Agreement") is made on this 27th day of December, 2019 (the "Effective Date") by and between ChemImage Corporation ("CI"), a Pennsylvania corporation with its principal office at 7325 Penn Avenue, Suite 200, Pittsburgh, PA 15208, and Ethicon, Inc., a New Jersey corporation with its principal offices at U.S. Highway 22 West, Somerville, NJ 08876 ("Company"), and shall become effective on the Effective Date.  CI and Company are each a "Party", and, collectively, the "Parties".

**WHEREAS**, CI is a company with expertise in development and commercialization of a wide range of chemical imaging technologies, including hyperspectral imaging, multispectral imaging, and development of molecular chemical imaging technology products and applications for potential use in surgery, diagnostics and other medical applications;

**WHEREAS**, Company desires to develop and commercialize products incorporating CI's proprietary technology through the Development Program, as defined below and

**WHEREAS**, CI wishes to support the Development Program;

**NOW, THEREFORE**, in consideration of the mutual covenants set forth in this Agreement, the Parties agree as follows:

## 1. — DEFINITIONS

For purposes of this Agreement, the terms defined in this Article 1 shall have the following meanings whether used in their singular or plural forms.  Use of the singular shall include the plural and vice versa, unless the context requires otherwise:

"Affiliate" shall mean, with respect to any Person, any other Person who directly or indirectly, by itself or through one or more intermediaries, controls, or is controlled by, or is under direct or indirect common control with, such Person.  For purposes of this definition, the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.  Control will be presumed if one Person owns, either of record or beneficially, more than fifty percent (50%) of the voting stock or other interests of any other Person.

"Agreement" shall mean this agreement, together with all appendices, exhibits and schedules hereto, and as the same may be amended or supplemented from time to time hereafter by a written agreement duly executed by authorized representatives of each Party hereto.

"Applicable Law" shall mean all applicable laws, statutes, rules, regulations, ordinances and other pronouncements having the binding effect of law of any applicable Governmental Authority, including any rules, regulations, guidelines or other requirements of the Regulatory Authorities, that may be in effect from time to time in the Territory.

"Budget" shall mean the total budget for the direct and indirect costs, expenses, and other fees for the Development Program agreed to by the Parties and attached to the Agreement as

Exhibit C, which Budget (a) may be amended from time to time solely upon the mutual written agreement of the Parties, and (b) shall detail the projected allocation and use of the funds to be paid by Company to CI with respect to the Development Program; *provided* that the Budget shall not include sales, marketing and commercial manufacturing costs, which shall be Company's sole responsibility.

"Cancer Localization Functionality" shall mean the capability to identify and localize cancer tumors in a surgical field in real time, including without limitation when obscured by other tissues.

"Chartering Approval" shall mean the Company's internal review of the product concept, project scope and business case and approval for development, such approval decision to be made by Company at its sole discretion per its Cadence product development process.

"CI" shall have the meaning set forth in the preamble of this Agreement.

"CI Core IP" shall mean all Intellectual Property Controlled by CI or its Affiliates (i) as of the Effective Date or (ii) developed by CI during the Term independent of this Agreement without the use of Company funds paid to CI pursuant to this Agreement, and that may be used outside the Fields, including but not limited to the CI Core Know-How, the CI Licensed Patents and the CI Core Software, exclusive in all cases of any "Joint IP" pursuant to the Phase 1 Feasibility Agreement.

"CI Core Know-How" shall mean all Know-How Controlled by CI or its Affiliates (i) as of the Effective Date or (ii) developed by CI during the Term independent of this Agreement without the use of Company funds paid to CI pursuant to this Agreement, and that may be used outside the Fields.

"CI Core Software" shall mean Software Controlled by CI or its Affiliates (i) as of the Effective Date or (ii) developed by CI during the Term independent of this Agreement without the use of Company funds paid to CI pursuant to this Agreement, and that may be used outside the Fields, including those applications listed on Exhibit D to this Agreement and any modifications, improvements and derivative works thereof developed by CI or Company, except that modifications, improvements and derivative works made by Company pursuant to the Escrow License shall not be deemed CI Core Software.

"CI Developed EndoVere IP" shall mean all Intellectual Property developed by CI pursuant to the Development Plan or this Agreement that can be used in the EndoVere Field (but excluding CI-developed Intellectual Property directed solely to Lightsphere Field) including, but not limited to, Patent Rights, invention disclosures, copyrights, Know-how, Software (inclusive of source code), and devices and systems pursuant to this Agreement.

"CI Developed Lightsphere IP" shall mean Intellectual Property developed by CI pursuant to the Development Plan or this Agreement that can be used in the Lightsphere Field and not in the EndoVere Field including, but not limited to, CI Lightsphere Licensed Patents, invention disclosures, copyrights, Know-how, Software (exclusive of source code), and devices and systems pursuant to this Agreement.

"CI Indemnified Party" shall have the meaning set forth in Section 8.2.

"CI Licensed Patents" shall mean all Patent Rights Controlled by CI or its Affiliates with priority as of the Effective Date listed in Appendix A or otherwise reduced to practice as evidenced by written records of CI or otherwise documented in CI's written records as of the Effective Date and identified by docket and disclosure numbers in an updated Appendix A.

"CI Lightsphere Licensed Patents" shall mean all Patent Rights Controlled by CI or its Affiliates directed to CI Developed Lightsphere IP, including the Patent Rights listed in Appendix B and any subsequently filed Patent Rights identified by CI in an updated Appendix B after the Effective Date.

"Claim" shall have the meaning set forth in Section 8.3.

"Collaboration IP" shall mean and all Intellectual Property developed jointly by CI and Company pursuant to the Development Plan and/or this Agreement including, without limitation, the Collaboration Know-How, the Collaboration Patents, and the Collaboration Software.

"Collaboration Know-How" shall mean all Know-How developed jointly by CI and Company pursuant to the Development Plan and/or this Agreement.

"Collaboration Patents" shall mean all Patent Rights developed jointly by CI and Company pursuant the Development Plan and/or to this Agreement.

"Collaboration Software" shall mean all Intellectual Property rights in Software developed jointly by CI and Company pursuant to the Development Program, this Agreement, and/or during the commercialization of products resulting therefrom.

"Commercially Reasonable Efforts" shall mean:

(a) in the case of CI, the efforts and resources typically used by biomedical technology or software companies similar in size and scope to CI to perform the obligation at issue; and

(b) in the case of Company, the efforts and resources typically used by Company and its Affiliates to perform the obligation at issue;

in each case, which efforts shall be comparable to efforts made with respect to other products at a similar stage of development or in a similar stage of product life, with similar developmental risk profiles, of similar market and commercial potential, taking into account the competitiveness of the market place, the proprietary position of the products, the regulatory structure involved, the regulatory authority-approved labeling, the product profile, end user acceptability and usability, the profitability of the applicable products (taking into account payments to CI under this Agreement), issues of safety and efficacy, the likely timing of the product's entry into the market, the likelihood of receiving Regulatory Approval and other relevant scientific, technical and commercial factors. Commercially Reasonable Efforts require that the Party: (i) promptly assign responsibility for such obligation to specific employee(s) who are held accountable for progress and monitor such progress on an ongoing basis, (ii) set and seek to achieve specific and meaningful

objectives for carrying out such obligation, and (iii) make and implement decisions and allocate resources designed to advance progress with respect to such objectives.

"Company" shall have the meaning set forth in the preamble of this Agreement.

'Company Assigned IP" shall have the meaning set forth in Section 9.1.2(b).

"Company Calendar Quarter" is the usual and customary Company calendar quarter, used by Company for all of its internal accounting purposes, of approximately three (3) months, in which each of the first two months consist of four weeks and the third month consists of five weeks. A list of the Company Calendar Quarters through 2023 is provided in Exhibit F to this Agreement, which list Company shall update no later than one hundred eighty (180) days prior to the end of the last Company Calendar Quarter then listed on Exhibit F.

"Company Calendar Year" is Company's fiscal year which ends on the Sunday nearest to the end of the month of December (even if Sunday is in January of the following calendar year). A list of the Company Calendar Years through 2023 is provided in Exhibit F to this Agreement, which list Company shall update no later than one hundred eighty (180) days prior to the end of the last Company Calendar Year then listed on Exhibit F.

"Company Indemnified Party" shall have the meaning set forth in Section 8.1.

"Company IP" shall mean all Intellectual Property Controlled by Company or its Affiliates as of the Effective Date of this Agreement or developed independently of this Agreement.

"Completed Deliverables" shall have the meaning set forth in Section 10.8.4.

"Confidential Information" shall have the meaning set forth in Section 6.1.

"Controlled" (except for the purposes of the definition of "Affiliate") shall mean the legal authority or right of a Party hereto to grant a license or sublicense of intellectual property rights to another Party hereto, or to otherwise disclose proprietary or trade secret information to such other Party, without breaching the terms of any agreement with a Third Party, infringing upon the intellectual property rights of a Third Party, or misappropriating the proprietary or trade secret information of a Third Party.

"Cover", "Covered" or "Covers" shall mean, with respect to a product, technology, process, method, or mode of administration that, in the absence of ownership of or a license granted under a particular Valid Claim, the manufacture, use, offer for sale, sale, or importation of such product or the practice of such technology, process, method, or mode of administration would infringe such Valid Claim or, in the case of a claim that has not yet issued, would infringe such claim if it were to issue and become a Valid Claim.

"Covered Employee" shall have the meaning set forth in Section 6.1.6.

"Critical Structure Identification Functionality" shall mean the capability to identify critical structures, including without limitation blood vessels, ureters, nerves, and bile ducts, in a surgical field in real time and when obscured by other tissues.

4

"Deliverable(s)" shall mean the tangible and intangible information and materials identified as deliverables in the Development Plan.

"Development Payments" shall mean the payments by Company to CI to support CI's activities under the Development Program, as set forth on Exhibit B.

"Development Plan" shall have the meaning set forth in Section 2.1.

"Development Program" shall mean the project to develop Licensed Products for use and commercialization in the Fields in accordance with the Development Plan.

"Development Termination Date" shall mean the date that is three (3) months following the completion of the last Milestone.

"Development Timeline" shall have the meaning set forth in Section 2.1.

"Disclosing Party" shall have the meaning set forth in Section 6.1.2.

"Dispute" shall have the meaning set forth in Section 12.2.

"Dollars" shall have the meaning set forth in Section 3.1.4.

"Effective Date" shall have the meaning set forth in the preamble.

"Embedded Deliverable Software" shall mean Software delivered by CI to Company pursuant to this Agreement for loading onto Licensed Products, which Software enables Cancer Localization Functionality, Critical Structure Identification Functionality, and/or Lightsphere Functionality. CI Core Software that is included in the Embedded Deliverable Software shall be identified in an updated Exhibit D that is delivered with therewith.

"EndoVere Field" shall mean applications directed to surgical detection, visualization and identification of anatomic structures, including but not limited to benign or cancerous tissues and tumors as well as tissue perfusion in connection with the performance of a surgical procedure on the human body, including endoluminal procedures utilizing a flexible endoscope, except as specifically set forth in the Field Exclusions.

"Escrow Agreement" shall mean an escrow agreement among CI, Company and an escrow agent substantially in the form as set forth in Exhibit G pursuant to which CI shall deposit the source code constituting the CI Core Software and Embedded Deliverable Software.

"Escrow License" shall have the meaning set forth in Section 4.5.3.

"FDA" shall mean the United States Food and Drug Administration, or any successor agency having regulatory jurisdiction over the manufacture, distribution and sale of medical devices and drugs in the United States, and its territories and possessions.

"Field" or "Fields" shall mean the EndoVere Field and the Lightsphere Field.

"Field Exclusions" shall mean applications within the EndoVere Field and the

5

Lightsphere Field (i) for detection, visualization and identification of cancerous tumors and diagnosis of cancerous tumors in connection with a diagnostic procedure performed on the human body with a flexible endoscope that is manipulated solely by mechanical linkages between the angulation controls on the handpiece and the distal segment of the endoscope, including without limitation diagnostic endoscopy procedures not performed by a robot, and (ii) for cancer tumor diagnosis in connection with diagnostic procedures such as colonoscopy, esophagogastroduodenoscopy (EGD), and other diagnostic procedures in the areas of urology, neurology and dermatology.

"First Commercial Sale" shall mean the earlier of the first sale of a Licensed Product by Company or an Affiliate, licensee, sublicensee, transferee or successor of Company in a country in the Territory or the date upon which a Licensed Product is first commercially launched in that country.

"First Press Release" shall have the meaning set forth in Section 6.2.1.

"Generalized Posting" shall have the meaning set forth in Section 6.1.6.

"Governmental Authority" shall mean any court, tribunal, agency, department, legislative body, commission, authority or other instrumentality of any supra national, national, state, county, city or other political subdivision in the world.

"Indemnified Party" shall have the meaning set forth in Section 8.3.

"Indemnifying Party" shall have the meaning set forth in Section 8.3.

"Installed Base" shall have the meaning set forth in Section 10.4.2.

"Intangible Know-How" shall mean Know-How retained by a person in his or her unaided memory, provided that Know-How (i) received by a Party in any written or electronic form or (ii) reduced by a receiving Party to any written or electronic form shall not qualify as Intangible Know-How.

"Intellectual Property" shall mean all Patent Rights, trademarks, Software, copyrights, trade secrets pursuant to the provisions in Section 9.5, Know-How, all other intellectual property, whether or not patentable, and applications for any of the foregoing, owned, leased, licensed, used or held for use, directly or indirectly, by or on behalf of the relevant Party, and all proprietary rights to such Intellectual Property.

"IR&D Methodology" shall have the meaning set forth in Section 3.1.5.

"Joint Steering Committee" or "JSC" shall have the meaning set forth in Section 2.4.1.

"Know-How" shall mean all confidential, non-public, proprietary data and results, technical information, know-how, inventions, unpublished patent applications (i.e., patent applications withdrawn before publication and any provisional patent application that is not converted to a non-provisional patent application or to which no non-provisional patent application claims priority), discoveries, trade secrets, processes, procedures, techniques, new developments,

compositions, products, compounds, material, methods, formulas, formulation, improvements, protocol, results of experimentation or testing, technology, ideas or other proprietary information and documentation thereof (including related papers, invention disclosures, blueprints, drawings, flowcharts, diagrams, diaries, notebooks, specifications, methods of manufacture, methods of service, data processing techniques, compilations of information), design or other know-how, whether or not patentable or copyrightable.  Know-How shall not include any Patent Rights with respect thereto.

"Launch Deadline" shall have the meaning set forth in Section 10.2.2(b).

"Licensed Product" shall mean any device or other product (or any portion thereof) that is (i) Covered by at least one (1) Valid Claim of the CI Licensed Patents or CI Lightsphere Licensed Patents, (ii) incorporates CI Core Know-How or (iii) incorporates CI Core Software.

"Lightsphere Field" shall mean applications related to diagnosis of cancerous tumors in connection with the performance of a surgical or diagnostic procedure performed on the human body, such diagnosis being non-inferior to diagnosis by histopathologic examination of tissue specimens obtained from tissue biopsy, including endoluminal procedures utilizing a flexible endoscope, except as specifically set forth in the Field Exclusions.

"Lightsphere Functionality" shall mean diagnosis of cancer tumors that is demonstrated, to be non-inferior, as indicated by Company's inclusion of CI Developed Lightsphere IP in a Licensed Product, to the diagnosis of cancer tumors obtained by histopathologic examination of a tissue biopsy.

"Lightsphere Patent Royalty Term" shall mean the period commencing from the Effective Date until the expiration of the last to expire Valid Claim of the CI Lightsphere Licensed Patents.

"Losses" shall have the meaning set forth in Section 8.1.

"Maintenance Minimum" shall have the meaning set forth in 5.6.1.

"Milestone Payments" shall mean the payments by Company to CI upon the occurrence of the Milestones, as set forth on Exhibit B.

"Milestones" shall mean the performance milestones for the Development Program established by the Parties, as set forth on Exhibit B.

"Non-Publishing Party" shall have the meaning set forth in Article 7.

"Party" and "Parties" shall each have the meaning set forth in the preamble of this Agreement.

"Patent Dispute" shall have the meaning set forth in Section 9.3.1.

"Patent Rights" shall mean the rights and interests in and to issued patents and pending patent applications in any country, jurisdiction or region (including inventor's certificates and utility models), including all provisionals, non-provisionals, PCT applications, substitutions,

continuations, continuations-in-part, divisionals, renewals and all patents granted thereon, and all reissues, reexaminations, extensions, confirmations, revalidations, registrations and patents of addition thereof, including patent term restorations, supplementary protection certificates, patent term adjustments, , and any foreign equivalents to any of the foregoing.

"Patent Royalties" shall have the meaning set forth in Section 5.4.

"Patent Royalty Term" shall mean the period commencing from the Effective Date until the expiration of the last to expire Valid Claim of the CI Licensed Patents.

"Person" shall mean any individual, corporation, partnership, association, joint-stock company, trust, unincorporated organization or government or political subdivision thereof.

"Phase 1 Feasibility Agreement" shall mean the Tissue Feasibility and Research Funding Agreement executed as of September 7, 2017 between CI and Ethicon, Inc.

"Pre-Launch Product Development" shall have the meaning set forth in Section 3.1.5.

"Program Coordinator" shall have the meaning set forth in Section 2.4.1.

"Publishing Party" shall have the meaning set forth in Article 7.

"Receiving Party" shall have the meaning set forth in Section 9.5.

"Recipient" shall have the meaning set forth in Section 6.1.2.

"Recipient Notice Requirement" shall have the meaning set forth in Section 6.1.3.

"Regulatory Approval" shall mean, with respect to any country, all authorizations, approvals or clearances by the appropriate Regulatory Authority necessary for commercial sale of a Licensed Product in that country including, without limitation and where applicable, approval of labeling and manufacturing. "Regulatory Approval" in the United States shall mean final approval of a medical device pursuant to Section 510(k) of the Federal Food, Drug and Cosmetic Act of 1938, as amended, a Premarket Approval Application (PMA), or any other approval rules or regulations required by the Regulatory Authority pursuant to the then-applicable provisions of the Code of Federal Regulations permitting marketing of a Licensed Product in interstate commerce in the United States. "Regulatory Approval" in the European Union shall mean final approval of a CE Mark or any other approval rules or regulations required by the Regulatory Authority.

"Regulatory Authority" shall mean, with respect to a country in the Territory, any national (*e.g.*, the FDA), supranational (*e.g.*, the European Commission, the Council of the European Union), regional, state or local regulatory agency, department, bureau, commission, council, or other Governmental Authority that is concerned with or regulates the development, testing, packaging, labeling, storage, sale, quality, safety, efficacy, reliability or manufacturing and servicing of medical devices.

"Reportable Units Deployed" shall have the meaning set forth in Section 5.5.1.

"Results" shall have the meaning set forth in Article 7.

"Safety or Regulatory Failure" shall mean any of the following: (i) the Company makes a reasonable and good faith determination that a Licensed Product presents a safety or health concern to patients such that, based on then-available data and according to its independent patient safety monitoring protocols (for which determination CI may provide supporting information), the Company cannot ethically in good faith continue to administer or provide such Licensed Product to patients; or (ii) the Company receives a final unconditional non-approval letter or decision from the FDA or a similar Regulatory Authority in the European Union and Japan with respect to such Licensed Product that has rendered the Company's receipt of regulatory approval of such Licensed Product in such market not reasonably likely, or (iii) the Company determines, as confirmed by the JSC, after pre-submission meetings with a Regulatory Authority with respect to a Licensed Product that it is unlikely that commercially relevant Regulatory Approval can be achieved within the timeframes and budget defined in the Development Plan or within such other timeframes and budget attainable using Commercially Reasonable Efforts.

"Software" shall mean any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code, object code, human readable form or other form, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow charts and other work product used to design, plan, organize and develop any of the foregoing, (d) screens, user interfaces, application programming interfaces, software development kits, report formats, firmware, development tools, templates, menus, buttons and icons and (e) documentation, including user manuals and other training documentation relating to any of the foregoing. Software shall not include any Patent Rights with respect thereto.

"Software Maintenance" shall mean software maintenance and technical support services provided by CI with respect to any CI Core Software or Embedded Deliverable Software, in all cases as further set forth in Exhibit H to this Agreement.

"Software Maintenance Fee" shall have the meaning set forth in Section 5.6.1.

"Software Maintenance Fee Cap" shall have the meaning set forth in Section 5.6.1.

"Software Update" shall mean periodic updates to the Software issued by CI to Company pursuant to Software Maintenance, including without limitation bug-fixes, error correction and intermediate releases.

"Software Upgrade" shall mean a major release of the Software which includes substantial modifications, improvements or additional functionality, including without limitation expansion of medical indication, or that requires a Regulatory Approval or a filing with a Regulatory Authority.

"Substantially Different Version" shall have the meaning set forth in Section 5.6.1.

"Tangible Know How" shall mean Know-How provided in any written or electronic form.

9

"Tax" or "Taxes" means any present or future taxes, levies, imposts, duties, charges, assessments or fees in the nature of a tax (including any interest thereon).

"Term" shall have the meaning set forth in Section 10.1.

"Territory" shall mean worldwide.

"Third Party" shall mean any Person which is not a Party or an Affiliate of any Party to this Agreement.

"Units Deployed" shall mean the number of Licensed Products sold, invoiced, delivered, or otherwise disposed or deployed by Company, its Affiliates, licensees, sublicensees, transferees and/or successors, either in bona fide, arms-length transactions or in other than in an arm's length transaction, including but not limited to barters, counter-trades, or loss leaders, to Third Parties since the Effective Date, all as determined in accordance with the selling Party's usual and customary accounting methods, which are in accordance with U.S. generally accepted accounting principles, consistently applied.

In the case of sales or other disposals of a Licensed Product between or among the selling Party and its Affiliates, licensees, sublicensees, transferees and/or successors, for resale, Units Deployed shall be calculated as above only on the first arm's-length sale thereafter to a Third Party.

"Valid Claim" shall mean a claim of an issued and unexpired Patent Right (whether issued as of or after the Effective Date), which claim has not been revoked or held unenforceable, unallowable, unpatentable or invalid by a decision of a court or other governmental authority of competent jurisdiction (which decision is not appealable or has not been appealed within the time allowed for appeal) and which claim has not been cancelled, withdrawn from consideration, abandoned, disclaimed, denied or admitted to be invalid or unenforceable through reissue, re-examination, inter partes review, post-grant review or disclaimer, opposition procedure, nullity suit, or otherwise.

"WIP" shall have the meaning set forth in Section 10.8.4.

## 2. — DEVELOPMENT PROGRAM

2.1.   Development Plan.  The Parties have agreed upon a written plan (the "Development Plan") that defines the scope of work in the applicable Development Program, including (i) a description of research activities during such period to be performed by CI and Company, respectively, (ii) as applicable, a description of activities necessary to achieve Regulatory Approval, and (iii) a timeline for the foregoing (i)-(ii) (the "Development Timeline").  The JSC will review and prepare updates to the Development Plan on an annual basis (or as otherwise scientifically necessary) by September 15 for the following calendar year, and will approve the plan no later than November 15 of the calendar year in which such plans are prepared, provided that such dates shall be adjusted as reasonably necessary to align with Company annual business planning and budget processes.  The Development Plan may not be modified or amended in any material respect without the unanimous consent of the JSC.  The Development Plan shall be consistent with the terms of this Agreement and shall be appended to and form a part of this Agreement.  In the event of an inconsistency between a Development Plan and this Agreement,

the terms of the Development Plan will prevail.  The initial Development Plan is attached hereto as <u>Exhibit A</u>.

    2.2.  <u>Responsibilities</u>.

    2.2.1  **CI Responsibilities**.  During the Term, CI shall be solely responsible for the tasks allocated to CI under the Development Plan and shall use Commercially Reasonable Efforts in conducting the Development Plan and other services under this Agreement.  CI will also provide Company with reasonable access to the CI Core IP necessary for Company to perform its activities under the Development Plan during the Term.

    2.2.2  **Company Responsibilities**.  Company shall be solely responsible, at its sole cost, for the tasks, if any, allocated to Company under any Development Plan, which responsibilities shall consist of:

    (a)  monitoring patient safety data;

    (b)  maintaining all applicable regulatory compliance and conducting all clinical trials in accordance with Applicable Law.  Company warrants that it has at all times complied and will continue to comply with all Regulatory Authority and applicable foreign rules, regulations, requirements and guidelines regarding the design, manufacture and labeling of the Licensed Product which are used or supplied by Company in connection with the Development Program that are under the regulatory control of the Regulatory Authority or such comparable foreign agencies, including applicable good clinical practices and quality systems.  In addition, if items are shipped in interstate or international commerce, Company will comply with all Regulatory Authority and international rules, regulations, requirements and guidelines applicable to such shipment;

    (c)  providing CI with reasonable access to the Company Know-How necessary for CI to perform its activities under the Development Plan during the Term;

    (d)  using Commercially Reasonable Efforts to commercialize and market one or more Licensed Products throughout the Territory upon completion of the Development Plan and receipt of Regulatory Approval, provided that the Company's decision not to market one or more Licensed Products in any particular jurisdiction shall not be deemed a breach of this Section 2.2.2(d) if such decision is consistent with its exercise of Commercially Reasonable Efforts.

    2.3.  <u>Duration of the Development Program</u>.  The Development Program shall commence on the Effective Date and shall conclude on the Development Termination Date, unless extended by mutual agreement of the Parties, or unless earlier terminated in accordance with the provisions of Article 10 hereof.

    2.4.  <u>Joint Steering Committee</u>.

    2.4.1  **Composition and Purposes.**  CI and Company will establish a Joint Steering Committee (the "<u>JSC</u>") which will consist of two CI members and two Company members, each of whom shall be senior employees authorized to make the decisions for its

respective Party allocated to the JSC set forth immediately below. The JSC shall only be responsible for the following:

(a)    to adjust the Development Timeline, Milestones and the Launch Deadline, as necessary in its sole discretion, to further the goals of the Development Program;

(b)    to determine whether the Milestones specified in Exhibit B have been met;

(c)    to discuss any increases in the Budget that either Party may deem necessary and provide a written recommendation related thereto; *provided* that neither Party shall be obligated to pay any such increases unless it agrees in writing, in its sole discretion, to do so;

(d)    to consider, review, reevaluate and discuss the Development Plan, taking into consideration ongoing research outcomes and other scientific and commercial development;

(e)    to consider modifications to the Development Plan (including adjustments to the Development Timeline) proposed by either Party and to make recommendations in accordance with this Section 2.4;

(f)    to review and provide input to Company on the annual marketing plan and forecast model for the following year, including country-by-country launch plans for upcoming global product launches;

(g)    to review and approve upgrades, improvements and indication expansion responsive to market and/or regulatory requirements as recommended by either CI or Company, and to review and approve CI-proposed pricing therefor; and

(h)    to review and approve Pre-Launch Product Development work pursuant to Section 3.1.5 as requested by Company, including pricing therefor as proposed by CI.

The JSC shall appropriately extend the Launch Deadline in the following circumstances (among any others that it may agree upon): (i) a force majeure event under Section 12.6 occurs that negatively impacts CI's ability to achieve the Launch Deadline; (ii) a change in law or regulation occurs that negatively impacts CI's ability to achieve the Launch Deadline; (iii) delays by Regulatory Authority in reviewing any regulatory submissions by Company or in defining protocols and standards for such review; or (iv) other circumstances mutually agreed by the parties in writing.

Each Party shall select one of its members to act as a program coordinator (each, a "Program Coordinator") from designees to the JSC (who may be changed at any time or from time to time). The Program Coordinator for CI shall serve as the Chairperson of the JSC.

The JSC shall have no authority to revise the terms of this Agreement or to act on behalf of either Party in connection with Third Parties.

2.4.2    **Meetings.**  The JSC shall meet no less frequently than once in each six (6) month period during the Development Program; *provided*, *however*, that the JSC shall meet more frequently if requested by the Program Coordinator of either Party.  The first meeting of the JSC shall be held within sixty (60) days of the Effective Date.  Meetings of the JSC shall be held at such times and locations as may be mutually agreed upon by the Program Coordinators, which times and locations shall be communicated in writing (including, without limitation, by email) to the other members of the JSC with reasonable advance notice of the meeting.  The JSC may choose to invite experts or other parties to attend part of meetings, at its sole discretion (upon agreement of both Program Coordinators).  At least one (1) CI member and one (1) Company member shall be required to participate in a meeting for such meeting to be deemed a quorum.  So long as a quorum is present at a meeting, the JSC may make such recommendations as are within the scope of the JSC's authority hereunder.  Members of the JSC may attend each meeting either in person or by means of telephone or other telecommunications device that allows all participants to hear and speak at such meeting simultaneously.  At least twenty (20) business days prior to each meeting, the Parties shall each deliver (including by email) to the JSC a written report detailing the progress made on the Development Program since the last meeting of the JSC.

