**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHEMIMAGE CORPORATION | |
| Plaintiff, | No.: 1:24-cv-2646 (JMF) |
| v. | |
| JOHNSON & JOHNSON and ETHICON, INC. | |
| Defendants. | |

## PLAINTIFF CHEMIMAGE CORPORATION'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................II

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ........................................................................................................3

      A.      Johnson & Johnson Pursues ChemImage .................................................3

      B.      The Agreement.............................................................................................4

              1.      The Agreement Sets Out the Parties' Expectations ......................4

              2.      Termination For Cause ..................................................................5

              3.      Termination Without Cause...........................................................5

      C.      ChemImage Achieves the First Milestone ..................................................6

      D.      Ethicon and Johnson & Johnson Terminate Pretextually ..........................7

LEGAL STANDARD.................................................................................................................8

ARGUMENT ..............................................................................................................................8

I.      CHEMIMAGE HAS STATED A BREACH OF CONTRACT CLAIM
      AGAINST JOHNSON & JOHNSON ..........................................................8

II.     CHEMIMAGE HAS STATED A CLAIM FOR TORTIOUS INTERFERENCE
      AGAINST JOHNSON & JOHNSON ..........................................................12

      A.      The Tortious Interference Claim Arises Under a Separate Set of Facts
             Than the Contract Claim.............................................................................13

      B.      ChemImage Has Stated a Claim for Tortious Interference..........................15

III.    CHEMIMAGE HAS STATED A CLAIM FOR DIRECT DAMAGES..........................17

      A.      The Agreement Explicitly Contemplates the Damages ChemImage Seeks .........17

      B.      The $40 Million Termination Fee Is Not a Limitation on Liability ......................21

      C.      Damages Are Not Limited to the Notice Period....................................................22

CONCLUSION...........................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Addison Terry Co., Inc. v. N.F.L. Films, Inc.*,
   390 F. Supp. 621 (S.D.N.Y. 1974) ...............................................................23

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
   306 F. Supp. 3d 610 (S.D.N.Y. 2018)...........................................................9, 12

*AP Links, LLC v. Russ*,
   2017 WL 3394599 (E.D.N.Y. Aug. 7, 2017) .................................................15

*Array BioPharma, Inc. v. AstraZeneca AB*,
   126 N.Y.S.3d 91 (1st Dep't 2020) ................................................................11

*Ashland Mgmt. Inc. v. Janien*,
   624 N.E.2d 1007 (1993).................................................................................20

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).........................................................................................8

*Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*,
   11 N.E.3d 676 (N.Y. 2014)............................................................................18

*Bitterman v. Gluck*,
   256 A.D. 336 (N.Y. App. Div. 1939) ............................................................24

*Capricorn Invs. III, L.P. v Coolbrands Int'l, Inc.*,
   897 N.Y.S.2d 668 (Sup. Ct. N.Y. Cnty. 2009) .............................................11

*CBS Broadcasting Inc. v. Jones*,
   460 F. Supp. 2d 500 (S.D.N.Y. 2006)...........................................................22

*Cerberus Capital Mgmt., L.P. v. Snelling & Snelling, Inc.*,
   2005 WL 4441899 (N.Y. Sup. Ct. Dec. 19, 2005) ........................................15

*Ciamara Corp. v. Widelab, Inc.*,
   2013 WL 6331927 (S.D.N.Y. Dec. 5, 2013) .............................................23, 24

*Clarke v. TRIGO U.S., Inc.*,
   2023 WL 2456814 (S.D.N.Y. Mar. 10, 2023) ...............................................11

*Crabtree v. Tristar Auto. Grp., Inc.*,
   776 F. Supp. 155 (S.D.N.Y. 1991) ................................................................11

*DKR Capital, Inc. v. AIG Int'l W. Broadway Fund, Ltd.*,
    2003 WL 22283836 (S.D.N.Y. Oct. 2, 2003) ........................................................................12

*ESI, Inc. v. Coastal Corp.*,
    61 F. Supp. 2d 35 (S.D.N.Y. 1999) ........................................................................9

*Georgitsi Realty, LLC v. Penn-Star Ins.*,
    702 F.3d 152 (2d Cir. 2012).........................................................................16

*Goldman v. Belden*,
    754 F.2d 1059 (2d Cir. 1985).........................................................................8

*Horowitz v. Nat'l Gas & Elec., LLC*,
    2018 WL 4572244 (S.D.N.Y. Sept. 24, 2018)........................................................13, 15

*In re Hale Desk Co.*,
    97 F.2d 372 (2d Cir. 1938).........................................................................22

*In re Signature Apparel Grp. LLC*,
    577 B.R. 54, 115 (Bankr. S.D.N.Y. 2017) ..............................................................16

*Int'l Minerals and Resources, S.A. v. Pappas*,
    96 F. 3d 586 (2d Cir. 1996).........................................................................15

*Jennings v. Hunt Cos., Inc.*,
    367 F. Supp. 3d 66 (S.D.N.Y. 2019).......................................................................9

*Kahala Corp. v. Holtzman*,
    2011 WL 1118679 (S.D.N.Y. Mar. 24, 2011) ............................................................22

*Kargo, Inc. v. Pegaso PCS, S.A. de C.V.*,
    2008 WL 2930546 (S.D.N.Y. July 29, 2008) ...........................................................16

*Kenford Co. v. Cty. of Erie*,
    73 N.Y.2d 312 (N.Y. 1989) ...................................................................18, 23

*LaFaro v. New York Cardiothoracic Grp., PLLC*,
    570 F.3d 471 (2d Cir. 2009).........................................................................8

*Lockheed Martin Corp. v. Retail Holdings, N.V.*,
    639 F.3d 63 (2d Cir. 2011).........................................................................19

*Maricultura Del Norte, S. de R.L. de C.V. v. Umamie Sustainable Seafood, Inc.*,
    769 Fed. Appx. 44 (2d Cir. 2019)........................................................................13

*McKeefry v. Town of Bedford*,
    2019 WL 6498312 (S.D.N.Y. Dec. 2, 2019) ...........................................................8

*Merrill Lynch Capo. Servs., Inc. v. UISA Fin.*,
  2012 WL 1202034 (S.D.N.Y. April 10, 2012) ....................................................18

*Millgard Corp. v. E.E. Cruz/NAB/Frontier-Kemper*,
  329 Fed. Appx. 307 (2d Cir. 2009)...................................................................24

*Millgard Corp. v. E.E. Cruz/Nab/Frontier-Kemper*,
  2003 WL 22801519 (S.D.N.Y. Nov. 24, 2003) ................................................21

*Moreno-Godoy v. Kartagener*,
  7 F.4th 78 (2d Cir. 2021) .........................................................................17, 18

*Oldcastle Precast, Inc. v. U.S. Fid. & Guar. Co.*,
  458 F. Supp. 2d 131 (S.D.N.Y. 2006)...........................................................18, 19

*Paine Webber Inc. v. Bybyk*,
  81 F.3d 1193 (2d Cir. 1996)......................................................................19, 20

*Powerbox (USA), Inc. v. Honeywell Int'l, Inc.*,
  2020 WL 6151491 (S.D.N.Y. Oct. 20, 2020) ..................................................10

