```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                                       :
CHEMIMAGE CORPORATION,                                                 :
                                                                       :
                               Plaintiff,                              :
                                                                       :          24-CV-2646 (JMF)
               -v-                                                     :
                                                                       :          OPINION AND ORDER
JOHNSON & JOHNSON et al.,                                              :
                                                                       :
                               Defendants.                             :
                                                                       :
-----------------------------------------------------------------------X
```

JESSE M. FURMAN, United States District Judge:

ChemImage Corporation ("ChemImage"), a company that pioneered certain imaging technology, brings this suit for breach of contract and tortious interference against Johnson & Johnson ("J&J"), a global company engaged in the research, development, manufacture, and sale of a range of healthcare products, and Ethicon, Inc. ("Ethicon"), a wholly owned subsidiary of J&J responsible for the development and commercialization of J&J's surgical intervention technologies. ChemImage alleges that J&J and Ethicon improperly terminated (or interfered with) an agreement between ChemImage and Ethicon regarding the development and sale of certain artificial-intelligence-based light imaging technology. ChemImage seeks over $1.5 billion in damages. Defendants now move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for partial dismissal of the Amended Complaint. Specifically, they seek to dismiss all claims against J&J and to cap ChemImage's damages at $40 million pursuant to a contractual provision regarding termination by Ethicon without cause. For the reasons that follow, the Court concludes that ChemImage pleads plausible claims against J&J but that ChemImage's damages are indeed limited (though not necessarily to $40 million). Accordingly, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

## BACKGROUND

The following facts, drawn from ChemImage's Amended Complaint, *see* ECF No. 36 ("Compl."), and from the operative agreement between ChemImage and Ethicon, *see* ECF No. 36-1 ("Agreement"), are assumed to be true for purposes of this motion.[1] *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

ChemImage has developed groundbreaking imaging technology that can assist with the detection of tumor lesions and margins, key anatomic structures, and tissue perfusion during surgical procedures, offering surgeons a simpler way to identify critical structures and abnormal areas during surgery. *See* ECF No. 36 ("Compl."), ¶¶ 36-37. In or around 2019, J&J and Ethicon sought to partner with ChemImage in an effort for J&J to close the gap with its competitors in the surgical robotics space. *Id.* ¶¶ 34-38. ChemImage, Ethicon, and J&J negotiated an agreement that would govern the development and commercialization of the ChemImage technology. *Id.* ¶ 39. Several J&J executives were involved in negotiations, among others. *Id.* ¶¶ 40-41. During negotiations, Ethicon and ChemImage retained external valuation experts to develop a model for projecting anticipated royalty revenues from the commercialization of the technology. *Id.* ¶ 42. They projected that the project would generate between $1.3 billion and $1.7 billion in royalties to ChemImage. *Id.*

On December 27, 2019, ChemImage and Ethicon entered into a Research, Development, License and Commercialization Agreement (the "Agreement"), which outlined the project, detailed the parties' intellectual property rights, and prescribed the allocation of proceeds from any successful commercialization of the technology. *Id.* ¶¶ 48-49; *see also* Agreement. The Agreement outlined an iterative development process, with six development milestones and six regulatory

---

[1]      The Amended Complaint and the Agreement are both sealed. Redacted versions appear at ECF No. 38 and ECF No. 38-1, respectively.

milestones, "target dates" for certain research and development tasks, and "anticipated invoice date[s]" for the milestones to be paid by Ethicon. Compl. ¶¶ 50-51; *see also* Agreement Ex. B. The Agreement did not itself mandate the technical requirements or data protocols required to meet each milestone, but it provided for the formation of a Joint Steering Committee ("JSC") that was to include, at all times, two senior employees each from ChemImage and Ethicon with decision-making authority and was to meet at least once every six months. Compl. ¶¶ 52-54, 56; *see also* Agreement § 2.4. Various J&J executives served on the JSC or attended its meetings. Compl. ¶ 55. The JSC was responsible for making decisions around key processes and deliverables that would move the project forward, including the critical task of determining whether a given milestone had been met. *Id.* ¶ 57. All JSC decisions required a unanimous vote; in the event that the JSC was unable to reach a unanimous decision, the Agreement outlined an alternative dispute resolution process. *Id.* ¶ 58; *see also* Agreement § 2.4.3.