2.4.3    **Voting and Deadlocks.**  The CI members shall collectively have one (1) vote on the JSC, and the Company members shall collectively have one (1) vote on the JSC. Decisions of the JSC shall be made by unanimous vote.

(a)    In the event a deadlock occurs involving a matter that does not require modification of the Development Plan, the JSC shall attempt to resolve such deadlock for a period of thirty (30) days by engaging in good faith discussions.  If such deadlock is not resolved after such thirty (30) day period, then each Party shall have the final decision-making authority with respect to the conduct of specific activities allocated to it under the Development Plan.

(b)    In the event a deadlock occurs with respect to a modification of the Development Plan, the JSC shall attempt to resolve such deadlock for a period of thirty (30) days by engaging in good faith discussions.  In the case of a JSC deadlock after such period, the issue will be escalated to the Head of Digital Surgery of Company and to the Chief Executive Officer of CI for resolution for a period of fifteen (15) days.  If the issue cannot be resolved after such combined forty-five (45) day period, either Party may refer the unresolved matter for binding arbitration pursuant to Section 12.9 of this Agreement.

(c)    Notwithstanding the foregoing Sections 2.4.3(a) - (b), any dispute requiring the amendment of this Agreement shall require the written agreement of the Parties without regard to Section 12.2 and nothing in this Section 2.4.3 shall modify a Party's right to invoke the dispute resolution process set forth in Sections 12.2 in the event that either Party wishes to dispute the grounds for any termination of the other party for cause.

2.5.    Termination of JSC.  The JSC shall continue until the termination or expiration of the Agreement.

## 3. — DEVELOPMENT FUNDING; RECORDS

3.1.  <u>Development Funding</u>.

3.1.1  **Payments.**  In accordance with the terms, and subject to the conditions, set forth in this Agreement, and provided that the Effective Date has occurred, Company shall make payments to CI of up to ███████████ in accordance with <u>Exhibit B</u> attached hereto.

3.1.2  **Budget**.  CI hereby covenants and agrees to solely use the funds provided by Company to CI and identified in the Development Plan and <u>Exhibit B</u> to fund the Development Program in accordance with the Budget (including, without limitation, making applicable payments to subcontractors and vendors).  In addition, if, upon conclusion of the Development Program or the termination of the Agreement in accordance with this Agreement, CI is in possession of unspent funds, then, CI shall, within thirty (30) days following conclusion of the Development Program or termination of this Agreement, as applicable, refund such unspent funds to Company in such manner as Company shall reasonably instruct CI; *provided* that CI shall not be obligated to refund any such funds (i) to the extent that they are needed to pay for non-cancelable commitments entered into prior to the date of termination or the conclusion of the Development Program and such commitments were consistent with the Development Program or (ii) if the Agreement was terminated pursuant to Section 10.2.1.

3.1.3  **Limitations.**  If at any time CI believes in good faith that an increase in the Budget is necessary to accomplish the Development Plan, CI shall present its proposal for a Budget increase at the next meeting of the JSC, and the JSC shall prepare written recommendations for the Company.  Company shall review such proposal and recommendations in good faith and determine in its sole discretion whether it is willing to commit to such increased costs.  If the Parties cannot agree to a Budget increase after good faith discussions the Parties may escalate the request to Head of Digital Surgery of Company and to the Chief Executive Officer of CI for resolution.  If the Parties are still deadlocked after such escalation, then no more than once every two Calendar Quarters, CI may unilaterally implement such increase provided that the requested increase is less than or equal to $100,000, otherwise the decision on the Budget increase will be made by Company. This Section 3.1.3 shall not be subject to the procedures of Sections 12.2 and 12.9.

3.1.4  **Payments.**  All payments to be made hereunder (including, without limitation, pursuant to Article 5) shall be made in United States dollars ("<u>Dollars</u>") and, shall be made by wire transfer of immediately available funds.

3.1.5  **Pre-Launch Product Development Payments**.  CI will provide ongoing technical support for the Embedded Deliverable Software to the Company product development teams between Chartering Approvals and associated product launches of Licensed Products ("<u>Pre-Launch Product Development</u>") upon the reasonable request of Company and pursuant to a budget and other terms approved by the JSC.  Unless otherwise agreed by the JSC, CI's pricing for such Pre-Launch Product Development shall be calculated by CI's IR&D development cost methodology, as such methodology is described in <u>Exhibit K</u> attached to this Agreement (the "<u>IR&D Methodology</u>"), with fifteen percent (15%) markup.  CI shall invoice Company on a monthly basis for any Pre-Launch Product Development and such amount shall be due thirty (30)

14

days after Company's receipt of an undisputed invoice.  Each invoice shall provide a description of the Pre-Launch Product Development services covered by such invoice.

    3.2.   <u>Records; Reporting Obligations; Audits</u>.

        3.2.1   **Records.**

        (a)   CI shall prepare and maintain complete and accurate books and records, according to its customary project management and record-keeping practices, in connection with the Development Program (including trial and testing records and financial records of expenditures relating to the Development Program) and the development of any Licensed Product, and shall keep all such books and records for no less than the shorter of (i) a period of six (6) years following the conclusion of the Development Program, or (ii) the period of time consistent with its documented record retention policies.  Company shall have the right, at its own expense, to inspect such books and records at the CI offices during normal business hours and not more than once in any calendar year.

        (b)   Company shall prepare and maintain complete and accurate project management records, according to its customary project management and record-keeping practices, in connection with the Development Program and the development of any Licensed Product, and shall keep all such records for no less than the shorter of (i) a period of six (6) years following the conclusion of the Development Program, or (ii) the period of time consistent with its documented record retention policies.  CI shall have the right, at its own expense, to inspect such records at the Company offices during normal business hours and not more than once in any Company Calendar Year.

        3.2.2   **Reports.**  CI shall furnish to Company the following reports and/or notices:

        (a)   As soon as practicable, and in any event within thirty (30) days after the end of each calendar quarter (including the calendar quarter ending December 31), financial reports which describe the use of funds related to the Development Program (including, without limitation, a detailed breakdown of the actual costs of the Development Program and how such funds have been allocated and in fact used in respect of the Development Program), the progress made toward achieving the purposes of the Development Program, including, without limitation, Milestones achieved and the development of any Licensed Product, and any other information that Company reasonably requests, including information regarding or needed to support clinical trials and regulatory filings.

        (b)   Promptly, at the conclusion of the Development Program, a closing report in reasonable detail prepared by CI or a CI-approved Third Party, setting forth CI's final analysis, summary tables, data listings, results and conclusions from the Development Program and other customary information and materials.

        (c)   With respect to any subcontract or permitted assignment by CI of this Agreement or its rights and/or obligations hereunder, or any proposed merger, acquisition, consolidation or similar transaction involving CI:  (i) if such transaction is permitted without consent under Section 12.8 hereof, CI shall give Company notice thereof within thirty (30)

days of the consummation thereof; and (ii) if such transaction is not permitted under Section 12.8 without Company's consent, CI shall give Company notice thereof at least thirty (30) days prior to the proposed consummation thereof subject to Company's obligations under Article 6 hereof, provided, however, such notice shall not constitute Company's consent thereto.

3.2.3    **Notices.**   As soon as practicable, and in any event promptly after the commencement thereof, each Party shall provide notice to the other Party of any actions, suits, claims, proceedings, investigations and inquiries that directly or indirectly involve or impact a Party and which could have a material adverse effect on the Development Program or a Licensed Product.

## 4. — LICENSES, SOURCE CODE ESCROW, AND MAINTENANCE

4.1.    <u>License to Company</u>.

4.1.1    **EndoVere License.**   Subject to the terms and conditions of this Agreement, including but not limited to Section 4.5, CI grants to Company an exclusive (including as to CI except for any activities CI is obligated to conduct under this Agreement), royalty-bearing (for the duration of the Patent Royalty Term) license , with the right to sublicense (through multiple tiers and subject to Section 4.3), to the CI Core IP in the EndoVere Field  to develop, commercialize, make, have made, use, sell, have sold, import and otherwise exploit the Licensed Products in the Territory.  Upon the expiration of the Patent Royalty Term, the foregoing license shall become fully paid up.

4.1.2    **Lightsphere License.**   Subject to the terms and conditions of this Agreement, including but not limited to Section 4.5, CI grants to Company a non-exclusive, royalty-bearing (for the duration of the Lightsphere Patent Royalty Term) license, with the right to sublicense (through multiple tiers and subject to Section 4.3), to the CI Core IP and CI Developed Lightsphere IP in the Lightsphere Field to develop, commercialize, make, have made, use, sell, have sold, import and otherwise exploit the Licensed Products in the respective Fields in the Territory.  Upon the expiration of the Lightsphere Patent Royalty Term, the foregoing license shall become fully paid up.

4.1.3    **Phase 1 Feasibility Agreement IP License**.  Subject to the terms and conditions of this Agreement, CI grants to Company an exclusive, royalty-free license to use the Joint IP developed pursuant to the Parties' Phase 1 Feasibility Agreement in the Fields in the Territory.

4.2.    <u>License to CI</u>.

4.2.1    Subject to the terms and conditions of this Agreement, Company hereby grants to CI a royalty-free, non-exclusive license, with the right to grant sublicenses (through multiple tiers) subject to Section 4.3, under the Company IP, Collaboration IP, and CI Developed EndoVere IP, solely to perform the activities allocated to CI under this Agreement during the Term.

4.2.2    Subject to the terms and conditions of this Agreement, Company hereby grants CI a royalty-free, non-exclusive license, with the right to grant sublicenses (through multiple

16

tiers) subject to Section 4.3, to use the Collaboration IP and the CI Developed EndoVere IP in the Field Exclusions and outside the Fields in the Territory.

4.2.3    **Phase 1 Feasibility Agreement IP License**.  Subject to the terms and conditions of this Agreement, Company grants to CI an exclusive, royalty-free license to use the Joint IP developed pursuant to the Parties' Phase 1 Feasibility Agreement outside the Fields in the Territory.

4.3.    <u>Sublicensing</u>.  All sublicenses granted by Company or CI shall be consistent with the terms and conditions of this Agreement and will include confidentiality, non-disclosure and non-use provisions at least as restrictive or protective of the Parties as those set forth in this Agreement.  Each Party will remain responsible and liable for the performance of all respective sublicensees through all tiers under their sublicensed rights to the same extent as if such activities were conducted by such Party and will ensure that any such sublicensees comply with all relevant provisions of this Agreement.  Any sublicense granted hereunder that is inconsistent with this Section 4.3 will be null and void.

4.4.    <u>No Implied Rights</u>.  Except as expressly provided in this Agreement, neither Party shall be deemed by estoppel, implication or otherwise to have granted the other Party any license or other right with respect to any intellectual property of such Party.

4.5.    <u>CI Source Code Escrow</u>.

4.5.1    CI will be required to provide the CI Core Software and Embedded Deliverable Software licensed to Company under this Agreement in object code form only, except as otherwise provided in Section 9.1.2(d).  Notwithstanding the foregoing, within 45 days of the Effective Date, CI shall deposit into escrow, pursuant to and subject to the provisions of the Escrow Agreement, the source code, databases and relevant documentation for the CI Core Software and Embedded Deliverable Software, if any, (collectively, the "<u>Deposit Materials</u>") with the Escrow Agent (as defined in the Escrow Agreement).  CI shall ensure that: (a) the source code deposited into the escrow will include sufficient instructions to enable Company to build the source code into executable versions of the Deposit Materials, (b) such deposit will be the version then currently in use by CI and Company pursuant to the Development Plan or Development Program, and (c) all components of the Deposit Materials required for Company to build executable versions of the Deposit Materials will be deposited into Escrow, and (d) such deposit will be free of computer viruses or disabling functions or keys.  In the event of a conflict between the terms and conditions of this Agreement and the Escrow Agreement, the terms of this Agreement shall control.

4.5.2    CI shall update the escrow deposits in accordance with the Escrow Agreement to reflect updates, enhancements, and modifications to the Deposit Materials upon major updates of the Deposit Materials, but in any event not less frequently than once every six months.

4.5.3    **Escrow License**.  Upon the occurrence of a Release Condition (as defined in the Escrow Agreement), Company may demand release of the source code for the Deposit Materials from the Escrow Agent, pursuant to the terms of the Escrow Agreement, to continue to

maintain and develop the Licensed Products and is hereby granted an exclusive, royalty-free (except as set forth below) right and license to use the source code for the Deposit Materials in the EndoVere Field and a non-exclusive, royalty-free right and license to use the source code for the Deposit Materials in the Lightsphere Field, in each case with the right to sublicense (through multiple tiers) subject to Section 4.3, to reproduce, modify, use, deploy, distribute, perform, commercialize and otherwise exploit the source code for the Deposit Materials in connection with the Licensed Products in the respective Fields in the Territory (collectively, the "Escrow License"). For the avoidance of doubt, the Escrow License remains subject to Section 5.4 during the Patent Royalty Term and Lightsphere Patent Royalty Term, as applicable.

    4.5.4  <u>Confidentiality for Deposit Materials and related Restrictions</u>.  Company shall not disclose or distribute the Deposit Materials, or any portion thereof, to any third party, except with the prior written consent of CI, except that Company may disclose or otherwise provide access to the Deposit Materials without the prior written consent of CI to any person that is Company's employee, contractor or agent who has agreed to confidentiality obligations at least as protective as the terms of this Section 4.5.4 and who needs to have access to the Deposit Materials in order to perform their duties in furtherance of Company's rights hereunder, and provided further that such prior written consent is not necessary in the event that CI has ceased to operate, is dissolved or liquidated, or is otherwise disposed of such that consent cannot by matter of law be obtained.  Company shall undertake, and shall have any contractor or agent to whom the Deposit Materials are disclosed agree to undertake commercially reasonable measures, consistent with the measures that such contractor or agent takes to protect its own confidential information of similar nature, to prevent unauthorized disclosure of any portion of the Deposit Materials, including, without limitation, by establishing reasonable security and access restrictions to prevent access to or use of the Deposit Materials by unauthorized persons and installing the Deposit Materials only upon computers that are password protected.  Notwithstanding any provision in this Agreement, Company shall not use the Deposit Materials for any purposes beyond the scope of the Escrow License granted hereunder.  Except as otherwise expressly permitted in this Agreement, Company shall not assign, sublicense, market, sell, lease, rent, distribute, convey or otherwise transfer, or pledge as security or otherwise encumber, the rights and licenses granted hereunder with respect to the Deposit Materials.  In no event shall Company remove or alter any copyright or other proprietary mark or notice of CI included as part of the Deposit Materials.  Company shall ensure that its use of Deposit Materials comprised of material owned by a third party that is not an Affiliate of CI complies in all respects with any contractual or other legally binding obligations of CI to any such third party, provided that CI has notified Company reasonably in advance in writing with respect to any such obligations.  Company shall not enter into any contractual relationship or other legally binding obligation with any third party that has the effect of encumbering the use by CI of the Deposit Materials.  Company shall undertake all measures necessary to ensure that its use of the Deposit Materials complies in all respects with all Applicable Laws by governing authorities having jurisdiction over Company or the Deposit Materials.  Except for any warranties, representations or covenants provided by CI in Article 11 of this Agreement with respect to any Intellectual Property that is included in the Deposit Materials, any and all Deposit Materials provided to Company under this Agreement is provided on an "AS IS" basis, and to the maximum extent permitted by law CI disclaims any and all warranties with respect to the Deposit Materials, whether express, implied or statutory, including, without limitation, any warranties of merchantability, fitness for a particular purpose, non-interference, and/or data accuracy.   UPON A RELEASE OF ANY OF THE DEPOSIT

MATERIALS AND TO THE EXTENT RESULTING FROM ANY MODIFICATIONS OF THE DEPOSIT MATERIALS BY COMPANY OR ANY PRODUCTS PRODUCED BY OR FOR COMPANY, AFTER SUCH RELEASE, THROUGH THE MODIFICATION OF THE DEPOSIT MATERIALS, IN NO EVENT SHALL CI BE LIABLE TO COMPANY FOR ANY INCIDENTAL, INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, WHETHER ARISING IN LAW OR EQUITY, REGARDLESS OF THE NATURE OF THE CLAIM, INCLUDING, WITHOUT LIMITATION, LOST PROFITS, COSTS OF DELAY, ANY FAILURE OF DELIVERY, BUSINESS INTERRUPTION, COSTS OF LOST OR DAMAGED DATA OR DOCUMENTATION, OR LIABILITIES TO THIRD PARTIES ARISING FROM ANY SOURCE, EVEN IF CI HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES RELATING TO THE USE OF THE DEPOSIT MATERIALS.  THIS LIMITATION UPON DAMAGES AND CLAIMS IS INTENDED TO APPLY WITHOUT REGARD TO WHETHER OTHER PROVISIONS OF THE AGREEMENT HAVE BEEN BREACHED OR HAVE PROVEN INEFFECTIVE WITH REGARD TO SUCH USE OR SUCH PRODUCTS.

4.6.    Software Maintenance Support.

4.6.1    CI shall provide Software Maintenance in accordance with Exhibit H to this Agreement.

4.6.2    CI shall designate and identify to Company a principal point of contact for receiving Software Maintenance service requests from Company.  Software Maintenance will be provided to Company by qualified technicians familiar with the software pursuant to Exhibit H or otherwise agreed in writing by the Parties.

## 5. — COMMERCIALIZATION; ROYALTIES

5.1.    Development and Commercialization of a Licensed Product.    Following the completion of the work set forth in the Development Plan relating to the Development Program Company shall have sole responsibility for the development and commercialization of one or more Licensed Products pursuant to Section 2.2.2(d).  Company shall plan and control all commercial activities and shall determine the extent of, and amount of resources appropriate for, such activities.   In the event Company decides to cease commercialization of any Licensed Product, Company shall promptly notify CI in writing of such decision.

5.2.    Upfront Payment.  In partial consideration for the grant of rights hereunder, within fifteen (15) days of the Effective Date, Company shall pay to CI a one-time, non-refundable, aggregate sum of ███████████████████████████, payable by wire transfer of immediately available funds according to instructions that CI shall provide to Company within ten (10) days of the Effective Date.

5.3.    Development Payments; Milestone Payments.  In partial consideration for the grant of rights hereunder, Company shall pay CI the Development Payment and Milestone Payment amounts set forth in Exhibit B to this Agreement pursuant to the further terms and conditions for each payment as set forth in Exhibit B.

5.4.  Royalties.

5.4.1  **Patent Royalty.**  In partial consideration for the licenses granted to Company under Sections 4.1.1, 4.1.2, and 4.5.3  Company shall pay to CI the following (collectively, the "Patent Royalties"):

(a)    until the expiration of the Patent Royalty Term, an annual license fee of ▉▉▉▉ per year per each Unit Deployed with Embedded Deliverable Software installed and Critical Structure Identification Functionality activated that utilizes the CI Core IP, Collaboration IP, and/or CI Developed EndoVere IP;

(b)    until the expiration of the Patent Royalty Term, an annual license fee of ▉▉▉▉ per year per each Unit Deployed with Embedded Deliverable Software installed and Cancer Localization Identification Functionality activated that utilizes the CI Core IP, Collaboration IP and/or CI Developed EndoVere IP; and

(c)    until the expiration of the Lightsphere Patent Royalty Term, an annual license fee of ▉▉▉▉ per year per each Unit Deployed with Embedded Deliverable Software installed and Lightsphere Functionality activated that utilizes CI Developed Lightsphere IP.

5.5.  Sales Reports.

5.5.1    Within sixty (60) days after the Company Calendar Quarter during which the First Commercial Sale occurred and within sixty (60) days following each Company Calendar Quarter thereafter in which there are Units Deployed with respect to which Patent Royalties or Software Maintenance Fees are due to CI pursuant to this Agreement ("Reportable Units Deployed"), Company shall (A) furnish to CI a written report covering the relevant period setting forth (i) the Reportable Units Deployed during such period, including the number of new Reportable Units Deployed, the number of renewed licenses on already deployed Reportable Units Deployed, and of any removed Reportable Units Deployed, and (ii) a calculation of the amount due to CI for the foregoing in accordance with Sections 5.4 and 5.6.1 and (B) pay to CI the amounts due as described in such written report.  Company shall keep accurate records in accordance with standard accounting practices and in sufficient detail to enable a third party reasonably to verify the royalty and maintenance amounts due hereunder.

5.5.2    Upon the written request of CI, at CI's expense and not more than one time in any twelve (12)-month period, Company shall permit a national independent accounting firm selected by CI (and subject to Company's approval, such approval not to be unreasonably withheld, delayed or denied), to have access during normal business hours to those records of Company as may be reasonably necessary to examine and verify the accuracy of the report furnished by Company pursuant to this Section 5.5.  If such examination determines that actual Reportable Units Deployed were greater than the amount reported by Company to CI, CI shall invoice Company for the underpayment amount due and such amount shall be due within thirty (30) days after Company's receipt of such undisputed invoice.  In the event that underpayment is more than ten percent (10%) of the actual amount due during the audited period, Company shall pay the reasonable expenses associated with such examination.

5.6.    <u>Software Maintenance and Upgrade Fees</u>.

5.6.1    Company shall pay CI an annual maintenance fee, paid pursuant to Section 5.5.1, of $1,250 per Reportable Units Deployed for Software Maintenance ("<u>Software Maintenance Fee</u>").  The annual amount for the Software Maintenance Fees shall not exceed $5.0 million per year ("<u>Software Maintenance Fee Cap</u>"), provided that such Software Maintenance Fee Cap shall be increased by $2.0 million per year for each additional Substantially Different Version for which CI is obligated to continue performing Software Maintenance under this Agreement. "Substantially Different Version" shall mean another version of the Embedded Deliverable Software which includes substantial structural, functional, code and/or technical differences such that it must be treated from a maintenance perspective as a separate product and not simply a point, minor or major upgrade of an existing version.

(a)    Notwithstanding the foregoing, from the initial First Commercial Sale of a Licensed Product through the end of the calendar year three years after such initial First Commercial Sale, Company shall pay a minimum annual Software Maintenance Fee of $1.0 million per year (the "<u>Maintenance Minimum</u>").

(b)    For the calendar year during which the initial First Commercial Sale occurs, the Maintenance Minimum shall be prorated for the remaining days in such year following such initial First Commercial Sale.

(c)    In the event that Company's Software Maintenance Fees for the whole or partial years covered in (a) and (b) above do not meet the Maintenance Minimum, Company shall include the true-up amount in the final Company Calendar Quarterly report and payment of each such Company Calendar Year.

5.6.2    CI shall develop and implement, and Company shall pay CI a fee for, JSC-approved Software Upgrades pursuant to a budget and other terms approved by the JSC. The JSC must agree to any Software Upgrades to be created by CI and the budget or fee therefore before any project associated therewith begins.  Prior to approving any Software Upgrade project, the JSC will determine whether or not such Software Upgrade project will result in a Substantially Different Version.  Unless otherwise agreed by the JSC, the fee for Software Upgrades shall be calculated pursuant to the IR&D Methodology with twenty percent (20%) markup. CI shall invoice Company on a quarterly basis for any Software Upgrade services and such amount shall be due thirty (30) days after Company's receipt of an undisputed invoice.  Each invoice shall provide a description of the Software Upgrade services covered by such invoice.   CI shall not, in bad faith, deadlock the JSC with respect to approving requested Software Upgrades and, in the event CI notifies the JSC that it cannot or will not perform a necessary Software Upgrade, Company shall have the right to utilize the Escrow License in order to develop, use, support and maintain any such Software Upgrade at its own cost.

5.7.    <u>Activation Process</u>.    At the appropriate time in the Development Timeline, Company and CI will consider, review, and discuss potential options provided by Company for activation processes for the Embedded Delivered Software as installed on Licensed Products. Potential options for activation include, without limitation, manual activation at the deployed Licensed Product in a hospital, physical and/or virtual shipment of license keys, and any new

technology for activation available for use after the Effective Date by the Company. CI will have the opportunity to provide input on merits, tradeoffs, and prioritization of the activation processes and if necessary, based on such input, both Parties will consider modifying the Development Plan to implement such processes, as permitted by Section 2.4.1(e). Final decision on the activation process to be used in the Licensed Products, including where it may vary by country or customer, will be at the discretion of the Company and will be documented in writing, including the method by which units are activated and tracked, which documentation will be provided to CI. Company shall use industry-standard contractual and technological measures to restrict customer from accessing or using the Embedded Deliverable Software installed on a Licensed Product unless such customer's Licensed Product goes through the activation process. Furthermore, at the appropriate time in the Development Timeline, Company will coordinate with the JSC to put into place a visibility mechanism for CI into the Company activation and tracking system for the Licensed Products, provided that such mechanism is consistent with all Applicable Laws, and provided, further that CI acknowledges such eventual system has not been developed yet and its implementation is subject to Company's resources and infrastructure needs.

## 6. — CONFIDENTIALITY

6.1.  Confidentiality.

6.1.1  **Definition of Confidential Information**.  For purposes of this Agreement, "Confidential Information" shall mean the terms and provisions of this Agreement and any Know-How, confidential or proprietary information, or any other knowledge, information, data, including all notes, books, papers, diagrams, documents, reports, e-mail, memoranda, visual observations, oral communications or materials in whatever form or medium, supplied or otherwise made available by Disclosing Party (as defined below), whether in tangible or intangible form, the confidentiality of which Disclosing Party takes reasonable measures to protect and which is either marked as "confidential" or by its nature or the circumstances surrounding its disclosure should reasonably be regarded as confidential.  "Confidential Information" shall not, however, include any information of Disclosing Party that:  (a) is already known to Recipient (as defined below) as evidenced by Recipient's written records, *provided* that such information is not known by the Recipient to be subject to a legal, fiduciary or contractual obligation of confidentiality to the Disclosing Party; (b) becomes publicly known through no wrongful act of or breach of this Agreement by Recipient; (c) is received from a Third Party that Recipient believes in good faith is not prohibited from disclosing it to Recipient; or (d) is independently developed by or behalf of Recipient as established by Recipient's written records or competent evidence without reference to the Confidential Information.

6.1.2  **Non-Disclosure.**  Each Party and its Affiliates and representatives ("Recipient") shall keep confidential all, and not disclose any, Confidential Information it receives or received from the other Party and the other Party's Affiliates ("Disclosing Party") during the Term and for three (3) years thereafter, (except for Confidential Information constituting trade secrets under applicable law, for which the non-disclosure obligations shall survive for so long as such Confidential Information retains its status as a trade secret), and, other than as provided herein or without first obtaining the prior written consent of Disclosing Party, shall not disclose any Confidential Information to any Person, except to directors, officers, employees, consultants,  or counsel (collectively, the "Representatives") of Recipient who, and to the extent they, have a need

to know and are under a written obligation of confidentiality consistent with the requirements of this Agreement.  In addition, CI may share Confidential Information solely of a financial nature to its existing or prospective investors or lenders as part of their due diligence investigations (collectively, "Financial Representatives"), provided that such Financial Representatives (a) are not a competitor of J&J or its Affiliates in the Medical Device business, (b) are informed of the confidential nature of such Confidential Information and of the terms of this Agreement, and (c) are under a written obligation of confidentiality consistent with the requirements of this Agreement.  The Parties agree that each will be fully responsible for any breach by its Representatives or Financial Representatives of their confidentiality obligation.  Recipient shall use not less than the same degree of care to keep confidential and not disclose Confidential Information as used to protect Recipient's own similar information, but in no event less than a reasonable degree of care.

6.1.3    **Required Disclosure.**  Notwithstanding Section 6.1.2 above, Recipient's disclosure of Confidential Information shall not be prohibited if such disclosure is required by Applicable Law or by order of a Governmental Authority; *provided*, *however*, that, Recipient shall have first given prompt notice to Disclosing Party of any possible requirement and Disclosing Party shall have been afforded a reasonable opportunity to cooperate and oppose, seek confidential treatment, prevent or limit such disclosure (with Recipient providing reasonable assistance to Disclosing Party in such efforts) and only that portion of Confidential Information that Recipient is legally required to disclose, as advised by Recipient's legal counsel is disclosed (the "Recipient Notice Requirement"); *provided further* that the Recipient Notice Requirement shall not apply to proceedings which, by Applicable Law or order of a Governmental Authority, are of a nature that the existence of such proceedings may not be disclosed or made public.  In the event that Recipient discloses any Confidential Information pursuant to the immediately preceding sentence, Recipient shall cooperate with Disclosing Party in the prosecution of any appeal that Disclosing Party decides to pursue.

6.1.4    **No Use of Confidential Information.**  Recipient hereby agrees and acknowledges that, other than as reasonably necessary to exercise its rights and fulfill its obligations under this Agreement or without first obtaining Disclosing Party's prior written consent, Recipient shall not use any of Disclosing Party's Confidential Information.