*Royal Indem. Co. v. Wyckoff Heights Hosp.*,
  953 F. Supp. 460 (E.D.N.Y. 1996) .............................................................20, 21

*RUS, Inc. v. Bay Industries, Inc.*,
  2004 WL 1240578 (S.D.N.Y. 2004)...................................................................11

*S&S Hotel Ventures Ltd. Partnership v. 777 S.H. Corp.*,
  489 N.Y.S.2d 478 (N.Y. App. Div. 1985) ..........................................................13

*Terminal Cent., Inc. v. Henry Modell & Co., Inc.*,
  628 N.Y.S.2d 56 (N.Y. App. Div. 1995) .............................................................21

*TNT USA Inc. v. DHL Exp. (USA), Inc.*,
  2012 WL 601452 (E.D.N.Y. Feb. 23, 2012)...................................................23, 24

*Tractabel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
  487 F.3d 89 (2d Cir. 2007)...............................................................................20

*TransformaCon, Inc. v. Vista Equity Partners, Inc.*,
  2015 WL 4461769 (S.D.N.Y. 2015).................................................................9, 10

*Ullman-Briggs, Inc. v. Salton, Inc.*,
  754 F. Supp. 1003 (S.D.N.Y. 1991)...................................................................20

*VR Optics, LLC v. Peloton Interactive, Inc.*,
  2017 WL 3600427 (S.D.N.Y. Aug. 18, 2017) ...................................................15

*Watermelons Plus, Inc. v New York City Dept. of Educ.*,
    76 A.D.3d 973 (N.Y. App. Div. 2010) ..................................................................24

*Watson v. Russell*,
    44 N.E. 161 (N.Y. 1896).......................................................................................24

*World Wide Packaging, LLC v. Cargo Cosmetics, LLC*,
    144 N.Y.S.3d 41 (1st Dep't 2021) ......................................................................11

*Zeising v. Kelly*,
    152 F. Supp. 2d 335 (S.D.N.Y. 2001)...................................................................14

## **Rules**

Federal Rule of Civil Procedure 12(b)(6) ........................................................................8

## **Other Authorities**

Black's Law Dictionary (11th ed. 2019).............................................................20, 21

<u>**PRELIMINARY STATEMENT**</u>

ChemImage Corporation ("<u>ChemImage</u>" or "<u>Plaintiff</u>") pioneered AI-based light imaging technology for use across a variety of surgical applications. When it partnered with Johnson & Johnson ("<u>J&J</u>") and Ethicon, Inc. ("<u>Ethicon</u>" and together with J&J, "<u>Defendants</u>") in 2019, ChemImage believed it had found a collaborator that would help it efficiently develop and market its technology, which had been in development since 2002. In negotiating the Research, Development, License and Commercialization Agreement (the "<u>Agreement</u>")[1], the parties evinced an expectation that ChemImage's cutting edge technology, already some two decades in the making, would not just make it to market, but thrive: the Agreement provides for anticipated Royalty Payments[2] "***in partial consideration***" of the licenses ChemImage granted Ethicon, royalties that the parties' external valuation consultants valued at between $1.3 billion to $1.7 billion. So confident were the parties in ChemImage and its technology that they set Ethicon's price for terminating the Agreement "without cause" at $40 million, and expressly declared in the Agreement that anticipated Milestone Payments and Royalty Payments "***shall not be deemed anything other than direct damages***."

The hope that ChemImage placed in Ethicon and J&J turned out to be misplaced when, in early 2023, Defendants pretextually terminated the Agreement "for cause," alleging that ChemImage committed a material breach by failing to achieve a Development Milestone, even though the Agreement contained no deadlines by which Development Milestones must be achieved. Had Defendants elected to terminate the Agreement "without cause" and pay the $40 million termination fee, ChemImage would have had the requisite notice (120 days), funding ($40

---

[1]  Citations to "Agreement" are to Ex. 1 to the Amended Complaint. *See* Dkt. 36-1.
[2]   Capitalized terms have the meaning ascribed to them in the Amended Complaint unless otherwise noted. Cites to "¶" refer to the Amended Complaint, Dkts. 36, 38.

million), and unencumbered rights to its intellectual property to resume independent operations and/or begin the search for a new partner. By purporting to terminate for cause when no cause existed, Defendants crippled ChemImage and caused damages far in excess of $40 million. Without adequate time, resources, and unfettered rights to its intellectual property, ChemImage was forced to shut its doors.

This action is about Defendants' failure to hold up their end of the bargain. In their Motion to Dismiss ("Motion"), Defendants do not dispute these facts, but instead sidestep them and attempt to rewrite both the Agreement and the law.

*First*, Defendants contend that the contract claim against J&J should be dismissed because J&J is not a party to the Agreement. But New York law is clear that J&J is bound by the Agreement so long as it manifested an intent to be bound by the Agreement. This they did by, *inter alia*, actively negotiating the Agreement alongside ChemImage and Ethicon, ultimately giving final approval for the Agreement, contributing personnel to the Joint Steering Committee ("JSC") and Data Review Board ("DRB"), and contracting for notice rights in the Agreement.

*Second*, Defendants contend that the tortious interference claim is impermissibly duplicative of the contract claim. But New York law permits a plaintiff to allege both breach of contract and tortious interference where, as here, the Defendant owed separate duties to Plaintiff and violated each of them independently. Under these circumstances—where J&J both breached the Agreement to which it manifested an intent to be bound *and also* interfered in ChemImage's relationship with Ethicon—New York law permits ChemImage to bring both tort and contract claims against J&J. Moreover, the law is clear that J&J cannot (1) escape liability for breach of contract by asserting it is not a party to the Agreement then (2) claim it is shielded from tort claims by the very same contract to which it purports not to be bound.

*Third*, Defendants seek to cast the $40 million termination fee as a cap on ChemImage's damages, contrary to the plain terms of the Agreement. Defendants **had** the opportunity to terminate without cause upon payment of a $40 million fee and proper notice **but chose not to**. Instead, Defendants pretextually terminated for cause—crippling ChemImage's business in the process. Thus, Defendants are liable for any direct damages flowing from their breach. The parties in this case expressly defined damages to include "liability for **lost** Development Payments, Milestone Payments or Patent Royalties." And Defendants do not cite a single case in support of the proposition that the Court should read the $40 million "without cause" termination fee as a damages cap when the parties did not so define it in the Agreement. The Motion should be denied.

## STATEMENT OF FACTS

### A. Johnson & Johnson Pursues ChemImage

ChemImage was founded in 2002 by a team of doctors and scientists who shared a vision of creating breakthrough imaging technology with the potential to revolutionize surgical outcomes. ¶ 36. ChemImage's technology was rooted in its proprietary, AI-based software that leveraged molecular spectroscopy, digital imaging, and machine learning to assist in the real-time detection of biological materials. *Id.* The technology promised to revolutionize healthcare, allowing surgeons to identify critical structures and abnormal areas during surgery in real-time. *Id.*

By 2019, ChemImage's technology was far along in development but needed to be paired with an appropriate device before being deployed by surgeons in the field. ¶ 80. To that end, ChemImage sought a partner with the resources and know-how to help finalize development of the technology and market it to its full potential. J&J, meanwhile, was working quickly to catch up to its competitors in the surgical robotics space: in 2015 J&J partnered with Verb Surgical, Inc. ("Verb") to develop a large-scale general surgery robot, and in February 2019, J&J acquired Auris Health ("Auris"), another major player in the field. ¶¶ 33-35. ChemImage served a

complementary role in this portfolio: developing these technologies alongside one another would allow J&J to differentiate itself when it entered the surgical robotics market. J&J pitched its vision for a strategic partnership to ChemImage and, in late 2019, ChemImage elected to partner with J&J and its wholly owned subsidiary, Ethicon. ¶¶ 39-48.