Under the Agreement, Ethicon agreed to pay ChemImage $7 million up front, a total of $149 million if all of the milestones were met, and royalty payments to be paid upon commercialization; projections valued these potential royalty payments at $1.5 billion or more. Compl. ¶¶ 59-61; *see also* Agreement §§ 5.3, 5.4, Ex. B. The Agreement included two termination provisions: one regarding for-cause termination and one regarding without-cause termination. As relevant here, Ethicon was permitted to terminate the Agreement *for cause* if ChemImage was in material breach and failed to cure such breach within thirty days of receiving written notice. Compl. ¶¶ 66-73; *see also* Agreement § 10.3. If Ethicon terminated for cause, ChemImage would grant Ethicon certain limited intellectual property rights. Compl. ¶ 71; *see also* Agreement § 10.3.3. Ethicon was also permitted to terminate *without cause* upon 120 days' notice and the payment of $40 million. Compl. ¶¶ 74-77; *see also* Agreement § 10.4. If Ethicon terminated without cause, Ethicon would relinquish all rights to ChemImage's intellectual property, and Ethicon would grant ChemImage a

3

non-exclusive license to any jointly developed intellectual property. Compl. ¶ 76; *see also* Agreement § 10.4.4.

In October 2020, the JSC determined that ChemImage achieved the first milestone, "Milestone 1A." Compl. ¶ 78. Ethicon then proceeded to slow-roll development under the Agreement, delaying efforts by failing to timely provide the necessary equipment, facilities, testing support, and materials to continue development, and unilaterally pushing for extensions of relevant deadlines. *Id.* ¶¶ 80-85. Once the project had progressed enough to require decisions involving study design, research methodology, and data analysis and integrity, ChemImage and Ethicon formed the Data Review Board ("DRB"), which was responsible for reviewing data quality, data processing strategies, and assessment methods. *Id.* ¶¶ 88-89. Employees from both Ethicon and J&J participated in DRB meetings, and J&J also retained a third-party consultant, Cambridge Consultants, to assist with its evaluation of the algorithm and data framework and to participate in DRB meetings. *Id.* ¶¶ 90-91. Among the protocols discussed and adopted by the DRB was the use of "ignore labels," which were to be applied to any object in a data set that was not affirmatively identified with certainty by a trained human such that the image would be excluded from the calculations for evaluation. *Id.* ¶¶ 93-95.

Achieving the next milestone — "Milestone 1B" — required ChemImage software to be paired with Ethicon-designed hardware. *Id.* ¶ 96. In mid-2022, the JSC convened and, with Ethicon's encouragement, narrowed the scope of the milestone to focus only on veins, arteries, and bile ducts and postponed work on ureters and nerves. *Id.* ChemImage prepared an interim report on its progress for the JSC's review at the October 14, 2022 JSC meeting, following which the JSC finalized the acceptance protocol for the milestone. *Id.* ¶ 97. After multiple collaborative rounds of testing and review, on December 16, 2022, ChemImage submitted its final report purporting to demonstrate that the next milestone had been achieved. *Id.* ¶ 99; *see* ECF No. 43-2. The JSC never

made its required determination as to whether the milestone had been achieved. Compl. ¶¶ 102-03. In fact, and notwithstanding ChemImage's insistence that the JSC make its determination, Ethicon and J&J refused to even attend further meetings. *Id.* ¶ 103.