6.1.5    **Prior Confidentiality Agreement.**  This Article 6 shall supersede that certain confidentiality agreement between the Parties dated November 6, 2018, as amended, and all Confidential Information disclosed thereunder shall be deemed to be disclosed hereunder.

6.1.6    **No Solicitation of Other Party's Employees**.  Each Party agrees that, for a period from the Effective Date until the termination or expiration of the Agreement (except for termination pursuant to Section 10.4, in which case the period shall extend for a period of five (5) years following the termination or expiration) it will not, directly or indirectly, solicit for employment or hire any employee of the other Party who has been performing or is reasonably expected to perform services under this Agreement and whose name is provided by such other Party in writing (a "Covered Employee"), which writing shall be provided to the other Party within thirty (30) days of the Effective Date and may be updated by a Party from time to time during the Term by providing the updated list to the JSC, without the prior written consent of such other Party; provided, however, that the foregoing shall not preclude such first Party from (a) making

generalized solicitations for employment (not targeted at Covered Employees) through advertisements (including, without limitation, in newspapers, trade journals, employment websites or job boards) or search firms (such solicitation, a "Generalized Posting") and hiring any persons through such Generalized Posting, provided, that such first Party does not encourage or advise such firm to approach any such Covered Employee, (b) responding to or hiring any Covered Employee who contacts such first Party at his or her own initiative without any direct or indirect encouragement or solicitation by such first Party (other than as permitted by clause (a) of this section) or with whom such first Party is already in employment discussions as of the date of this Agreement (and the resulting employment), (c) soliciting for employment or hiring any person who ceased being employed by such other Party prior to commencement of employment discussions between such first Party and such person (and the resulting employment), or (d) solicitations of any Covered Employees by employees of the first Party who can be demonstrated to satisfy all of the following conditions as of the applicable time: (i) such employee of the first Party has not received and has not had access to any Confidential Information of the other Party, (ii) such employee of the first Party has not otherwise been involved in the first Party's evaluation, review or implementation of the Development Program, and (iii) such employee of the first Party is not acting at the direction or suggestion of, or on behalf of, any person who would not satisfy the requirements of clauses (i) and (ii) above (and the resulting employment). In addition, the Parties agree that a public posting, forwarding or general advertisement of the Generalized Posting by any employee of the first Party (e.g., via public sharing on LinkedIn) shall not be a violation of the non-solicitation obligation of this section.

6.1.7    **Right to Injunctive Relief.** Each Party agrees that breaches and potential breaches of this Article 6 may cause irreparable harm to the other Party and shall entitle such other Party, in addition to any other remedies available to it (subject to the terms of this Agreement), to the right to seek injunctive relief enjoining such action without the necessity of posting a bond.

6.1.8    **Public Release of Know-How.** For the avoidance of doubt, any information constituting Know-How of a Disclosing Party that becomes publicly known through no wrongful act of or breach of this Agreement by Recipient shall no longer be deemed Know-How under this Agreement.

6.2.    Publicity; Use of Name.

6.2.1    Around the end of the first quarter following the Execution Date of this Agreement, CI shall be permitted to issue the press release of Exhibit E (the "First Press Release") with written approval from Company. The First Press Release may be placed on CI's website or in an industry room, but shall not be placed on the news wire or publicly announced in any other manner without written approval from Company. Thereafter, the Parties shall mutually agree upon any additional press releases including the exact timing and content of any press release or other public statement relating to this Agreement and the transactions contemplated herein.

6.2.2    Except as may be otherwise provided herein, neither Party shall issue any press release, report or make any filing or statement in connection with this Agreement or the transactions described herein without the prior written consent of the other Party; *provided*, *however*, that it shall not be unreasonable for any Party to withhold consent with respect to any press release, report, filing or public statement containing the financial terms of this Agreement

and any of such Party's Confidential Information; and *provided further* that this Section 6.2.2 shall not preclude any Party from issuing any such press release or report or filing or making any such public statement if such release, report, filing or statement is (a) legally required by Applicable Laws, or (b) required by the rules of any stock exchange on which such Party's securities are listed.

6.2.3    In each instance, the Party desiring to issue any press release or report, or to make any filing or public statement shall provide the other Party with a written copy of the proposed release, report, filing or statement at least five (5) business days in advance to allow such other Party to comment upon such release, report, filing or statement.

6.2.4    Except as may be otherwise provided herein, no Party shall have any right, express or implied, to use in any manner the name or other designation of the other Party or any other trade name, trademark or logos of the other Party for any purpose.

## 7. — PUBLICATION

Both Parties acknowledge the importance of publication with respect to the Development Program. As such, each of CI and Company reserves the right to publish or publicly present the data generated during the performance of, or as a result of, the Development Program (the "Results"), subject to the following terms and conditions.  The Party proposing to publish or publicly present the Results (the "Publishing Party") will submit a draft of any proposed manuscript or speech to the other Party (the "Non-Publishing Party") for comments at least twenty (20) business days prior to submission for publication or oral presentation.  The Non-Publishing Party shall notify the Publishing Party in writing within twenty (20) business days of receipt of such draft whether it agrees with the publication and can amend or revise the publication or presentation including (a) removing information of the Non-Publishing Party which it considers to be Confidential Information under the provisions of Article 6 hereof, (b) removing information that if published would have an adverse effect on a patent application which the Non-Publishing Party intends to file, (c) removing information which the Non-Publishing Party reasonably believes would be likely to have a material adverse impact on the development or commercialization of a Licensed Product, or (d) removing any other information to which the Non-Publishing Party wishes to redact.  In any such notification, the Non-Publishing Party shall indicate with specificity its suggestions regarding the manner and degree to which the Publishing Party may disclose such information.  No Party shall publish the Confidential Information of the other Party without the prior written consent of such other Party in violation of Article 6 of this Agreement.  Further, should the Non-Publishing Party not agree to the publication or presentation, the Publishing Party shall not disclose the publication or presentation.  The Parties agree that authorship of any publication will be determined based on the customary standards then being applied in the relevant scientific journal.

## 8. — INDEMNIFICATION

8.1.    Indemnification by Company.    Company shall indemnify, defend and hold harmless CI, its Affiliates, and its and their respective directors, officers, employees, consultants and agents and their respective successors, heirs and assigns (each, a "Company Indemnified Party"), from and against any and all claims, suits, losses, liabilities, damages for personal injury, property damage or otherwise, costs, penalties, fines and expenses (including reasonable fees of

attorneys) (collectively, "<u>Losses</u>") asserted against a Company Indemnified Party by one or more Third Parties to the extent resulting from or arising out of:

(a)    the conduct of the Development Program by Company or its Affiliates or their respective directors, officers, employees, consultants, agents, representatives, licensees, sublicensees, subcontractors and/or investigators under this Agreement, or any actual or alleged violation of law resulting therefrom;

(b)    any claim of infringement or misappropriation of Intellectual Property with respect to CI's use of Company IP in the Development Program or from any Licensed Product developed pursuant to this Agreement;

(c)    Company's material breach of any of its representations, warranties, covenants and/or obligations under Article 11 or Section 8.5 of this Agreement, or the negligence or willful misconduct of any Company Indemnified Party in connection with Company's performance of its obligations under this Agreement; and

(d)    any tort claims of personal injury (including death) relating to or arising out of any such injury sustained as the result of, or in connection with, any Development Program activities conducted by Company.

8.2.    <u>Indemnification by CI</u>.  CI shall indemnify, defend and hold harmless Company, its Affiliates, and their respective directors, officers, employees, consultants and agents and their respective successors, heirs and assigns (each, a "<u>CI Indemnified Party</u>"), from and against any and all Losses asserted against a CI Indemnified Party by one or more Third Parties to the extent resulting from or arising out of:

(a)    the conduct of: (i) the Development Program by a CI Indemnified Party under this Agreement, or any actual or alleged violation of law resulting therefrom;

(b)    any claim of infringement or misappropriation of Intellectual Property with respect to Company's use of CI Core IP or CI Lightsphere IP in the Development Program or the Licensed Products pursuant to this Agreement;

(c)    CI's material breach of any of its representations, warranties, covenants and/or obligations under Article 11 or Section 8.5 of this Agreement, or the negligence or willful misconduct of any CI Indemnified Party in connection with CI's performance of its obligations under this Agreement; and

(d)    any tort claims of personal injury (including death) relating to or arising out of any such injury sustained as the result of, or in connection with, any Development Program activities conducted by CI.

8.3.    <u>Claims Procedures</u>.  A Party (the "<u>Indemnified Party</u>") shall promptly notify the other Party (the "<u>Indemnifying Party</u>") in writing in the event it becomes aware of a claim, suit or proceeding (a "<u>Claim</u>") for which indemnification may be sought by the Indemnifying Party pursuant to this Article 8.  Promptly after such notice, the Indemnifying Party and Indemnified

Party shall meet to discuss how to respond to such Claim. The Indemnified Party shall provide sufficient information and reasonable assistance to the Indemnifying Party, at the Indemnifying Party's expense, in defense of such Claim. The Indemnifying Party may assume the defense of such Claim with counsel of its choice, the fees and expenses of which shall be paid by the Indemnifying Party. In any such Claim, the Indemnified Party shall have the right to retain its own counsel to participate in and monitor such defense, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party unless (a) the Indemnifying Party and the Indemnified Party shall have mutually agreed in writing to the retention of such counsel or (b) the named parties to any such proceeding (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party and representation of both Parties by the same counsel would be inappropriate due to actual or potential differing interests between them. The Indemnifying Party shall not be liable for any settlement of any Claim effected without its written consent, but, if settled with such consent or if there be a final judgment for the plaintiff, the Indemnifying Party agrees to indemnify the Indemnified Party from and against any loss or liability by reason of such settlement or judgment. The Indemnifying Party shall not, without the written consent of the Indemnified Party, effect any settlement of any pending or threatened Claim in respect of which the Indemnified Party is a party and indemnity could have been sought hereunder by the Indemnified Party, unless such settlement includes an unconditional release of the Indemnified Party from all liability on claims that are the subject matter of such proceeding.

8.4.    <u>Limitation of Liability</u>.  Neither Party nor its Affiliates or their respective directors, officers, employees, consultants or agents or their respective successors, heirs or assigns shall be liable to the other Party for any special, indirect, incidental, consequential, punitive or exemplary damages, including but not limited to lost profits or revenue suffered by either Party or any of its Affiliates, or their respective directors, officers, employees, consultants or agents or their respective successors, heirs or assigns, *provided, however,* that the preceding liability limitation shall not apply to liability arising from any willful misconduct or intentionally wrongful act, liability from a breach of Section 6.1, or to the extent a Party may be required to indemnify the other Party under this Article 8 for Losses to be paid to a Third Party. In addition, neither Party shall have any obligation to provide indemnification to the other Party under this Article 8 for any Losses to the extent resulting from the other Party's gross negligence or willful misconduct. For the avoidance of doubt, the Parties agree that liability for lost Development Payments, Milestone Payments or Patent Royalties payable hereunder shall not be deemed anything other than direct damages.

8.5.    <u>Insurance</u>.  Each Party shall, no later than the First Commercial Sale and for five (5) years after expiration of the Term or termination of this Agreement, obtain and maintain at its own cost and expense from a qualified insurance company (*provided*, *however*, that either Party may satisfy all or part of its obligation through its insurance captive) product liability insurance providing protection against any and all claims, demands, and causes of action arising out of any defects, alleged or otherwise, of the Licensed Products or its use, design or manufacture, or any material incorporated in the Licensed Products. The amount of coverage shall be a minimum of Twenty Million U.S. Dollars (US$20,000,000) combined single limit coverage for each occurrence for bodily injury or for property damage and shall be provided from an insurance company qualified to write global product liability coverage. Each Party agrees, upon request, to furnish the other Party with a certificate of insurance evidencing such insurance coverage (at the execution

of this Agreement and at each subsequent renewal) and shall provide the other Party with a thirty (30) calendar day notice of cancellation or non-renewal of such coverage.

## 9. — Intellectual Property

9.1.  <u>Intellectual Property Ownership</u>.

9.1.1    CI Ownership.  CI shall own and retain all right, title and interest in and to all CI Core IP and CI Developed Lightsphere IP.

9.1.2    Company Ownership.

(a)    As between Company and CI, and except for CI Core Software included in Embedded Deliverable Software, Company shall own and retain all right, title and interest in and to all Licensed Products.

(b)    Company shall own and retain all right, title and interest in and to all Collaboration IP and CI Developed EndoVere IP (together, the "<u>Company Assigned IP</u>").  All such Company Assigned IP shall be "works made for hire" to the extent allowed by Applicable Law.

(c)    To the extent any Company Assigned IP does not qualify as, or otherwise fails to be, "works made for hire" in accordance with Section 9.1.2(b), CI assigns and agrees to assign to Company all right, title and interest under all Intellectual Property Rights in and to such Company Assigned IP.  To the extent CI engages any such personnel, agents, contractors, or Affiliates, CI has and will have appropriate written agreements with all such persons consistent with the requirements in Section 9.1.2(b). To the extent such assignment or agreement to assign rights and ownership is invalid or any of the foregoing rights, including so-called "moral rights" or rights of "droit moral," may be inalienable, CI waives and agrees not to exercise such rights, and if such waiver and agreement are deemed invalid, CI hereby grants to Company and its designees the exclusive, transferable, perpetual, irrevocable, worldwide and royalty-free right to make, use, market, modify, distribute, transmit, copy, sell, practice, and offer for sale and import the Company Assigned IP and any process, technology, software, article, equipment, system, unit, product or component part covered by the Company Assigned IP or a claim of any patent in any part of the Company Assigned IP.

(d)    At Company's request and expense, CI will execute any instrument, or obtain the execution of any instrument, including from any employee or contractor, that may be appropriate to assign the rights to Company in accordance with this Section 9.1.2 or perfect such rights in Company's name, and shall provide Company all Source Code and other documents detailing the design and operation of the Company Assigned IP, in whatever format Company may reasonably require,.  If CI fails to execute any assignment in accordance with this Section 9.1.2 within 15 days after a written request by Company, CI hereby appoints Company as CI's attorney in fact for the sole purpose of executing any such assignment on behalf of CI to Company.  CI shall assist Company, at Company's expense and as Company may request, in any proceeding or litigation involving the Company Assigned IP.

(e)    Copyright Notice.  On all reports, labels, software code, UI screens, flowcharts and/or diagrams contained in the Company Assigned IP, the following copyright notice must be placed by CI:

Copyright © 20xx by Ethicon, Inc. All rights reserved.

Except as expressly indicated herein, nothing set forth in this Agreement shall affect the ownership or control of any Intellectual Property that exists and are owned, licensed to or controlled by a Company or CI on or before the Effective Date or developed independent of the Development Program or this Agreement.

9.1.3    Each employee, agent or independent contractor of a Party or its respective Affiliates performing work under this Agreement shall, prior to commencing such work, be bound by invention assignment obligations, including:  (i) promptly reporting any invention, discovery, process or other intellectual property right; (ii) presently assigning to the applicable Party or Affiliate all of his or her right, title and interest in and to any invention, discovery, process or other intellectual property; (iii) cooperating in the preparation, filing, prosecution, maintenance and enforcement of any patent and patent application; and (iv) performing all acts and signing, executing, acknowledging and delivering any and all documents required for effecting the obligations and purposes of this Agreement.  It is understood and agreed that such invention assignment agreement need not reference or be specific to this Agreement.

9.2.    Patent Preparation and Maintenance.

9.2.1    CI, at its own expense, shall have the sole right to prepare, file, prosecute and maintain, throughout the world, the CI Licensed Patents and CI Lightsphere Licensed Patents. Further, CI shall be solely responsible for the continued prosecution of any pending patent applications included in the CI Licensed Patents and CI Lightsphere Licensed Patents, as well as the prosecution of patent applications subsequently filed pursuant to 9.2.1(a) below.

(a)    The Parties shall consult with each other concerning the desirability of filing additional patent applications (continuations and divisionals) to seek an increase in the amount of protection afforded by the CI Licensed Patents and CI Lightsphere Licensed Patents.  Upon the reasonable request of Company, CI shall prepare and file such applications.

(b)    CI shall pay all government fees in any given country required to maintain the CI Licensed Patents and CI Lightsphere Licensed Patents.

(c)    CI shall file patent applications in those foreign countries which may be designated in writing by Company and Company shall be permitted to consult with CI in the selection of foreign patent counsel and in the preparation and prosecution of said foreign patent applications.  Company shall bear the cost of such patent applications.

(d)    CI shall promptly notify Company in the event CI decides to abandon or discontinue prosecution of any one or more patent applications included in CI Licensed Patents and CI Lightsphere Licensed Patents, fails to issue a patent on an application which receives an allowance, or discontinue maintaining an issued patent included in the CI Licensed

Patents and CI Lightsphere Licensed Patents. Such notification will be given no less than 45 days prior to the date on which patent(s)\application(s) will become abandoned.

(e)    CI may abandon, withdraw or discontinue prosecution of such patent(s)\application(s) by giving Company written notice at least 45 days prior to such abandonment.

(f)    Thereafter, Company shall have the option, exercisable upon written notification to CI, to assume full responsibility for the maintenance and/or prosecution of such abandoned patent(s)\application(s), in which event all right title and interest in and to such patent(s)\application(s) shall be promptly assigned by CI to Company. Thereafter, Company shall have no further royalty obligations to CI for any Licensed Product covered only by one or more claims of such patent(s)/application(s) but no other Valid Claims.

(g)    Within 90 days of the Effective Date, CI shall provide Company with copies of complete file histories for each pending patent application worldwide included in the CI Licensed Patents.

(h)    CI shall provide Company with all correspondence delivered to or received from any Patent Office in connection with the CI Licensed Patents and CI Lightsphere Licensed Patents within 30 days of CI's receipt thereof. Upon receiving Company docket numbers for the CI Licensed Patents and CI Lightsphere Licensed Patents from Company, CI shall use reasonable efforts to ensure that all such correspondence delivered to or received from any Patent Office in connection with the CI Licensed Patents and CI Lightsphere Licensed Patents is done so in accordance with the First-to-File® reporting system set forth in Appendix C. Company shall have the right to consult with CI or its designated attorney regarding proposed amendments to the claims of patent applications included in the CI Licensed Patents and CI Lightsphere Licensed Patents during prosecution to ensure that the scope of patent coverage is adequate.

(i)    Ten days prior to the end of each calendar quarter, CI shall provide Company with a quarterly report listing each issued, unexpired U.S. patent included in the CI Licensed Patents and CI Lightsphere Licensed Patents, identified by patent number, title and issue date. Additionally, such quarterly report shall include a listing of the following: a) each U.S. patent application included in the Licensed Patents filed during the preceding calendar quarter, identified by attorney docket number; serial number and filing date; case type, e.g. parent, continuation, divisional or CIP; and title; and b) the status of each pending U.S. application included in the CI Licensed Patents and CI Lightsphere Licensed Patents.

9.2.2    Company, at its own expense, shall have the sole right to pursue, prepare, file, prosecute and maintain, throughout the world, any Collaboration Patents and CI Developed EndoVere Patents. CI shall cooperate with Company and will cause its officers, employees, and consultants to cooperate in connection with the same, including, upon reasonable request of Company, promptly executing any and all patent applications, formal documents, assignments, or other instruments which Company deems necessary or useful for the filing, prosecution, maintenance, enforcement and/or defense of any patent applications or patents claiming or covering any Collaboration Patents or CI Developed EndoVere Patents. Upon reasonable request

by CI, Company will meet with CI to discuss the strategy with respect to the prosecution of any such Collaboration Patents or CI Developed EndoVere Patents arising from this Agreement and the Development Program. Company shall consider in good faith, take into account and implement where appropriate in Company's judgment, the reasonable comments made by CI.

9.3.    <u>Enforcement and Defense of Patents.</u>

9.3.1    If either Party becomes aware of any actual or potential infringement by a Third Party of any Patent Rights part of the Collaboration IP, CI Core IP, CI Developed EndoVere IP, CI Developed Lightsphere IP, or Company IP that Covers a Licensed Product or any attack by a Third Party on the validity or enforceability of such Patent Rights (including any interference, opposition, revocation or declaratory judgment action, but excluding any actions in the ordinary course of prosecution and maintenance of Patent Rights) (each, a "<u>Patent Dispute</u>"), such Party shall promptly notify the other Party in writing to that effect.

9.3.2    CI shall have the right, but not the obligation, at its own cost and expense, to take action to obtain a discontinuance of the Patent Dispute or bring any action, suit or proceeding against the applicable Third Party under the applicable CI Core IP or CI Developed Lightsphere IP. Company shall cooperate with CI in any such action, suit or proceeding as reasonably requested by CI.

9.3.3    Company shall have the right, but not the obligation, at its own cost and expense, to take action to obtain a discontinuance of the Patent Dispute or bring any action, suit or proceeding against the applicable Third Party under the applicable Company IP, Collaboration IP, or CI Developed Lightsphere IP. CI shall cooperate with Company in any such action, suit or proceeding as reasonably requested by Company.

9.4.    <u>Third Party Infringement Suit.</u>

9.4.1    If a Third Party sues a Party or any of such Party's Affiliates or any sublicensees (each Person so sued being referred to herein as a "<u>Sued Party</u>"), alleging that the conduct by either Party in a Development Program or the exploitation of any Licensed Product pursuant to this Agreement infringes or will infringe such Third Party's Intellectual Property Rights, then if the Sued Party is entitled to indemnification pursuant to Article 8 on account of such suit, then the terms and conditions of Article 8 and not Section 9.4.2 shall apply to such suit.

9.4.2    If the Sued Party is not entitled to indemnification pursuant to Article 8 on account of such suit, then the Sued Party shall provide the other Party with the complaint alleging infringement within 30 days of receipt. Upon the Sued Party's request and in connection with the Sued Party's defense of any such Third Party infringement suit, the other Party shall provide reasonable assistance to the Sued Party for such defense, at the Sued Party's expense. The Sued Party shall keep the other Party reasonably informed of all material developments in connection with any such suit and shall not, without the other Party's prior written consent, enter into any settlement or consent decree that requires any payment by or admits or imparts any other liability to the other Party.

9.5.    <u>Trade Secrets</u>. Except as necessary to perform its respective tasks and activities under this Agreement and the Development Plan, each Party agrees not to disclose any of its trade

secrets.  For any trade secrets necessary to be disclosed by one Party (for purposes of this Section 9.5, the Disclosing Party) to the other Party (the "Receiving Party") so that the Receiving Party can perform its respective tasks and activities under this Agreement, the Disclosing Party shall provide Notice to the Receiving Party.  Notice shall include, at a minimum, a technical summary of the trade secret the Disclosing Party wishes to disclose and an indication of its need, use, risks, and benefits for the Receiving Party to conduct its activities and tasks under this Agreement and the Development Plan.   The Receiving Party shall notify the Disclosing Party within thirty (30) days by signing the respective technical summary that the Receiving Party wants to receive the trade secret of the Disclosing Party.  Upon signature of the technical summary by the Receiving Party, the Disclosing Party may then disclose the trade secret marked and labeled property as such to the Receiving Party and the Receiving Party shall treat the trade secret as such.  If the Receiving Party does not want to receive the trade secret and, thus, does not sign the technical summary, the Receiving Party shall not be obligated to treat any information the Disclosing Party proceeds to disclose as a trade secret.  Further, should Company receive CI source code via Escrow as indicated in Section 4.5.1, Company agrees to hold the CI Source Code as a trade secret.

## 10. — TERM AND TERMINATION

10.1. Term.  Unless earlier terminated as provided herein, this Agreement shall become effective as of, and the term of this Agreement shall commence on, the Effective Date and shall continue until terminated by mutual written agreement of the Parties, by one Party pursuant to this Article 10, or expiration or termination of all licenses and fees hereunder.

10.2. Termination by CI for Cause.

10.2.1     CI may, without prejudice to any other remedies available to it at law or in equity, terminate this Agreement in the event Company shall have materially breached or defaulted in the performance of any of its obligations hereunder, and such breach or default shall have continued for thirty (30) days after a written notice was received by Company from CI, which notice specifies in reasonable detail the nature of the breach or default, states that Company is required to cure such breach or default and states that failure to cure such breach or default will result in termination of this Agreement, provided however, if the breach or default is not reasonably capable of being cured within such 30-day period, termination shall not be effective if Company commences cure of the breach or default within such 30-day period and thereafter diligently prosecutes such cure to completion.  Notwithstanding the foregoing provisions of this Section 10.2.1, from the date that Company informs CI that it wishes to commence a proceeding in accordance with the dispute resolution procedures set forth in Section 12.2, until the date such proceeding has been concluded, the running of the time periods referred to in this Section 10.2 for curing a breach or default shall be suspended with respect to the subject matter of the dispute, claim or controversy, provided that, following the conclusion of such proceedings set forth in Section 12.2, Company shall have no more than thirty (30) days to cure such breach or default regardless of whether such breach or default is reasonably capable of being cured within such 30-day period; provided, further, that the foregoing clause will not apply if the breach was such that Company could not reasonably take steps to prosecute a cure of such breach during the aforementioned proceedings.

10.2.2    Without limitation, any of the following, should they occur, shall constitute a Company material breach:

(a)    Company's failure, subject to the cure provisions of Section 10.2.1, to obtain Chartering Approval for EndoVere Licensed Products;

(b)    Company's failure to make the First Commercial Sale of a Licensed Product on or before fifty-four (54) months after the Effective Date (the "Launch Deadline") or failure to otherwise reasonably adhere to the Development Timeline for any reason other than a Safety or Regulatory Failure; *provided*, *however*, that if Company is otherwise not in material breach of this Agreement:

(i)    Company shall be entitled to extension of such Launch Deadline so long as, promptly upon determination that an event has occurred that is likely to delay the First Commercial Sale of a Licensed Product beyond the Launch Deadline, Company presents the JSC with a detailed plan for addressing such delay, such plan to contain a description of Company's proposed resource allocation and proposed timing to overcome such delay.  The JSC shall then determine the length of extension in good faith, taking into account Company's proposed timing for overcoming such delay; or

(ii)    Company shall be entitled to a modification of such Development Timeline so long as, promptly upon determination that an event has occurred that is likely to reasonably prevent Company from adhering to the Development Timeline, Company presents the JSC with a detailed plan for addressing such modification, such plan to contain a description of Company's proposed resource allocation and proposed timing to overcome such modification.  The JSC shall then determine the length of the modification in good faith, taking into account Company's proposed timing to overcome such event; or

(iii)    Company shall be entitled to extension of the Launch Deadline provided it has timely submitted the Licensed Product to the Regulatory Authority for approval but, through no fault of Company, the Regulatory Authority's undue delay causes Company to miss the Launch Deadline.  In such case, the Launch Deadline shall be extended by the such period of undue delay; or

(iv)    Company shall be entitled to extension of the Launch Deadline to the extent necessary to offset any delays resulting from CI's failure to adhere to the Development Timeline and timely meet its Development Milestones.

10.2.3    Effect of Termination under Section 10.2.  If this Agreement is terminated under this Section 10.2, and subject to any license granted in accordance with this Article 10, all licenses and sublicenses granted under Sections 4.1 and 4.2.1 shall automatically terminate and such license rights shall revert to the owner of the applicable Intellectual Property.

10.3.    Termination by Company for Cause.

10.3.1    Company may, without prejudice to any other remedies available to it at law or in equity, terminate this Agreement in the event CI shall have materially breached or defaulted in the performance of any of its obligations hereunder, and such breach or default shall

have continued for thirty (30) days after a written notice was received by CI from Company, which notice specifies in reasonable detail the nature of the breach or default, states that CI is required to cure such breach or default and states that failure to cure such breach or default will result in termination of this Agreement, provided however, if the breach or default is not reasonably capable of being cured within such 30-day period, termination shall not be effective if CI commences cure of the breach or default within such 30-day period and thereafter diligently prosecutes such cure to completion.  Notwithstanding the foregoing provisions of this Section 10.3.1, from the date that Company informs CI that it wishes to commence a proceeding in accordance with the dispute resolution procedures set forth in Section 12.2 and until the date such proceeding has been concluded, the running of the time periods referred to in this Section 10.3 for curing a breach or default shall be suspended with respect to the subject matter of the dispute, claim or controversy, provided that, following the conclusion of such proceedings set forth in Section 12.2, Company shall have no more than thirty (30) days to cure such breach or default regardless of whether such breach or default is reasonably capable of being cured within such 30-day period; provided, further, that the foregoing clause will not apply if the breach was such that CI could not reasonably take steps to prosecute a cure of such breach during the aforementioned proceedings.

10.3.2    Without limitation, any of the following, should they occur, shall constitute a CI material breach:

(a)    CI's failure, subject to the cure provisions of Section 10.3.1, to achieve a Development Milestone as described in Exhibit B.