### B. The Agreement

#### 1. The Agreement Sets Out the Parties' Expectations

In crafting the Agreement, ChemImage negotiated with both Ethicon and J&J. ¶¶ 39-47. For example, ChemImage presented its technology *directly* to Ashley McEvoy, J&J's then-Worldwide Executive Vice President, MedTech division, ¶ 41, and J&J gave final approval for the Agreement on behalf of Ethicon. ¶¶ 43-44. The Agreement is dedicated not just to the development of ChemImage's technology, but also to how the parties would share and manage the proceeds of sales of devices incorporating the technology, as well as the licensing of ChemImage's proprietary intellectual property up to and through commercialization. The Agreement reflects these expectations in a number of ways.

***First***, the parties contracted that "liability for *lost* Development Payments, Milestone Payments, or Patent Royalties payable hereunder ***shall not be deemed anything other than direct damages*.**" ¶ 63; *see also* Agreement § 8.4 (emphasis added). The parties' decision to designate "lost Development Payments, Milestone Payments, and Patent Royalties" as "direct damages" demonstrates that the damages ChemImage seeks were within the contemplation of the parties at the time the Agreement was entered into.

***Second***, while external deal consultants projected the Project to generate $1.3 to $1.7 billion in royalties, Ethicon paid just $7 million up front to acquire the rights to license, develop, and market ChemImage's technology. ¶ 59. In exchange for this up-front payment, the Agreement provides for royalties plus $149 million in milestone payments upon the achievement of six

development milestones and six regulatory milestones (the "Milestones").  ¶¶ 50-52; *see also* Agreement, Ex. B.

**Third**, the Agreement provides Ethicon with the option of terminating without cause, but only upon 120-days' notice and payment of a $40 million termination fee.  ¶ 75.  Under a "without cause" termination, ChemImage would have clear title to all of its intellectual property.  ¶ 76.

## 2.  Termination For Cause

Under Section 10.3.1, Ethicon could terminate the Agreement "for cause" in the event of a "material breach" by ChemImage.  ¶ 66; *see also* Agreement § 10.3.1.  The Agreement defines a single way that ChemImage might "materially breach" the Agreement: if it "fail[ed] … to achieve a Development Milestone."  ¶ 67; *see also* Agreement § 10.3.2.  The JSC was required to "determine whether the Milestones … have been met," but the Agreement did not set any deadlines by which *any* of the Milestones must be met, reflecting the parties' expectation of both development *and* commercialization of ChemImage's valuable technology, without tethering the Project to an immutable development timeframe.  *See* ¶¶ 12, 68, 100; *see also* Agreement § 2.4.1(b), Ex. B.  Termination for cause did not incur any costs to Ethicon, and in fact caused certain, valuable licenses belonging to ChemImage to be assigned to Ethicon.  ¶ 71; *see also* Agreement § 10.3.3.  Termination for cause required only a 30-day notice period, but gave ChemImage the opportunity to cure a material breach so long as it commenced cure within 30 days.  ¶¶ 69-70; *see also* Agreement § 10.3.1.

## 3.  Termination Without Cause

In contrast to termination for cause, termination "without cause" under Section 10.4 required Ethicon to give ChemImage 120-days' notice and pay $40 million.  ¶ 75; *see also* Agreement § 10.4.1.  Termination without cause also caused Ethicon to relinquish all rights to

ChemImage's Intellectual Property and grant ChemImage a license to any jointly developed intellectual property. ¶ 76; *see also* Agreement § 10.4.4.

### C.    ChemImage Achieves the First Milestone

Less than a year after the parties entered into the Agreement, the JSC determined that ChemImage achieved Milestone 1A. ¶ 78. Around this time, however, progress on the Project slowed due to Ethicon and J&J's delays. While ChemImage had been able to achieve Milestone 1A largely under its own initiative, achieving the next Milestone, Milestone 1B, required ChemImage to pair its technology with a prototype J&J/Ethicon device. ¶¶ 80, 96; *see also* Agreement, Ex. B. In the midst of a strategic sea change, J&J and Ethicon began slow-walking the Project, failing to timely provide the necessary equipment, facilities, testing support, and materials for ChemImage to continue development. ¶ 81. J&J also hampered ChemImage's access to its Blue Ash testing facility around this time, despite having previously insisted that all Milestone 1A research be conducted at Blue Ash. ¶ 79. J&J also hamstrung the JSC, initiating frequent turnover of J&J and Ethicon appointees. ¶¶ 84-85. In spite of these obstacles, ChemImage forged ahead.

Around this time, ChemImage and Ethicon formed the Data Review Board ("DRB") to help evaluate decisions involving study design, research methodology, and data analysis and integrity. ¶ 88. At various times, J&J employees served on the DRB or otherwise participated in DRB meetings. ¶ 90. As successful development of ChemImage's technology depended on a robust and dependable data set, the DRB determined that the Project should make use of "ignore labels" to flag objects in a data set that could not affirmatively be corroborated by the ground truth team. ¶¶ 93-95. The use of ignore labels was critical to the success of the Project, as accurately training the algorithm required a dependable data set made up of signals that had been unequivocally identified by a skilled surgeon. ¶ 94. Recognizing that properly training

ChemImage's algorithm required fastidious attention to the inputs used, the DRB agreed that objects flagged with an ignore label would not be factored in to calculations for evaluation. *Id.*

With the DRB-approved ignore label process in place, ChemImage set about working to demonstrate achievement of Milestone 1B. ¶ 96. In mid-2022, the JSC elected to narrow the scope of Milestone 1B to focus only on veins, arteries, and bile ducts ("VAB"), postponing work on ureters and nerves until after completion of the VAB portion of Milestone 1B. *Id.*

At the October 14, 2022 JSC meeting, the JSC reviewed and approved these acceptance criteria, ¶ 97, and noted that ChemImage had met its quarterly goals and that interim results showed "good performance" as ChemImage neared completion of its work on VAB. ¶¶ 97-98. ChemImage submitted its VAB Final Report (the "Final Report") on December 16, 2022. ¶ 99. The Final Report incorporated the DRB-approved ignore label process and demonstrated success based on the acceptance criteria adopted by the JSC in October 2022. *Id.* At this point, without any explanation to ChemImage, Defendants' engagement trickled to a halt and Defendants all but ceased their collaboration on the Project, refusing to convene the JSC to make the required determination about ChemImage's achievement of Milestone 1B. ¶¶ 102-03.