On March 6, 2023, Ethicon sent ChemImage a letter indicating that it was terminating the Agreement "for cause for failure to achieve a Development Milestone, which constitutes a Material Breach," pointing to Ethicon's purported statement in June 2022 that the project was at risk of termination if ChemImage did not demonstrate technical feasibility by the end of the calendar year. *Id.* ¶¶ 105-06; *see also* ECF No. 43-1. ChemImage responded by stating that it was prepared to cure any identified deficiency or purported breach consistent with the Agreement, but that, given the nature of the project and lack of reasonable detail in the termination letter, it could not cure without additional information and cooperation from Ethicon. Compl. ¶ 109. The parties made an effort to resolve their dispute, but Ethicon unilaterally terminated the Agreement effective April 26, 2023, before that effort ran its course. *Id.* ¶¶ 110-13. ChemImage initially furloughed most of its employees, hoping to reach a resolution, but once it became clear that the Agreement was indeed terminated, it was forced to lay off all of its employees and eventually close its doors. *Id.* ¶ 124. This litigation followed.

ChemImage brings claims for breach of contract (against both Ethicon and J&J) and tortious interference with contract (against J&J only), seeking, among other damages, $18 million in lost "Development Milestone Payments," $126 million in lost "Regulatory Milestone Payments," and $1.5 billion in lost "Patent Royalties," as well as a declaratory judgment regarding intellectual property rights. *Id.* ¶¶ 125-66, Prayer for Relief.

## LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the

plaintiff. *See Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018). A court will not dismiss any claims unless the plaintiff has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) — that is, one that contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, a plaintiff must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusion" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Further, if the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* at 570.

## DISCUSSION

Defendants ask the Court to (1) dismiss all claims against J&J; and (2) cap damages for ChemImage's breach of contract claim at $40 million. The Court will address each issue in turn.

**A. The Claims Against J&J**

Defendants move to dismiss the contract claims against J&J on the ground that it was not a signatory to the Agreement. *See* ECF No. 42 ("Defs.' Mem."), at 19-22. In general, "a party who is not a signatory to a contract cannot be held liable for breaches of that contract." *MBIA Ins. Corp. v. Royal Bank of Canada*, 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009); *see EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty."). That is true even when, as here, the non-signatory (J&J) is the corporate parent of the signatory (Ethicon), as corporate parents and subsidiaries are "legally distinct entities" and "a contract under the corporate name of one is not treated as that of both." *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993). Significantly, however, a non-signatory can be held liable for breach where it manifests an intent to be bound by the contract. "Courts have found that a

6

non-signatory 'manifested an unequivocal intent to be bound' by a contract where the non-signatory . . . was the 'key decision-maker' in contract negotiations," *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 306 F. Supp. 3d 610, 625 (S.D.N.Y. 2018) (quoting *RUS, Inc. v. Bay Indus., Inc.*, No. 1-CV-6133 (GEL), 2004 WL 1240578, at *21 (S.D.N.Y. May 25, 2004)), "where it 'attended meetings . . . and participated in the negotiations and drafting' of the contract,'" *id.* (quoting *ESI, Inc. v. Coastal Corp.*, 61 F. Supp. 2d 35, 73-74 (S.D.N.Y. 1999)), or "where it micro-managed performance under the [c]ontract," *id.* (quoting *Impulse Mktg. Grp., Inc. v. Nat'l Small Bus. All., Inc.*, No. 5-CV-7776 (KMK), 2007 WL 1701813, at *6 (S.D.N.Y. June 12, 2007)) (cleaned up).