10.3.3    Effect of Termination under Section 10.3.  If this Agreement is terminated under this Section 10.3, and subject to any license granted in accordance with this Article 10, (a) all licenses and sublicenses granted under Sections 4.1 and 4.2 shall automatically terminate and such license rights shall revert to the owner of the applicable Intellectual Property; and (b) CI hereby grants to Company an exclusive, assignable (consistent with Section 12.8) and sublicensable license to the CI Core IP, and a non-exclusive, assignable (consistent with Section 12.8) and sublicensable license to the CI Developed Lightsphere IP, as necessary to make, have made manufacture, have manufactured, sell, and have sold the Licensed Products in the Fields in the Territory subject to each Party's respective rights and obligations under Section 5.4 and Section 5.5, which shall survive such termination; provided that Company's royalty shall be subject to a 50% reduction, and (c) CI shall provide Software Maintenance subject to Company's continued payment of Software Maintenance Fees, which fee shall be subject to a 50% reduction (except that the Maintenance Minimum shall not be subject to any such reduction).

10.4.    Termination by Company without Cause.

10.4.1    Subject to Sections 10.4.1(a) and 10.4.3, after thirty (30) months from the Effective Date until such date that the first application for a Regulatory Approval of a Licensed Product is submitted to a Regulatory Authority, Company may terminate this Agreement, for any reason, upon one hundred twenty (120) days written notice to CI.

(a)    Termination under Section 10.4.1 shall be effective only if, within one hundred twenty (120) days of its provision of written notice to CI required pursuant to

Section 10.4.1, Company shall pay to CI by wire transfer a non-refundable sum equal to ███████
███████████████████████████████

      10.4.2    Subject to Sections 10.4.2(a) and 10.4.3, at any time after Company has used Commercially Reasonable Efforts to market the Licensed Product(s) for thirty-six (36) months from the First Commercial Sale, Company may terminate this Agreement, for any reason, upon one hundred eighty (180) days written notice to CI.

      (a)    Termination under Section 10.4.2 shall be effective only if, within one hundred eighty (180) days of its provision of written notice to CI required pursuant to Section 10.4.2, Company shall pay to CI by wire transfer a non-refundable sum equal to the greater of ███████████████████████████ or (ii) the greatest amount of total Patent Royalties paid to CI in any period of twelve (12) consecutive calendar months during the three (3) years preceding the date of the termination notice; provided that following the effective date of the termination, Company may continue to use the CI Core IP and CI Developed Lightsphere IP, solely as included in the Embedded Deliverable Software, to service and provide support to all outstanding end user licensees of the Licensed Products (i.e., "activations" or the "Installed Base") and to receive Software Maintenance from CI for such Installed Base, provided that Company shall continue to pay to CI all Patent Royalties and Maintenance Service Fees as provided in the Agreement for so long as such Installed Base remains active.

      10.4.3    The exercise by Company of its right to terminate this Agreement pursuant to Sections 10.4.1 and 10.4.2 is conditioned upon Company not being in uncured, material breach of any of its obligations under the Agreement prior to termination.

      10.4.4    Effect of Termination under Section 10.4.

      (a)    If this Agreement is terminated under this Section 10.4, and subject to any license granted in accordance with this Article 10, (a) all licenses and sublicenses granted under Sections 4.1 and 4.2 shall automatically terminate and such license rights shall revert to the owner of the applicable Intellectual Property; and (b) Company grants to CI a royalty-free, non-exclusive license, with the right to grant sublicenses, to the Collaboration IP and CI Developed EndoVere IP in the Territory.

      (b)    If this Agreement is terminated under this Section 10.4, (a) CI grants to Company a non-exclusive license to the Intangible Know-How from the CI Core IP and the Intangible Know-How from the CI Developed Lightsphere IP, and (b) Company grants to CI a non-exclusive license to the Intangible Know-How from Company IP, the Intangible Know-How from the Collaboration IP, and the Intangible Know-How from the CI Developed EndoVere IP. Both Parties agree pursuant to Section 10.8.4 to destroy any Tangible Know-How.

      10.5.  Termination for Safety or Regulatory Failure.  In the event of a Safety or Regulatory Failure, either Party may terminate without prejudice to any other remedies available to it at law or in equity.

      10.5.1    Effect of Termination under Section 10.5. If this Agreement is terminated under this Section 10.5, and subject to any license granted in accordance with this Article 10, all

licenses and sublicenses granted under Sections 4.1 and 4.2 shall automatically terminate and such license rights shall revert to the owner of the applicable Intellectual Property.

      10.6.  Termination for Intellectual Property Dispute.

      10.6.1    Each Party shall have the right to terminate this Agreement in its entirety at any time during the Term in the event that the Intellectual Property Rights of a Third Party are or would be infringed by any of the Licensed Products, provided that Company may exercise this right to terminate only if, after consultation with the JSC, the Parties cannot, using Commercially Reasonable Efforts, develop a design-around to avoid such infringement that would result in a product comparable to the Licensed Products or obtain a license from such Third Party to avoid such infringement.

      10.6.2    Effect of Termination under Section 10.6.  If this Agreement is terminated under this Section 10.6, and subject to any license granted in accordance with this Article 10, (a) all licenses and sublicenses granted under Sections 4.1 and 4.2 shall automatically terminate and such license rights shall revert to the owner of the applicable Intellectual Property, and (b) CI shall grant to Company a non-exclusive license, with the right to grant sublicenses (through multiple tiers) subject to Section 4.3, to the CI Core Patents and CI Lightsphere Patents to make, have made, use, sell, have sold, import and otherwise exploit a product Covered by a Valid Claim of a CI Core Patent or CI Lightsphere Patent provided that Company pays CI the royalties pursuant to Section 5.4 at the same rate as if such product were a Licensed Product.

      10.7.  Termination for Bankruptcy and Insolvency.   Either Party shall have the right to terminate this Agreement immediately without penalty if a case or proceeding (i) under the bankruptcy laws of the United States now or hereafter in effect is filed against the other Party or all or substantially all of its assets and such petition or application is not dismissed within sixty (60) days after the date of its filing or the other Party shall file any answer admitting and not contesting such petition, or (ii) under the bankruptcy laws of the United States now or hereafter in effect or under any insolvency, reorganization, receivership, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at law or equity) is filed by the other Party for all or substantially all of its assets.

      10.7.2    Effect of Termination under Section 10.7.  If this Agreement is terminated under this Section 10.7, and subject to any license granted in accordance with this Article 10, (a) all licenses and sublicenses granted under Sections 4.1 and 4.2 shall automatically terminate and such license rights shall revert to the owner of the applicable Intellectual Property, and (b) CI shall grant to Company a non-exclusive license, with the right to grant sublicenses (through multiple tiers) subject to Section 4.3, to the CI Core Patents and CI Lightsphere Patents to make, have made, use, sell, have sold, import and otherwise exploit a product Covered by a Valid Claim of a CI Core Patent or CI Lightsphere Patent provided that Company pays CI the royalties pursuant to Section 5.4 at the same rate as if such product were a Licensed Product.

      10.8.  General Effect of Termination; Survival.

      10.8.1    Except as otherwise set forth in this Article 10, termination or expiration of this Agreement for any reason shall be without prejudice to any rights that shall have accrued

to the benefit of any Party prior to such termination or expiration. Such termination or expiration shall not relieve any Party from obligations which are expressly indicated to survive termination of this Agreement.

10.8.2   If this Agreement is terminated, except as otherwise provided in this Article 10, all of the Parties' rights and obligations under, and/or the provisions contained in Articles 6 (Confidentiality), 8 (Indemnification), 9 (Intellectual Property), and 12 (Miscellaneous Provisions) and Sections 5.5 (solely to the extent that Section 5.4 survives) and 10.8 shall survive termination or expiration of this Agreement.

10.8.3   If this Agreement is terminated for any reason except pursuant to Section 10.4, (a) CI grants to Company a non-exclusive license to the CI Core Know-How and Know-How from the CI Developed Lightsphere IP, and (b) Company grants to CI a non-exclusive license to the Know-How from Company IP, the Collaboration Know-How, and the Know-How from the CI Developed EndoVere IP.

10.8.4   If this Agreement is terminated for any reason, the Parties will return (or destroy, if indicated by the other Party and certified by the destroying Party) all data, files, records and other materials within thirty (30) days of the date of termination containing or comprising the other Party's Confidential Information; *provided* that each Party may retain one (1) copy of such data, files, records or other materials for archival and legal compliance purposes, and nothing herein shall require the destruction of back-up media made in the ordinary course of business. Further, if this Agreement is terminated for any reason other than by CI pursuant to Section 10.2 or Company pursuant to Section 10.4, CI shall provide to Company, promptly following the effective date of termination, all Deliverables that have been fully executed or completed under the terminated Development Plan (the "Completed Deliverables") and any incomplete Deliverables, including all materials and information relating thereto, and all work in progress conducted under the terminated Development Plan (collectively the "WIP"). Within thirty (30) days following delivery by CI of the Completed Deliverables and WIP, Company shall pay CI any money due but unpaid to CI for milestones completed or activities conducted pursuant to this Agreement up to the effective date of termination.

## 11. — CONDITIONS, REPRESENTATIONS AND WARRANTIES

11.1. Mutual Representations.  Each Party represents and warrants to the other Party that:

(a)   **Organization.**   Such Party is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is organized.

(b)   **Authorization and Enforcement of Obligations.**   Such Party: (i) has the requisite power and authority and the legal right to enter into this Agreement and to perform its obligations hereunder, (ii) has the requisite resources and expertise to perform its obligations hereunder, and (iii) has taken all requisite action on its part to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder. This Agreement has been duly executed and delivered on behalf of such Party, and constitutes a legal, valid, binding obligation, enforceable against such Party in accordance with its terms.

(c)    **Consents.**    All necessary consents, approvals and authorizations of all Governmental Authorities and other persons or entities required to be obtained by such Party in connection with the execution and delivery of this Agreement have been obtained.

(d)    **No Conflict.**  The execution and delivery of this Agreement and the performance of such Party's obligations hereunder:  (i) do not conflict with or violate any requirement of Applicable Laws, regulations or orders of governmental bodies, (ii) do not conflict with, or constitute a breach or default under, any contractual obligation of such Party, and (iii) do not conflict with or result in a breach of any provision of the organizational documents of such Party.

(e)    **Licenses and Permits.**  Such Party has all licenses, permits, agreements and other approvals and authorizations required to conduct the Development Program in compliance with all Applicable Laws.

11.2. <u>CI Representations</u>.  CI represents, warrants and covenants that:

(a)    The use of the CI Core IP does not infringe upon or misappropriate any Intellectual Property of a Third Party.

(b)    With respect to the Company Assigned IP, CI has and will have the full and necessary rights therein to assign such Company Assigned IP to Company pursuant to Section 9.1.2, and CI's creation of the Company Assigned IP shall not misappropriate any Intellectual Property or other proprietary rights of a Third Party.

(c)    <u>Exhibit D</u> contains a complete list of all third-party software, including free and open source software as well as proprietary third-party code, that is embedded in, bundled with, or delivered with or as part of the CI Core Software and, once created, the Embedded Deliverable Software.  At least thirty (30) days prior to the release of any Update or Upgrade of any CI Core Software or Embedded Deliverable Software, CI shall notify Company in writing of all third-party software, including free and open source software as well as proprietary-third party code, that is embedded in, bundled with, or delivered with or as part of such Update or Upgrade.

(d)    All uses of third-party software in or with the CI Core Software, CI contributions to Collaboration Software, and Software comprising CI Developed EndoVere IP or CI Developed Lightsphere IP are, or will be, in full compliance with the applicable license terms for such third-party software.   CI warrants that the CI Core Software, CI contributions to the Collaboration Software, and Software comprising CI Developed EndoVere IP or CI Developed Lightsphere IP do not, or will not, contain any software licensed under a license that would require that the CI Core Software, Collaboration Software, or Software comprising CI Developed EndoVere IP or CI Developed Lightsphere IP, or any Licensed Products when combined with such software as permitted under this Agreement, must be (i) disclosed or distributed in source code form, (ii) freely licensed, or (iii) redistributable at no charge, under the license applicable to such software.

(e)    **Ethicon Policies.**  CI shall comply with Company's policies regarding (i) Data Safeguards Policy, attached hereto as <u>Exhibit I</u>, and (ii) to the extent that CI's

work or services under this Agreement involves the processing of any personally identifiable information, Protection of Personal Information, attached hereto as <u>Exhibit J</u>.

        (f)     CI

        (i)     owns all right, title, and interest in and to the CI Licensed Patents and the CI Lightsphere Licensed Patent free and clear of all encumbrances, and no third party has notified CI that it is claiming any ownership of or right to the Licensed Patents;

        (ii)     is presently aware of no patents, patent applications, or other prior art not already previously disclosed to Company in writing that is owned by a third party that would invalidate an issued CI Licensed Patent or CI Developed Lightsphere Patent or preclude the issuance of any patents pursuant to claims in a pending CI patent application;

        (iii)     none of the CI Licensed Patents or CI Lightsphere Licensed Patents as of the Effective Date is involved in any pending or threatened litigation, arbitration, administrative or other proceedings, or governmental investigation other than ordinary patent application prosecution proceedings;

        (iv)     has not received any notice of invalidity or infringement of any of the Licensed Patents or the CI Lightsphere Licensed Patents as of the Effective Date;

        (v)     has no outstanding encumbrances or agreements, including any agreements with academic institutions, universities, or third-party employers, whether written, oral or implied, which would be inconsistent with the licenses granted herein;

        (vi)     at the time of execution of this Agreement, believes the CI Licensed Patents and CI Lightsphere Licensed Patents are valid and enforceable;

        (vii)     the CI Licensed Patents and CI Lightsphere Licensed Patents are the only patents or pending patent applications related to the Fields that CI currently owns or otherwise has the right to grant licenses therein, whether domestic or foreign.

        11.3.     <u>Company Representations</u>.  Company represents, warrants and covenants that:

        (a)     None of the products provided by Company that will incorporate the CI Core IP, Collaboration IP or CI Developed EndoVere IP infringe upon or misappropriate any Intellectual Property of a Third Party; and

        (b)     none of the products provided by Company that will incorporate the CI Core IP, Collaboration IP or CI Developed EndoVere IP is involved in any

pending or threatened litigation, arbitration, administrative or other proceedings, or governmental investigation other than ordinary patent application prosecution proceedings.

11.4. <u>Covenants.</u>

(a)     Each Party covenants that it shall, and shall cause its controlled Affiliates to, at all times comply in all material respects with all Applicable Laws in connection with its activities under this Agreement.

(b)     Each Party covenants that it shall not, and shall not permit any of its controlled Affiliates to, grant during the Term any rights that are inconsistent with the rights granted to Company herein.

(c)     Each Party covenants that it shall not, and shall not permit any of its controlled Affiliates to place into commerce any Licensed Product that, to such Party's knowledge, violates the Intellectual Property Rights of any Third Party.

(d)     CI will not enter into any agreements with Third Parties that would have a material adverse effect on the rights granted to Company hereunder or CI's ability to fully perform its obligations hereunder.

11.5. <u>Disclaimer</u>.  EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, THE PARTIES MAKE NO REPRESENTATIONS AND EXTEND NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, AND PARTICULARLY THE PARTIES DISCLAIM ALL IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.  THE PARTIES UNDERSTAND THAT EACH LICENSED PRODUCT IS THE SUBJECT OF ONGOING RESEARCH AND DEVELOPMENT AND THAT NEITHER PARTY CAN ASSURE THE SAFETY, USEFULNESS OR COMMERCIAL OR TECHNICAL VIABILITY OF EACH LICENSED PRODUCT.

## 12. — MISCELLANEOUS PROVISIONS

12.1. <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without reference to conflict of laws principles. The (a) United Nations Convention on Contracts for the International Sale of Goods and (b) Uniform Computer Information Transactions Act, as such model act is or may be enacted in any jurisdiction, will not govern any aspect of this Agreement, including, without limitation, any of the parties' rights and obligations arising pursuant to this Agreement.

12.2. <u>Dispute Resolution.</u>

Except for disputes governed by Section 12.9, prior to either Party commencing proceedings pursuant to <u>Appendix C</u> such Party shall make a written request to the other Party for a meeting to attempt to resolve any dispute, claim or controversy arising from or related in any way to this Agreement or the interpretation, application, breach, termination or validity thereof, including any claim of inducement of this Agreement by fraud or otherwise (a "<u>Dispute</u>"). Pursuant to such written request, each Party shall make available one of its senior officers to meet

in at least one face-to-face meeting and seek in good faith to resolve the Dispute within ten (10) days of the delivery of such written request; provided, however, that this Section 12.2 shall not apply if a Party initiates action seeking immediate injunctive relief for which it reasonably believes there is insufficient time to conduct such a meeting.

12.3.  Jurisdiction.  The state and federal courts of the State of New York shall have exclusive jurisdiction over all actions arising herefrom pursuant to Appendix C.

12.4.  Taxes.

12.4.1    Company will make all payments to CI under this Agreement without deduction or withholding for Taxes except to the extent that any such deduction or withholding is required by Applicable Law in effect at the time of payment.

12.4.2    Any Tax required to be deducted or withheld from amounts payable under this Agreement will be paid by Company on behalf of CI to the appropriate Governmental Authority, and Company will furnish CI with proof of payment of such Tax. Any such Tax required to be withheld will be an expense of and borne by CI.  If any such tax is assessed against and paid by Company, then CI will reimburse and hold harmless the Company from and against such Tax.

12.4.3    The Company and CI will cooperate to secure a reduction in the rate of applicable withholding Taxes, including by providing all documentation required by any taxing authority or reasonably requested by the other Party.  On the Effective Date, CI will deliver to the Company an accurate and complete Internal Revenue Service Form W-9.

12.5.  Waiver.  No provision of this Agreement may be waived except in writing by a duly authorized officer of both Parties hereto.  No failure or delay by either Party hereto in exercising any right or remedy hereunder or under applicable law will operate as a waiver thereof, or a waiver of any right or remedy on any subsequent occasion.

12.6.  Force Majeure.  Neither Party will be in breach hereof by reason of its delay in the performance of or failure to perform any of its obligations hereunder, if that delay or failure is caused by strikes, acts of God or the public enemy, riots, incendiaries, interference by civil or military authorities, compliance with governmental priorities for materials, or any fault beyond its reasonable control (a "Force Majeure Event").  In such event CI or Company, as the case may be, shall immediately notify the other Party in writing of such Force Majeure Event and of the period for which such Force Majeure Event is expected to continue.  The Party giving such notice shall thereupon be excused from such of its obligations under this Agreement to the extent due to such Force Majeure Event for so long as the Force Majeure Event lasts.  To the extent possible, the non-performing Party shall use reasonable efforts to mitigate the Force Majeure Event.

12.7.  Severability.  Should one or more provisions of this Agreement be or become invalid, illegal or unenforceable then the Parties hereto shall attempt to agree upon valid provisions in substitution for the invalid provisions, which in their economic effect come so close to the invalid provisions that it can be reasonably assumed that the Parties would have accepted this Agreement with those new provisions.  If the Parties are unable to agree on such valid provisions,

the invalidity of such one or more provisions of this Agreement shall nevertheless not affect the validity of any other portion of the Agreement.

12.8.  <u>Assignment</u>.  This Agreement may not be assigned or otherwise transferred, whether by operation of law or otherwise, by either Party without the prior written consent of the other Party; *provided*, *however*, that either Party may assign this Agreement, without the consent of the other Party, (i) to any of its Affiliates, if the assigning Party unconditionally guarantees in writing the full performance of its Affiliate's obligations hereunder, or (ii) in connection with such Party's merger, consolidation, or transfer, divestiture or sale of all or substantially all of the assets of such Party to which this Agreement relates; *provided* that the successor, surviving entity, purchaser of assets, transferee, or other similar party, as applicable, expressly assumes in full in writing such Party's obligations under this Agreement and does not compete with a material portion of the other Party's overall operations.  Any purported assignment in contravention of this Section 12.8 shall, at the option of the non-assigning Party, be null and void and of no effect.  This Agreement shall be binding upon and enforceable against the successor to or any permitted assignees from either of the Parties hereto.

12.9.  <u>Arbitration Upon JSC Impasse</u>.  In the event of any impasse at the JSC, either Party may submit the matter for resolution to arbitration pursuant to the rules then pertaining of the International Institute for Conflict Prevention and Resolution for Non-Administered Arbitration (available at http://www.cpradr.org), or successor ("CPR"), except where those rules conflict with these provisions, in which case these provisions control.  The arbitration will be held in Pittsburgh, PA.

12.9.1    The parties agree to cooperate (A) to attempt to select the neutral(s) by agreement within twenty (20) days of initiation of the arbitration, including jointly interviewing the final candidates; (B) to meet with the neutral(s) within ten (10) days of selection; and (C) to agree at that meeting or before upon procedures for discovery and as to the conduct of the hearing that will result in the hearing being concluded and written decision being rendered within no more than three (3) months after selection of the neutral(s).

12.9.2    The arbitration panel shall consist of three neutrals chosen from the CPR Panels of Distinguished Neutrals (or, by agreement, from another provider of neutrals) each of whom is a professional with at least ten (10) years' experience with the medical technology industry.  Each neutral shall be impartial and independent of the parties and shall abide by the Code of Ethics for Arbitrators in Commercial Disputes (available at <u>http://www.adr.org/EthicsAndStandards</u>).

12.9.3    In the event the parties cannot agree upon procedures for discovery and conduct of the hearing meeting the schedule set forth in Section 12.10.2 above, then the neutral(s) shall set dates for the hearing, any post-hearing briefing, and the issuance of the award in accord with the Section 12.10.2 schedule.  The neutral(s) shall provide for discovery according to those time limits, giving recognition to the understanding of the parties that they contemplate reasonable discovery, including document demands and depositions, but that such discovery be limited so that the Section 12.10.2 schedule may be met without difficulty.

12.10.    Counterparts.  This Agreement may be executed in duplicate, each of which shall be deemed to be original and both of which shall constitute one and the same Agreement.

12.11.    No Agency.  The Parties agree that the relationship of Company and CI established by this Agreement is that of independent contractors.  Nothing herein contained shall be deemed to create an agency, joint venture, amalgamation, partnership or similar relationship between Company and CI or to constitute one as the agent of the other.  Notwithstanding any of the provisions of this Agreement, neither Party to this Agreement shall at any time enter into, incur, or hold itself out to Third Parties as having authority to enter into or incur, on behalf of the other Party, any commitment, expense, or liability whatsoever, and all contracts, expenses and liabilities in connection with or relating to the obligations of each Party under this Agreement shall be made, paid, and undertaken exclusively by such Party on its own behalf and not as an agent or representative of the other.  Moreover, each Party agrees not to construe this Agreement or any of the transactions contemplated hereby as a partnership for any tax purpose.

12.12.    Notice.  All communications between the Parties with respect to any of the provisions of this Agreement will be sent to the addresses set out below, or to such other addresses as may be designated by one party to the other by notice pursuant hereto, by prepaid, certified air mail (which shall be deemed received by the other Party on the seventh (7th) business day following deposit in the mails), or by facsimile transmission, or other electronic means of communication (which shall be deemed received when transmitted), with confirmation by first class letter, postage pre-paid, given by the close of business on or before the next following business day:

> if to Company, at:
>
> > Ethicon, Inc.
> > 4545 Creek Rd.
> > Cincinnati, Ohio 45242
> > Attn:  President
>
> > With a copy to:
> >
> > Ethicon, Inc.
> > 4545 Creek Rd.
> > Cincinnati, Ohio 45242
> > Attn: Vice President of Law
> >
> > > and
> >
> > Johnson & Johnson Law Department
> > One Johnson & Johnson Plaza
> > New Brunswick, NJ 08933
> > Fax: (732) 524-1277
> > Attn: General Counsel, Medical Devices

43

if to CI at:

> ChemImage Corporation
> 7325 Penn Avenue, Suite 200
> Pittsburgh, PA 15208
> Attn:  Chief Technology Officer and Chief Operating Officer

> with a copy to:

> EMG Legal Services, LLC
> 8004 Split Oak Drive
> Bethesda, MD 20817
> Attn: Jay Birnbaum, Esq.

12.13.    <u>Headings</u>.  The paragraph headings are for convenience only and will not be deemed to affect in any way the language of the provisions to which they refer.

12.14.    <u>Entire Agreement</u>.  This Agreement constitutes and contains the complete and final understanding and agreement of the Parties and cancels and supersedes any and all prior negotiations, correspondence, understandings and agreements, whether oral or written, between the Parties relating to the matters referred to herein, and may only be amended by a written document, duly executed on behalf of the respective Parties.

12.15.    <u>Notice of Adverse Events</u>.  During the term of this Agreement, the Parties shall keep each other promptly and fully informed and shall promptly notify appropriate authorities in accordance with Applicable Law, after receipt of information with respect to any serious adverse event, directly or indirectly attributable to the Development Program or to the use or application of any Licensed Product.

12.16.    <u>Expenses</u>.  Except as otherwise expressly provided herein, each Party shall bear the costs, fees and expenses incurred by such Party in connection with this Agreement.

12.17.    <u>Licenses and Permits</u>.  Each Party shall, at its sole cost and expense, maintain in full force and affect all necessary licenses, permits, and other authorizations required by Applicable Law in order to carry out its duties and obligations hereunder.

12.18.    <u>Amendment</u>.  No amendment, modification or supplement of any provision of this Agreement shall be valid or effective unless made in writing and signed by a duly authorized officer of each Party.

12.19.    <u>Further Acts</u>.  Each Party shall do, execute, perform and deliver and shall procure to be done, executed, performed and delivered all such further acts, deeds, documents and things as the other Party may reasonably require from time to time to give full effect to the terms of this Agreement.

12.20.     <u>Compliance with Laws</u>.   Both CI and Company shall perform their obligations under this Agreement in accordance with Applicable Law, including applicable anti-corruption laws and export control, economic sanctions laws and anti-boycott regulations, and each Party shall bear its own costs in ensuring compliance therewith.  No Party shall, or shall be required to, undertake any activity under or in connection with this Agreement that violates, or which it reasonably believes may violate, any Applicable Law, including applicable anti-corruption laws and export control, economic sanctions laws and anti-boycott regulations.

12.21.     <u>No Third Party Rights or Obligations</u>.   Except for the rights to indemnification provided for under Article 8, no provision of this Agreement shall be deemed or construed in any way to result in the creation of any rights or obligation in any Person not a Party to this Agreement.

12.22.     <u>Remedies Cumulative</u>.  All rights and remedies of each Party under this Agreement will be cumulative and non-exclusive of any other rights or remedies available to such Party at law or in equity or provided for in this Agreement.

12.23.     <u>Construction; Interpretation</u>.  This Agreement was negotiated and executed in English, and the original language version shall be controlling; all communications and notices hereunder shall be in English.  The Parties acknowledge that they have both had the opportunity to negotiate regarding any issues in connection with this Agreement that were of concern to them and, therefore, expressly waive the benefit of any presumption that ambiguities should be construed in favor of or against either Party.  Except where the context otherwise requires, the use of any gender herein shall be deemed to be or include the other genders, the use of the singular shall be deemed to include the plural (and vice versa) and the word "or" is used in the inclusive sense commonly associated with the term "and/or".  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include the Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof and (d) all references herein to sections or Exhibits shall be construed to refer to sections or Exhibits of this Agreement.  To the extent the terms and conditions of the body of this Agreement conflict with the terms and conditions of any exhibit hereto, the terms and conditions of the exhibit shall govern.

[*Remainder of page intentionally left blank.*]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the Effective Date.