### D. Ethicon and Johnson & Johnson Terminate Pretextually

Without any advance notice, Ethicon sent ChemImage a termination letter (the "Termination Letter") on March 6, 2023, purporting to terminate the Agreement "for cause for failure to achieve a Development Milestone," which Ethicon claimed constituted a Material Breach of the Agreement despite the fact that the Agreement contained ***no deadlines*** by which any of the Milestones must be met. ¶ 100, 104. ChemImage requested the "reasonable detail" necessary to allow it to begin curing the alleged breach, as required by the Agreement, and indicated to Ethicon that it was prepared to cure. ¶¶ 108-110. ChemImage thereafter informed Ethicon it was commencing the dispute resolution process and requested an in-person meeting of senior

executives to discuss the purported termination. ¶ 110. On April 26, 2023, ***prior to the end of the cure period***, Ethicon unilaterally terminated the Agreement, allegedly for cause pursuant to Section 10.3. ¶ 113.

Defendants' actions were devastating to ChemImage. Without the resources to continue developing its technology and a cloud over its intellectual property, ChemImage was forced to close up shop. ¶¶ 121-24. Over a year later, ChemImage continues to receive offers from potential development partners that it is unable to pursue due to Defendants' wrongful actions. ¶ 158. J&J's scheme to rid itself of ChemImage without paying the bargained for $40 million termination fee and prevent ChemImage from taking its technology to a competitor had succeeded. ¶¶ 114-20.

## LEGAL STANDARD

On a Rule 12(b)(6) motion, the Court credits the allegations in the complaint and draws all reasonable inferences for the plaintiff. *LaFaro v. New York Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009) (citation omitted). The court does not "weigh the evidence … but merely … determine[s] whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). A complaint survives if it pleads "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For this purpose, the Court can consider (1) facts alleged in the complaint and documents attached or incorporated by reference; and (2) documents integral to the complaint and relied upon in it. *McKeefry v. Town of Bedford*, 2019 WL 6498312, at *3 (S.D.N.Y. Dec. 2, 2019).

## ARGUMENT

## I.  CHEMIMAGE HAS STATED A BREACH OF CONTRACT CLAIM AGAINST JOHNSON & JOHNSON

Defendants argue that ChemImage's contract claim against J&J must be dismissed because "J&J is not a party to the Agreement." Dkt. 42 ("Mot.") at 19. Despite acknowledging that a non-

signatory can be bound by a contract if they "manifested an unequivocal intent to be bound," *id.* (quoting *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 306 F. Supp. 3d 610, 625 (S.D.N.Y. 2018), Defendants ignore that an "unequivocal intent" to be bound may be inferred where, as here, the non-signatory "attended meetings … and participated in the negotiations and drafting of the contract." *Alaska Elec. Pension Fund*, 306 F. Supp. 3d at 625 (citations omitted); *see also TransformaCon, Inc. v. Vista Equity Partners, Inc.*, 2015 WL 4461769, at *5 (S.D.N.Y. 2015) (presentation given to executives of non-signatory parent corporation "supports the conclusion that non-signatory[] intended to be bound" by contract); *Jennings v. Hunt Cos., Inc.*, 367 F. Supp. 3d 66, 71-72 (S.D.N.Y. 2019) (involvement of non-signatory's officers in negotiations supported conclusion that non-signatory manifested an intent to be bound by contract).

The Complaint is replete with allegations that J&J manifested an intent to be bound to the Agreement by attending meetings and participating in the negotiation and drafting of the Agreement. For example, Peter Shen, J&J's then-Chief Technology Officer, was intimately involved in negotiations with ChemImage leading up to the signing of the Agreement. Compl. ¶ 40. Senior J&J executives Ashley McEvoy (J&J's then-Worldwide Executive Vice President, Medtech division) and Alex Gorsky (J&J's then-Chief Executive Officer and Chairman) "attended meetings with [ChemImage], received information about the Project … and participated in the negotiations and drafting of the [Agreement]," ultimately giving final approval for Ethicon to enter into the Agreement. *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 73 (S.D.N.Y. 1999); *see also* ¶ 41. Indeed, the press release appended to the Agreement indicates that ChemImage partnered "***with Johnson & Johnson***" to advance J&J's position in the surgical robotics space, ¶ 45 (emphasis added), and on October 14, 2020, J&J's Head of Innovation, Michael Preminger, announced publicly that J&J was "very excited about [the] collaboration" with ChemImage." ¶

46.   These allegations alone are sufficient to raise a plausible inference that J&J manifested an intent to be bound by the Agreement.  *See TransformaCon*, 2015 WL 4461769, at *5 (allegations sufficient to demonstrate parent's intent to be bound by subsidiary's contract with plaintiff where subsidiary "agreed to the contract under [parent's] watch and control" and parent "was intimately involved in and would benefit from the contract").

Defendants also ignore that J&J ***acted as a Party to the Agreement***, by appointing its employees to the JSC.  ¶ 55; *see also* Agreement § 2.4.1 (JSC to consist of "senior employees authorized to make decisions ***for its respective Party***").  The fact that J&J appointed its employees to the four-member JSC (*i.e.*, a right reserved for ***Parties*** to the Agreement)—"support[s] a plausible inference that [J&J] intended to be bound by the contract."  *Powerbox (USA), Inc. v. Honeywell Int'l, Inc.*, 2020 WL 6151491, at *4 (S.D.N.Y. Oct. 20, 2020) (non-signatory's intent to be bound by contract was evident from its continued communications with plaintiff following execution of contract).  Indeed, the JSC was the Project's guiding committee and the sole entity tasked with determining whether Milestones had been met.  ¶¶ 57, 68, 102.

Further, that many of the Project's participants held themselves out as J&J employees during the time when they worked on the Project[3] further supports a plausible inference that J&J intended to be bound by the Agreement.  *See* ¶ 55 (alleging that J&J employees Sarah Moore, Marco Kristensen, Paul Ritchie, and Tamara Lanier served on the JSC or attended JSC meetings).

Defendants similarly gloss over the fact that J&J explicitly contracted for notice rights under the Agreement.  Mot. at 22.  But Courts have held that [e]ven if a party does not sign the

---

[3]   Defendants assert that several of the individuals identified by ChemImage as J&J employees were in fact Ethicon employees.  *See* Mot. at 21.  ChemImage notes that Ms. Lanier, Mr. Aksoy, Mr. Kristensen, and Mr. Ritchie each represent on their public LinkedIn pages that they are or were J&J employees during the relevant time period.  ¶¶ 40, 55, 90.

relevant written agreement, it will be bound if the totality of its expressed words and deeds manifests an intent to be bound." *RUS, Inc. v. Bay Industries, Inc.*, 2004 WL 1240578 (S.D.N.Y. 2004). The fact that J&J negotiated the Agreement, approved the Agreement, acted as a party to the Agreement, **and** contracted for notice rights under the Agreement all "manifest an intent to be bound" by that Agreement.