Whether ChemImage's allegations are sufficient to state a claim of breach against J&J as a non-signatory to the Agreement is a close question, but the Court concludes that they make the cut. For starters, there is a factual dispute with respect to whether certain people named in the Amended Complaint were, at the relevant times, employees of J&J or Ethicon (or perhaps both). *Compare* Defs.' Mem. 20-21, *with* ECF No. 47 ("Pl.'s Opp'n"), at 10 & n.3. Contrary to Defendants' suggestion, *see* Defs.' Mem. 20-21, the Court cannot resolve that dispute on the present record, and, in any event, ChemImage's allegations are not limited to those employees. ChemImage alleges broadly that "[a] number of high-level J&J employees were involved in negotiating and approving the Agreement," Compl. ¶¶ 40-41; that "J&J had ultimate decision-making authority over Ethicon and approved the Agreement," *id.* ¶ 43; that "J&J would directly benefit from the Agreement by enhancing its position in the surgical robotics space" and made various public representations holding out the partnership as being between ChemImage and J&J, *id.* ¶¶ 44-46; that J&J negotiated for a notice provision directing all Agreement-related communications between the parties to be sent to J&J's legal department, *id.* ¶ 47; and that J&J was consistently involved in various aspects of the performance of the Agreement, including "by appointing several members to the JSC," *id.* ¶ 55, participating in DRB meetings, *id.* ¶ 90, and retaining a third-party consultant "to assist with its

7

evaluation of the algorithm and data framework," *id.* ¶ 91.  More broadly, ChemImage alleges that Ethicon terminated the Agreement "at J&J's direction." *See, e.g.*, *id.* ¶¶ 10-11.

      These allegations may or may not prove to be true.  And there are facts in the record — most notably, a provision in the Agreement stating that "no provision of this Agreement shall be deemed or construed in any way to result in the creation of any rights or obligation in any Person not a Party to this Agreement," Agreement ¶ 12.21 — that cut against holding J&J liable for any breach.  But taken together, the allegations are enough for the Court to infer that J&J "was intimately involved in and would benefit from" the Agreement, that J&J "participated in the negotiation" of the Agreement, and that Ethicon "agreed to the contract under [J&J's] watch and control." *TransformaCon, Inc. v. Vista Equity Partners, Inc.*, No. 15-CV-3371 (SAS), 2015 WL 4461769, at *5 (S.D.N.Y. July 21, 2015); *see id.* at *5-6 (finding that the plaintiff had plausibly alleged that the parent company "manifested the intent to be bound by the contract because it participated in the negotiation and controlled the subsidiary during the contract negotiations for its own benefit").  Discovery may reveal that J&J did "manifest[] an unequivocal intent to be bound," *Alaska Elec. Pension Fund*, 306 F. Supp. 3d at 625, but for now, assuming the truth of ChemImage's allegations and drawing all plausible inferences in its favor, the Court cannot rule out the possibility of J&J being liable for any breach.

      Defendants' arguments with respect to ChemImage's tortious interference claim against J&J — that it is duplicative of the contract claim and that it fails to state a claim because J&J was acting to protect its own economic interest and because ChemImage fails to plausibly allege causation, *see* Defs.' Mem. 22-25 — can be even more swiftly rejected.  First, while the contract claim against J&J lives on, J&J very much does not concede that it is a party to the Agreement; it is thus manifestly *not* "undisputed that the relationship between the parties [is] defined by a written contract." *Horowitz v. Nat'l Gas & Elec., LLC*, No. 17-CV-7742 (JPO), 2018 WL 4572244, at *7

(S.D.N.Y. Sept. 24, 2018). It follows that ChemImage "may plead in the alternative both breach of contract and tortious interference claims." *Id.* Second, the so-called "economic interest" defense is "an affirmative defense to a tortious interference claim, rather than an element to be pled." *Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*, 450 F. Supp. 3d 358, 372 (S.D.N.Y. 2020). Accordingly, "it may be raised on a pre-answer motion to dismiss only if the facts establishing it are clear from the face of the complaint," which is not the case here. *Rizzo v. N.Y.C. Dep't of Sanitation*, No. 23-CV-7190 (JMF), 2024 WL 3274455, at *3 (S.D.N.Y. July 2, 2024). Finally, ChemImage alleges that J&J controlled Ethicon's conduct under the Agreement and ultimately directed Ethicon to terminate when its "corporate priorities" shifted and it perceived a "strategic" opportunity to "retreat from aspects of its failed surgical robotics play and redirect resources" elsewhere. *See, e.g.*, Compl. ¶¶ 115-20. That suffices to plead causation. *See, e.g.*, *Snowbridge Advisors LLC v. ESO Cap. Partners UK LLP*, 589 F. Supp. 3d 401, 420 (S.D.N.Y. 2022) ("To state a claim for tortious interference with contract, a plaintiff must [] allege that the contract would not have been breached but for the defendant's conduct." (internal quotation marks omitted)).