**ChemImage Corporation**

By: _____

Name: __Jeffrey Cohen_____

Title: __President_____

**Ethicon, Inc.**

By: _____

Name: __Noam Krantz_____

Title: __WW VP, Business Development__

[*Signature Page to Research, Development, License and Commercialization Agreement*]

Confidential

## **Exhibit A**

**DEVELOPMENT PLAN**

[PDF SLIDES FOLLOW]

# EXHIBIT A - Development Plan

# J&J Medical Devices Stage-Gate Process





# Technical Stage Gate Priorities:
## Critical Structure Identification Functionality & Cancer Localization Functionality

Further details and timeline of the Development Plan to be updated at the kick-off and JSC meetings

**NOTIONAL TECH DEVELOPMENT PLAN[1,2]**

| Pre-Charter | Charter | Gate 1 | Gate 2 | Gate 3 | Launch |
|---|---|---|---|---|---|
| **Define Opportunity & Product Proof of Concept** | **Formally Establish NPD Project** | **Biz Commitment: scope, timing, financials** | **Ensure design meets customer needs** | **Ensure Readiness for Production** | |
| 🟦 Cancer Loc: Ex Vivo and In Vivo Small Animal Tumor imaging | 🟩 Target Product Profile (TPP) & Preliminary Requirements defined | 🟩 Product Design & Finalize Requirements | 🟩 Validation and Verification (V&V) | 🟩 Design Transfer for Production | **JOINTLY LEAD** |
| 🟦 Cancer Loc: Tumor & Lymph Node Wavelength Selection | 🟩 "Technical Feasibility is Confirmed" | 🟩 Risk Adjusted Schedule | ⬜ Pre-Launch Evidence Generation to Support Regulatory &/or V&V | ⬜ Establish Post-Launch Stabilization Plan | **ERIE LEAD** |
| 🟦 Crit. Structures & Cancer Loc: Erie Portion of Scope Development | 🟩 Product Proof of concept is Demonstrated | ⬜ Finalize Pre & Post Launch Evidence Plan | 🟩 Complete any necessary Design Adjustments | 🟦 Support Preparation of Regulatory Submission | **ETHICON LEAD** |
| ⬜ Critical Structures and Cancer Loc: Ethicon Portion of Scope Development | 🟩 Risks & Mitigations Identified | ⬜ Establish Preliminary Regulatory Plan | ⬜ Design Freeze | ⬜ Submit Regulatory | |
| 🟩 Proof of Concept: In Vivo Testing for Crit. Structures & Cancer Loc | 🟩 IP Assessment Complete | ⬜ Supply Chain Assessment | ⬜ Supply Chain Preparations | ⬜ Supply Chain Activation | |

1: This is not a final development plan. Joint planning is required between Ethicon and Erie to ensure the creation of a comprehensive plan, where workstream ownership is clearly identified and risks/mitigations have been worked thru within the core team.

2: Detail Not Displayed: Ethicon's funding of dedicated development, commercial, and other cross-functional resources to drive all business case development, commercialization planning, and execution activities throughout the stage-gate process.



ETHICON CONFIDENTIAL AND PROPRIETARY – NOT FOR REDISTRIBUTION - 12/20/19  3

**Exhibit B**

**DEVELOPMENT AND MILESTONE PAYMENT SCHEDULE**

1. R&D Payment Schedule and Terms

| No. | Major R&D Tasks Accomplished | Anticipated Invoice Date | Payment Amount |
|---|---|---|---|
| 1 | Critical Structure (CS) System Requirements; CS & Tumor Detection (TD) ex vivo testing; Prep for CS and TD in vivo demos | 31 Jan 2020 | ███ |
| 2 | Prep for CS and TD in vivo demos; Signal to Noise Ratio (SNR) Modeling | 29 Feb 2020 | █ |
| 3 | CS in vivo surgery 1 | 31 Mar 2020 | █ |
| 4 | CS in vivo surgery 2; Design of CS Pimento | 30 Apr 2020 | █ |
| 5 | CS in vivo surgery 3; Sm. animal tumor work; CS Pimento Design Review (DR) | 31 May 2020 | █ |
| 6 | SW for CS Pimento; Analyze data from CS in vivo surgeries | 30 Jun 2020 | █ |
| 7 | Milestone (MS) 1A demo; Develop models for TD in vivo surgeries | 31 Jul 2020 | █ |
| 8 | SW for CS Pimento; CS Pimento ex vivo testing | 31 Aug 2020 | █ |
| 9 | CS in vivo surgery 1 w/CS Pimento; TD System Requirements | 30 Sep 2020 | █ |
| 10 | CS in vivo surgery 2; TD in vivo surgery 1 | 31 Oct 2020 | █ |
| 11 | Design of TD Pimento; TD in vivo surgery 2 | 30 Nov 2020 | █ |
| 12 | CS in vivo surgery 3; MS 2A Demo | 31 Dec 2020 | █ |
| 13 | MS 1B Demo | 31 Jan 2021 | █ |
| 14 | CS Charter Decision; TD Pimento DR | 29 Feb 2021 | █ |
| 15 | Planning for TD in vivo surgeries; | 31 Mar 2021 | █ |
| 16 | TD Pimento SW | 30 Apr 2021 | █ |
| 17 | TD Pimento ex vivo testing | 31 May 2021 | █ |
| 18 | TD in vivo surgery 1 w/TD Pimento | 30 Jun 2021 | █ |
| 19 | TD in vivo surgery data analysis | 31 Jul 2021 | █ |
| 20 | TD in vivo surgery 2 w/TD Pimento | 31 Aug 2021 | █ |
| 21 | TD in vivo surgery 3 w/TD Pimento | 30 Sep 2021 | █ |
| 22 | MS 2B demo; Transition Planning | 31 Oct 2021 | █ |
| 23 | TD Charter Decision | 30 Nov 2021 | █ |
| 24 | R&D Payment 23 – Lightsphere Diagnostics R&D | 31 Jan 2022 | █ |
| 25 | R&D Payment 24 – Lightsphere Diagnostics R&D | 29 Feb 2022 | █ |
| 26 | R&D Payment 25 – Lightsphere Diagnostics R&D | 31 Mar 2022 | █ |
| 27 | R&D Payment 26 – Lightsphere Diagnostics R&D | 30 Apr 2022 | █ |
| 28 | R&D Payment 27 – Lightsphere Diagnostics R&D | 31 May 2022 | █ |
| 29 | R&D Payment 28 – Lightsphere Diagnostics R&D | 30 Jun 2022 | █ |
| 30 | R&D Payment 29 – Lightsphere Diagnostics R&D | 31 Jul 2022 | █ |
| 31 | R&D Payment 30 – Lightsphere Diagnostics R&D | 31 Aug 2022 | █ |
| 32 | R&D Payment 31 – Lightsphere Diagnostics R&D | 30 Sep 2022 | █ |
| 33 | R&D Payment 32 – Lightsphere Diagnostics R&D | 31 Oct 2022 | █ |
| 34 | R&D Payment 33 – Lightsphere Diagnostics R&D | 30 Nov 2022 | █ |
| 35 | R&D Payment 34 – Lightsphere Diagnostics R&D | 31 Dec 2022 | █ |
| 36 | R&D Payment 35 – Lightsphere Diagnostics R&D | 31 Jan 2023 | █ |
| 37 | R&D Payment 36 – Lightsphere Diagnostics R&D | 29 Feb 2023 | █ |
| 38 | R&D Payment 37 – Lightsphere Diagnostics R&D | 31 Mar 2023 | █ |
| 39 | R&D Payment 38 – Lightsphere Diagnostics R&D | 30 Apr 2023 | █ |
| 40 | R&D Payment 39 – Lightsphere Diagnostics R&D | 31 May 2023 | █ |
| 41 | R&D Payment 40 – Lightsphere Diagnostics R&D | 30 Jun 2023 | █ |
| 42 | R&D Payment 41 – Lightsphere Diagnostics R&D | 31 Jul 2023 | █ |
| 43 | R&D Payment 42 – Lightsphere Diagnostics R&D | 31 Aug 2023 | █ |
| 44 | R&D Payment 43 – Lightsphere Diagnostics R&D | 30 Sep 2023 | █ |
| 45 | R&D Payment 44 – Lightsphere Diagnostics R&D | 31 Oct 2023 | █ |
| 46 | R&D Payment 45 – Lightsphere Diagnostics R&D | 30 Nov 2023 | █ |
| 47 | R&D Payment 46 – Lightsphere Diagnostics R&D | 31 Dec 2023 | █ |
| | **Total** | | █ |

a. All R&D Payments detailed in the above table shall be due thirty (30) days after Company's receipt of undisputed invoices for completion of work associated with each R&D payment.

2.  Development Milestone Payment Schedule and Terms

| No. | Development Milestone Payment Descriptions | Milestone Payment Amount |
|---|---|---|
| 1 | Development Milestone 1A: Successful in vivo Demonstration of CI Visualization System for Critical Structures Identification Functionality | ███████ |
| 2 | Development Milestone 1B: Successful in vivo Demonstration with Modified JNJ Visualization System for Critical Structures Identification Functionality | ███████ |
| 3 | Development Milestone 1C: EndoVere Critical Structures Identification Functionality Visualization Chartering Approval | ███████ |
| 4 | Development Milestone 2A: Successful in vivo Demonstration of CI Visualization System for Cancer Localization Functionality | ███████ |
| 5 | Development Milestone 2B: Successful in vivo Demonstration with Modified JNJ Visualization System for Cancer Localization Functionality | ███████ |
| 6 | Development Milestone 2C: EndoVere Cancer Localization Functionality Visualization Chartering Approval | ███████ |
| | Total | ███████ |

a. Within sixty (60) days after receipt of an invoice from CI stating that a respective Development Milestone has been met (which determination is a function of the JSC pursuant to 2.41.(b) of this Agreement), as further described in the Development Plan and Exhibit B-1 (the "Development Milestone Event"), Company shall pay, or shall cause one to its Affiliates to pay, to CI the respective Milestone Payment for such Development Milestone unless Company disputes in writing and in good faith CI's assertion that such Development Milestone has been met.

b. The approval criteria for each Development Milestone is identified in Exhibit B-1 to this Agreement.

3.  Regulatory Milestone Payment Schedule and Terms

| No. | Regulatory Milestone Payment Descriptions | Milestone Payment Amount |
|---|---|---|
| 1 | Regulatory Milestone 1: EndoVere Critical Structures FDA Regulatory Milestone Payment | ███████ |
| 2 | Regulatory Milestone 2: EndoVere Critical Structures CE Regulatory Milestone Payment | ███████ |
| 3 | Regulatory Milestone 3: EndoVere Cancer Localization FDA Regulatory Milestone Payment | ███████ |

| | | |
|---|---|---|
| 4 | Regulatory Milestone 4: EndoVere Cancer Localization CE Regulatory Milestone Payment | ███████ |
| 5 | Regulatory Milestone 5: Lightsphere Diagnostics Cancer Diagnosis FDA Regulatory Milestone Payment for approval by FDA of regulatory submission from Company or an Affiliate for a system that is indicated for Lightsphere Functionality | ███████ |
| 6 | Regulatory Milestone 6: Lightsphere Diagnostics Cancer Diagnosis CE Regulatory Milestone Payment for Company or an Affiliate obtaining a CE Mark for a system that is indicated for Lightsphere Functionality | ███████ |
| | **Total** | ███████ |

    a.   Within sixty (60) days after receipt by Company or one of its Affiliates of the respective Regulatory Approval with respect to a Regulatory Milestone, as further described in the Development Plan (the "Regulatory Milestone Event"), Company shall pay, or shall cause one to its Affiliates to pay, to CI the respective Milestone Payment for such Regulatory Milestone.

**Exhibit B-1**

## DEVELOPMENT MILESTONE ACCEPTANCE CRITERIA

This Exhibit lays out the acceptance criteria for the Development Milestones identified in Exhibit B, Section 2.

| | |
|---|---|
| 1 | Development Milestone 1A: Successful in vivo Demonstration of CI Visualization System for Critical Structure Identification Functionality |
| 2 | Development Milestone 1B: Successful in vivo Demonstration with Modified JNJ Visualization System for Critical Structures Identification Functionality |
| 3 | Development Milestone 1C: EndoVere Critical Structure Identification Functionality Visualization Chartering Approval |
| 4 | Development Milestone 2A: Successful in vivo Demonstration of CI Visualization System for Cancer Localization Functionality |
| 5 | Development Milestone 2B: Successful in vivo Demonstration with Modified JNJ Visualization System for Cancer Localization Functionality |
| 6 | Development Milestone 2C: EndoVere Cancer Localization Functionality Visualization Chartering Approval |

**Document Originally Prepared by:**

Emir Osmanagic, Ethicon

Tamara Lanier, Ethicon

Patrick Treado, ChemImage

Chuck Gardner, ChemImage

1. **Preamble**

   The intent of this Exhibit is to address approval criteria related to milestones 1a, 1b, 1c, 2a, 2b, and 2c.  These Development Milestones (Exhibit B, Section 2) are grouped into three Milestones related to Critical Structure Identification Functionality and another three milestones related to Cancer Localization Functionality.  Each of the groups of three consist of Milestones: a.) - successful in-vivo demonstration using CI visualization system), Milestone; b.) – successful in-vivo demonstration using prototype J&J/Ethicon visualization system, and Milestone; and c.) – charter approval.

   The intent of this Exhibit is to further provide detailed approval criteria for each Development Milestone, as a set of clear guidelines, expectations, method and tools definitions and otherwise quantify criteria of success.

   As laid out in the sections below, the Exhibit will address each Milestone separately, while common and related items are listed here as a part of the preamble.  The Deliverable must meet all Functional Success Criteria and Technical Detection Success Criteria in order for the applicable development Milestone to be met.


   **Milestone Acceptance Protocol Development Expectations.**

   -   A milestone acceptance protocol will be jointly developed for each milestone using the milestone's criteria (technical success, milestone functional success, and characterization) and customer insights to guide the protocol development.
   -   Medical, Clinical, Pre-Clinical advisors will be utilized, as needed, to deliver a technically and clinically relevant milestone acceptance protocol that aligns with the milestone detail outlined for Milestones 1a, 1b, 2a, & 2b.
   -   The final milestone acceptance protocol will be approved by the project core team, while utilizing the below sections as a foundation.


   **Common Milestone Expectations for Algorithms, Data Collections & Characterization of Performance for 1a, 1b, 2a and 2b.**

   -   Characterize Maximum System Performance in Detection: Characterize current performance and assess the technical pathway to further maximize system performance and outputs, including but not limited to Algorithm Optimization, Sensitivity, Specificity, Signal to Noise Ratio and other relevant statistical analyses.
   -   Characterize Latency: Determine current latency levels, assess if there is a technical pathway to reduce latency to <100ms for final commercial product.
   -   Perfusion: Characterize and record ability to visualize perfusion with the Milestone 1a and 1b visualization system
   -   Characterize Multi-Target Detection and Differentiation: Characterize and assess the technical pathway to optimize the detection and differentiation of multiple targets simultaneously. Document tradeoffs / impacts on system requirements.  For specific criteria, look at each milestone multi-target success criteria.
   -   Positive Predictive Value (PPV) & Negative Predictive Value (NPV): Collect & analyze data to characterize and jointly define a clinically meaningful PPV & NPV as a deliverable for Milestones 1a and 2a that can be used as a measure during future stages of the development program.

**Common Milestone Expectations for Independent Design Review.**

- A 3rd Party Consultant to conduct design review to characterize current design, to create recommendations for successful development and execution for the subsequent Milestones.
- Design reviews to occur during 1a, 1b, 2a, and 2b and will include an assessment of technical and design risks and the milestone acceptance protocols.
- This design review is to be conducted during the course of the Milestone work and will be completed before the actual milestone demonstration at Ethicon, with details available for inclusion in the Milestone Deliverable Report.

    **Strategic Intent of the Design Review Process:**

    Milestone 1a & 2a:

    - Review the design of current milestone system
    - Inform development pathways and risk mitigation plans for Integration with prototype J&J Visualization System

    Milestone 1b & 2b:

    - Review the design of current milestone system
    - Inform development pathways and risk mitigation plans for developing full commercial system

2. **Milestone 1a – Successful in-vivo demonstration of ChemImage Visualization System of Critical Structure Identification Functionality.**

    **Milestone Description**: Utilize the ChemImage (CI) Visualization system to demonstrate real-time (or near real-time) in-vivo detection of critical structures when buried in up to 5mm of tissue and to characterize the system's ability to detect up to 10mm. At the end of this milestone, a demonstration of the detection capabilities outlined below will be held at Ethicon, for the core team. A report will be delivered outlining how the technology successfully achieved the Milestone.

    **Functional Success Criteria:**

    Successful Detection (On a scene by scene basis within the final testing protocol):
    - Sensitivity ≥ 80%
    - Specificity ≥ 80%
    - Area Under the ROC Curve (AUC) ≥ 0.80

    Detection Demonstration Personnel:
    - Non-project individual to serve as the "surgeon"
    - Individual has ability to visually confirm target structures when they are at 0 mm depth
    - Individual has surgical training and experience (veterinary or human)

    Detection Targets (targets to be further specified in the pre-clinical protocol):
    - Ureter
    - Nerve (myelinated/non-myelinated of various sizes)
    - Vessel (Veins or Arteries)
    - Bile duct

Surgical Scenes, Backgrounds and Obscurants:
  - Surgical scenes, backgrounds and obscurants will be jointly defined and finalized
    during the preclinical protocol development
  - Medical and pre-clinical advisors will be utilized to ensure clinical relevance

Detection confirmation and verification of critical structure location and tissue depth:
  - Detection with ChemImage visualization system
  - Location verification and depth confirmation through independent method (e.g.
    ionizing radiation scan, and/or dissection, to be defined through milestone acceptance
    protocol with Ethicon pre-clinical experts)

**Technical Detection Success Criteria:**

Visualization System:
  - ChemImage visualization system (all ChemImage technology required to enable visualization
    and detection) that supports real-time/near real-time detection of critical structures.
  -
  - Detection does not require post-processing of data
  - Real-time/near real-time detection results will be compared with Post-Processed detection
results to provide assessment of improvement pathways

Max # of Detection Wavelengths:
  - Tradeoffs between # of detection wavelengths and detection performance (AUC) will be
    assessed to estimate the minimum # of detection wavelengths needed to assess
    Detection Targets

Near real-time upper boundary:
  - Visualize detection results within 1 second on the scene

In-vivo model:
  - Large animal (e.g. porcine or ovine, TBD with pre-clinical experts)

Depth of Detection:
  - Demonstrate detection at 0 mm to 5 mm for all detection targets
  - Characterize detection capabilities at 5 mm to 10 mm for all detection targets

Laparoscope Characteristics:
  - Shall be consistent with current system(s) design:
    Focus, working distance, tradeoffs between # of detection wavelengths and detection
    performance (AUC) will be assessed to estimate the minimum number of detection wavelengths
    needed to assess Detection Targets, field of view and spatial resolution
  - Comparison with J&J Visualization System design to be undertaken

RGB/MCI operations:
  - Must allow user to operate under RGB light (and/or white light) while also detecting the critical
    structures using the ChemImage technology

Multi-target:
  - Must be able to demonstrate detection of multiple targets simultaneously with a CI
    visualization system, for example MCI-E G1.0 or MCI-E G2.0 (2 targets at minimum)

  - Characterize ability and tradeoffs to detect all critical structures in the scene
  - Characterize ability and tradeoffs to differentiate among different types of targets

Cleaning:
  - Must have a cleaning protocol that will enable the visualization platform to meet the criteria
    for use in animals as a part of the milestone acceptance protocol


3. **Milestone 1b – Successful in-vivo demonstration with a prototype J&J/Ethicon Visualization System of Critical Structure Identification Functionality.**

   **Milestone Description**: Integrate the CI technology into a prototype J&J Visualization system and use the resulting system to demonstrate real-time in-vivo detection of critical structures when buried in up to 5mm of tissue and characterize the system's ability to detect up to 10mm. At the end of this milestone, a demonstration of the detection capabilities outlined below will be held at Ethicon, for the core team. A report will be delivered outlining how the technology successfully achieved the Milestone.

   **Functional Success Criteria:**

   Successful Detection (On a scene by scene basis within the final testing protocol):
     - Sensitivity ≥ 80%
     - Specificity ≥ 80%
     - Area Under the ROC Curve (AUC) ≥ 0.80
     - Characterize opportunities and tradeoffs for higher sensitivity and specificity

   Detection Demonstration Personnel:
     - Non-project individual to serve as the "surgeon"
     - The individual has ability to visually confirm target structures when they are at 0 mm depth
     - The individual has surgical training and experience (veterinary or human)

   Detection Targets (targets to be further specified in the pre-clinical protocol):
     - Ureter
     - Nerve (myelinated/non-myelinated of various sizes)
     - Vessel (Veins or Arteries)
     - Bile duct

   Surgical Scenes, Backgrounds and Obscurants:
     - Surgical scenes, backgrounds and obscurants will be jointly defined and finalized
       during the preclinical protocol development
     - Medical and pre-clinical advisors will be utilized to ensure clinical relevance

   Detection confirmation and verification of critical structure location and tissue depth:
      - Location verification and depth confirmation through independent method (e.g.
      ionizing radiation scan, and/or dissection, to be defined through milestone acceptance
      protocol with Ethicon pre-clinical experts)

**Technical Detection Success Criteria:**

Visualization System:
- Prototype J&J/Ethicon Visualization system that incorporates the ChemImage Critical Structure Identification Functionality
- Supports real-time detection of critical structures
- Real-Time detection results will be compared with Post-Processed detection results to provide assessment of improvement pathways

Detection Wavelengths:
- Maximum number of detection wavelengths not to exceed 10
- Characterize ability and tradeoffs to utilize between 1 and 10 detection wavelengths as it relates to device performance characteristics

Real-time upper boundary:
- Visualize detection results within 100 milli-seconds on the scene

In-vivo model:
- Large animal (e.g. porcine or ovine, TBD with pre-clinical experts)

Depth of Detection:
- Demonstrate detection at 0 mm to 5 mm for all detection targets
- Characterize detection capabilities at 5 mm to 10 mm for all detection targets

Laparoscope Characteristics:
- Will be defined by the J&J Visualization System Project Team and delivered within the prototype: Focus, working distance, field of view and spatial resolution

RGB/MCI operations:
- Must allow user to operate under RGB light (and/or white light) while also detecting the critical structures using the ChemImage technology

Multi-target:
- Must be able to demonstrate detection of multiple targets simultaneously using J&J visualization system (2 targets at minimum)
- Characterize ability and tradeoffs to detect all critical structures in the scene
- Characterize ability and tradeoffs to differentiate among different types of targets
- Characterize ability and tradeoffs to implement "Set it and Forget it" mode (no need for user to provide additional target-specific inputs)

Cleaning:
- Must have a cleaning protocol that will enable the visualization platform to meet the criteria for use in animals as a part of the milestone acceptance protocol

4. **Milestone 1c – Assemble the Technical and Business Case to obtain Critical Structure Identification Functionality Visualization Charter Approval.**

| Illustrative Pre-Charter Check List *To be finalized by project team as we approach the close of Milestone 1b* | Ethicon Role | ChemImage Role | JSC Role |
|---|---|---|---|
| Product Concepts & Value Proposition | Lead Creation | Support Creation | Review & Approve |
| Target Product Profile[2] | Lead Creation | Support Creation | Review & Approve |
| Market Research Overview | Lead Creation | Support Creation | Review & Approve |
| Design and Feasibility Summary | Co-Create | Co-Create | Review & Approve |
| IP Summary | Lead Creation | Support Creation | Review & Approve |
| Regulatory Strategy | Lead Creation<br>• Lead planning and execution of Pre-Submission Meeting with FDA prior to pursuing charter approval[1] | Support Creation<br>• Support Pre-Submission Meeting with FDA prior to pursuing charter approval[2] | Review & Approve |
| Manufacturing Assessment (COGS) | Lead Creation | Support Creation | Review & Approve |
| Financials | Lead Creation | Support Creation | Review & Approve |
| Risks & Assumptions & Dependencies | Lead Creation | Support Creation | Review & Approve |
| High Level Project Plan | Lead Creation | Support Creation | Review & Approve |
| Recommendations / Ask | Lead Creation | Support Creation | Review & Approve |

---

[1] The FDA Pre-Submission meeting is likely to occur in parallel with the work for Milestones 1a & 1b

[2] The Target Product Profile detail may include but is not limited to: Opportunity Assessment & Business Proposal (Marketing), Product Design & Quality (R&D and Design Quality), Financial Analysis (Marketing and Finance), Market Execution (Marketing), Supply Chain & Quality (Operations, Purchasing, Quality), Regulatory Affairs (Regulatory), Market Strategy and Market Access (HEMA), Evidence Generation (Clinical Affairs), Medical Affairs/Safety (Med Affairs/Safety), Project Management & Project Risk (PM). CI to contribute to preparation and completeness of the document for charter

5. **Milestone 2a – Successful in-vivo demonstration of ChemImage Visualization System for Cancer Localization Functionality.**

**Milestone Description**: Utilize the ChemImage (CI) Visualization system to demonstrate real-time (or near real-time) in-vivo detection of Tumors when buried in up to 5mm of tissue and to characterize the system's ability to detect up to 10mm. At the end of this milestone, a demonstration of the detection capabilities outlined below will be held at Ethicon, for the core team. A report will be delivered outlining how the technology successfully achieved the Milestone.

**Functional Success Criteria:**

Successful Detection (On a scene by scene basis within the final testing protocol):
  - Sensitivity ≥ 80%
  - Specificity ≥ 80%
  - Area Under the ROC Curve (AUC) ≥ 0.80

Detection Demonstration Personnel:
  - Non-project individual to serve as the "surgeon"
  - Individual has ability to visually confirm target structures when they are at 0 mm depth
  - Individual has surgical training and experience (veterinary or human)

Detection Targets:
  - **Lung Cancer**
  - **Colorectal Cancer**
  - Gastric
  - Esophageal
  - Liver
  - Uterine/Cervical
  - Ovarian
  - **Kidney**
  - Prostate

ChemImage recommends focus targets as marked in bold.  As we work with the pre-clinical support, understanding animal models available, the team will consider the recommendations when selecting the final test targets and reaching alignment.

Surgical Scenes, Backgrounds and Obscurants:
  - Surgical scenes, backgrounds and obscurants will be jointly defined and finalized
    during the preclinical protocol development
  - Medical and pre-clinical advisors will be utilized to ensure clinical relevance

Detection confirmation and verification of tumor location and tissue depth:
  - Detection with ChemImage visualization system
  - Location verification and depth confirmation through independent method (e.g.
    ionizing radiation scan, and/or dissection, to be defined through milestone acceptance
    protocol with Ethicon pre-clinical experts)

**Technical Detection Success Criteria:**

11

Visualization System:
  - ChemImage visualization system (all ChemImage technology required to enable visualization
    and detection) that supports real-time/near real-time detection of tumors.

  - Detection does not require post-processing of data
  - Real-time/near real-time detection results will be compared with Post-Processed detection
results to provide assessment of improvement pathways

Max # of Detection Wavelengths:
  - Tradeoffs between # of detection wavelengths and detection performance (AUC) will be
    assessed to estimate the minimum # of detection wavelengths needed to assess
    Detection Targets

Near real-time upper boundary:
  - Visualize detection results within 1 second on the scene

In-vivo model:
  - In-Vivo Model will be jointly defined & finalized during protocol development
  - Medical & Clinical/Pre-Clinical advisors will be utilized to ensure clinical relevance

Depth of Detection:
  - Demonstrate detection at 0 mm to 5 mm for all detection targets
  - Characterize detection capabilities at 5 mm to 10 mm for all detection targets

Laparoscope Characteristics:
  - Shall be consistent with current system(s) design
      - Focus
      - Working Distance
      - Field of View
      - Spatial Resolution
  - Comparison with J&J Visualization System design to be undertaken

RGB/MCI operations:
  - Must allow user to operate under RGB light (and/or white light) while also detecting Tumors
using the ChemImage technology

Multi-target:
  - Must be able to demonstrate detection of multiple targets simultaneously with a CI
    visualization system, for example MCI-E G1.0 or MCI-E G2.0 (2 targets at minimum)
  - Characterize ability and tradeoffs to detect all Tumors in the scene
  - Characterize ability and tradeoffs to differentiate among different types of targets

Cleaning:
  - Must have a cleaning protocol that will enable the visualization platform to meet the criteria
    for use in animals as a part of the milestone acceptance protocol

6. **Milestone 2b – Successful in-vivo demonstration with a prototype J&J/Ethicon Visualization System for Cancer Localization Functionality.**

**Milestone Description**: Integrate the CI technology into a prototype J&J Visualization system and use the resulting system to demonstrate real-time in-vivo detection of Tumors when buried in up to 5mm of tissue and characterize the system's ability to detect up to 10mm. At the end of this milestone, a demonstration of the detection capabilities outlined below will be held at Ethicon, for the core team. A report will be delivered outlining how the technology successfully achieved the Milestone.

**Functional Success Criteria:**

Successful Detection (On a scene by scene basis within the final testing protocol):
  - Sensitivity ≥ 80%
  - Specificity ≥ 80%
  - Area Under the ROC Curve (AUC) ≥ 0.80
  - Characterize opportunities and tradeoffs for higher sensitivity and specificity

Detection Demonstration Personnel:
  - Non-project individual to serve as the "surgeon"
  - The individual has ability to visually confirm target structures when they are at 0 mm depth
  - The individual has surgical training and experience (veterinary or human)

Detection Targets (targets to be further specified in the pre-clinical protocol):
  - **Lung Cancer**
  - **Colorectal Cancer**
  - Gastric
  - Esophageal
  - Liver
  - Uterine/Cervical
  - Ovarian
  - **Kidney**
  - Prostate

ChemImage recommends focus targets as marked in bold. As we work with the pre-clinical support, understanding animal models available, the team will consider the recommendations as selecting the final test targets and reaching alignment.