To support the argument that J&J did not intend to be bound by the Agreement, Defendants rely principally on inapposite cases concerning allegations of veil piercing or "alter ego" theories. Mot. at 19-22. For example, Defendants cite *Crabtree v. Tristar Auto. Grp., Inc.*, 776 F. Supp. 155, 166 (S.D.N.Y. 1991), to support their contention that "a non-signatory to a contract cannot be named as a defendant in a breach of contract action[.]" *Id.*; Mot. at 19. But the Court in *Crabtree* found that individual defendants could not be reached for damages **by piercing the corporate veil**. But ChemImage has not alleged that Ethicon is an alter ego of J&J or that Ethicon is merely a vehicle through which J&J conducted its operations.[4] Similarly, *World Wide Packaging, LLC v. Cargo Cosmetics, LLC*, 144 N.Y.S.3d 41 (1st Dep't 2021) involved a complaint that was "silent on how the business relationship between plaintiff and the subsidiary defendants had evolved" and there was "no allegation about who negotiated the pricing or the general terms." *Id.* at 42. So too in *Clarke v. TRIGO U.S., Inc.*, 2023 WL 2456814 (S.D.N.Y. Mar. 10, 2023), where the plaintiff relied on a "Letter of Intent" sent by the non-signatory party, which the court found to be extrinsic and unenforceable. The allegations here bear no similarities to those raised

---

[4]   *Array BioPharma, Inc. v. AstraZeneca AB*, 126 N.Y.S.3d 91 (1st Dep't 2020) is similarly inapposite, as it involved the dismissal of the plaintiff's breach of contract claim on the basis of a failure to plead any facts to support **veil piercing or alter ego theories**. Likewise, the plaintiff in *Capricorn Invs. III, L.P. v Coolbrands Int'l, Inc.*, 897 N.Y.S.2d 668 (N.Y. Sup. Ct. 2009) contended that the defendant parent company was a **corporate shell** for the subsidiary.

in *Clarke* or *World Wide Packaging*, and instead make clear that J&J actively negotiated the Agreement alongside Ethicon and gave final approval to the Agreement. ¶¶ 39-44.

And to the extent Defendants cite to *Alaska*, which at least applies the appropriate legal standard, the facts of that case paint a different picture than what ChemImage has alleged with respect to J&J. The plaintiff in *Alaska* did not allege that the defendant parent company was involved in contract negotiations or played any role in pre-execution decision-making; instead, the *Alaska* plaintiff argued that, "[a]t most," the parent and its subsidiary "had a close relationship." 306 F. Supp. 3d at 625. As detailed above, ChemImage's allegations of J&J's involvement in the negotiations are far more robust, spanning both the pre-and post-execution period. *See* discussion *supra* pp. 4, 9-10. And as the *Alaska* Court recognized, a non-signatory ***does*** manifest an intent to be bound where, as here, the non-signatory "was the key decision-maker in contract negotiations" or "attended meetings…and participated in the negotiations and drafting" of the contract. *Alaska* at 625 (citations omitted); *see* Compl. ¶¶ 40-46.

In sum, the Complaint pleads a plausible inference that J&J manifested an intent to be bound by the Agreement sufficient to survive a motion to dismiss. *See, e.g.*, *DKR Capital, Inc. v. AIG Int'l W. Broadway Fund, Ltd.*, 2003 WL 22283836, at *1 (S.D.N.Y. Oct. 2, 2003) ("[D]efendant's motion to dismiss should be granted only if it appears that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief.").

## II. CHEMIMAGE HAS STATED A CLAIM FOR TORTIOUS INTERFERENCE AGAINST JOHNSON & JOHNSON

Defendants assert that ChemImage's claim against J&J for tortious interference must be dismissed because it is "impermissibly duplicative of its contract claim" and because J&J, as corporate parent, was entitled to interfere with the Agreement to protect its economic interests.

*See* Mot. at 22-25. For the reasons below, neither of these arguments support dismissal of the tortious interference claim at this stage.

A. **The Tortious Interference Claim Arises Under a Separate Set of Facts Than the Contract Claim**

As an initial matter, Defendants contend the tortious interference claim against J&J must be dismissed because it is duplicative of ChemImage's contract claim against J&J. *See* Mot. at 22-23. While, as a general rule, courts in this circuit do not permit the "exact[] same conduct ... to be assigned as both a breach of contract and a tort," *Maricultura Del Norte, S. de R.L. de C.V. v. Umamie Sustainable Seafood, Inc.*, 769 Fed. Appx. 44, 55 (2d Cir. 2019), that general rule is not applicable where "plaintiffs show that their tort claim is based on a duty that springs from circumstances extraneous to and not constituting elements of, the parties' contract." *Horowitz v. Nat'l Gas & Elec., LLC*, 2018 WL 4572244, at *7 (S.D.N.Y. Sept. 24, 2018) (internal quotations and citation omitted). ChemImage "ha[s] met that burden here" because its "tortious interference claim can stand entirely on [J&J's] alleged interference with [Ethicon's] obligations to [ChemImage]" under the Agreement. *Id.*

Indeed, this reasoning applies *a fortiori* where, as here, J&J has not conceded its obligations under the Agreement. *See id.* (denying motion to dismiss tortious interference claim as duplicative of contract claim in part because defendant contested that it was a party to the contract at issue); *see also S&S Hotel Ventures Ltd. Partnership v. 777 S.H. Corp.*, 489 N.Y.S.2d 478, 481 (N.Y. App. Div. 1985) (reversing dismissal of tortious interference claim where plaintiff "allege[d] a breach of duty by defendant to refrain from interfering ... separate and distinct from" defendant's breach of contract).

Plaintiff has plausibly pled the elements of a tortious interference claim against J&J and that the actions constituting J&J's interference are separate from and extraneous to its actions

constituting a breach of contract. To state a claim for tortious interference with contract under New York Law, ChemImage "must allege that (1) a valid and enforceable contract between the plaintiff and a third party existed; (2) the defendants had knowledge of the contract; (3) the defendants intentionally procured the breach; and (4) the plaintiff suffered damages." *Zeising v. Kelly*, 152 F. Supp. 2d 335, 349 (S.D.N.Y. 2001). ChemImage has alleged the existence of a valid and enforceable contract, ¶¶ 48-77, 151, that J&J had knowledge of the contract, ¶¶ 37-47, 152, that J&J intentionally procured a breach of the Agreement by Ethicon, ¶¶ 84-85, 102-03, 114-16, 119-20, 154, and that ChemImage suffered damages as a result. ¶¶ 115, 120, 157-59. Moreover, the allegations in the Complaint sufficiently allege that J&J's actions constituting tortious interference—*e.g.* hamstringing the JSC at critical junctures and directing Ethicon to fabricate a "for cause" termination of the Agreement without justification—are based on a separate duty (the duty not to interfere with the contractual relationship between ChemImage and Ethicon) than the obligations J&J itself assumed under the contract (the duty to jointly develop and commercialize the technology and make Milestone payments).