**B. Damages Recoverable Under the Agreement**

That leaves Defendants' arguments about the damages that ChemImage can recover for breach of contract. Under New York law, which applies here, "direct damages" for breach of contract — which is all that the Agreement allows, *see* Agreement § 8.4 — "are usually expectation damages, measured 'by what it would take to put the non-breaching party in the same position that it would be in had the breaching party performed as promised under the contract.'" *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021) (quoting *Latham Land I, LLC v. TGI Friday's, Inc.*, 948 N.Y.S.2d 147, 151-52 (3d Dep't 2012)). In line with this principle, courts applying New York law have long held that "[w]here a contract permits a party to terminate upon notice, and a party fails to provide the required notice, contract damages are limited to the notice

9

period." *TNT USA Inc. v. DHL Exp. (USA), Inc.*, No. 09-CV-481 (JS), 2012 WL 601452, at *7 (E.D.N.Y. Feb. 23, 2012) (quoting *Millenium Aviation Servs., Inc. v. Gen. Dynamics Co.*, 335 F. App'x 76, 78 (2d Cir. 2009) (summary order)); *accord Millgard Corp. v. E.E. Cruz/NAB/Frontier-Kemper*, 329 F. App'x 307, 310 (2d Cir. 2009) (summary order) ("[Plaintiff] is entitled to lost profits measured from the time of contract up to the time when it would have been terminated for convenience."); *Bitterman v. Gluck*, 256 A.D. 336, 337 (1st Dep't 1939) ("[D]amages are allowed only up to the time the contract would have terminated if notice had been given." (citing *inter alia Watson v. Russell*, 149 N.Y. 388, 391-92 (1896)); *cf. Watermelons Plus, Inc. v. N.Y.C. Dep't of Educ.*, 76 A.D.3d 973, 974 (1st Dep't 2010) (holding that the defendant could "not be subject to damages based on [the plaintiff's] alleged loss of future profits for any period following the 120th day, measured from the time when . . . [the plaintiff] expressly repudiated the contract, thus causing its effective termination as of that date, at the very latest"). Any damages beyond the notice period, these courts reason, "would put [the plaintiff] in a *better* position than it would have been had [the defendant] complied with the . . . notice termination provision; therefore they are not compensable expectation damages." *TNT USA, Inc. v. DHL Express (USA), Inc.*, No. 09-CV-481 (JS), 2013 WL 12366931, at *3 (E.D.N.Y. Mar. 19, 2013).

  In light of this precedent, Defendants are on firm ground in arguing that ChemImage cannot recover anywhere near the billions of dollars in damages that it seeks on its contract claim. Ethicon purported to terminate the Agreement for cause pursuant to Section 10.3 of the Agreement on March 6, 2023. *See* Compl. ¶¶ 105-06; *see also* ECF No. 43-1. If Defendants are right and that termination was proper because ChemImage had failed to achieve a specified milestone, *see* Agreement § 10.3.2 (specifying that ChemImage's "failure . . . to achieve a Development Milestone" would constitute "a material breach" that could justify termination for cause), then ChemImage's breach claim would fail and it would be entitled to no damages at all. But if

10

Defendants are wrong and Ethicon was not entitled to terminate for cause under Section 10.3, its notice of termination would, as ChemImage concedes, "amount to a termination *without cause*." Compl. ¶ 148; *see, e.g.*, *Process Am., Inc. v. Cynergy Holdings, LLC*, No. 12-CV-772 (BMC), 2014 WL 3844626, at *13 (E.D.N.Y. Apr. 30, 2014) ("Regardless of whether the February 2011 letter was a proper termination 'for cause' pursuant to [the agreement], the letter at the very least gave adequate notice of Cynergy's intent not to renew the [agreement] ninety days later, in May 2011 . . . . Thus, at the latest, Cynergy effectively terminated the Agreement without cause as of May 2011."). In that instance, ChemImage's damages would be limited to the $40 million termination fee for which it bargained, *see* Agreement § 10.4.1(a), and any direct damages that it would have incurred in the 120-day period after March 6, 2023.