Surgical Scenes, Backgrounds and Obscurants:
  - Surgical scenes, backgrounds and obscurants will be jointly defined and finalized during the preclinical protocol development
  - Medical and pre-clinical advisors will be utilized to ensure clinical relevance

Detection confirmation and verification of Tumor location and tissue depth:
  - Location verification and depth confirmation through independent method (e.g. ionizing radiation scan, and/or dissection, to be defined through milestone acceptance protocol with Ethicon pre-clinical experts)

13

**Technical Detection Success Criteria:**

Visualization System:
  - Prototype J&J/Ethicon Visualization system that incorporates the ChemImage Cancer Localization Functionality
  - Supports real-time detection of critical tissue structures
  - Real-Time detection results will be compared with Post-Processed detection results to
   provide assessment of improvement pathways

Detection Wavelengths:
  - Maximum number of detection wavelengths not to exceed 10
  - Characterize ability and tradeoffs to utilize between 1 and 10 detection wavelengths as it relates to device performance characteristics

Real-time upper boundary:
  - Visualize detection results within 100 milli-seconds on the scene

In-vivo model:
  - In-Vivo Model will be jointly defined & finalized during protocol development
  - Medical & Clinical/Pre-Clinical advisors will be utilized to ensure clinical relevance

Depth of Detection:
  - Demonstrate detection at 0 mm to 5 mm for all detection targets
  - Characterize detection capabilities at 5 mm to 10 mm for all detection targets

Laparoscope Characteristics:
  - Will be defined by the J&J Visualization System Project Team and delivered within prototype:
   Focus, working distance, field of view and spatial resolution

RGB/MCI operations:
  - Must allow user to operate under RGB light (and/or white light) while also detecting the Tumor using the ChemImage technology

Multi-target:
  - Must be able to demonstrate detection of multiple targets simultaneously using J&J
   visualization system (2 targets at minimum)
  - Characterize ability and tradeoffs to detect all Tumors in the scene
  - Characterize ability and tradeoffs to differentiate among different types of targets
  - Characterize ability and tradeoffs to implement "Set it and Forget it" mode (no need for user
   to provide additional target-specific inputs)

Cleaning:
  - Must have a cleaning protocol that will enable the visualization platform to meet the criteria
   for use in animals as a part of the milestone acceptance protocol

7. **Milestone 2c – Assemble the Technical and Business Case to obtain Cancer Localization Functionality Charter Approval.**

| Illustrative Pre-Charter Check List *To be finalized by project team as we approach the close of Milestone 1b* | Ethicon Role | ChemImage Role | JSC Role |
|---|---|---|---|
| Product Concepts & Value Proposition | Lead Creation | Support Creation | Review & Approve |
| Target Product Profile[2] | Lead Creation | Support Creation | Review & Approve |
| Market Research Overview | Lead Creation | Support Creation | Review & Approve |
| Design and Feasibility Summary | Co-Create | Co-Create | Review & Approve |
| IP Summary | Lead Creation | Support Creation | Review & Approve |
| Regulatory Strategy | Lead Creation<br>• Lead planning and execution of Pre-Submission Meeting with FDA prior to pursuing charter approval[3] | Support Creation<br>• Support Pre-Submission Meeting with FDA prior to pursuing charter approval[4] | Review & Approve |
| Manufacturing Assessment (COGS) | Lead Creation | Support Creation | Review & Approve |
| Financials | Lead Creation | Support Creation | Review & Approve |
| Risks & Assumptions & Dependencies | Lead Creation | Support Creation | Review & Approve |
| High Level Project Plan | Lead Creation | Support Creation | Review & Approve |
| Recommendations / Ask | Lead Creation | Support Creation | Review & Approve |

---

[3] The FDA Pre-Submission Meeting is likely to occur in parallel with the work for Milestones 2a & 2b

[4] The Target Product Profile detail may include but is not limited to: Opportunity Assessment & Business Proposal (Marketing), Product Design & Quality (R&D and Design Quality), Financial Analysis (Marketing and Finance), Market Execution (Marketing), Supply Chain & Quality (Operations, Purchasing, Quality), Regulatory Affairs (Regulatory), Market Strategy and Market Access (HEMA), Evidence Generation (Clinical Affairs), Medical Affairs/Safety (Med Affairs/Safety), Project Management & Project Risk (PM). CI to contribute to preparation and completeness of the document for charter

**<u>Exhibit C</u>**

**BUDGET**


The initial Budget of R&D expenses is listed in Section 1(a) of Exhibit B.

The Parties may update this Exhibit from time to time as necessary pursuant to Sections 2.4, 3.1.2 and 3.1.3 of this Agreement.

**Exhibit D**

**CI Core Software**

CI Core Software:

| No. | Suite (Version) | Software Tool (Version) |
|-----|-----------------|-------------------------|
| 1 | CI Spectral Suite | CI XPert (v.5.0.40.0) |
| 2 | CI Spectral Suite | CI Spectral Kitchen (v.1.2.30.0) |
| 3 | CI Spectral Suite | CI Spectral Chef (v.1.2.30.0) |
| 4 | CI Spectral Suite | CI MCI-E (v.1.2.30.0) |
| 5 | CI Spectral Suite | CI Conformal Training SW (v.1.2.30.0) |

<u>Third Party Software</u>:  The following is a complete list of all third party software, including free and open source software as well as proprietary third party code, that is delivered with or as part of the Core CI Software and Embedded Deliverable Software, once created:

| No. | Library | Version # | Capability Provided | Download Site | License Type and Link |
|-----|---------|-----------|---------------------|---------------|----------------------|
| 1 | **Apache Thrift** | 0.9.1.1 | Cross platform framework for code generation of service interfaces, service stacks, message types and serialization. | https://thrift.apache.org/download | Apache License 2.0 http://www.apache.org/licenses/LICENSE-2.0 |
| 2 | **ZeroMQ** | 3.0.12310.0 | Utilized by our custom service framework for its transport layer | https://zeromq.org/download/ | MIT/X11 http://zguide.zeromq.org/ |
| 3 | **OpenCV/EMGU** | 3.4.1.2976 | Open source image processing library used to perform common image processing tasks. EMGU is the .NET wrapper used | https://opencv.org/; http://www.emgu.com/wiki/index.php/Download_And_Installation | OpenCV: BSD 3-Clause License https://opencv.org/ EMGU Commercial License v. 4 http://www.emgu.com/wiki/files/Emgu.CV.Commercial.License.4.pdf |
| 4 | **Caliburn Micro** | 3.0.1.0 | The Model–view–viewmodel (MVVM) framework used for our Windows Presentation Foundation (WPF) applications | https://caliburnmicro.com/ | MIT License https://github.com/Caliburn-Micro/Caliburn.Micro/blob/master/License.txt |
| 5 | **Ninject** | 3.0.0.15 | Our dependency injection framework | http://www.ninject.org/download.html | Apache License 2.0 https://github.com/ninject/ninject1/blob/master/LICENSE.txt |
| 6 | **HDF5** | 1.8.9.0 | File format for creating portable, scalable datasets | https://www.hdfgroup.org/solutions/hdf5/ | HDF5 License https://support.hdfgroup.org/ftp/HDF5/releases/COPYING |
| 7 | **Accord** | 3.8.2 | Machine learning framework combined with audio and imaging processing libraries | http://accord-framework.net/ | GNU Lesser Public License 2.1 http://accord-framework.net/license.html |

**Exhibit E**

**PRESS RELEASE**

## *ChemImage Partners with Johnson & Johnson to Progress the Development of ChemImage Advanced Visualization Tools in Surgery*

- **Molecular chemical imaging experts and surgery experts pioneering the future of surgery together**

**PITTSBURGH, Pennsylvania, <insert date>** — ChemImage is a Pittsburgh-based molecular chemical imaging company working to solve important unmet needs in healthcare with breakthrough technology.  ChemImage has therefore entered into a partnership with Johnson & Johnson to progress the development of ChemImage proprietary visualization and Awareness of ThingsTM (AoT) technology for healthcare applications. ChemImage technology can provide clinicians with critical information and situational awareness about the in-vivo environment, with the goal of improving both efficiency of care and patient outcomes. "We are excited to enter into this agreement with Johnson & Johnson to leverage their expertise and leadership in elevating the standard of care by introducing solutions to help patients recover faster and live longer," stated Jeffrey Cohen, MD, President of ChemImage. "We believe our mission to make the world healthier and safer aligns directly with the Johnson & Johnson Credo of responsibility to provide value for all stakeholders including patients, doctors and nurses, employees, business partners, communities, and stockholders.  We are looking forward to a long and successful relationship."

**About ChemImage Corporation**

ChemImage Corporation is committed to making the world healthier and safer through dramatic advancements in chemical imaging technologies.  The company's proprietary, state-of-the-art chemical imaging sensors, algorithms and analysis software enable solutions to some of the world's most challenging health and safety issues.  With performance leading chemical imaging technology, ChemImage strives to provide people all over the world with an Awareness of Things™ (AoT™), giving a new level of situational awareness to people in their everyday lives. More information can be found at www.chemimage.com.

**Media Contact**
Veronica Rillo, Marketing Manager
Office: (412) 241-7335 x269
Mobile: (801) 656-7084
Email: rillov@chemimage.com

1

**Exhibit F**

**Company Calendar Quarters and Calendar Year**

| Calendar Quarter & Calendar Year | Date |
| --- | --- |
| 4Q19 / CY19 | 12/29/19 |
| 1Q20 | 3/29/20 |
| 2Q20 | 6/28/20 |
| 3Q20 | 9/27/20 |
| 4Q20 / CY20 | 1/3/21 |
| 1Q21 | 4/421 |
| 2Q21 | 7/4/21 |
| 3Q21 | 10/3/21 |
| 4Q21 / CY21 | 1/2/22 |
| 1Q22 | 4/3/22 |
| 2Q22 | 7/3/22 |
| 3Q22 | 10/2/22 |
| 4Q22 / CY22 | 1/1/23 |
| 1Q23 | 4/2/23 |
| 2Q23 | 7/2/23 |
| 3Q23 | 10/1/23 |
| 4Q23 / CY23 | 12/31/23 |

1

## **Exhibit G**

**ESCROW AGREEMENT**

PDF Attached



| Effective Date | |
|---|---|
| **Deposit Account Number** | |
| *Effective Date and Deposit Account Number to be supplied by Iron Mountain only. | |

## Three-Party Escrow Service Agreement

1. **Introduction**
   This Three Party Escrow Service Agreement (the "**Agreement**") is entered into by and between ChemImage Corporation (the "**Depositor**"), and by Ethicon Inc. (the "**Beneficiary**") and by Iron Mountain Intellectual Property Management, Inc. ("**Iron Mountain**"). Depositor, Beneficiary, and Iron Mountain may be referred to individually as a "**Party**" or collectively as the "**Parties**" throughout this Agreement.

   (a) The use of the term services in this Agreement shall refer to Iron Mountain services that facilitate the creation, management, and enforcement of software or other technology escrow accounts as described in Exhibit A attached to this Agreement ("**Services**"). A Party shall request Services under this Agreement by selecting such Service on Exhibit A upon execution of the Agreement or by submitting a work request for certain Iron Mountain Services ("**Work Request**") via written instruction or the online portal maintained at the website located at www.ironmountainconnect.com or other websites owned or controlled by Iron Mountain that are linked to that website (collectively the "**Iron Mountain Website**").

   (b) The Beneficiary and Depositor have, or will have, entered into a license agreement or other agreement ("**License Agreement**") conveying intellectual property rights to the Beneficiary, and the Parties intend this Agreement to be considered as supplementary to such agreement, pursuant to Title 11 United States [Bankruptcy] Code, Section 365(n).

2. **Depositor Responsibilities and Representations**
   (a) It shall be solely the Depositor's responsibility to: (i) make an initial deposit of all proprietary technology and other materials covered under this Agreement ("**Deposit Material**") to Iron Mountain within forty-five (45) days of the Effective Date; (ii) make any updates required pursuant to separate agreement between Beneficiary and Depositor to the Deposit Material during the Term (as defined below) of this Agreement; and (iii) ensure that a minimum of one (1) copy of Deposit Material is deposited with Iron Mountain at all times. At the time of each deposit or update, Depositor will provide an accurate and complete description of all Deposit Material sent to Iron Mountain using the form attached to this Agreement as Exhibit B.

   (b) Depositor represents that it lawfully possesses all Deposit Material provided to Iron Mountain under this Agreement and that any current or future Deposit Material liens or encumbrances will not prohibit, limit, or alter the rights and obligations of Iron Mountain under this Agreement. Depositor warrants that with respect to the Deposit Material, Iron Mountain's proper administration of this Agreement will not violate the rights of any third parties.

   (c) Depositor represents that all Deposit Material is readable and useable in its then current form; if any portion of such Deposit Material is encrypted, the necessary decryption tools and keys to read such material are deposited contemporaneously.

3. **Beneficiary Responsibilities and Representations**
   (a) Beneficiary acknowledges that, as between Iron Mountain and Beneficiary, Iron Mountain's obligation is to maintain the Deposit Material as delivered by the Depositor and that, other than Iron Mountain's inspection of the Deposit Material (as described in Section 4) and the performance of any of the optional verification Services listed in Exhibit A, Iron Mountain has no other obligation regarding the completeness, accuracy, or functionality of the Deposit Material.

   (b) It shall be solely the Beneficiary's responsibility to monitor whether a deposit or deposit update has been accepted by Iron Mountain.

4. **Iron Mountain Responsibilities and Representations**
   (a) Iron Mountain agrees to use commercially reasonable efforts to provide the Services requested by Authorized Person(s) (as identified in the "**Authorized Person(s)/Notices Table**" below) representing the Depositor or Beneficiary in a Work Request. Iron Mountain may reject a Work Request (in whole or in part) that does not contain all required information at any time upon notification to the Party originating the Work Request.

   (b) Iron Mountain will conduct a visual inspection upon receipt of any Deposit Material and associated Exhibit B. If Iron Mountain determines that the Deposit Material does not match the description provided by Depositor represented in Exhibit B, Iron Mountain will notify Depositor of such discrepancy.

(c) Iron Mountain will provide notice to the Beneficiary of all Deposit Material that is accepted and deposited into the escrow account under this Agreement. Either Depositor or Beneficiary may obtain information regarding deposits or deposit updates upon request or through the Iron Mountain Website.

(d) Iron Mountain will follow the provisions of Exhibit C attached to this Agreement in administering the release of Deposit Material.

(e) Iron Mountain will hold and protect Deposit Material in physical or electronic vaults that are either owned or under the control of Iron Mountain, unless otherwise agreed to by the Parties.

(f) Except for release of Deposit Material pursuant to Exhibit C, upon receipt of written instructions by both Depositor and Beneficiary, Iron Mountain will permit the replacement or removal of previously submitted Deposit Material. The Party making such request shall be responsible for getting the other Party to approve the joint instructions. Any Deposit Material that is removed from the deposit account will be either returned to Depositor or destroyed in accordance with Depositor's written instructions.

(g) Should transport of Deposit Material be necessary for Iron Mountain to perform Services requested by Depositor or Beneficiary under this Agreement or following the termination of this Agreement, Iron Mountain will use a commercially recognized overnight carrier such as Federal Express or United Parcel Service. Iron Mountain will not be responsible for any loss or destruction of, or damage to, such Deposit Material while in the custody of the common carrier.

5. **Deposit Material Verification**

(a) Beneficiary may submit a verification Work Request to Iron Mountain for one or more of the Services defined in Exhibit A attached to this Agreement and Depositor consents to Iron Mountain's performance of any level(s) of such Services. Upon request by Iron Mountain and in support of Beneficiary's request for verification Services, Depositor shall promptly complete and return an escrow deposit questionnaire and reasonably cooperate with Iron Mountain by providing reasonable access to its technical personnel whenever reasonably necessary.

(b) The Parties consent to Iron Mountain's use of a subcontractor to perform verification Services. Such subcontractor shall be bound by the same confidentiality obligations as Iron Mountain and shall not be a direct competitor to either Depositor or Beneficiary. Iron Mountain shall be responsible for the delivery of Services of any such subcontractor as if Iron Mountain had performed the Services. Depositor warrants and Beneficiary warrants that any material they respectively supply for verification Services is lawful, does not violate the rights of any third parties and is provided with all rights necessary for Iron Mountain to perform verification of the Deposit Material.

(c) Iron Mountain will work with a Party who submits any verification Work Request for Deposit Material covered under this Agreement to either fulfill any standard verification Services Work Request or develop a custom Statement of Work ("**SOW**"). Iron Mountain and the requesting Party will mutually agree in writing to an SOW on terms and conditions that include but are not limited to: description of Deposit Material to be tested; description of verification testing; requesting Party responsibilities; Iron Mountain responsibilities; Service Fees; invoice payment instructions; designation of the paying Party; designation of authorized SOW representatives for both the requesting Party and Iron Mountain with name and contact information; and description of any final deliverables prior to the start of any fulfillment activity. Provided that the requesting Party has identified in the verification Work Request or SOW that the Deposit Material is subject to the regulations of the International Traffic in Arms Regulations (22 CFR 120)(hereinafter "**ITAR**"), Iron Mountain shall ensure that any subcontractor who is granted access to the Deposit Material for the performance of verification Services shall be a U.S. Person as defined in 8 U.S.C. 1101(a)(20) or who is a protected person as defined in 8 U.S.C. 1324b(a)(3). After the start of fulfillment activity, each SOW may only be amended or modified in writing with the mutual agreement of both Parties, in accordance with the change control procedures set forth in the SOW. If the verification Services extend beyond those described in Exhibit A, the Depositor shall be a necessary Party to the SOW governing the Services.

6. **Payment**

The Party responsible for payment designated in the Paying Party Billing Contact Table ("**Paying Party**") shall pay to Iron Mountain all fees as set forth in the Work Request ("**Service Fees**"). All Service Fees are due within thirty (30) calendar days from the date of invoice in U.S. currency and are non-refundable. Iron Mountain may update Service Fees with a ninety (90) calendar day written notice to the Paying Party during the Term of this Agreement (as defined below). The Party is liable for any taxes (other than Iron Mountain income taxes) related to Services purchased under this Agreement or shall present to Iron Mountain an exemption certificate acceptable to the taxing authorities. Applicable taxes shall be billed as a separate item on the invoice. Any Service Fees not collected by Iron Mountain when due shall bear interest until paid at a rate of one percent (1%) per month (12% per annum) or the maximum rate permitted by law, whichever is less. Notwithstanding the non-performance of any obligations of Depositor to deliver Deposit Material under the License Agreement or this Agreement, Iron Mountain is entitled to be paid all Service Fees that accrue during the Term of this Agreement.

7. **Term and Termination**

(a) The term of this Agreement is for a period of one (1) year from the Effective Date ("**Initial Term**") and will automatically renew for additional one (1) year terms ("**Renewal Term**") (collectively the "**Term**"). This Agreement shall continue in full force and effect until one of the following events occur: (i) Depositor and Beneficiary provide Iron Mountain with sixty (60) days' prior written joint notice of their intent to terminate this Agreement; (ii) Beneficiary provides Iron Mountain

and Depositor with sixty (60) days' prior written notice of its intent to terminate this Agreement; (iii) the Agreement terminates under another provision of this Agreement; or (iv) any time after the Initial Term, Iron Mountain provides sixty (60) days' prior written notice to the Depositor and Beneficiary of Iron Mountain's intent to terminate this Agreement. The Effective Date and the Deposit Account Number shall be supplied by Iron Mountain only. The Effective Date supplied by Iron Mountain and specified above shall be the date Iron Mountain sets up the escrow account.

(b) Unless the express terms of this Agreement provide otherwise, upon termination of this Agreement, Iron Mountain shall return physical Deposit Material to the Depositor and erase electronically submitted Deposit Material. If reasonable attempts to return the physical Deposit Material to Depositor are unsuccessful, Iron Mountain shall destroy the Deposit Material.

(c) In the event of the nonpayment of undisputed Service Fees owed to Iron Mountain, Iron Mountain shall provide all Parties to this Agreement with written notice of Iron Mountain's intent to terminate this Agreement. Any Party to this Agreement shall have the right to make the payment to Iron Mountain to cure the default. If the past due payment is not received in full by Iron Mountain within thirty (30) calendar days of the date of such written notice, then Iron Mountain shall have the right to terminate this Agreement at any time thereafter by sending written notice to all Parties. Iron Mountain shall have no obligation to perform the Services under this Agreement (except those obligations that survive termination of this Agreement, which includes the confidentiality obligations in Section 10) so long as any undisputed Service Fees due Iron Mountain under this Agreement remain unpaid.

8. **Infringement Indemnification**

Anything in this Agreement to the contrary notwithstanding, Depositor at its own expense shall defend, indemnify and hold Iron Mountain fully harmless against any claim or action asserted against Iron Mountain (specifically including costs and reasonable attorneys' fees associated with any such claim or action) to the extent such claim or action is based on an assertion that Iron Mountain's administration of this Agreement infringes any patent, copyright, license or other proprietary right of any third party. When Iron Mountain has notice of a claim or action, it shall promptly notify Depositor in writing. Depositor may elect to control the defense of such claim or action or enter into a settlement agreement, provided that no such settlement or defense shall include any admission or implication of wrongdoing on the part of Iron Mountain without Iron Mountain's prior written consent, which consent shall not be unreasonably delayed or withheld. Iron Mountain shall have the right to employ separate counsel and participate in the defense of any claim at its own expense.

9. **Warranties**

IRON MOUNTAIN WARRANTS ANY AND ALL SERVICES PROVIDED HEREUNDER SHALL BE PERFORMED IN A COMMERCIALLY REASONABLE MANNER CONSISTENT WITH INDUSTRY STANDARDS. EXCEPT AS SPECIFIED IN THIS SECTION, ALL CONDITIONS, REPRESENTATIONS, AND WARRANTIES INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, SATISFACTORY QUALITY, OR ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE, ARE HEREBY EXCLUDED TO THE EXTENT ALLOWED BY APPLICABLE LAW. AN AGGRIEVED PARTY MUST NOTIFY IRON MOUNTAIN PROMPTLY UPON LEARNING OF ANY CLAIMED BREACH OF ANY WARRANTY AND, TO THE EXTENT ALLOWED BY APPLICABLE LAW, SUCH PARTY'S REMEDY FOR BREACH OF THIS WARRANTY SHALL BE SUBJECT TO THE LIMITATION OF LIABILITY AND CONSEQUENTIAL DAMAGES WAIVER IN THIS AGREEMENT. THIS DISCLAIMER AND EXCLUSION SHALL APPLY EVEN IF THE EXPRESS WARRANTY AND LIMITED REMEDY SET FORTH ABOVE FAILS OF ITS ESSENTIAL PURPOSE.

10. **Confidential Information**

Iron Mountain shall have the obligation to implement and maintain safeguards designed to protect the confidentiality of the Deposit Material and use at least the same degree of care to safeguard the confidentiality of the Deposit Material as it uses to protect its own confidential information, but in no event less than a reasonable degree of care. Except as provided in this Agreement Iron Mountain shall not use or disclose the Deposit Material. Iron Mountain shall not disclose the terms of this Agreement to any third party other than its financial, technical, or legal advisors, or its administrative support service providers. Any such third party shall be bound by the same confidentiality obligations as Iron Mountain. If Iron Mountain receives a subpoena or any other order from a court or other judicial tribunal pertaining to the disclosure or release of the Deposit Material, Iron Mountain will promptly notify the Parties to this Agreement unless prohibited by law. After notifying the Parties, Iron Mountain may comply in good faith with such order or subpoena. It shall be the responsibility of Depositor or Beneficiary to challenge any such order or subpoena; provided, however, that Iron Mountain does not waive its rights to present its position with respect to any such order or subpoena. Iron Mountain will cooperate with the Depositor or Beneficiary, as applicable, to support efforts to quash or limit any order or subpoena, at such Party's expense.

11. **Limitation of Liability**

EXCEPT FOR: (I) LIABILITY FOR DEATH OR BODILY INJURY; (II) PROVEN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; OR (III) THE INFRINGEMENT INDEMNIFICATION OBLIGATIONS OF SECTION 8, ALL OTHER LIABILITY RELATED TO THIS AGREEMENT, IF ANY, WHETHER ARISING IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, OF ANY PARTY TO THIS AGREEMENT SHALL BE LIMITED TO $100,000 (USD).

**12.** **Consequential Damages Waiver**

IN NO EVENT SHALL ANY PARTY TO THIS AGREEMENT BE LIABLE FOR ANY INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES, LOST PROFITS, ANY COSTS OR EXPENSES FOR THE PROCUREMENT OF SUBSTITUTE SERVICES (EXCLUDING SUBSTITUTE ESCROW SERVICES), OR ANY OTHER INDIRECT DAMAGES, WHETHER ARISING IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE EVEN IF THE POSSIBILITY THEREOF MAY BE KNOWN IN ADVANCE TO ONE OR MORE PARTIES.

**13.** **General**

(a) Purchase Orders. In the event that the Paying Party issues a purchase order or other instrument used to pay Service Fees to Iron Mountain, any terms and conditions set forth in the purchase order which constitute terms and conditions which are in addition to those set forth in this Agreement or which establish conflicting terms and conditions to those set forth in this Agreement are expressly rejected by Iron Mountain.

(b) Right to Make Copies. Iron Mountain shall have the right to make copies of all Deposit Material as reasonably necessary to perform the Services. Iron Mountain shall copy all copyright, nondisclosure, and other proprietary notices and titles contained on Deposit Material onto any copies made by Iron Mountain. Any copying expenses incurred by Iron Mountain as a result of a Work Request to copy will be borne by the requesting Party. Iron Mountain may request Depositor's reasonable cooperation in promptly copying Deposit Material in order for Iron Mountain to perform this Agreement.

(c) Choice of Law. The validity, interpretation, and performance of this Agreement shall be construed under the laws of the Commonwealth of Massachusetts, USA, without giving effect to the principles of conflicts of laws.

(d) Authorized Person(s). Depositor and Beneficiary must each authorize and designate one person whose actions will legally bind such Party ("**Authorized Person**" who shall be identified in the Authorized Person(s) Notices Table of this Agreement or such Party's legal representative) and who may manage the Iron Mountain escrow account through the Iron Mountain website or written instruction. Depositor and Beneficiary warrant that they shall maintain the accuracy of the name and contact information of their respective designated Authorized Person during the Term of this Agreement by providing Iron Mountain with a written request to update its records for the Party's respective Authorized Person which includes the updated information and applicable deposit account number(s).

(e) Right to Rely on Instructions. With respect to release of Deposit Material or the destruction of Deposit Material, Iron Mountain shall rely on instructions from a Party's Authorized Person. In all other cases, Iron Mountain may act in reliance upon any instruction, instrument, or signature reasonably believed by Iron Mountain to be genuine and from an Authorized Person, officer, or other employee of a Party. Iron Mountain may assume that such representative of a Party to this Agreement who gives any written notice, request, or instruction has the authority to do so. Iron Mountain will not be required to inquire into the truth of, or evaluate the merit of, any statement or representation contained in any notice or document reasonably believed to be from such representative.

(f) Force Majeure. No Party shall be liable for any delay or failure in performance due to events outside the defaulting Party's reasonable control, including without limitation acts of God, strikes, riots, war, acts of terrorism, fire, epidemics, or delays of common carriers or other circumstances beyond its reasonable control. The obligations and rights of the excused Party shall be extended on a day-to-day basis for the time period equal to the period of the excusable delay.

(g) Notices. Iron Mountain shall have the right to rely on the last known address provided by each the Depositor and Beneficiary for its respective Authorized Person and Billing Contact as set forth in this Agreement or as subsequently provided as an update to such address. All notices regarding Exhibit C (Release of Deposit Material) shall be sent by commercial express mail or other commercially appropriate means that provide prompt delivery and require proof of delivery. All other correspondence, including but not limited to invoices and payments, may be sent electronically or by regular mail. The Parties shall have the right to rely on the last known address of the other Parties. Any correctly addressed notice to the last known address of the other Parties, that is refused, unclaimed, or undeliverable shall be deemed effective as of the first date that said notice was refused, unclaimed, or deemed undeliverable by electronic mail, the postal authorities, or commercial express mail.

(h) No Waiver. No waiver of any right under this Agreement by any Party shall constitute a subsequent waiver of that or any other right under this Agreement.

(i) Assignment. No assignment of this Agreement by Depositor or Beneficiary or any rights or obligations of Depositor or Beneficiary under this Agreement is permitted without the written consent of Iron Mountain, which shall not be unreasonably withheld or delayed. Iron Mountain shall have no obligation in performing this Agreement to recognize any successor or assign of Depositor or Beneficiary unless Iron Mountain receives clear, authoritative and conclusive written evidence of the change of Parties.