And Defendants are incorrect that ChemImage's damages prayer heralds an impermissibly duplicative tort claim. *See* Mot. at 22-23. As an initial matter, Defendants' *ipse dixit* that ChemImage's damages claims for "lost opportunities from J&J's pretextual impairment of ChemImage's intellectual property and the total impairment of the value of ChemImage" is "vague" is easily disproven. *Id.* ChemImage has alleged, for instance, that J&J intentionally terminated the Agreement in a way that would prevent ChemImage from partnering with a competitor by miring its intellectual property. ¶¶ 11, 115-16, 119-20, 156. The Amended Complaint further alleges that ChemImage "continues to receive solicitations from interested investors and business partners, but is unable to pursue these offers as a direct result of J&J's

unjustified directive to Ethicon to terminate the Agreement." ¶ 156. "Damages for tortious interference can include (a) the pecuniary loss of the benefits of the contract … ; (b) consequential losses for which the interference is the legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference." *AP Links, LLC v. Russ*, 2017 WL 3394599, at *8 (E.D.N.Y. Aug. 7, 2017) (quoting *Int'l Minerals and Resources, S.A. v. Pappas*, 96 F. 3d 586, 597 (2d Cir. 1996)) (cleaned up). ChemImage has properly alleged unique damages arising from J&J's tortious interference.

Moreover, it would be irrelevant even if ChemImage had not properly pled a separate quantum of damages against J&J for its tortious interference with the Agreement. "[T]he proponent of a tortious interference claim may allege as damages the loss suffered by the plaintiff, including the opportunities for profits on business diverted from it." *Cerberus Capital Mgmt., L.P. v. Snelling & Snelling, Inc.*, 2005 WL 4441899, at *6 (N.Y. Sup. Ct. Dec. 19, 2005) (internal citation and quotations omitted) ; *see also Pappas*, 96 F.3d 586, 597 ("It is well-settled that, under New York law, a plaintiff in a tortious interference with contract case is entitled to damages in the amount of the full pecuniary loss of the benefits of the contract[.]").

## B. ChemImage Has Stated a Claim for Tortious Interference

Defendants further assert that ChemImage failed to state a claim for tortious interference because J&J was privileged, as the parent of its subsidiary Ethicon, to interfere in the Agreement in order to protect its economic interests. Mot. at 23-25. At the outset, Defendants' claim fails because "[t]he economic interest defense does not apply … where the allegedly interfering part[y] acted to protect their own interest instead of their interest in the breaching party's business." *VR Optics, LLC v. Peloton Interactive, Inc.*, 2017 WL 3600427, at *5 (S.D.N.Y. Aug. 18, 2017); *see also Horowitz*, 2018 WL 4572244 at *6 (rejecting economic interest defense where plaintiff did not allege that third party's interference with contract "was for anyone's benefit other than" that

of the third party).  The Amended Complaint makes clear that J&J's interference was done for its own benefit as part of a broader shift in corporate strategy.  *See* ¶ 11 ("J&J instructed Ethicon to terminate the Agreement under Section 10.3 not only to avoid Section 10.4's $40 million termination fee, but also … [to] tie up ChemImage's core intellectual property and ***J&J saw that as an opportunity*** to give its 'pet project'—Verb—a head start."); ¶¶ 115-16 (explaining that "Ethicon's pretextual termination was done ***at J&J's direction***" following its "strategic decision to retreat from aspects of its failed surgical robotics play and redirect resources to Verb") (emphasis added); ¶¶ 118-120 (discussing the "shift in ***J&J's corporate priorities***" that caused it to "knowingly and intentionally cause[] Ethicon to breach the Agreement") (emphasis added).

Moreover, the economic interest defense is not available to a defendant that acted with malice, *i.e.* "intentionally and with improper motives."  *In re Signature Apparel Grp. LLC*, 577 B.R. 54, 115 (Bankr. S.D.N.Y. 2017); *see also Kargo, Inc. v. Pegaso PCS, S.A. de C.V.*, 2008 WL 2930546, at *10 (S.D.N.Y. July 29, 2008) (economic interest defense may be rebutted upon "a showing either of malice on the one hand, or fraudulent or illegal means on the other").  Malice in the legal sense is ascribed a "liberal meaning" and includes "the intentional doing of a wrongful act without legal justification."  *Georgitsi Realty, LLC v. Penn-Star Ins.*, 702 F.3d 152, 156 (2d Cir. 2012).  Thus, the economic interest defense does not permit J&J to intentionally and improperly scheme to create the circumstances by which a "for cause" termination of the Agreement might come to fruition, nor could J&J instruct Ethicon to fabricate a material breach of the Agreement to avoid having to pay the $40 million termination fee and prevent ChemImage from partnering with a competitor.

Yet this is precisely what ChemImage has alleged: that J&J "knowingly" and "intentionally" interfered in the relationship between ChemImage and Ethicon in order to

"hamstring ChemImage's valuable intellectual property and prevent it from going to a competitor."

¶ 120. At the very least, Plaintiff has raised an issue of material fact over whether J&J's orchestration of the termination was "wrongful and without legal justification." In light of these allegations, Defendants have not met their burden of showing that they are entitled to summary dismissal of this claim.

## III. CHEMIMAGE HAS STATED A CLAIM FOR DIRECT DAMAGES

As to ChemImage's contract claim, Defendants move to dismiss damages in excess of $40 million under the theory that the $40 million termination fee—in Section 10.4 of the Agreement—limits their liability. But Defendants ignore a bright red flag of their own creation: they did not terminate under Section 10.4. Instead, they chose to pretextually terminate "for cause" under a **different** section, Section 10.3, precisely **to avoid** the termination fee. *See* ¶¶ 114-15. Having elected to terminate under Section 10.3, Defendants relinquished their right to take cover under the $40 million termination fee for their bad acts. The plain reading of the Agreement (which has no analogous fee in the event of a "for cause" termination) ends Defendants' campaign to limit ChemImage's recovery. Nevertheless, Defendants' arguments also fail for the following reasons.

### A. The Agreement Explicitly Contemplates the Damages ChemImage Seeks

Defendants assert that ChemImage impermissibly seeks to recover for "amounts it supposedly would have earned years into the future *if* the parties' relationship had continued and *if* ChemImage's technology had been successfully developed," including Development Payments, Milestone Payments, and Patent Royalties. Mot. at 14-15. ChemImage's loss of these payments is not a speculative harm ChemImage might face in the future—it is an injury it feels now as a result of Defendants' decision to shutter the program and breach the Agreement. "In New York, it is well established that the non-breaching party may recover 'general damages which are the natural and probable consequence of the breach.'" *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85

(2d Cir. 2021) (quoting *Kenford Co. v. Cty. of Erie*, 73 N.Y.2d 312, 319 (N.Y. 1989)). "These direct damages are usually expectation damages, measured by what it would take to put the non-breaching party in the same position that it would be in had the breaching party performed as promised under the contract.'" *Id.* (citations omitted). Under New York law, "[l]ost profits may be either general or consequential damages, depending on whether the non-breaching party bargained for such profits and they are the direct and immediate fruits of the contract." *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 11 N.E.3d 676, 680 (N.Y. 2014) (citations omitted). "To recover damages, [ChemImage] must establish with certainty that it suffered some loss, but it need not prove the amount of loss with certainty." *Merrill Lynch Capo. Servs., Inc. v. UISA Fin.*, 2012 WL 1202034, *22 (S.D.N.Y. Apr. 10, 2012) (cleaned up).