      That dooms the vast majority of ChemImage's requested damages. Separate and apart from the $40 million termination fee, ChemImage seeks more than $140 million in milestone payments and $1.5 billion or more in royalty payments. *See* Compl., Prayer for Relief; Pl.'s Opp'n 19. In support of these requests, it points to Section 8.4 of the Agreement, which provides that "liability for lost Development Payments, Milestone Payments or Patent Royalties payable hereunder shall not be deemed anything other than direct damages." Pl.'s Opp'n 19 (quoting Agreement § 8.4). But even if that provision means what ChemImage says — which Defendants dispute, *see* Defs.' Mem. 18 — ChemImage would be eligible to recover damages only for "'lost' Milestones and Royalties, *i.e.*, Milestones and Royalties that *would have been earned* if not for Defendants' breach," *see* Pl.'s Opp'n 20, namely payments that "would have been earned" in the 120-day notice period following Ethicon's notice of termination. That rules out the $1.5 billion or more in royalty payments, as the parties were far from commercializing any product. And it rules out milestone payments that ChemImage does not allege it would have earned during the 120-day period after March 6, 2023. Whether or not these damages would otherwise qualify as direct, they are not

11

recoverable because they exceed "what it would take to put the non-breaching party in the same position that it would be in had the breaching party performed as promised under the contract." *Moreno-Godoy*, 7 F.4th at 85.

That said, Defendants go too far when they assert — as they do in their reply memorandum of law — that the $40 million termination fee "is a 'cap' on damages for ChemImage's claims." ECF No. 49 ("Defs.' Reply"), at 2. Instead, they get it right in their initial memorandum of law, when they argue that ChemImage's damages are limited to "(i) the agreed-upon $40 million termination fee, *plus* (ii) any damages that ChemImage can prove it would have incurred during the 120-day notice period from March 6 to July 4, 2023." Defs.' Mem. 16 (emphasis added); *accord id.* 18-19 & n.9. There may well be a "plus." For one thing, ChemImage alleges that it achieved Milestone 1B even before Ethicon's March 6, 2023 termination notice and, if true, it may be entitled the corresponding milestone payment. For another, ChemImage alleges that by wrongfully terminating the Agreement for cause under Section 10.3 rather than terminating the Agreement without cause under Section 10.4, Defendants "caused" it "damages far in excess of $40 million" because, "[w]ithout the $40 million and unimpeded rights to its core intellectual property, ChemImage lost the full value of its technology" and "eventually close[d] its doors." Compl. ¶¶ 122-24. The Court intimates no view on whether ChemImage can recover damages for these harms if it prevails on its claim of breach. For now, it is enough to say that ChemImage's damages are indeed limited and that most of the damages it seeks fall well outside of those limits.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. ChemImage's claims against J&J survive, at least for now, but its damages for the breach of contract claims, if proved, are limited to "(i) the agreed-upon $40 million termination fee,

12

plus (ii) any damages that ChemImage can prove it would have incurred during the 120-day notice period from March 6 to July 4, 2023." Defs.' Mem. 16.

Unless and until the Court orders otherwise, Defendants shall answer ChemImage's claims **within two weeks of the date of this Opinion and Order**.

The Clerk of Court is directed to terminate ECF No. 41.

SO ORDERED.

Dated: August 12, 2024
      New York, New York

                                                      JESSE M. FURMAN
                                          United States District Judge