(j) Severability. In the event any of the terms of this Agreement become or are declared to be illegal or otherwise unenforceable by any court of competent jurisdiction, such term(s) shall be null and void and shall be deemed deleted from this Agreement. All remaining terms of this Agreement shall remain in full force and effect.

(k) <u>Independent Contractor Relationship</u>.  Depositor and Beneficiary understand, acknowledge, and agree that Iron Mountain's relationship with Depositor and Beneficiary will be that of an independent contractor and that nothing in this Agreement is intended to or should be construed to create a partnership, joint venture, or employment relationship.

(l) <u>Attorneys' Fees</u>.  Any costs and fees incurred by Iron Mountain in the performance of obligations imposed upon Iron Mountain solely by virtue of its role as escrow service provider including, without limitation, compliance with subpoenas, court orders, discovery requests, and disputes arising solely between Depositor and Beneficiary, including, but not limited to, disputes concerning a release of the Deposit Material shall, unless adjudged otherwise, be divided equally and paid by Depositor and Beneficiary.

(m) <u>No Agency</u>.  No Party has the right or authority to, and shall not, assume or create any obligation of any nature whatsoever on behalf of the other Parties or bind the other Parties in any respect whatsoever.

(n) <u>Disputes</u>.  Any dispute, difference or question arising among any of the Parties concerning the construction, meaning, effect or implementation of this Agreement or the rights or obligations of any Party will be submitted to, and settled by arbitration by a single arbitrator chosen by the corresponding Regional Office of the American Arbitration Association in accordance with the Commercial Rules of the American Arbitration Association.  The Parties shall submit briefs of no more than 10 pages and the arbitration hearing shall be limited to two (2) days maximum.  Arbitration will take place in Boston, Massachusetts, USA.  Any court having jurisdiction over the matter may enter judgment on the award of the arbitrator.  Service of a petition to confirm the arbitration award may be made by regular mail or by commercial express mail, to the attorney for the Party or, if unrepresented, to the Party at the last known business address.

(o) <u>Interpleader</u>.  Anything to the contrary notwithstanding, in the event of any dispute regarding the interpretation of this Agreement, or the rights and obligations with respect to the Deposit Material in escrow or the propriety of any action contemplated by Iron Mountain hereunder, then Iron Mountain may, in its sole discretion, file an interpleader or similar action in any court of competent jurisdiction to resolve any such dispute.

(p) <u>Regulations</u>.  Depositor and Beneficiary each represent and covenant that upon the Effective Date of this Agreement and throughout the term of this Agreement, that: (i) it is not identified on any restricted party lists; or located in countries identified on any restricted country lists; or using the Deposit Material or the Services for any restricted end uses; including those promulgated by the U.S. Departments of State, Commerce and Treasury; (ii) it is and shall remain compliant with all laws and regulations applicable to its performance under this Agreement, including, but not limited to ITAR, any export control and economic sanctions or government regulations of any country from or to which the Deposit Material may be delivered in accordance with the provisions of this Agreement; and (iii) it will not take any action that will cause Iron Mountain to be in violation of such laws and regulations, and will not require Iron Mountain to directly or indirectly take any action that might cause it to be in violation of such laws and regulations.  Depositor will not provide Iron Mountain with Deposit Material that is subject to export controls and controlled at a level other than EAR99/AT.  With respect to Deposit Material containing personal information and data, Depositor agrees to (i) procure all necessary consents in relation to personal information and data; and (ii) otherwise comply with all applicable privacy and data protection laws as they relate to the subject matter of this Agreement.  Iron Mountain is responsible for and warrants, to the extent of their individual actions or omissions, compliance with all applicable laws, rules and regulations to the extent that it is directly regulated by the law, rule or regulation and to the extent that it knows or has been advised that, as a result of this Agreement, its activities are subject to the law, rule or regulation.

(q) <u>No Third Party Rights</u>.  This Agreement is made solely for the benefit of the Parties to this Agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this Agreement unless otherwise agreed to by all of the Parties.

(r) <u>Entire Agreement</u>.  The Parties agree that this Agreement, which includes all attached Exhibits and all valid Work Requests and SOWs submitted by the Parties, is the complete agreement between the Parties concerning the subject matter of this Agreement and replaces any prior or contemporaneous oral or written communications between the Parties.  There are no conditions, understandings, agreements, representations, or warranties, expressed or implied, which are not specified in this Agreement.  Each of the Parties warrant that the execution, delivery, and performance of this Agreement has been duly authorized and signed by a person who meets statutory or other binding approval to sign on behalf of its organization as named in this Agreement.  This Agreement may be modified only by mutual written agreement of all the Parties.

(s) <u>Counterparts</u>.  This Agreement may be executed electronically in accordance with applicable law or in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

(t) <u>Survival</u>.  Sections 7 (Term and Termination), 8 (Infringement Indemnification), 9 (Warranties), 10 (Confidential Information), 11 (Limitation of Liability), 12 (Consequential Damages Waiver), and 13 (General) of this Agreement shall survive termination of this Agreement or any Exhibit attached to this Agreement.

(BALANCE OF THIS PAGE LEFT INTENTIONALLY BLANK – SIGNATURE PAGE FOLLOWS)

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the Effective Date by their authorized representatives:

| | DEPOSITOR | | BENEFICIARY |
|---|---|---|---|
| Signature | | Signature | |
| Print Name | Jeffrey Cohen | Print Name | Noam Krantz |
| Title | President | Title | WW VP, Business Development |
| Date | 12/27/19 | Date | 12/27/19 |

| IRON MOUNTAIN INTELLECTUAL PROPERTY MANAGEMENT, INC. | |
|---|---|
| Signature | |
| Print Name | John Boruvka |
| Title | Vice President, Sales |
| Date | December 27, 2019 \| 17:32 PST |

(BALANCE OF THIS PAGE LEFT INTENTIONALLY BLANK — NOTICES TABLES AND EXHIBITS FOLLOW)

Approved as to IPM Operational Content:
Iron Mountain IPM Service Delivery
On behalf of Melba Thomas

Name: Roshonda Sutton, Contracts Specialist
Date: December 26, 2019

| Authorized Person Notices Table | | | |
|---|---|---|---|
| Please provide the names and contact information of the Authorized Persons under this Agreement.  Please complete all information as applicable.  Incomplete information may result in a delay of processing. | | | |
| **DEPOSITOR (Required information)** | | **BENEFICIARY (Required information)** | |
| **Company Name** | ChemImage Corporation | **Company Name** | Ethicon Inc. |
| **Print Name** | John Belechak | **Print Name** | Paul Ritchie |
| **Title** | COO | **Title** | Director, R&D Pipeline |
| **Email Address** | belechak@chemimage.com | **Email Address** | pritchie@its.jnj.com |
| **Street Address** | 7235 Penn Ave., Ste. 200 | **Street Address** | 4545 Creek Rd. (ML23) |
| **City** | Pittsburgh | **City** | Cincinatti |
| **State/Province** | PA | **State/Province** | OH |
| **Postal/Zip Code** | 15208 | **Postal/Zip Code** | 45242 |
| **Country** | USA | **Country** | USA |
| **Phone Number** | 412-241-7335 | **Phone Number** | 513-337-8454 |

| Paying Party Billing Contact Information Table (Required information) | |
|---|---|
| Please provide the name and contact information of the Billing Contact for the Paying Party under this Agreement.  All Invoices will be sent to this individual at the address set forth below. Incomplete information may result in a delay of processing. | |
| **Company Name** | Ethicon Inc. |
| **Print Name** | Quinton Noe |
| **Title** | Sr. Financial Analyst |
| **Email Address** | qnoe@its.jnj.com |
| **Street Address** | 4545 Creek Rd. |
| **City** | Cincinatti |
| **State/Province** | OH |
| **Postal/Zip Code** | 45242 |
| **Country** | USA |
| **Phone Number** | 513-337-8099 |
| **Fax Number** | n/a |
| **Purchase Order #** | |

**IRON MOUNTAIN INTELLECTUAL PROPERTY MANAGEMENT, INC.**

All notices should be sent to ipmclientservices@ironmountain.com OR Iron Mountain Intellectual Property Management, Inc., Attn: Client Services, 6111 Live Oak Parkway, Norcross, Georgia, 30093, USA.  Telephone: 800-875-5669.  Facsimile: 770-239-9201

**Exhibit A**
**Escrow Services Fee Schedule – Work Request**

| Deposit Account Number | |
|---|---|

| Service | Service Description - Three-Party Escrow Service Agreement<br>All services are listed below. Check the requested service and submit a Work Request to Iron Mountain for services requested after agreement signature. | One-Time/Per Service Fees | Annual Fees |
|---|---|---|---|
| ☒ Setup Fee (Required at Setup) | One-time Setup Fee for Iron Mountain to setup a standard Three-Party Escrow Service Agreement. | $2,700 | |
| ☒ Deposit Account Fee (Required at Setup) | Iron Mountain will set up one deposit account to manage and administrate access to Deposit Material to be secured in a controlled storage environment. Iron Mountain will provide account services that include unlimited deposits, electronic vaulting, access to Iron Mountain Connect™ Escrow Management Center for secure online account management, submission of electronic Work Requests, and communication of status. Release of deposit material is also included in the annual fee. An oversize fee of $200 USD per 1.2 cubic foot will be charged for deposits that exceed 2.4 cubic feet. | | $1,200 |
| ☒ Beneficiary Fee (Required at Setup) | Iron Mountain will fulfill a Work Request to add a Beneficiary to an escrow deposit account and manage account access rights. Beneficiary will have access to Iron Mountain Connect™ Escrow Management Center for secure online account management, submission of electronic Work Requests, and communication of status. | | $950 |
| ☐ File List Test | Iron Mountain will perform one (1) File List Test, which includes a Deposit Material media readability analysis, a file listing, a file classification table, virus scan outputs, and confirmation of the presence or absence of a completed escrow deposit questionnaire. A final report will be sent to the requesting Party regarding the Deposit Material. The deposit must be provided on CD, DVD-R, or deposited electronically. If, through no fault of Iron Mountain, testing cannot be completed within twelve (12) months of being ordered, Iron Mountain will issue a final failed test report identifying the reason for the failure and the testing shall be considered completed. | $3,000 | N/A |
| ☐ Level 1 Inventory and Analysis Test | Iron Mountain will perform one (1) Inventory and Analysis Test on the specified deposit, which includes the outputs of the File List Test, identifying the presence/absence of build, setup and design documentation (including the presence or absence of a completed escrow deposit questionnaire), and identifying materials required to recreate the Depositor's application development and production environments. Output includes a report that includes compile and setup documentation, file classification tables and file listings. The report will list required software development materials, including, without limitation, required source code languages and compilers, third-party software, libraries, operating systems, and hardware, and Iron Mountain's analysis of the deposit. A final report will be sent to the requesting Party regarding the Deposit Material. If, through no fault of Iron Mountain, testing cannot be completed within twelve (12) months of being ordered, Iron Mountain will issue a final failed test report identifying the reason for the failure and the testing shall be considered completed. | $6,000 or based on SOW if custom work required | N/A |
| ☐ Dual Vaulting | Iron Mountain will store and manage a redundant copy of the Deposit Material in one (1) additional location. All Deposit Material (original and copy) must be provided by the Depositor. | N/A | $800 |
| ☐ Remote Vaulting | Iron Mountain will store and manage the Deposit Material in a remote location, designated by the client, outside of Iron Mountain's primary escrow vaulting location. All Deposit Material (original and copy) must be provided by the Depositor. | N/A | $800 |
| ☐ Custom Contract Fee | Custom contract changes to Iron Mountain templates are subject to the Custom Contract Fee, which covers the review and processing of custom or modified contracts. [Not Applicable] | $950 | N/A |
| **Additional Verification Services (Fees based on Statement of Work)** | | | |
| Level 2 Deposit Compile Test | Iron Mountain will fulfill a Statement of Work (SOW) to perform a Deposit Compile Test, which includes the outputs of the Level 1 - Inventory and Analysis Test, plus recreating the Depositor's software development environment, compiling source files and modules, linking libraries and recreating executable code, providing a pass/fail determination, and creation of comprehensive compilation documentation with a final report sent to the Paying Party regarding the Deposit Material. The requesting Party and Iron Mountain will agree on a custom SOW prior to the start of fulfillment. A completed escrow deposit questionnaire is required for execution of this test. | | |
| Level 3 Binary Comparison Test | Iron Mountain will fulfill a Statement of Work (SOW) to perform one Binary Comparison Test - Binary Comparison, which includes the outputs of the Level 2 test, a comparison of the executable files built from the Deposit Compile Test to the actual executable files in use by the Beneficiary to ensure a full binary-level match, with a final report sent to the Requesting Party regarding the Deposit Material. The Paying Party and Iron Mountain will agree on a custom SOW prior to the start of fulfillment. A completed escrow deposit questionnaire is required for execution of this test. | | |
| Level 4 Full Usability Test | Iron Mountain will fulfill a Statement of Work (SOW) to perform one Deposit Usability Test - Full Usability, which includes which includes the outputs of the Level 1 and Level 2 tests (if applicable). Iron Mountain will confirm that the deposited application can be setup, installed and configured and, when installed, will execute functional tests, based on pre-determined test scripts provided by the Parties, and create comprehensive setup and installation documentation. A final report will be sent to the Paying Party regarding the Deposit Material. The Paying Party and Iron Mountain will agree on a custom SOW prior to the start of fulfillment. A completed escrow deposit questionnaire is required for execution of this test. | | |

(REMAINDER OF PAGE LEFT INTENTIONALLY BLANK – PAYING PARTY SIGNATURE PAGE FOLLOWS)

Pursuant to the Agreement, the undersigned hereby issues this Work Request for performance of the Service(s) selected above.

| Paying Party – For Future Work Request Use Only | |
| --- | --- |
| **Paying Party Name** | Ethicon, Inc. |
| **Signature** | |
| **Print Name** | Noam Krantz |
| **Title** | WW VP, Business Development |
| **Date** | 12/27/19 |

**IRON MOUNTAIN INTELLECTUAL PROPERTY MANAGEMENT, INC.**
All Work Requests should be sent to ipmclientservices@ironmountain.com OR Iron Mountain Intellectual Property Management, Inc., Attn: Client Services, 6111 Live Oak Parkway, Norcross, Georgia, 30093, USA. Telephone: 800-875-5669. Facsimile: 770-239-9201

## Exhibit B
### Deposit Material Description
### (This document must accompany each submission of Deposit Material)

| Company Name | | Deposit Account Number | |
|---|---|---|---|
| Deposit Name | | Deposit Version | |

(Deposit Name will appear in account history reports)

**Deposit Media**
(Please Label All Media with the Deposit Name Provided Above)

| Media Type | Quantity | Media Type | Quantity |
|---|---|---|---|
| ☐ CD-ROM / DVD | | ☐ USB Drive | |
| ☐ DLT Tape | | ☐ Documentation | |
| ☐ DAT Tape(4mm/8mm) | | ☐ Hard Drive / CPU | |
| ☐ LTO Tape | | ☐ Circuit Board | |
| ☐ Other (please describe): | | | |
| | | | |
| | | | |

| | Total Size of Transmission (specify in bytes) | # of Files | # of Folders |
|---|---|---|---|
| ☐ Electronic Deposit | | | |

**Deposit Encryption**
(Please check either "Yes" or "No" below and complete as appropriate)
Is the media or are any of the files encrypted? ☐ Yes or ☐ No
If yes, please include any passwords and decryption tools description below. Please also deposit all necessary encryption software with this deposit. Depositor at its option may submit passwords on a separate Exhibit B.

| Encryption tool name | | Version | |
|---|---|---|---|
| Hardware required | | | |
| Software required | | | |
| Other required information | | | |

**Deposit Certification** (Please check the box below to certify and provide your contact information)

| ☐ I certify for Depositor that the above described Deposit Material has been transmitted electronically or sent via commercial express mail carrier to Iron Mountain at the address below. | | ☐ Iron Mountain has inspected and accepted the above described Deposit Material either electronically or physically. Iron Mountain will notify Depositor of any discrepancies. | |
|---|---|---|---|
| Print Name | | Name | |
| Date | | Date | |
| Email Address | | | |
| Telephone Number | | | |

**Note: If Depositor is physically sending Deposit Material to Iron Mountain, please label all media and mail all Deposit Material with the appropriate Exhibit B via commercial express carrier to the following address:**

Iron Mountain Intellectual Property Management, Inc.
Attn: Vault Administration
6111 Live Oak Parkway
Norcross, GA 30093
Telephone: 800-875-5669
Facsimile: 770-239-9201

## Exhibit C
### Release of Deposit Material

| Deposit Account Number | |
|---|---|

Iron Mountain will use the following procedures to process any Beneficiary Work Request to release Deposit Material. All notices under this Exhibit C shall be sent pursuant to the terms of Section 13(g) Notices.

1. **Release Conditions.**
   Depositor and Beneficiary agree that a Work Request for the release of the Deposit Material shall be based solely on one or more of the following conditions (defined as "**Release Conditions**"):

   (i)   Depositor's material breach of this Agreement, the License Agreement or other agreement between the Depositor and Beneficiary regulating the use of the Deposit Material covered under this Agreement where such breach continues uncured for a period of thirty (30) days following written notice thereof provided by Beneficiary to Depositor, provided however, if such breach is not reasonably capable of being cured within such 30-day period, it shall not constitute a Release Condition for so long as Depositor commences cure of the breach within such 30-day period and thereafter diligently prosecutes such cure to completion; or

   (ii)  Failure of the Depositor to function as a going concern or operate in the ordinary course; or

   (iii) Depositor is subject to voluntary or involuntary bankruptcy, dissolution, or liquidation, provided that the Beneficary may not use any bankruptcy, dissolution, or liquidation by Depositor as a basis for a release of the Escrow Deposits under this paragraph if such bankruptcy, dissolution, or liquidation is caused by Beneficary's failure to timely pay undisputed amounts owed under the License Agreement; or

   (iv)  As provided for in Section 5.6.2 of the License Agreement, in the event Depositor, in bad faith, deadlocks the JSC with respect to approving requested Software Upgrades (as defined in the License Agreement) or in the event Depositor notifies the JSC that it cannot or will not perform a necessary Software Upgrades.

2. **Release Work Request.**
   A Beneficiary may submit a Work Request to Iron Mountain to release the Deposit Material covered under this Agreement. To the extent that the Deposit Material is subject to applicable U.S. export control regulations and laws, including ITAR, the Beneficiary Work Request to release the Deposit Material must include Beneficiary's certification that such release would be compliant with the applicable U.S. export control regulations and laws, including ITAR. Iron Mountain will send a written notice of this Beneficiary Work Request within five (5) business days to the Depositor's Authorized Person.

3. **Contrary Instructions.**
   From the date Iron Mountain mails written notice of the Beneficiary Work Request to release Deposit Material covered under this Agreement, Depositor's Authorized Person shall have ten (10) business days to deliver to Iron Mountain contrary instructions. Contrary instructions shall mean the written representation by Depositor that a Release Condition has not occurred or has been cured (**"Contrary Instructions"**). Contrary Instructions shall be on company letterhead and signed by a Depositor Authorized Person. Upon receipt of Contrary Instructions, Iron Mountain shall promptly send a copy to Beneficiary's Authorized Person. Additionally, Iron Mountain shall notify both Depositor and Beneficiary Authorized Persons that there is a dispute to be resolved pursuant to the Disputes provisions of this Agreement. Iron Mountain will continue to store Deposit Material without release pending (i) instructions from Depositor to release the Deposit Material to Beneficiary; or (ii) dispute resolution pursuant to the Disputes provisions of this Agreement; or (iii) withdrawal of Contrary Instructions from Depositor's Authorized Person or legal representative; or (iv) receipt of an order from a court of competent jurisdiction. The existence of a Release Condition dispute shall not relieve the Paying Party from payment of applicable Service Fees.

4. **Release of Deposit Material.**
   If Iron Mountain does not receive timely Contrary Instructions from a Depositor Authorized Person or receives written instructions directly from Depositor's Authorized Person to release a copy of the Deposit Material to the Beneficiary, Iron Mountain is authorized to release Deposit Material to the Beneficiary. Iron Mountain is entitled to receive any undisputed, unpaid Service Fees due Iron Mountain from the Parties before fulfilling the Work Request to release Deposit Material covered under this Agreement. Any Party may cure a default of payment of Service Fees.

5. **Termination of Agreement Upon Release.**
   This Agreement will terminate upon the release of Deposit Material held by Iron Mountain.

6. **Right to Use Following Release.**
   Beneficiary has the right under this Agreement to use the Deposit Material for the sole purpose of continuing the benefits afforded to Beneficiary by the License Agreement. Notwithstanding, the Beneficiary shall not have access to the Deposit Material unless there is a release of the Deposit Material in accordance with this Agreement. Beneficiary shall be obligated to maintain the confidentiality of the released Deposit Material.

## Exhibit H

## TECHNICAL SUPPORT SCHEDULE

This Technical Support Schedule sets forth the details of the Technical Support relationship between CI and the Company, pursuant to which CI (for purposes of this Schedule, the "Supplier") shall provide Technical Support for any Software included in any Deliverable, including without limitation CI Embedded Software, CI Developed EndoVere IP or CI Developed Lightsphere IP, to the extent such Software is incorporated into the Licensed Products (such Software, for purposes of this Schedule, the "Product"):

1.    **DEFINITIONS.** As used in this Technical Support Schedule, the following capitalized terms have the meanings set forth in this Section 1 (Definitions). Any capitalized terms used but not defined in this Technical Support Schedule will have the meanings ascribed thereto in the Agreement.

    1.1    **"Error"** means a Severity Level 1 Error, a Severity Level 2 Error, a Severity Level 3 Error or a Severity Level 4 Error.

    1.2    **"Permanent Correction"** means a resolution to an Error that completely and permanently remedies such Error and causes the Product to operate free from any other Error and without any degradation of performance or loss of functionality.

    1.3    **"Severity Level 1 Error"** means any Error that renders a Product or any portion thereof inoperative, or so impairs its operation as to have critical or catastrophic impact to Company's use of the Product. Examples of Severity Level 1 Errors include without limitation, situations in which a Product is down and causing Company to experience a total loss of service, continuous or frequent instabilities, loss of connectivity or inability to communicate as intended, inability to process transactions, failure of a Product to comply with any Applicable Laws, creation of a hazard or emergency, or inability to deploy a primary feature or function of the Product.

    1.4    **"Severity Level 2 Error"** means any Error that substantially impairs the use of one or more portions, features or functions of a Product. Examples of Severity Level 2 Errors include without limitation, situations in which an Error is causing intermittent impact to Company, loss of redundancy, loss of routine administrative or diagnostic capability, or inability to deploy a secondary feature or function of the Product.

    1.5    **"Severity Level 3 Error"** means any Error that has a minimal impact on the performance or operation of a Product. An example of a Severity Level 3 Error includes without limitation, an Error having only a minimal adverse impact on Company.

1.6    **"Severity Level 4 Error"** means any Error that has no impact on the performance, operation, or use of a Product by Company. An example of a Severity Level 4 Error includes without limitation, misspelled error messages and Documentation errors not requiring a rapid turnaround.

1.7    **"Work Around"** means a resolution, fix, or work-around to an Error that (i) remedies or circumvents such Error on a temporary basis pending a Permanent Correction, (ii) causes the Product to operate free from any other Error and without any loss of functionality or material degradation of performance and (iii) is reasonably acceptable to Company. Without limitation, a Work Around may consist of specific administrative steps, alternative programming or a temporary patch to Software that circumvents the Error.

2.    **<u>DELETED.</u>**

3.    **<u>TECHNICAL SUPPORT.</u>** In consideration of the Software Maintenance Fee, Supplier shall provide Company the following Technical Support Services:

3.1    **Error Notification and Classification**. When reporting an Error to Supplier, Company shall identify the Error as a Severity Level 1, 2, 3 or 4 Error based on Company's initial evaluation thereof. If Supplier becomes aware of an Error, Supplier shall, in accordance with the Initial Response timeframe set forth in Section 3.2 (Error Response and Resolution) of this Technical Support Schedule, notify Company in such manner as Company may designate from time to time and identify the Error as a Severity Level 1, 2, 3 or 4 Error based on Supplier's initial evaluation. Supplier and Company shall cooperate in good faith to jointly determine whether an Error is a Severity Level 1, 2, 3 or 4 Error; provided, however, that if Supplier and Company cannot come to a joint determination despite such good faith efforts, Company's determination, in its reasonable discretion, will control. Company may report to Supplier any Severity Level 1 or 2 Error 24 hours per day, seven days per week, and any Severity Level 3 or 4 Error during Supplier's normal business hours.

3.2    **Error Response and Resolution**.  Upon notification by Company of an Error or upon Supplier otherwise becoming aware of an Error, Supplier shall immediately commence and diligently pursue the correction thereof, at all times employing at least the level of effort (**"Level of Effort"**) designated in the chart set forth below in this Section 3.2 (the **"Technical Support Chart"**) and in all instances providing an initial response (the **"Initial Response"**), Work Around and Permanent Correction to Company within the timeframes set forth in the Technical Support Chart, as measured from the earlier of the time that Company notifies Supplier or Supplier first becomes aware of an Error. The Initial Response from Supplier shall include, as applicable (i) Supplier's acknowledgment or notification to Company of such Error, (ii) Supplier's classification of such Error as either a Severity Level 1, 2, 3 or 4 Error in accordance with Section 3.1 (Error Notification and Classification) of this Technical Support Schedule, and if such classification differs

4

from that of Company, the reasons therefor, and (iii) Supplier's specific action plan for addressing and resolving the Error, including a good faith estimate on the length of time required for Supplier to provide a Work Around and Permanent Correction. In addition, Supplier shall provide Company with updates to the status of Supplier's efforts (the **"Status Updates"**) by telephone, email or such other means as may be reasonably designated by Company from time to time, no less frequently than the timeframes identified in the Technical Support Chart immediately below.

| Severity Level | Level of Effort | Initial Response | Work Around | Permanent Correction | Status Updates |
|---|---|---|---|---|---|
| 1 | Commercially Reasonable Efforts, 24 hours per day, seven days per week | Immediate, but in no event to exceed 30 minutes | Six hours | Three calendar days | Every three hours prior to a Work Around and every calendar day thereafter |
| 2 | Commercially Reasonable Efforts, 24 hours per day, seven days per week | One hour | 24 hours | Five calendar days | Every six hours prior to a Work Around and every calendar day thereafter |
| 3 | Commercially Reasonable Efforts, during normal business hours | One Business Day | 10 Business Days | 20 Business Days | Every two Business Days prior to a Work Around and every five Business Days thereafter |
| 4 | Commercially Reasonable Efforts, during normal business hours | Five Business Days | 20 Business Days | Next Update | Every five Business Days prior to a Work Around |

3.3 **Technical Support**. Supplier shall establish and maintain the organization and processes necessary to provide telephone, email, web-based and facsimile based technical support, troubleshooting, Error identification, isolation and remediation, and other assistance directly to Company to support Company's use, deployment and validation of the Products every Business Day from 7:00 a.m. to 7:00 p.m. local time, and after normal business hours and on holidays, as necessary to support Supplier's obligations under this Technical Support Schedule, with escalation through the following lines of support:

(a) **Support Level 1 – Error Verification**. Supplier's general technical support staff (i) responds to and logs problems, inquiries or other Errors

5

concerning the performance, functionality or operation of the Product, including installation and configuration, and (ii) if possible, provides Error identification, diagnosis, analysis and resolution.

(b) **Support Level 2 – Error Determination**. Supplier's specialist-level technical support staff provides diagnosis of problems, performance deficiencies or other Errors in the Product through Error isolation and replication, lab simulation, interoperability testing and remote diagnostics, and if possible, implements a Work Around or Permanent Correction.

(c) **Support Level 3 – Error Resolution**. Supplier's senior-level technical support staff performs troubleshooting and problem/Error isolation and implements a Work Around or Permanent Solution. In the case of an Error, Supplier's senior-level technical support will identify the source, create a reproducible test, document the details of the Error and develop a Work Around or Permanent Correction.

(d) **Support Level 4 – Backup Engineering and Technical Support**. If previous support levels have failed, Supplier's backup engineering and technical support staff isolates a problem or Error and implements a Work Around or Permanent Correction.

3.4 **Remote Diagnosis**. Solely for the purpose of enabling Supplier to provide Technical Support for Products hereunder, Company may from time to time, in its sole discretion, allow Supplier remote or electronic access to the Products, Licensed Products or Company's systems either via a dial-up connection, VPN or other electronic means designated by Company; provided, however, that Supplier, in connection with any such access, shall (i) comply with all Company's requirements and policies (including without limitation, as set forth in Sections 6 (Confidential Information) and Exhibit I (Data Safeguards) of the Agreement) and (ii) limit any access to Company's systems to such areas and to such information as is necessary for Supplier to perform Technical Support. Moreover, Company expressly reserves the right to immediately terminate such remote access, without advance notice to Supplier, if Company determines, in its sole discretion, that such access poses an undue security or compliance risk.