Defendants correctly note that Section 8.4 of the Agreement speaks to "the amounts that may be recovered in the event of a breach or termination," but go to great lengths to avoid the plain language of that provision. *Compare* Mot. at 17 *with* Agreement § 8.4. Section 8.4 reflects the parties' carefully crafted intent: while disclaiming generally any liability for "special, indirect, incidental, consequential, punitive or exemplary damages, including but not limited to lost profits or revenue," the Agreement carves out an exception to this general prohibition by proclaiming that, "[f]or the avoidance of doubt … liability for lost Development Payments, Milestone Payments, or Patent Royalties payable hereunder ***shall not be deemed anything other than direct damages***," which are recoverable under the contract. ¶ 136; *see also* Agreement § 8.4, Ex. B (providing for $23 million in Development Milestone Payments and $126 million in Regulatory Milestone Payments). Despite this plain language, Defendants urge the Court to read a general limitation on lost profit damages to override the more specific provision that unequivocally defines these specific amounts as "direct damages." *See, e.g., Oldcastle Precast, Inc. v. U.S. Fid. & Guar.*

*Co.*, 458 F. Supp. 2d 131, 142 (S.D.N.Y. 2006) ("Where there is an inconsistency between a specific provision and a general provision of a contract, the specific provision controls.").  But neither the plain text of the Agreement nor New York law sanction this backward interpretation.

Far from being "speculative and unfounded," Mot. at 17, the damages ChemImage seeks are consistent both with New York law and the parties' clear intent as expressed in the Agreement. Each category of damages ChemImage seeks is a defined term with a prescribed dollar value, and was explicitly carved out from Section 8.4's limitation of liability: Development Payments ($23 million); Milestone Payments ($126 Million); and Patent Royalties (defined and priced per unit in § 5.4 of the Agreement and estimated by the parties' external valuation consultant to be approximately $1.5 billion, ¶¶ 5, 42, 159).  To read the Agreement—as Defendants urge—to preclude recovery of specific damages clearly bargained for by the parties would upend the parties' intent and transgress bedrock New York law.  *See Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) ("It is axiomatic under New York law … that the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties.") (cleaned up).

And Defendants' interpretation of the word "payable" as limiting ChemImage's recovery to any amounts already due and owing relies on a misreading of the Agreement and is similarly unsupported by the law.  *See* Mot. at 18.  Section 8.4 provides that "liability for lost Development Payments, Milestone Payments or Patent Royalties payable hereunder ***shall not be deemed anything other than direct damages***."  (emphasis added).  In reading Section 8.4, Defendants emphasize the word "payable" but ignore the word "***lost***."  Payments currently owed to ChemImage cannot plausibly be described as "***lost*** Development Payments, Milestone Payments or Patent Royalties."  The word "lost" has a "plain meaning" in the damages context: "profits that

*would have been made*" if not for the breach.[5]  Lost Profits, *Black's Law Dictionary* (11th ed. 2019); *see also Paine Webber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) ("In interpreting a contract, words and phrases are given their plain meaning.") (cleaned up).  By its plain terms, the Agreement contemplates damages for "***lost***" Milestones and Royalties, *i.e.* Milestones and Royalties that ***would have been earned*** if not for Defendants' breach.  ChemImage is therefore entitled to recover these amounts as direct damages because they are "precisely what [ChemImage] bargained for, and only an award of damages equal to lost profits will put [ChemImage] in the same position [it] would have occupied had the contract been performed." *Tractabel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109-10 (2d Cir. 2007); *see also Ullman-Briggs, Inc. v. Salton, Inc.*, 754 F. Supp. 1003, 1008 (S.D.N.Y. 1991) ("Damages in a breach of contract action are intended to put the injured party in the same position they would have been in if the contract had been performed.").

Defendants' contention regarding "payable" is also rooted in a strained interpretation of New York law that defies common sense, citing *Royal Indem. Co. v. Wyckoff Heights Hosp.* for the proposition that the "the only reasonable understanding of the term payable is a sum which is enforceably due or obligated, but not yet actually remitted."  Mot. at 18 (internal quotations omitted).  But in *Wyckoff*, the Court was interpreting a specific insurance policy term, "Ultimate Net Loss," that was defined by the policy to mean "the total sums actually paid or payable as damages in a settlement of claim."  953 F. Supp. 460, 464 (E.D.N.Y. 1996).  The court reasoned that the policyholder's reading of the term "payable" to mean, at any time "now or in the future"

---

[5]  ChemImage has alleged that Defendants' breach was the but for cause of its damages.  *See* ¶ 135.  The fact that ChemImage's damages are forward looking does not render them incapable of being remedied.  *See Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007, 1010-11 (N.Y. 1993) (party may recover for lost profits that were "within the contemplation of the parties at the time the contract was entered into and are capable of measurement with reasonable certainty").

would be "untenable" because it would allow the policyholder to trigger its policy coverage on the basis of speculative losses that had yet to occur. *Wyckoff*, at 465. Indeed, as the *Wyckoff* court recognized, "'payable' might mean a future obligation in some circumstances," but it did not make sense in the context of the specific insurance policy at issue. *Id.* In this context, however, where the parties contracted that "lost" *i.e.* future Milestone Payments and Royalty Payments "payable [under the Agreement] shall not be deemed anything other than direct damages," a more contextually appropriate reading of the word "payable" is its ordinary usage, which is simply an amount "that is to be paid." *See* Payable, *Black's Law Dictionary* (11th ed. 2019) ("(Of a sum of money or a negotiable instrument) that is to be paid. An amount may be payable without being due.").

**B.    The $40 Million Termination Fee Is Not a Limitation on Liability**

Defendants also seek summary dismissal of the vast majority of ChemImage's damages under the flawed premise that "[e]ven if ChemImage could show that Ethicon failed to properly terminate *for cause*, ChemImage's damages would be limited to the amounts it would have received if Ethicon had terminated *without* cause." Mot. at 14; *see also id.* at 17. But this would be true only if the $40 million fee for a "without cause" termination were a limitation on liability, which it is not.

Contrary to Defendants' assertion, in New York, "the mere inclusion of a right to terminate … [does not] negat[e] any liability for lost profits regardless of whether" Defendants had the option, pre-termination, to pay a fee and terminate the Agreement without cause. *Millgard Corp. v. E.E. Cruz/Nab/Frontier-Kemper*, 2003 WL 22801519, at *2 (S.D.N.Y. Nov. 24, 2003). Indeed, the law is clear that "[l]imitations on a party's liability will not be implied and to be enforceable must be clearly, explicitly and unambiguously expressed in a contract." *Terminal Cent., Inc. v. Henry Modell & Co., Inc.*, 628 N.Y.S.2d 56, 59 (N.Y. App. Div. 1995). Similarly, New York

courts reject efforts to limit contractual remedies in the event of a breach unless the contracting parties made a particular remedy "clearly exclusive on its face." *Kahala Corp. v. Holtzman*, 2011 WL 1118679, at *3 (S.D.N.Y. Mar. 24, 2011) (discussing *In re Hale Desk Co.*, 97 F.2d 372, 373 (2d Cir. 1938)).