3.5 **On-Site Technical Support**. If a Severity Level 1 or 2 Error cannot be resolved remotely within 24 hours or 48 hours, respectively, or if Supplier determines that the resolution of an Error requires the replacement of or changes to Hardware, Supplier will dispatch a senior level technician to the affected Designated Locations at no additional cost to Company. Any Supplier-dispatched technician shall comply with all Company's and its customers' requirements and policies (including without limitation, as set forth in Section 6 (Confidential Information) and Exhibit I (Data Safeguards) of the Agreement).

3.6 **Software Updates and Upgrades**. Supplier shall provide all Software Updates free of charge. Supplier shall provide Company all Software Upgrades pursuant to the terms and conditions in the Agreement. Supplier shall provide Technical Support for all Software Updates and, if applicable, Software Upgrades, pursuant to the Agreement and this Technical Support Schedule.

3.7 **Documentation Updates**. Supplier shall provide Company with updates, in both print and electronic form, for all Documentation (i) as necessary in connection with any Software Updates or Software Upgrades, and (iii) as otherwise required in connection with the resolution of any Error.

3.8 **Cooperation with Company's Other Suppliers**. Supplier shall assist Company in investigating, diagnosing and resolving any problems between the Products and any other software or hardware related to or used in connection with the Products.

3.9 **Form of Delivery of Software Updates and Software Upgrades**. Unless otherwise requested by Company, Supplier shall deliver all Software Updates and Software Upgrades to Company in electronic form such that no tangible media passes to Company.

4. <u>**SOFTWARE MAINTENANCE FEE.**</u> In consideration of all Technical Support provided to Company by Supplier, Company shall pay Supplier the Software Maintenance Fee set forth in Section 5.6.1 of the Agreement.

5. <u>**MANAGEMENT ESCALATION PROCESS.**</u> Supplier shall internally escalate the management of its Error correction process to that level of management set forth in the below table and make such managers available to Company for Status Updates and other communications as reasonably requested by Company, but in any event within the timeframes set forth in the table immediately below.

| Supplier Responsible Party | Severity Level 1 Error | Severity Level 2 Error | Severity Level 3 Error | Severity Level 4 Error |
|---|---|---|---|---|
| [Director, Technical Support] | Immediate | Immediate | Five Business Days | 10 Business Days |
| [Director, Customer Service] | One hour | Four hours | 10 Business Days | 30 Business Days |
| [Vice President, Customer Service] | Four hours | 12 hours | 20 Business Days | 60 Business Days |
| [Vice President, Engineering and Sales] | 12 hours | 24 hours | 30 Business Days | |
| [Executive Vice President, Operations and Field Operations] | 24 hours | 48 hours | | |

## Exhibit I

## DATA SAFEGUARDS

For purposes of this Exhibit I, the term "Supplier" means CI and the term "Buyer" means Company.

1. If Supplier possesses, accesses or processes any Buyer information that is not publicly available, has access to any Buyer information or to Buyer's computing resources using Supplier's computing and network resources over a network-to-network connection, or hosts any Buyer information on a Supplier-hosted, Internet-facing website or web application, it shall maintain an information security program that encompasses administrative, technical, and physical safeguards that meet or exceed the requirements specified in the then-current SISR (as defined in Section 6 of this Exhibit) and applicable industry standards to protect against threats to the unauthorized or accidental destruction, loss, alteration, or use of such Buyer information, and/or unauthorized disclosure or access thereof.

2. If Supplier uses a computing resource to access the Internet to view or input Buyer information that is not publicly available, provided that Supplier does not electronically or physically retain any non-public Buyer information subsequent to such access, Supplier's obligation with respect thereto shall be limited to meeting or exceeding the Internet Access-Only Requirements specified in the then-current SISR and any applicable industry standards reasonably intended to protect against threats to the unauthorized or accidental destruction, loss, alteration, or use of such non-public Buyer information, and the unauthorized disclosure or access thereof.

3. Supplier personnel who are provided ongoing access to Buyer's facilities and/or network and computing resources shall abide by all applicable Acceptable Use policies and complete the information security training approved by Buyer. For such personnel, Supplier shall conduct background checks and/or other investigations deemed necessary, as appropriate and permitted by applicable law. Supplier personnel with direct, unrestricted access to the Johnson & Johnson Network ("**JJNET**") shall complete Buyer's information security awareness training upon initial access to JJNET and annually thereafter. Supplier's access or connectivity may be terminated at any time upon violation of Buyer's policies and/or misuse or abuse of Supplier's privileges.

4. If Supplier discovers or is notified of a breach or potential breach of security relating to Buyer information that is not intended for public release, Supplier shall: (a) notify Buyer within 24 hours of such breach or potential breach; and (b) if Buyer information was in the possession of Supplier at the time of such breach or potential breach, Supplier shall (i) promptly investigate and remediate the effects of the breach or potential breach, and (ii) provide Buyer with satisfactory assurance that such breach or potential breach will not reoccur.

5. No Buyer information shall be sold, assigned, leased or otherwise disposed of to a third party, or commercially exploited, by or on behalf of Supplier or its personnel without Buyer's express written consent. Supplier shall not collect, share, disclose or use any Buyer information, except as necessary to perform the services described in the Agreement. Furthermore, Supplier

represents and acknowledges that it does not receive, nor is Buyer providing, any such Buyer information in consideration for the provision of the services or otherwise; and Supplier does not and shall not derive any benefit, economic or otherwise, from such Buyer information. Supplier additionally represents and warrants that the provision of the services (as described in the Agreement) shall comply with applicable data protection laws.

6. **"SISR"** means the Johnson & Johnson Supplier Information Security Requirements in effect as of the Effective Date, as revised from time to time by Buyer and made available to Supplier. Supplier shall have 30 days after receipt of a SISR revision to object to any new requirements contained therein that would cause a material increase in Supplier's efforts to comply with such new requirements in connection with an existing Work Order, if any. In such case, Supplier shall notify Buyer of any proposed additional fees for such new requirements, which shall apply only if the parties sign a corresponding Change Order to the applicable Work Order. Absent the parties signing such Change Order, Supplier shall be excused from performing such new requirements requiring materially increased efforts but shall comply with all other new requirements contained therein. If Supplier intends to implement a change to its systems, policies or procedures that would reduce the level of safeguards in place as of the Effective Date, Supplier shall notify Buyer and only implement such change upon Buyer's approval.

### Exhibit J

### PROCESSING OF PERSONAL INFORMATION

It is the intent of the Parties that **only limited Personal Information, deidentified Personal Information, and/or pseudonymized Personal Information** related to the development and support of the Licensed Products, as further defined below, will be made available to CI (for purposes of this Exhibit, the "Supplier") during the Term of this Agreement.

### A.    Definitions

"**Data Protection Legislation**" means all applicable data privacy and data protection laws, including the EU General Data Protection Regulation 2016/679 ("GDPR"), the UK Data Protection Act 2018, and HIPAA, as well as any statute or statutory provision which amends, extends, consolidates or replaces any such applicable data privacy and data protection laws. The terms "personal data," "data subject", "controller", "processor" and "process" (and its derivatives) shall have the meanings given to them in the Data Protection Legislation.

"**Deidentified**" in accordance with HIPAA refers to the process(es) by which direct and/or indirect identifiers are removed from health information so that data subjects are no longer individually identifiable. Health information is not individually identifiable if it does not identify an individual and if the covered entity has no reasonable basis to believe it can be used to identify an individual.

"**Health Insurance Portability and Accountability Act of 1996, as amended, and the implementing privacy and security regulations** (collectively, "HIPAA")" requires the protection and confidential handling of health information. It provides industry-wide data privacy and security requirements for the safeguarding of the information.

"**Personal Information**" means data that directly or indirectly identifies or can be used to identify an individual.

"**Privacy Breach**" means any unintended or unauthorized access, acquisition, use, disclosure, storage or destruction of, or damage to, Personal Information.

"**Process,**" "**Processed**" and "**Processing**" means the use, disclosure, transfer, storage, deletion, combination, access or other use of Personal Information or PHI as contemplated by applicable privacy and data protection laws.

"**Pseudonymized**" or "**Pseudonymous**" under the GDPR means the processing of personal data in such a manner that the personal data can no longer be attributed to a specific individual without the use of additional information, provided such information is kept separately and is subject to technical and organizational measures to ensure the personal data are not attributed to an identified or identifiable natural person.

### B.    Privacy & Data Protection

1 **Categories of Data**. Only (i) limited Personal Information and (ii) Personal Information deidentified under HIPAA and/or pseudonymized under GDPR and related to the support obligations of Supplier under the Agreement, may be processed pursuant to this Agreement, and only in accordance with this Exhibit.

2. **Supplier Compliance**.  In connection with the Processing of Personal Information that is received or accessed by Supplier from Company or its affiliates, or from their employees, representatives or contractors, or others on behalf of Company or its affiliates, Supplier shall, and shall ensure that any person engaging in the Processing of Personal Information on its behalf in connection with this Agreement (i) will comply with this Exhibit, and (ii) will comply with its obligations as a Processor under the Data Protection Legislation with respect to Personal Information processed by it individually in connection with the Agreement.

3. **Supplier Obligations**. Supplier shall Process Personal Information only to perform its obligations under this Agreement or as otherwise instructed by Company in writing from time to time.

4. **Third Party Access & Onward Transfers**. Supplier shall ensure that Personal Information is not disclosed to, transferred to or allowed to be accessed by any third party (including subcontractors and affiliates) without the prior written consent of Company, except as specifically set forth in the Agreement and this Exhibit.  In the event Company so consents, Supplier shall ensure that such third party is bound in writing to terms at least as restrictive as this Exhibit with respect to Personal Information, provide such writing to Company promptly upon request, and fulfill all applicable legal requirements, such as timely execution of data transfer agreements, including EU Standard Contractual Clauses, as applicable between the Supplier and the third party. Supplier shall remain responsible for all actions by such third parties with respect to the Personal Information.

5. **Cross-border Transfers**. Supplier shall take any steps reasonably requested by Company to assist Company in satisfying cross-border transfer obligations related to Personal Information in the event Personal Information of non-U.S. residents becomes accessible to Supplier.

6. **Data Subject Requests**. Supplier shall, unless specifically prohibited by applicable law, (i) promptly (and in any event within five (5) days of receipt) notify Company in writing if Supplier receives any requests, complaints or inquiries from an individual with respect to Personal Information Processed by Supplier, including opt-out requests, requests for access, rectification, deletion, or portability; or allegations that the Processing infringes an individual's rights under applicable Data Protection Legislation and, (ii) not respond to any such requests, complaints or inquiries unless expressly authorized to do so by Company.

7. **Privacy Breach Notification**. Supplier shall notify Company in writing immediately, and in any event within twenty-four (24) hours whenever Supplier reasonably believes that there has been a Privacy Breach.  Such notice will provide detailed information regarding such Privacy Breach, including its nature and scope; actual or potential cause; any reports to law enforcements; and,

measures being taken to investigate, correct, mitigate, and prevent future Privacy Breaches. Supplier will provide reasonable assistance and cooperation to Company to investigate and notify affected individuals, regulatory bodies, or credit reporting agencies with respect to any such Privacy Breach. Supplier shall not notify any individual or any third party of a Privacy Breach without Company's prior consent, except to the extent required by law and, in such case, Supplier shall promptly notify Company of such requirement.

8. **Reviews & Audits**. At any time during the term of this Agreement, upon request and in a reasonable time and manner, Supplier shall make its policies, procedures, practices, and books and records relating to the privacy and security of Personal Information and the Processing of Personal Information available to Company and/or its affiliates for review.

9. **Security Controls**. Supplier shall (i) implement appropriate technical, physical, and organizational measures to ensure a level of security appropriate to the risk to Personal Information as required by applicable Data Protection Legislation, including appropriate levels of encryption of Personal Information, whether stored within a system or being transferred to Controller or other third party; and (ii) impose a duty of strict confidentiality on any persons authorized to access or Process the Personal Information.

10. **Supplier Compliance Cooperation**. Supplier shall take any other steps reasonably requested by Company to assist Company with respect to: (i) complying or demonstrating Company's compliance with any notification, registration or other obligations applicable to Company or its affiliates under applicable Data Protection Legislation; (ii) carrying out privacy and data protection impact assessments and related consultations by government authorities; (iii) demonstrating regulatory accountability; or (iv) ensuring the security of Personal Information.

11. **Termination**. At the termination or expiration of the Agreement, when no longer necessary for Supplier to provide services to Company, or upon Company's request, Supplier shall immediately cease Processing Personal Information, and promptly and securely return, archive, or except as required by law destroy Personal Information in its possession, in accordance with Company's instructions. If destroying the Personal Information, Supplier shall take all reasonable steps to do so in such a way that the applicable records are made unreadable, unreconstructable and indecipherable.

12. **Indemnification**. Supplier agrees to indemnify, defend and hold harmless Company and its affiliates and their directors, employees, and agents from and against any and all claims and resulting damages, liabilities, expenses, fines and losses of any type, to the extent arising out of, or relating to the Supplier's failure (or the failure of any personnel, contractor, or agent of Supplier) to comply with the obligations under this Exhibit.

13. The Parties acknowledge and agree that the applicable Data Protection Legislation may be amended or augmented prior to the launch of the License Products and, consequently, agree in good faith to update this Exhibit as necessary in the future in order to ensure the Parties' continued compliance with such updated Data Protection Legislation.

## Exhibit K

## ChemImage Internal Research & Development ("IR&D") Cost Estimation Methodology

Cost Estimation Methodology:

- ChemImage's cost recovery rate structure is budget-based.

  - Overhead Rate Calculation Method: The Labor Overhead rate is applied to the total salary dollars that would recover expenses, including, but not limited to, payroll, taxes, benefits, bonuses, insurance, rents, building repairs and maintenance, utilities and depreciation.

  - Materials and Subcontractor ("M&S") Calculation Method: The M&S rate is applied to the total material and subcontractor dollars that would recover labor required to purchase & receive materials and process contracts.

  - General and Administrative ("G&A") Calculation Method: The G&A rate is applied to the total labor, labor overhead and M&S calculation dollars to recover the balance of all projected expenses.

- Invoice Calculation Method: Invoices are calculated by applying the mark-up fee percentage to the sum of the total Labor dollars from the above three categories applied to any given project, e.g. [Mark-up Fee Percentage] X [Labor Overhead + M&S + G&A].

## Appendix A

## CI LICENSED PATENTS

| No. | Issued | Patent # | Patent Title | Designation | Platform | Publication Status |
|-----|--------|----------|--------------|-------------|----------|--------------------|
| 1 | Issued | 7,463,345 | Method For Correlating Spectroscopic Measurements With Digital Images Of Contrast Enhanced Tissue | Secondary | EV | Published |
| 2 | Issued | 7,465,911 | Apparatus And Method For Chemical Imaging Of A Biological Sample With At Least Two Spectral Images Of The Sample Obtained Simultaneously | Secondary | EV | Published |
| 3 | Issued | 7,477,378 | Method For Correlating Spectroscopic Measurements With Digital Images Of Contrast Enhanced Tissue | Secondary | EV | Published |
| 4 | Issued | 7,554,659 | Hyperspectral Visible Absorption Imaging Of Molecular Probes And Dyes In Biomaterials | Primary | EV | Published |
| 5 | Issued | 7,564,546 | Dynamic Imaging Of Biological Cells And Other Subjects | Secondary | EV | Published |
| 6 | Issued | 7,596,404 | Method Of Chemical Imaging To Determine Tissue Margins During Surgery | Primary | EV | Published |
| 7 | Issued | 7,701,573 | Method For Correlating Spectroscopic Measurements With Digital Images Of Contrast Enhanced Tissue | Secondary | EV | Published |
| 8 | Issued | 8,078,268 | System And Method Of Chemical Imaging Using Pulsed Laser Excitation And Time-Gated Detection To Determine Tissue Margins During Surgery | Secondary | EV | Published |
| 9 | Issued | 8,400,574 | Short Wave Infrared Multi-Conjugate Liquid Crystal Tunable Filter | Secondary | EV | Published |
| 10 | Issued | 8,440,959 | Method And Apparatus For Automated Spectral Calibration | Secondary | EV | Published |
| 11 | Issued | 8,537,354 | System And Method For Instrument Response Correction Based On Independent Measurement Of The Sample | Secondary | EV | Published |
| 12 | Issued | 8,743,358 | System And Method For Safer Detection Of Unknown Materials Using Dual Polarized Hyperspectral Imaging And Raman Spectroscopy | Secondary | EV | Published |
| 13 | Issued | 9,157,800 | System And Method For Assessing Analytes Using Conformal Filters And Dual Polarization | Primary | EV | Published |
| 14 | Issued | 9,274,046 | System And Method For Gross Anatomic Pathology Using Hyperspectral Imaging | Primary | EV | Published |
| 15 | Issued | 9,329,086 | System And Method For Assessing Tissue Oxygenation Using A Conformal Filter | Primary | EV | Published |
| 16 | Pending | 14/215681 | System And Method For Detecting Target Materials Using A VIS-NIR Detector | Primary | EV | Published |
| 17 | Pending | 16/544,499 PCT/US2019/047064 | Discrimination Of Calculi And Tissues With Molecular Chemical Imaging | Primary | EV | **Unpublished** |

| 18 | Disclosed | 62/947,808 | Real-Time Multi-Target Detection | Secondary | EV | Disclosed |
|---|---|---|---|---|---|---|
| 19 | Issued | 6,717,668 | Simultaneous Imaging And Spectroscopy Apparatus | Secondary | EV&LD | Published |
| 20 | Issued | 6,788,860 | Chemical Imaging Fiberscope | Secondary | EV&LD | Published |
| 21 | Issued | 6,965,793 | Method For Raman Chemical Imaging Of Endogenous Chemicals To Reveal Tissue Lesion Boundaries In Tissue | Secondary | EV&LD | Published |
| 22 | Issued | 7,218,822 | Method And Apparatus For Fiberscope | EV Secondary, LS Primary | EV&LD | Published |
| 23 | Issued | 7,239,782 | Chemical Imaging Fiberscope | EV Secondary, LS Primary | EV&LD | Published |
| 24 | Issued | 7,242,468 | Method And Apparatus For Microlens Array/Fiber Optic Imaging | EV Secondary, LS Primary | EV&LD | Published |
| 25 | Issued | 7,330,747 | Invasive Chemometry | Secondary | EV&LD | Published |
| 26 | Issued | 7,362,489 | Multi-Conjugate Liquid Crystal Tunable Filter | Primary | EV&LD | Published |
| 27 | Issued | 7,522,797 | Method And Apparatus For Fiberscope | EV Secondary, LS Primary | EV&LD | Published |
| 28 | Issued | 7,551,821 | Chemical Imaging Fiberscope | EV Secondary, LS Primary | EV&LD | Published |
| 29 | Issued | 8,068,222 | Method And Apparatus For Microlens Array/Fiber Optic Imaging | EV Secondary, LS Primary | EV&LD | Published |
| 30 | Issued | 8,289,503 | System And Method For Classifying A Disease State Using Representative Data Sets | EV Secondary, LS Primary | EV&LD | Published |
| 31 | Issued | 8,532,726 | Invasive Chemometry | Secondary | EV&LD | Published |
| 32 | Issued | 8,736,777 | VIS-SNIR Multi-Conjugate Liquid Crystal Tunable Filter | Primary | EV&LD | Published |
| 33 | Issued | 9,041,932 | Conformal Filter And Method For Use Thereof | Primary | EV&LD | Published |
| 34 | Issued | 9,844,334 | System And Method For Intraoperative Detection Of Cancer Margins Using Conformal Filters In A Dual Polarization Configuration | Primary | EV&LD | Published |
| 35 | Pending | 15/374769 | Molecular Chemical Imaging Endoscopic Imaging Systems | Primary | EV&LD | Published |
| 36 | Pending | 15/401716 | System And Method For Detecting Target Materials Using A VIS-NIR Detector | Secondary | EV&LD | Published |
| 37 | Allowed | 15/932435 | Molecular Chemical Imaging Endoscopic Imaging Systems | Primary | EV&LD | Published |
| 38 | Pending | 16/244845 *PCT/US2019/013067* | Time Correlated Source Modulation For Endoscopy | Primary | EV&LD | **Unpublished** |
| 39 | Pending | 62/839220 | Hybrid Imaging Product And Hybrid Endoscopic System | Primary | EV&LD | **Unpublished** |
| 40 | Issued | RE39977 E1 | Near Infrared Chemical Imaging Microscope | Secondary | EV&LD | Published |

16

| 41 | Pending | 62/909525 | Fusion Of Molecular Chemical Imaging With RGB Imaging | Primary | EV&LD | **Unpublished** |
|----|---------|-----------|---------|---------|-------|-------------|
| 42 | Pending | 62/947,261 | Systems and Methods for Discrimination of Tissue Targets | Primary | EV&LD | Unpublished |
| 43 | Disclosed | 62/943,316 | Systems and Methods for Situ Optimization Programmable Light Emitting Diode Sources | Primary | EV&LD | Unpublished |
| 44 | Pending | 62/947,902 | Methods For Improved Operative Surgical Report Generation Using Machine Learning And Devices Thereof | Primary | EV&LD | Unpublished |
| 45 | Disclosed | 62/949,830 | Combining Imaging Modalities For Enhanced Tissue Detection | Secondary | EV&LD | Unpublished |

**\*Items in italics denote corresponding international patents.**

## Appendix B

## CI LICENSED LIGHTSPHERE PATENTS

| No. | Issued | Patent # | Patent Title | Designation | Platform | Publication Status |
|-----|--------|----------|--------------|-------------|----------|---------------------|
| 1 | Issued | 6,954,667 | Method For Raman Chemical Imaging And Characterization Of Calcification In Tissue | Primary | LD | Published |
| 2 | Issued | 7,012,695 | Method And Apparatus For Multi-Wavelength Imaging Spectrometer | Primary | LD | Published |
| 3 | Issued | 7,072,770 | Method For Identifying Components Of A Mixture Via Spectral Analysis | Secondary | LD | Published |
| 4 | Issued | 7,084,972 | Method And Apparatus For Compact Dispersive Imaging Spectrometer | Primary | LD | Published |
| 5 | Issued | 7,262,839 | Method And Apparatus For Compact Birefringent Interference Imaging Spectrometer | Primary | LD | Published |
| 6 | Issued | 7,307,705 | Method And Apparatus For Compact Dispersive Imaging Spectrometer | Primary | LD | Published |
| 7 | Issued | 7,330,746 | Non-Invasive Biochemical Analysis | Secondary | LD | Published |
| 8 | Issued | 7,486,395 | System And Method For A Chemical Imaging Threat Assessor With A Probe | Secondary | LD | Published |
| 9 | Issued | 7,557,915 | Automated Acquisition Of Spectral Data And Image Data | Primary | LD | Published |
| 10 | Issued | 7,626,696 | Method And Apparatus For Reconfigurable Field Of View In A FAST-Based Imaging System | Secondary | LD | Published |
| 11 | Issued | 7,697,576 | Cytological Analysis By Raman Spectroscopic Imaging | Primary | LD | Published |
| 12 | Issued | 7,738,095 | Method And Apparatus For Compact Spectrometer For Detecting Hazardous Agents | Secondary | LD | Published |
| 13 | Issued | 7,755,757 | Distinguishing Between Renal Oncocytoma And Chromophobe Renal Cell Carcinoma Using Raman Molecular Imaging | Primary | LD | Published |
| 14 | Issued | 7,808,633 | Spectroscopic System And Method For Predicting Outcome Of Disease | Primary | LD | Published |
| 15 | Issued | 7,848,000 | Birefringent Spectral Filter With Wide Field Of View And Associated Communications Method And Apparatus | Secondary | LD | Published |
| 16 | Issued | 7,956,996 | Distinguishing Between Invasive Ductal Carcinoma And Invasive Lobular Carcinoma Using Raman Molecular Imaging | Primary | LD | Published |
| 17 | Issued | 7,990,533 | System And Method For Analyzing Biological Samples Using RMI | Primary | LD | Published |
| 18 | Issued | 8,013,991 | Raman Difference Spectra Based Disease Classification | Primary | LD | Published |
| 19 | Issued | 8,269,174 | Method And Apparatus For Compact Spectrometer For Multipoint Sampling Of An Object | Secondary | LD | Published |
| 20 | Issued | 8,553,732 | Cytological Analysis By Raman Spectroscopic Imaging | Primary | LD | Published |
| 21 | Pending | 14/440987<br><br>*EP2917734<br>AU2013341327<br>CA2890437<br>JP2015541874* | System And Method For Serum Based Cancer Detection | Primary | LD | Published |
| 22 | Pending | 15/776649 | Raman-Based Immunoassay Systems And Methods | Primary | LD | Published |

18

| | | *CN20168079085* *EP16867078.4* | | | | |
|---|---|---|---|---|---|---|
| 23 | Pending | 62/951,507 | System And Method For Spectral Library Training | Secondary | LD | Disclosed |

**\*Items in italics denote corresponding international patents.**

## Appendix C

### Expedited Litigation

Any Dispute not subject to Arbitration for JSC impasses pursuant to the Agreement, including Disputes that may involve Affiliates of either Party, shall be resolved in accordance with this Appendix after the Parties meet pursuant to 12.2. Any dispute subject to Arbitration for JSC impasses pursuant to the Agreement, including Disputes that may involve Affiliates of either Party, shall be resolved in accordance with the Litigation provisions of this Appendix.

### Mediation

The parties shall first attempt in good faith to resolve any Dispute by confidential mediation in accordance with the then current *Mediation Procedure* of the International Institute for Conflict Prevention and Resolution ("CPR Mediation Procedure") (www.cpradr.org) before initiating litigation.  The CPR Mediation Procedure shall control, except where it conflicts with these provisions, in which case these provisions control.  The mediator shall be chosen pursuant to CPR Mediation Procedure.  The mediation shall be held in Pittsburgh, PA.

Either party may initiate mediation by written notice to the other party of the existence of a Dispute.  The parties agree to select a mediator within 20 days of the notice and the mediation will begin promptly after the selection.  The mediation will continue until the mediator, or either party, declares in writing, no sooner than after the conclusion of one full day of a substantive mediation conference attended on behalf of each party by a senior business person with authority to resolve the Dispute, that the Dispute cannot be resolved by mediation.  In no event, however, shall mediation continue more than 60 days from initial notice by a party to initiate meditation unless the parties agree in writing to extend that period.

Any period of limitations that would otherwise expire between the initiation of mediation and its conclusion shall be extended until 20 days after the conclusion of the mediation.

Either party has the right to seek from the appropriate court provisional remedies such as attachment, preliminary injunction, replevin, etc. to avoid irreparable harm, maintain the status quo, or preserve the subject matter of the Dispute.

### Litigation

20

If a Party desires to pursue resolution of the Dispute, the Dispute shall be submitted by for resolution by a judge sitting without a jury in the United States District Court for the Southern District of New York, if that court has subject matter jurisdiction, or otherwise to the New York state court of appropriate jurisdiction. If an appeal from the United States District Court for the Southern District of New York is warranted, such an appeal shall be submitted to The United States Court of Appeals for the Federal Circuit (CAFC) or Second Circuit Court of Appeals where appropriate.

The parties agree to seek an early conference with the court and to advise the court of this Agreement. The parties agree to make all filings required by the court on a schedule that will assure trial ready status eight months after the service of the first complaint and further agree to make all motions, including motions for summary judgment, on a schedule that will allow them to be fully considered by the court less than eight months after the service of the first complaint.

Both sides agree to conduct discovery in a manner and on a schedule designed to complete of discovery within nine months after service of the first complaint. To that end, each Party agrees to pursue no more than 40 hours of deposition testimony from all witnesses in the aggregate, including both fact and expert witnesses. The parties agree to work together to reach agreement to limit discovery of electronically stored information, including the use of date restrictions and file types. To obtain email, parties must propound specific email production requests directed to specific issues, rather than general discovery. Email production requests shall identify the custodian, search terms, and time frame.

EACH PARTY HERETO WAIVES: (1) ITS RIGHT TO TRIAL OF ANY ISSUE BY JURY, AND (2) WITH THE EXCEPTION OF RELIEF MANDATED BY STATUTE, ANY CLAIM TO PUNITIVE, EXEMPLARY, MULTIPLIED, INDIRECT, CONSEQUENTIAL OR LOST PROFITS/REVENUES DAMAGES.

The prevailing Party in any action commenced under this Appendix C shall be entitled to receive reasonable attorneys' fees and court costs as determined by the court hearing the Dispute.