It is therefore dispositive that the parties contracted for a $40 million termination fee, *not* a $40 million limitation on liability, as Defendants claim. *See* Mot. at 14-15; *see also* ¶¶ 9, 64, 74-77. The Agreement does not designate the $40 million termination fee a "limitation of liability." Instead, it is a fee that Defendants agreed to pay ChemImage in the event Defendants terminated the Agreement without cause. *See* Agreement § 10.4 ("Termination under [this section] shall be effective only if … [Ethicon] shall pay to [ChemImage] by wire transfer a non-refundable sum equal to Forty Million Dollars ($40,000,000.00)."). Had the parties intended to cast Section 10.4's $40 million termination fee as a limit on Defendants' liability, "they surely would have spelled that out in the Agreement." *CBS Broadcasting Inc. v. Jones*, 460 F. Supp. 2d 500, 505 (S.D.N.Y. 2006). Moreover, as discussed *supra*, the parties **did** bargain for other limitations on liability in Section 8.4 of the Agreement, but they not only elected not to define the termination fee as a cap on damages, but also explicitly carved out the direct damages ChemImage seeks in this action.

## C. Damages Are Not Limited to the Notice Period

Finally, Defendants assert that any damages ChemImage may recover beyond the $40 million termination fee "are limited to the notice period." Mot. at 15. But Defendants' interpretation can be supported only by ignoring key provisions of the Agreement, including Section 8.4, which explicitly defines "lost" future Milestone Payments and Royalty Payments as "direct damages." ¶¶ 62-64. Accepting Defendants' proposed cap on ChemImage's damages would nullify Section 8.4's bargained-for carveout for lost Milestones and Royalties and read it

out of the Agreement.[6]  *See Addison Terry Co., Inc. v. N.F.L. Films, Inc.*, 390 F. Supp. 621, 623 (S.D.N.Y. 1974) ("It is a cardinal rule of construction that a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect.") (cleaned up). Defendants should not be permitted to avoid their contractual obligations by cobbling together such a strained reading of the Agreement.

*Ciamara Corp. v. Widelab, Inc.* does not help Defendants' position.  *See* Mot. at 15, 17, 19.  In *Ciamara*, the court dismissed plaintiff's "lost future profits, harm to business reputation, and loss of goodwill" damages on the basis that the damages were speculative "volume targets" "more accurately describe[d]" as plaintiff's "obligations" than promises of defendant's liability "in the event of its breach."  2013 WL 6331927, at *4, *5(S.D.N.Y. Dec. 5, 2013).  Here, the Development Payments and Milestone Payments are not speculative—they were specifically defined in the Agreement as "direct damages" with a fixed amount.  *See* Agreement § 8.4; *see also supra* Section III.A.  And, unlike the "volume targets" in *Ciamara*, the parties here understood that lost Royalty Payments were "the probable result of a breach," *id.* at 4 (quoting *Kenford Co.*, 73 N.Y.2d at 319 ), as evidenced by the Agreement's characterization of lost Royalty Payments as "direct damages" that "***shall***" be paid "in partial consideration for the grant of rights."  Agreement §§ 5.3, 5.4, 8.4 (emphasis added).  These direct damages are a far cry from the speculative and unrecoverable "volume targets" at issue in *Ciamara*.

Defendants' other cases concern contracts terminable for convenience or without payment of a termination fee and are similarly inapposite.  For example, the defendant in *TNT USA Inc. v. DHL Exp. (USA), Inc.* had "an **unconditional** right to terminate the Agreement without cause on

---

[6]   It would also defeat the parties' agreement to designate Development Payments, Milestone Payments, and Royalty Payments as "partial consideration for the grant of rights" under the Agreement.  *See* Agreement §§ 5.3-5.4.

two years' notice." 2012 WL 601452, at *7 (E.D.N.Y. Feb. 23, 2012). But the lengthy, two-year notice period in *TNT* was key to the court's determination that limiting damages was warranted because "the higher costs [plaintiff] had to pay" for a substitute carrier in the wake of defendants' breach were "precisely … the damages to which plaintiff will be entitled if it can prove them at trial." *Id.* at *8. That is entirely different than the Agreement here, where "for cause" termination caused ChemImage to lose out not only on the bargained-for $40 million termination fee, but also the full value of its intellectual property. Under these circumstances, ChemImage could not simply "pay higher rates for the duration of the Agreement" to finish the Project's development with a substitute partner. *Id.*[7]

Defendants' reliance on *Watermelons Plus, Inc. v New York City Dept. of Educ.* is similarly unpersuasive. There, plaintiff's recovery was limited to damages accrued during a notice period following the termination of a supply contract that was terminable "for convenience." 76 A.D.3d 973, 974 (N.Y. App. Div. 2010). Significantly, however, it was the *Watermelons Plus* **plaintiff** that had expressly repudiated the contract—not the defendant. *Id.* And both *Bitterman v. Gluck* and *Watson v. Russell* concern at-will employment contracts facially unlike the Agreement here. *See Bitterman v. Gluck*, 256 A.D. 336, 337 (N.Y. App. Div. 1939); *Watson v. Russell*, 44 N.E. 161, 162 (N.Y. 1896). While limiting damages to a notice period may make sense under a supply contract or where a contract is terminable for convenience, where, as here, the parties have

---

[7] Similarly, in *Millgard*, the Court held that the plaintiff was entitled to recover lost profits "up to the time when [the contract] would have been terminated for convenience due to the impossibility of th[e] design" plaintiff contracted to produce. *Millgard Corp. v. E.E. Cruz/NAB/Frontier-Kemper*, 329 Fed. Appx. 307, 309 (2d Cir. 2009). ChemImage has alleged—and Defendants do not contest for the purposes of this Motion—that ChemImage's continued performance under the Agreement was feasible with Defendants' cooperation. *See* Compl. ¶¶ 98, 109, 129, 156. And, unlike in this case, the contract at issue in *Millgard* afforded the defendant the unilateral right to terminate for any reason without payment of a termination fee.

contracted for a sizable termination fee and structured their Agreement to contemplate not just development of the technology but also licensing and commercialization, limiting damages to a short notice period defeats the purpose of the bargained-for termination fee and incentivizes Defendants to concoct any basis, no matter how pretextual, for a "for cause" termination. Defendants do not cite any legal authority for the proposition that limiting damages to the notice period is warranted under these circumstances.

Reading the Agreement as precluding ChemImage from recovering damages beyond the $40 million termination fee would upend the parties' expectations and render the "direct damages" carveout in Section 8.4 superfluous. This unsupportable interpretation is not what the parties bargained for. Defendants should not be permitted to create an entirely new contractual provision that simultaneously imposes a $40 million *limitation* on ChemImage's liability while sanctioning Defendants' pretextual termination of the ChemImage partnership. Defendants' interpretation must be rejected.

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be dismissed in its entirety.

DATED:        June 18, 2024

                                    QUINN EMANUEL URQUHART &
                                    SULLIVAN, LLP


                                    By: /s/        *Alex Spiro*

                                    Alex Spiro
                                    Andrew J. Rossman
                                    Courtney C. Whang
                                    51 Madison Avenue, 22nd Floor
                                    New York, New York 10010-1601
                                    Telephone: (212) 849-7000
                                    Fax: (212) 849-7100
                                    alexspiro@quinnemanuel.com
                                    andrewrossman@quinnemanuel.com
                                    courtneywhang@quinnemanuel.com