UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                         :

CHEMIMAGE CORPORATION,         :

                 :

           Plaintiff,       :

                :          24-CV-2646 (JMF)

    -v-             :

                :     <u>AMENDED FINDINGS OF</u>

JOHNSON & JOHNSON et al.,     :     <u>FACT AND</u>

                :     <u>CONCLUSIONS OF LAW</u>[*]

          Defendants.   :

                :

------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

ChemImage Corporation ("ChemImage") is — or at least was — a company that specializes in chemical imaging technologies.  In 2019, it contracted with Ethicon, Inc. ("Ethicon"), a medical technology company that is wholly owned by the pharmaceutical giant Johnson & Johnson ("J&J"), to develop artificial intelligence-based light-imaging technologies for use in surgical procedures.  The agreement called for ChemImage to meet certain developmental and regulatory milestones, in which case it would receive substantial milestone payments from Ethicon.  By 2023, however, the project had fallen behind schedule and, dissatisfied with ChemImage's work, Ethicon terminated the agreement "for cause" on March 6, 2023, claiming that ChemImage had failed to achieve a milestone.  This litigation followed.

ChemImage brings a claim against Ethicon for breach of contract and a claim against J&J for tortious interference with contract.  *See* ECF No. 36 ("Compl.").  Specifically, ChemImage

---

[*]      These Amended Findings of Fact and Conclusions of Law incorporate two edits on Pages 56-57 that are described in a separate Memorandum Opinion and Order to be issued today.  The Findings of Fact and Conclusions of Law contained herein are otherwise unchanged.

contends that Ethicon breached the parties' agreement in four distinct ways: first, because Ethicon impermissibly terminated the agreement based on ChemImage's purported failure to meet only a subset of the relevant milestone; second, because Ethicon failed to terminate the agreement in accordance with the procedures set forth in the agreement, namely by convening the body that was tasked, under the agreement, with deciding whether a milestone was met; third, because Ethicon violated the notice and cure provisions of the agreement; and fourth, because ChemImage did, in fact, meet the relevant milestone.  In March 2025, the Court held a bench trial on ChemImage's claims.  Direct testimony was taken largely by affidavit.

For the reasons that follow, the Court finds that Ethicon breached the underlying contract when it terminated the parties' agreement for failure to achieve the relevant milestone without a final determination from the project's joint steering committee, the body tasked under the terms of the agreement with deciding whether a milestone had been met.  The Court either rejects or does not reach ChemImage's other theories of breach, and it concludes that J&J is not liable for tortious interference with contract.  Finally, the Court addresses the issue of relief, concluding that ChemImage is entitled under the terms of the parties' contract to a $40 million termination fee (plus statutory interest); an additional amount (to be determined, though lower than what ChemImage sought) for the "impairment" of certain intellectual property; attorneys' fees and costs; and a declaratory judgment with respect to certain intellectual property rights.

## FINDINGS OF FACT

Pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact based on the testimony and exhibits at trial.[1]

### A.  Ethicon Engages ChemImage

ChemImage is a company that — until the events that gave rise to this case — specialized in a range of chemical imaging technologies, including hyperspectral imaging and multispectral imaging.  DX1, at 5.[2]  Ethicon is a medical technology company that works in collaboration with clinicians and healthcare experts to develop surgical technologies.  *See* Lanier Aff. ¶ 14.  Ethicon is a wholly owned subsidiary of J&J's MedTech division, which is responsible for developing and commercializing J&J's surgical intervention technologies.  *Id.* ¶¶ 15-16.  J&J, of course, is a well-known healthcare company focused on the research, development, and manufacture of products for human health; its Innovative Medicine business segment focuses on medicinal solutions, while its MedTech business focuses on medical technologies.  *Id.* ¶ 16.  J&J is a holding company that operates through multiple subsidiaries including Ethicon; the company does not itself manufacture, distribute, or sell any products.  *Id.*

In or about 2015, Ethicon identified a growing need in the market for technologies capable of visualizing a surgical scene beyond what can be seen with the naked eye or a laparoscope.  Lanier Aff. ¶ 18.  The purpose of such technologies — which are known as

---

[1]    The Court ruled on most of the parties' objections to testimony and exhibits at trial.  To the extent that the Court cites in this Opinion to any evidence to which a party objected, the objection is overruled.  The Court need not and does not resolve the remaining objections.

[2]    "Tr.___" refers to the transcript of the trial, conducted from March 17 to 28, 2025; "__ Aff." Refers to a witness's trial testimony submitted by affidavit; "PX__" refers to a Plaintiff's Exhibit; "DX__" refers to a Defense Exhibit; and "Dep. Tr. __" refers to a deposition transcript.

advanced visualization (or advanced imaging) — is to augment knowledge of a patient's anatomy to, for example, identify and navigate critical structures, such as veins or arteries, during surgery. *Id.* Such structures are often obscured by layers of fat or tissue, which makes navigation more difficult. *Id.* Ethicon was interested in the use of such technologies in both robot-assisted and traditional surgical procedures. *Id.* ¶¶ 19-20.

Some advanced visualization technologies did exist at the time, but they had their limitations. For example, surgeons could inject near-infrared contrast agents into their patients to illuminate certain internal structures like the ureter. *Id.* ¶ 21. But a decision about whether to employ contrast injections that automatically identify a structure's location has to be made at least twenty-four hours in advance, and each reagent can illuminate only one critical structure at a time. *Id.* Moreover, some patients are allergic to the contrast dyes and, thus, not candidates for such treatment. Estape Aff. ¶ 23. Ethicon's advanced visualization team thus sought to develop a new, injection-free technology that would allow surgeons to make decisions about use at any point in time during the surgery and select multiple-use cases (i.e., lung cancer and pulmonary artery and pulmonary vein) during the same procedure. Lanier Aff. ¶ 21. To that end, Ethicon began pursuing multispectral imaging technology in 2017 as one way of satisfying these unmet needs. *Id.* ¶ 22. Multispectral imaging uses light wave patterns to identify objects and structures; then-recent studies had suggested that multispectral imaging and hyperspectral imaging (which uses even more wavelengths) could yield promising results for tissue, structure, or tumor detection. *Id.*

Ethicon identified ChemImage as a company that could potentially develop the multispectral imaging technology that it desired. *Id.* ¶ 22. ChemImage had developed chemical imaging technology that had been used in the detection of explosives in combat settings or the

delivery of contraband in prison mail. *Id.* ¶ 24. ChemImage claimed that it possessed the expertise and resources to adapt its technology to the desired healthcare applications. *Id.* ¶¶ 24-25. Specifically, ChemImage would use multispectral imaging to develop two technologies — which it called EndoVere and LightSphere — to provide a kind of "night vision" for surgeons. *See* DX301, at 19, 24. EndoVere would employ different wave lengths and digital imaging to "[r]eveal[] critical structures beyond the naked eye" and allow for "[a]ccurate tumor imaging in real time" during surgery. *See* PX149, at 2, 7. LightSphere would serve as a diagnostic technology that used light wavelengths and digital imaging to "reveal, in real-time, cancerous and pre-cancerous tissue." PX492, at 18. In general terms, these technologies would sequentially illuminate a surgical scene with different wavelengths of light. According to ChemImage, different structures in the body have different spectral characteristics and thus absorb and reflect different wavelengths of light. Its theory was that, by illuminating a scene with different wavelengths, critical structures within a particular scene (e.g., veins, arteries, and bile ducts) could be identified based on their unique light absorption and reflection characteristics. ChemImage's multispectral imaging technology would use nine different wavelengths of light to differentiate various internal structures. *See* Treado Aff. ¶¶ 12-14.

ChemImage's technologies would also incorporate "deep learning" — namely, a form of artificial intelligence ("AI") machine learning — to color-code various structures according to their spectral fingerprint in real time. *See* Lanier Aff. ¶ 5. That way, surgeons could identify different structures based on the color coding. *See id.* ¶ 25. The AI model could adapt the details of its operations based on prior input data, allowing it to "learn" and improve performance over time. Specifically, the AI model would "learn" spectral patterns to hone its ability to identify critical structures and distinguish those structures from other "background"

elements in a surgical scene. *See* Sodickson Aff. ¶¶ 37, 43, 45-48. To that end, the AI model was to first be trained using images where those critical structures had already been successfully identified by a surgeon and labeled. These labels were called "ground truth" and were to provide a kind of answer key from which the AI model could learn. *See id.* ¶¶ 41-44, 53. In certain cases, however, human surgeons and annotators might not be able to identify the ground truth of every pixel in a surgical image with certainty (due to, for example, obscuration). In those circumstances — known as "uncertain ground truth" — machine learning experts and data scientists might add labels to portions of images that indicate to the network how to treat that uncertainty. *Id.* ¶¶ 58-61. Annotations instructing the model to ignore uncertain portions of a dataset are known as "ignore labels." *Id.* ¶ 61. Ignore labels may instruct the network to either ignore uncertain pixels entirely or "down-weight" them for purposes of training the AI model. *Id.* The purpose of ignoring or down-weighting data in cases of uncertainty is to avoid inputting erroneous data in the model, which risks degrading the model's performance. *Id.* ¶¶ 59, 113.

In 2017, Ethicon commissioned ChemImage to conduct early-stage development work to determine the feasibility of using hyperspectral imaging for detection of critical structures in an *ex vivo* model (i.e., tissue samples in a petri dish). Lanier Aff. ¶ 28. After the results of ChemImage's initial work suggested that hyperspectral imaging had the potential to meet Ethicon's objective for intraoperative advanced visualization, Ethicon decided to pursue a research, development, license, and commercialization agreement with ChemImage. *Id.*

**B. The Agreement**

On December 27, 2019, after several months of negotiation, ChemImage and Ethicon entered into the Research, Development, License and Commercialization Agreement (the "Agreement"). *See* PX1 ("Agreement"). Under the Agreement, Ethicon agreed to pay

ChemImage up to $174 million, including $7 million upfront and $149 million in payments that would be met if certain specified "milestones" were met. *Id.* §§ 3.1, 5.2, Ex. B at 56-57. In turn, ChemImage granted Ethicon an exclusive license to the "CI Core IP in the Endovere Field" and a non-exclusive license to the "CI Core IP and CI Developed Lightsphere IP in the Lightsphere Field." *Id.* §§ 4.1.1, 4.1.2. That meant that, with respect to EndoVere, the Agreement granted Ethicon an exclusive license to all intellectual property ("IP") that ChemImage developed before or independent of the Agreement with applications directed to surgical detection, visualization, and identification of anatomic structures, as well as tumor detection ("CI Core Endovere IP"). *Id.* §§ 4.1.1, 1. And with respect to Lightsphere, the Agreement granted Ethicon a non-exclusive license to all IP that ChemImage developed both before and independent of the Agreement (the "CI Core LightSphere IP") and during the Agreement (the "CI Developed LightSphere IP") with applications related to tumor diagnosis. *Id.* §§ 4.1.2, 1. The parties called their work together "Project Erie" or the "Erie Program." *See* Treado Aff. ¶ 22.

Under Section 2.1 of the Agreement, the parties agreed to a "Development Plan" that defined the scope of work under the Agreement. Agreement § 2.1. The Plan, attached to the Agreement as Exhibit A, provided that "[f]urther details and timeline of the Development Plan" would be "updated at the kick-off and [Joint Steering Committee] meetings," and that "[j]oint planning is required between Ethicon and Erie to ensure the creation of a comprehensive plan." *Id.* Ex. A at 54. Exhibit B, also attached to the Agreement, established six "Development Milestones" and six "Regulatory Milestones" (together, the "Milestones"). *Id.* Ex. B at 56-58. The Development Milestones related to the achievement of certain technical steps; the Regulatory Milestones related to government approval of products incorporating ChemImage's technology. *Id.* Each Development Milestone required ChemImage to demonstrate a distinct set

of technological capacities. *Id.* at 59-69. In order to achieve Milestone 1A, for example, ChemImage was required to "[u]tilize the ChemImage (CI) Visualization system" to show "real-time . . . in-vivo detection of critical structures." *Id.* at 60. Meanwhile, to achieve Milestone 1B, ChemImage would have to demonstrate the same real-time in-vivo detection of structures, except this time "[i]ntegrat[ing] the CI technology" into a "prototype J&J Visualization System" and "us[ing] the resulting system" instead. *Id.* at 62. The Agreement did not provide fixed deadlines by which ChemImage was required to achieve any particular Milestone, but it did offer a range of target dates for certain research and development tasks, along with "anticipated invoice date[s]" to be paid by Ethicon for "Major R&D tasks." *Id.* at 55-58.

Section 2.4 of the Agreement, in turn, described the workings of the Joint Steering Committee or "JSC." It provided that the JSC would consist of two ChemImage members and two Ethicon members, "each of whom shall be senior employees [sic] authorized to make the decisions for its respective Party allocated to the JSC." *Id.* § 2.4.1. Under the Agreement, the JSC was responsible for, among other things, "adjust[ing] the Development Timeline, Milestone and Launch Deadline, as necessary in its sole discretion, to further the goals of the Development Program"; "consider[ing], review[ing], reevaluat[ing] and discuss[ing] the Development Plan, taking into consideration ongoing research outcomes and other scientific and commercial development"; and, most significant for purposes of this case, "determin[ing]] whether the Milestones specified in Exhibit B have been met." *Id.* §§ 2.4.1(a)-(d). Decisions of the JSC were to be made by unanimous vote, with ChemImage members together possessing one vote and Ethicon members together possessing one vote. *Id.* § 2.4.3.

The Agreement set forth two alternative procedures for use in the event that the JSC deadlocked on a particular issue. With respect to matters that did not require modification of the

Development Plan, the JSC was required to "attempt to resolve such deadlock for a period of thirty (30) days by engaging in good faith discussions," after which "each Party" would be given "final decision-making authority with respect to the conduct of specific activities allocated to it under the Development Plan." *Id.* § 2.4.3(a). With respect to matters that did require modification of the Development Plan, the Agreement also required "good faith discussions" to resolve the deadlock, after which either party could seek resolution through arbitration. *Id.* § 2.4.3(b). The Agreement provided that JSC meetings were to be held "no less frequently than once in each six (6) month period" and at either party's request. *Id.* § 2.4.2.

Section 10 governed termination of the Agreement. As relevant here, Section 10.3.1 provided that Ethicon could terminate the Agreement "for cause" as follows:

> [Ethicon] may, without prejudice to any other remedies available to it at law or in equity, terminate this Agreement in the event [ChemImage] shall have materially breached or defaulted in the performance of any of its obligations hereunder, and such breach or default shall have continued for thirty (30) days after a written notice was received by [ChemImage] from [Ethicon], which notice specifies in reasonable detail the nature of the breach or default, states that [ChemImage] is required to cure such breach or default and states that failure to cure such breach or default will result in termination of this Agreement, provided however, if the breach or default is not reasonably capable of being cured within such 30-day period, termination shall not be effective if [ChemImage] commences cure of the breach or default within such 30-day period and thereafter diligently prosecutes such cure to completion.

Agreement § 10.3.1. Of note, the Agreement listed one event, "should [it] occur, [that] shall constitute a [ChemImage] material breach: . . . [ChemImage's] failure, subject to the cure provisions of Section 10.3.1, to achieve a Development Milestone as described in Exhibit B." *Id.* § 10.3.2(a).

In the event of a "for cause" termination, the Agreement provided that all IP rights reverted to the owner of the applicable IP, and ChemImage was required to grant Ethicon (1) an exclusive, assignable license to the CI Core IP, and (2) a non-exclusive, assignable and

sublicensable license to the CI Developed Lightsphere IP. *Id.* § 10.3.3. That is, should Ethicon terminate the Agreement for cause, Ethicon would continue to hold exclusive rights to all IP that ChemImage had developed before or independent of the Agreement with applications to surgical detection, visualization, and identification of anatomic structures, as well as tumor detection. *Id.* §§ 4.1.1, 1. The Agreement defined "CI Core IP" as "all Intellectual Property Controlled by [ChemImage] or its Affiliates . . . including but not limited to the CI Core Know-How, the CI Licensed Patents, and the CI Core Software," with "Know-How" including, among other things, "discoveries, trade secrets, processes, procedures, techniques, . . . ideas or other proprietary information, . . . specifications, methods of manufacture, methods of service, [and] data processing techniques." *Id.* § 1.

Section 10.4 of the Agreement governed Ethicon's termination "without cause." In the event that Ethicon terminated the Agreement without cause, the parties agreed that Ethicon would "pay to [ChemImage] by wire transfer a non-refundable sum equal to Forty Million Dollars ($40,000,000.00)." *Id.* § 10.4.1(a). Additionally, all IP rights (including the CI Core IP), would revert to the owner of the applicable IP, and Ethicon would grant ChemImage royalty-free and nonexclusive licenses to the Collaboration IP and CI Developed EndoVere IP, as well as a non-exclusive license to certain intangible know-how from the Collaboration IP, the CI Developed EndoVere IP, and Ethicon's own IP. *See id.* § 10.4.4. In other words, ChemImage would retain full rights to all IP that ChemImage developed before or independent of the Agreement with applications directed to surgical detection, visualization, and identification of anatomic structures, as well as tumor detection. *See id.* §§ 4.1.1, 1. Finally, in the event of a breach, the Agreement limited potential damages to direct damages, providing that neither party "shall be liable to the other Party for any special, indirect, incidental, consequential, punitive or

exemplary damages, including but not limited to lost profits or revenue suffered by either Party."
Agreement § 8.4.

## C. Project Erie

### 1. Milestone 1A

The first Milestone, Milestone 1A, required ChemImage to demonstrate that it could detect five critical structures — ureters, nerves, veins, arteries, and bile ducts — in real-time at different levels of obscuration in a live animal with at least 80% sensitivity and 80% specificity using a ChemImage-designed visualization device. *See* Agreement Ex. B-1, at 60; Lanier Aff. ¶ 44. Sensitivity tracks whether a true target pixel is detected as a target (e.g., a pixel containing a vein is correctly identified as a vein), and specificity tracks whether a true background pixel is detected as background (e.g., a pixel containing no critical structure is correctly identified as such). Lanier Aff. ¶ 44. Milestone 1A was more technically complex than the pre-contract feasibility work ChemImage had conducted in petri dishes because the critical structures in live animals may be buried beneath tissue or fat and obscured by bodily fluids. *Id.* ¶ 75. The purpose of Milestone 1A was to demonstrate that ChemImage's technology could detect critical structures in a live animal. *Id.*

ChemImage achieved Milestone 1A by October 30, 2020. PX118, at 3. More specifically: (1) The JSC agreed to "acceptance criteria" for Milestone 1A that were based on the Milestone 1A criteria set forth in the Agreement; (2) ChemImage submitted a draft and a Final Report for Milestone 1A to the JSC for approval; (3) Ethicon and the technical consultant it hired to review Project Erie, Cambridge Consultants ("Cambridge"), reviewed the final Milestone 1A report; and (4) the JSC was convened to review the report and agreed that ChemImage had achieved Milestone 1A. *See* PX174; Ritchie Dep. Tr. 61-64. In practice, the JSC did not

conduct a formal vote to approve the milestone. *See* Tr. 42-45 (Treado testimony). Instead, once Ethicon's members conveyed their approval of the milestone, the full JSC convened to record unanimity as to the milestone achievement. *Id.* With the JSC having reached consensus over ChemImage's achievement of Milestone 1A, Ethicon then made the required $5,000,000 Milestone 1A payment to ChemImage. *See* Lanier Aff. ¶ 87.

## 2. Milestone 1B

Matters took a turn with Milestone 1B, which required ChemImage to demonstrate that it could detect the same five critical structures in real-time and at different levels of obscuration, but this time when integrated with an Ethicon surgical device and during clinically relevant procedures. *See* Lanier Aff. ¶ 46; Agreement Ex. B-1, at 62. The purpose of Milestone 1B was to demonstrate that ChemImage's hyperspectral technology could work in an Ethicon device in the setting in which it would be employed by an end-user surgeon — i.e., in a real surgical procedure performed in a surgical setting. *See* Lanier Aff. ¶ 47.

As an initial step, Milestone 1B required ChemImage to demonstrate that its technology could, integrated with Ethicon's surgical visualization system, detect perfusion — i.e., the flow of blood through the circulatory system. *See* PX192, at 5; Lanier Aff. ¶ 102. After a period of delay — whether due to technological limitations on ChemImage's or Ethicon's part, or both, is disputed (but ultimately immaterial) — ChemImage submitted a report in January 2022 outlining its success in detecting perfusion. *See* PX370 (final perfusion report). On February 11, 2022, Tamara Lanier, Senior Director of Global Strategic Marketing for Advanced Visualization at Ethicon and one of Ethicon's JSC members, informed ChemImage by email that Ethicon had reviewed the report and concluded that "the Erie program has met the aligned perfusion

performance requirements within Milestone 1B." DX327. The JSC then convened on March 9, 2022, and agreed that the perfusion requirement had been achieved. *See* Ritchie Dep. Tr. 93.

After completion of the perfusion requirement, ChemImage turned to the remaining components of Milestone 1B, which involved detection of the five critical structures: veins, arteries, bile ducts, ureters, and nerves. In June 2022, the Ethicon Project Erie team met with Peter Shen, the then-Global Head of MedTech Innovation and R&D for J&J, about Project Erie's progress, financial projections, and potential renegotiations. *See* DX673; Lanier Aff. ¶ 115. At one of these meetings, Shen recommended that ChemImage "[p]rioritize feasibility efforts targeting Veins, Arteries and Bile Ducts (VAB) by year end 2022 with final analysis and report out completed by February 2023" and to "[p]ostpone Ureter and Nerve feasibility efforts until 2023." PX280, at 2; *see also* Treado Aff. ¶ 44; Shen Dep. Tr. at 138-40. The parties referred to this partial Milestone 1B workflow as "VAB."

On June 20, 2022, members of the Ethicon Project Erie team relayed Shen's recommendation to ChemImage leadership, noting that the "Erie program has an urgent need to demonstrate Technical Feasibility Validated with Clinical Relevance Voice-of-Customer to Ethicon Organization or will face high-risk of termination end-of-year 2022." DX425, at 4. To that end — and given limited remaining labs scheduled for the remainder of 2022 — Ethicon recommended that ChemImage "[p]rioritize VAB for the remainder of 2022" and "[d]efer Ureter and Nerve to 2023." *Id.* at 9. At the June 28, 2022 JSC meeting, ChemImage formally agreed to this phased approach to Milestone 1B work. *See* Lanier Aff. ¶ 114, 118; DX304, at 17; DX386. By the next JSC meeting, held on August 2, 2022, ChemImage had fully implemented the plan to focus on the VAB portion of Milestone 1B, agreeing to prioritize "successful[] delivery of C[ritical] S[tructure] M[ilestone] 1B VAB." *See* DX260, at 4. ChemImage also agreed that its

final report demonstrating satisfaction of the Milestone 1B criteria with respect to VAB was due to Ethicon on December 16, 2022. *See* DX298, at 9.

As ChemImage proceeded with work on Milestone 1B, it implemented certain practices related to its use of ground truth and ignore labels.[3]  It did so with guidance from Ethicon's consultant, Cambridge.  In March 2021, for instance, Cambridge had prepared "labelling strategy" recommendations for ChemImage to utilize in its work on Project Erie, which included the use of "uncertain" labels in cases of "uncertainty" due to "obscuration" and "ignore" labels for "all features that will not appear in any realistic use case."  PX462, at 7.  And in May 2022, Cambridge provided Defendants with a presentation containing its "analysis of literature on ground truth labelling of hyperspectral images in the applications of critical structure identification."  PX220, at 2.  In mid-2022, Ethicon and ChemImage also established a "Data Review Board" ("DRB") to "resolve open questions about the Erie Program data catalog."  *See* Treado Aff. ¶¶ 57-58; PX99, at 6.  The DRB convened for the first time on May 10, 2022.  *See* Hansen Aff. ¶ 38.  At that meeting, ChemImage raised the possibility of using "general" ignore labels to address instances where the ground truth in an area of the image was uncertain.  *Id.*

The DRB ultimately agreed that ChemImage was permitted to use ignore labels without "further review by [the] DRB" for two limited purposes.  DX352A at 7.  First, the DRB authorized the use of "general" ignore labels when ChemImage's annotators were uncertain about background pixels that could not be resolved at ground truth reviewing meetings with Ethicon surgical staff.  *See id.*  Second, the DRB authorized the use of "target" or "class" ignore

---

[3]    ChemImage collected data related to the VAB component in a series of labs known as the "Erie labs."  *See* Lanier Aff. ¶ 103; Treado Aff. ¶¶ 50-56.  Although much of the evidence at trial concerned the Erie lab procedures, the Court's conclusions do not depend on what transpired in these labs.  As such, the Court need not and does not provide an in-depth account of the labs.

labels "to exclude 2nd and 3rd degree pixels from the 1st degree evaluation" — in other words, to exclude obscured pixels in unobscured scenes. *Id.*; *see* Tr. 57-58 (Treado testimony).  Consistent with the DRB's limited authorizations, a slide deck prepared for the JSC's May 24, 2022 meeting reflects ChemImage's understanding that ignore labels would be used only "for a subset of the data."  DX258, at 26.

### 3. The VAB Report

ChemImage submitted its final VAB report to Ethicon on December 16, 2022.  *See* PX2 ("VAB Report").  It purported to "demonstrate completion of the M1B VAB Performance Requirements."  *Id.* at 3.  Around the same time, Ethicon and J&J officials deliberated internally about their plans for Project Erie in 2023 — specifically, about ways to "restructure" Project Erie to "ensure sustainability of the program" in light of, among other things, "[t]ime delays," "increased expenses," "and [o]ngoing financial instability of ChemImage."  PX752, at 3.  For example, in a draft internal presentation dated January 5, 2023, Lanier recommended that Ethicon "fully *internalize* the Erie Feasibility and New Product Development program for both Critical Structures and Cancer Localization" moving forward.  *Id.* (emphasis added); *see* Tr. 596 (Lanier testimony).  Notably, that same draft presentation stated that, "[a]s of January 2023, the [Ethicon] team anticipates that feasibility will be achieved for Veins, Arteries and Bile Ducts" — i.e., the VAB component — "during Q1 2023."  PX752, at 3.

After submitting the final VAB report, ChemImage requested to convene a JSC meeting to determine whether it had satisfied Milestone 1B (or, more precisely, the VAB portion thereof), but Ethicon declined.  *See* Treado Aff. ¶ 69; PX587.  Instead, from January 17, 2023, through February 14, 2023, ChemImage received four rounds of extensive inquiries from Ethicon — or what the parties call "Q&A" — questioning aspects of ChemImage's data collection and use of

ignore labels.  *See* PX214.  At the same time, Ethicon postponed a "Ureter Nerve" lab that had previously been slated to take place during the week of February 13, 2023.  *See* PX615, at 1-2 (email exchange noting that Ethicon had "decided to postpone [the] Ureter Nerve (UN) lab . . . in light of the many questions that the team is in the midst of answering around ground truthing, annotations, and data collections especially as it relates to ignore labels and associated processes" and that "[r]esolving these are a gating item for creating a new plan" for the 2023 schedule).

In addition to postponing labs, Ethicon also cancelled a formal JSC meeting scheduled for February 28, 2023.  *See* Treado Aff. ¶ 73.  At that meeting, the JSC was slated to discuss "Update[s] on VAB," including the four rounds of inquiries from Ethicon about ChemImage's data practices.  PX730, at 6, 8 (prepared slides and agenda for the meeting).  The JSC was also prepared to preview the agenda for its scheduled March 28, 2023 meeting, which included "VAB Final Report Feedback & Approval Status."  *Id.* at 17.  Instead, the February 28, 2023 formal JSC meeting was converted into a "shortened JSC touchpoint" meeting that lasted "20-30 [minutes]" and involved minimal substantive discussion about the final VAB report.  *See* PX41; Tr. 623-27 (Lanier testimony).  That was the last time the JSC was convened.  Tr. 627 (Lanier testimony).  As discussed below, the JSC was next scheduled to convene on March 7, 2023, but Ethicon members declined the electronic meeting invitation, and the meeting did not occur.  *See* Treado Aff. ¶ 69; Tr. 130-31 (Treado testimony); Tr. 546 (Lanier testimony).

## D.  Ethicon Terminates the Agreement

Unbeknownst to ChemImage, as the Q&A process unfolded, Ethicon was deliberating internally about whether to terminate the Agreement.  On February 2, 2023, Ethicon members conveyed a recommendation to terminate the project to J&J officers.  *See* PX887.  On February

10, 2023, J&J officers agreed with the termination recommendation. *Id.*; Tr. 629 (Lanier testimony).

On March 6, 2023, Ethicon sent ChemImage a letter indicating that it was terminating the Agreement "for cause for failure to achieve a Development Milestone, which constitutes a Material Breach," pointing to Ethicon's June 2022 statement that the project was at risk of termination if ChemImage did not demonstrate technical feasibility by the end of 2022. *See* PX3 ("Termination Letter") at 2. In particular, Ethicon maintained that the final VAB report was "not evaluable" due to "several errors and flows in collecting and processing data [that] were identified upon review of the final report." *Id.* These included "uncertainty with respect to negative controls, use of omnipresent ignore labels, and data discrepancies between a preliminary report and the final report." *Id.* With respect to ChemImage's use of ignore labels, Ethicon claimed that "the process of using such labels was done contrary to the process proposed and agreed upon in [DRB] meetings and without review by Ethicon" and that, as a result, "there is a significant risk that the metrics are misleading indicators of performance." *Id.* Ethicon explained that "[t]hese errors are systematic and cannot be remedied by simply re-running the data and re-generating another report; rather, previously completed labs, data collection, and annotation processes would need to be reworked and repeated." *Id.* The letter concluded that "subject to the cure provisions in the Agreement, [Ethicon] is terminating effective thirty (30) days from the date hereof, which is April 5, 2023." *Id.* at 3. Following ChemImage's receipt of the termination letter, the parties cancelled a JSC meeting previously scheduled for the following day — March 7, 2023 — after Ethicon representatives declined to attend. *See* PX587; PX811.

ChemImage responded to Ethicon's termination letter in writing on March 17, 2023. *See* PX172, at 152-55. ChemImage wrote that it "disputes that there has been a material breach of

the Agreement," maintaining that it had "achieved the subsets of Milestone 1B . . . under the modified program plan." *Id.* at 152. ChemImage also objected that Ethicon's termination letter did not "specify in sufficient detail the nature of the alleged breach" and thus left it "unable to cure the purported deficiencies." *Id.* at 153. Finally, the letter requested a face-to-face meeting with Ethicon senior officers to discuss the termination. *See id.* at 154. Ethicon agreed to toll the thirty-day notice-and-cure period until the requested meeting took place. DX690, at 2. On April 7, 2023, senior officers from Ethicon and ChemImage met in Atlanta, Georgia. *See* PX181, at 2. At the meeting, Ethicon officers provided an overview of the various ways that ChemImage's final VAB report had allegedly failed to achieve Milestone 1B. *See id.* In response, ChemImage reiterated its position that no material breach had occurred. *See id.* at 3. ChemImage officers also inquired about whether the deficiencies were "fixable" and requested that Ethicon provide "cure path guidelines." *Id.* In response, Ethicon officers expressed their belief that ChemImage could not cure the breach. *Id.* The parties ultimately did not make headway, and, on April 26, 2023, Ethicon formally terminated the Agreement. *See* Lanier Aff. ¶ 156; DX511. At no point did ChemImage request permission to use Ethicon's labs to cure any purported defects in the final VAB report, *see* Treado Dep. 321; Lanier Aff. ¶ 155, or undertake efforts to collect new data and rework the report, *see* Treado Dep. 322, 324; Cohen Dep. 228; Saltman Dep. 201.

In April and May 2023, ChemImage laid off the majority of its staff and wound down its operations. *See* Cohen Aff. ¶ 61. At the same time, ChemImage made efforts to find another development partner to replace Ethicon. *Id.* ¶ 59. ChemImage engaged in talks with medical device companies Genesis MedTech, Abbvie, Renovo, and Leica. *Id.* ¶¶ 59-60. Although some of these companies expressed interest, *see, e.g.*, DX184, at 2 (Leica officer noting the company's "interest" and "agree[ment] that the ChemImage team has done a substantial job in proving core

feasibility"), ChemImage's search ultimately fell short, at least in part because Ethicon held an exclusive license to the CI Core IP in the aftermath of its for-cause termination. *See* Cohen Aff. ¶¶ 59-60. On April 25, 2023, for example, a Genesis MedTech officer wrote that the company was "very interested in collaborating with ChemImage" but needed to "understand the IP availability and if any constrains [sic] exist." PX184, at 1.

The parties participated in a mediation on July 25, 2023, but the efforts were unsuccessful. *See* Lanier Aff. ¶ 158; Cohen Aff. ¶ 62. ChemImage then commenced this action on April 8, 2024. *See* ECF No. 1.

## CONCLUSIONS OF LAW

ChemImage presses (1) a single claim for breach of contract against Ethicon on the ground that it improperly terminated the Agreement; and (2) a claim for tortious interference of contract against J&J.[4] The Court will address each claim in turn.

## A. Breach of Contract Against Ethicon

ChemImage alleges first that Ethicon improperly terminated the Agreement for cause under Section 10.3 of the Agreement. Under New York law, which both parties agree governs their agreement, "where the contract specifies conditions precedent to the right of cancellation, the conditions must be complied with." *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 727 (2d Cir. 1992) (collecting cases). "[F]ailure to effect termination according to the terms of a contract constitutes a breach." *Raviv v. Mirror Biologics, Inc.*, No. 22-CV-6847 (SLC), 2024 WL 2798870, at *18 (S.D.N.Y. May 31, 2024); *see also Brueckner v. You Can Beam LLC*, No. 20-

---

[4]     ChemImage included other claims in its Amended Complaint, *see* Compl. ¶¶ 125-36, 137-49, but some were dismissed, *see* ECF No. 64, it has since abandoned others, *see* ECF No. 134, at 2 nn.1 & 2.

CV-3323 (JSR), 2021 WL 2158733, at *4 (S.D.N.Y. May 27, 2021) ("When a contract's terms include a procedure for termination, here applicable New York law demands strict compliance with that procedure."). Here, Section 10.3 of the Agreement permitted Ethicon to terminate the Agreement for cause "in the event [ChemImage] shall have materially breached . . . any of its obligations." Agreement § 10.3.1. The Agreement then identifies one type of breach that is automatically material: "failure . . . to achieve a Development Milestone." Agreement § 10.3.2(a). As discussed, Ethicon ultimately terminated the Agreement based on ChemImage's purported failure to achieve the VAB component of Milestone 1B.

ChemImage alleges that Ethicon's termination breached the Agreement for four different reasons: first, because Section 10.3.2(a) does not allow termination "for cause" for purported failure to meet a *subset* of a Milestone; second, because Ethicon failed to convene the JSC to determine whether ChemImage had achieved Milestone 1B; third, because Ethicon violated the notice and cure provision of Section 10.3.1 by failing to provide ChemImage with reasonable detail as to the nature of the breach and preventing ChemImage from curing any purported deficiencies; and finally, because the asserted grounds for termination were baseless, so termination was substantively defective. *See* ECF No. 130 ("Pl.'s Mem."), at 55, 65. Because neither party disputes that the Agreement imposed a notice and cure requirement on Ethicon, the Court begins there.

### 1. Compliance with the Notice and Cure Requirement

As discussed, the Agreement allowed Ethicon to terminate "for cause" in the event that ChemImage materially breached or defaulted in the performance of its contractual obligations, provided that "such breach or default shall have continued for thirty (30) days after a written notice was received by [ChemImage] from [Ethicon], which notice specifies in reasonable detail

the nature of the breach or default, states that [ChemImage] is required to cure such breach or default and states that failure to cure such breach or default will result in termination of this Agreement." Agreement § 10.3.1. "[I]f the breach or default is not reasonably capable of being cured within such 30-day period," however, "termination shall not be effective if [ChemImage] commences cure of the breach or default within such 30-day period and thereafter diligently prosecutes such cure to completion." *Id.* ChemImage argues that Ethicon neither provided sufficient notice nor permitted it to cure the relevant deficiencies. *See* Pl.'s Mem. 61-65. The Court disagrees.

Beginning with notice, the Court concludes that Ethicon provided written notice that "specifie[d] in reasonable detail the nature of the breach or default." Agreement § 10.3.1. Significantly, the Second Circuit has cautioned against construing a contractual "notice provision as if it were a common law pleading requirement under which every slip would be fatal." *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 925 (2d Cir. 1977). "Rather, the law requires that the court look to see if defendant's actions in terminating a contract served the general purpose of the contract's pretermination notice provision." *Schwartz v. Fortune Magazine*, 89 F. Supp. 2d 429, 433 (S.D.N.Y. 1999). Further, "the appropriate standard for assessment of the adequacy of notice is one of reasonableness in view of all attendant circumstances." *Hughes v. Lenox Hill Hosp.*, 226 A.D.2d 4, 17 (N.Y. App. Div. 1st Dep't 1996). Where notice is provided in writing, the "attendant circumstances" may include related oral communications. *See, e.g.*, *Contemporary Mission*, 557 F.2d at 925 (finding a contractual notice requirement satisfied where a letter asserting breach of contract followed a related oral conversation); *Schwartz v. Fortune Mag.*, 89 F. Supp. 2d 429, 433 (S.D.N.Y. 1999) (holding that

the defendant's termination letter, "when coupled with the phone conversations he had with plaintiff that day," constituted sufficient notice).

Here, Ethicon provided written notice in its March 6, 2023 termination letter, which stated that Ethicon was terminating the Agreement because it "does not believe [ChemImage] has or will be able to achieve Milestone 1B as outlined in the Agreement."  Termination Letter 3.  The letter then specified several ways in which ChemImage's final VAB report was "not evaluable," including "uncertainty with respect to negative controls, use of omnipresent ignore labels, and data discrepancies between a preliminary report and the final report."  *Id.* at 2.  The letter also incorporated by reference the parties' prior discussions regarding concerns Ethicon had voiced about ChemImage's "data processing practices."  *Id.*  What is more, by the time Ethicon issued the termination letter, the parties had already gone through four rounds of their Q&A — that is, detailed communications about the ignore labels, negative controls, and other perceived data deficiencies.  *See, e.g.*, DX397A at 1, 30, 44, 62; DX442, at 1-2; DX446; DX439, at 5; DX365.  Taken together, all of this was more than sufficient to give ChemImage notice of "the nature of the breach."  Agreement § 10.3.1.  Indeed, "[c]ourts have routinely found termination notices with such detail," or less, "to be sufficient."  *Nat'l Gear & Piston, Inc. v. Cummins Power Systems, LLC*, 861 F. Supp. 2d 344, 362-63 (S.D.N.Y. 2012) (collecting cases).

Nor did Ethicon breach the Agreement's cure provision.  Ethicon's termination letter stated that the errors identified "are systematic and cannot be remedied by simply re-running the data and re-generating another report; rather, previously completed labs, data collection, and annotation processes would need to be reworked and repeated" to cure the breach.  Termination Letter 2.  In light of that, there is no dispute that Ethicon's asserted breach — the failure to achieve Milestone 1B — was "not reasonably capable of being cured within [the] 30-day

period." Agreement § 10.3.1. The central question, then, is whether ChemImage "commence[d]" cure of the breach . . . within such 30-day period *and* thereafter diligently prosecute[d] such cure to completion." *Id.* (emphasis added). It did not. Indeed, even assuming ChemImage "commenced" a cure within thirty days (which is doubtful in itself), there is no dispute that it failed to "diligently prosecute such cure *to completion*." *Id*. (emphasis added).

To get around that requirement, ChemImage invokes the "prevention doctrine," *see* Pl.'s Mem. 63, which "provides that a party may not insist upon performance of a condition precedent when its nonperformance has been caused by the party itself," *Pacific Life Ins. Co. v. US Bank Nat'l Ass'n*, 636 F. Supp. 3d 366, 423 (S.D.N.Y. 2022) (cleaned up). ChemImage maintains that, under the doctrine, "Ethicon had an affirmative obligation to help facilitate ChemImage's performance." Pl.'s Mem. 64 (cleaned up). Under New York law, however, the doctrine applies only where "the party's *active* conduct . . . prevent[ed] or hinder[ed] the fulfillment of the condition." *Blackrock Balanced Capital Portfolio (FI) v. U.S. Bank Nat'l Ass'n*, 165 A.D.3d 526, 527 (N.Y. App. Div. 1st Dep't 2018) (emphasis added); *see Fixed Income Shares: Series M v. Citibank, N.A.*, 157 A.D.3d 541, 542 (N.Y. App. Div. 1st Dep't 2018).

ChemImage insists that Ethicon actively prevented it from curing the alleged breach because Ethicon "cancelled . . . already scheduled labs [at J&J facilities] and refused to schedule other labs or meetings between the Parties to discuss the Development Plan." Pl.'s Mem. 63. If true, ChemImage might have had a compelling prevention doctrine argument. But ChemImage's account is not borne out by the record. For one thing, although Ethicon did cancel labs that had been planned for February and March 2023, those labs were intended for work on development steps scheduled to take place *after* ChemImage had completed the VAB deliverables — i.e., work concerning ureters and nerves. *See* DX266, at 6, 12, 13. For another, ChemImage never

sought permission to use Ethicon's labs for purposes of curing the defects in the final VAB report. *See* Treado Dep. 321 ("Q: ChemImage didn't ask Ethicon for access to the labs . . . in order to be able to conduct additional labs, correct? . . . A: No."); Lanier Aff. ¶ 155 ("No one from ChemImage requested access to Ethicon's labs to conduct additional testing."). Nor did ChemImage undertake any efforts on its own to collect new data, reassess the ground truth for its existing data, or redo the VAB report. *See* Treado Dep. 322, 324; Cohen Dep. 228:6-11; Saltman Dep. 201. Instead, at the April 7, 2023 meeting, ChemImage continued to insist that it had not breached the Agreement at all. *See* DX229, at 3-5. In fairness, ChemImage officers did ask whether any defects were "fixable" and received an answer in the negative, *see* PX181, at 3, but that represents the sum total of ChemImage's efforts to cure. Indeed, there is no evidence in the record that, following the meeting, ChemImage took any concrete steps to cure. Without more, it cannot be said that Ethicon is at fault for ChemImage's failure to "diligently prosecute such cure to completion." Agreement § 10.3.1. Accordingly, the Court concludes that Ethicon's termination of the Agreement did not violate the contract's notice and cure provisions.

### 2. Termination for Failure to Achieve a Milestone Subset

The remaining three breach theories, to which the Court turns now, concern whether ChemImage materially breached the Agreement by failing to achieve Developmental Milestone 1B. The Court need not dwell long on ChemImage's first theory of breach, standing alone. That theory asserts that Section 10.3.2(a) does not allow termination "for cause" for a purported failure to meet a subset of a Milestone — here, the VAB component of Milestone 1B. But there is nothing in the Agreement that supports ChemImage's claim that it fails to achieve Milestone 1B if and only if its shortcomings apply to all five critical structures (i.e., VAB components plus ureters and nerves). Indeed, Section 10.3 states that Ethicon "may . . . terminate this Agreement

in the event [ChemImage] shall have materially breached or defaulted in the performance of *any* of its obligations hereunder."  Agreement § 10.3.1 (emphasis added).  And, as a matter of simple logic, the failure to achieve a subset of Milestone 1B requirements *is* a failure to achieve Milestone 1B "as a whole."  ECF No. 129 ("Defs.' Mem."), at 136.  In response to this argument, ChemImage asserts that failure to achieve a Milestone subset cannot be a material breach because "the Agreement prescribed no deadlines by which [Milestone 1B] — or any Milestone — had to be met."  Pl.'s Mem. 58.  True, the Agreement did not itself set a deadline for achievement of Milestone 1B; instead, the Agreement left it up to the JSC to set a Development Timeline for the parties' activities under the Development Plan.  *See* Agreement §§ 2.1, 2.4.1(a).  But, as to the VAB deliverable for Milestone 1B, the JSC set a final deadline of December 16, 2022, which all parties understood and accepted.  *See* DX484, at 24; *see also* Treado Aff. ¶ 67 ("ChemImage submitted VAB Final Report on December 16, 2022, within the time allotted by the JSC.").  ChemImage's assertion that it had unlimited time to achieve Milestone 1B is thus baseless.

ChemImage's other response is that "Section 2.4.1(b) of the Agreement empowered only the jointly convened JSC to make th[e] determination" about its achievement of Milestone 1B. Pl.'s Mem. 58.  But that response conflates ChemImage's first breach theory with its second. The Court accordingly turns to that theory next.

### 3. Termination Without a JSC Milestone Determination

ChemImage's second theory of breach is that Ethicon violated the terms of the contract when it terminated the Agreement for cause based on a purported failure to achieve a Milestone without a final determination from the JSC.  As discussed, New York law demands "strict compliance" with a contract's "procedure for termination."  *Bruekner*, 2021 WL 2158733, at *4.

When a party terminates an agreement "without following the contractual procedures, the termination [is] invalid and breache[s]" the agreement itself — *regardless* of whether that party has a valid substantive basis for termination. *Gulf Ins. Co. v. Fidelity & Deposit Co. of Md.*, 16 Misc. 3d 1116(A), at *4 (N.Y. Sup. Ct. 2007); *see also A.S. Rampell, Inc. v. Hyster Co.*, 144 N.E.2d 371, 382 (N.Y. 1957) ("[W]here as here the parties have agreed to a termination clause, the clause has been enforced as written."); *O'Brien & Gere, Inc. of N. Am. v. G.M. McCrossin, Inc.*, 148 A.D.3d 1804, 1805-06 (N.Y. App. Div. 4th Dep't 2017) (affirming the grant of summary judgment on a breach of contract claim based on a failure to comply with termination procedures).

As noted, the Agreement expressly listed one condition precedent to "for cause" termination: "failure, subject to the cure provisions of Section 10.3.1, to achieve a Development Milestone." Separately, Section 2.4.1.(b) of the Agreement delegated responsibility for determining whether a Development Milestone was achieved to the JSC, which was composed of both ChemImage and Ethicon representatives. The parties do not dispute that the JSC was never convened to determine whether ChemImage had met Milestone 1B prior to termination on that exact basis. Indeed, the JSC met for the last time on February 28, 2023, for a "shortened . . . touchpoint" meeting that lasted only "20-30 [minutes]" and involved minimal substantive discussion about the final VAB report. *See* PX41, at 1; Tr. 623-27 (Lanier testimony); Treado Aff. ¶ 69. A JSC meeting scheduled for March 7, 2023 — the day after notice of termination — was cancelled because Ethicon members declined the electronic meeting invitation. *See* Treado Aff. ¶ 69; Tr. 130-31 (Treado testimony); Tr. 546 (Lanier testimony). As Lanier explained, "if [Ethicon is] terminating the agreement, then there is no need for the JSC itself to meet because there is nothing to govern." Tr. 546. The JSC was also scheduled to address "VAB Final Report

Feedback & Approval Status" on March 28, 2023, but that meeting did not take place either. *See* PX730, at 17. ChemImage thus argues that Ethicon breached the Agreement by failing to comply with the proper contractual termination procedures. The Court agrees.

For starters, Section 10.3.1 plainly sets forth an unambiguous condition precedent to termination. "Conditions precedent . . . must be expressed in plain, unambiguous language." *Olin Holdings Ltd. v. State of Libya*, 73 F.4th 92, 103 (2d Cir. 2023) (internal quotation marks omitted). They are often accompanied, for instance, by the "linguistic conventions of condition — such as 'if,' 'on condition that,' 'provided that,' 'in the event that,' and 'subject to.'" *Bank of N.Y. Mellon Trust Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.*, 821 F.3d 297, 305 (2d Cir. 2016) (internal quotation marks omitted). Section 10.3 fits the mold. First, Section 10.3.1 says that Ethicon "may . . . terminate [the] Agreement *in the event* [ChemImage] shall have materially breached . . . in the performance of any of its obligations hereunder." Agreement § 10.3.1 (emphasis added). Next, Section 10.3.2 says that failure to achieve a Development Milestone, "*should [it] occur*, shall constitute a [ChemImage] material breach." *Id.* § 10.3.2 (emphasis added). The relevant question, then, is not whether the Agreement sets forth any condition precedent to for-cause termination at all — it surely does — but rather, whether Section 2.4.1 is part and parcel of the condition set forth in Section 10.3.1.

On that score, Defendants argue first that "[t]here is no language in Section 10.3 of the Agreement conditioning Ethicon's right to terminate for cause on the JSC's determination of milestone completion." Defs.' Mem. 153. To be sure, Section 10.3 does not refer to the JSC. Instead, the provision that the JSC is "responsible" for "determin[ing] whether the Milestones specified in Exhibit B have been met," is contained in Section 2.4.1. Agreement § 2.4.1. But that does not mean, as Defendants suggest, that the two provisions are unrelated. Section 2.4.1

describes the process by which the parties determine whether ChemImage has "achieve[d] a Development Milestone" — that is, who decides that issue. And it is an elemental principle of contract law that "[a] written contract will be read as a whole, and every part will be interpreted with reference to the whole." *Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667, 670 (N.Y. 2003); *accord Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005).

Next, Defendants contend that the absence of language about the JSC in Section 10.3 is revealing because Section 10.6 of the Agreement — which governs termination of the Agreement in the event of certain intellectual property disputes — expressly contemplates JSC review as a condition precedent to termination. *See* Defs.' Mem. 155. That provision states: "Each Party shall have the right to terminate this Agreement in its entirety at any time during the Term in the event that the Intellectual Property Rights of a Third Party are or would be infringed by any of the Licensed Products, *provided that [Ethicon] may exercise this right to terminate only if, after consultation with the JSC,* the parties cannot . . . develop a design-around to avoid such infringement." Agreement § 10.6 (emphasis added). The express reference to JSC consultation here, according to Defendants, suggests that "the parties did not intend to impose any condition of JSC determination on Ethicon's right to terminate for cause under that section." Defs.' Mem. 155. But again, that argument is belied by the Agreement's express reference to JSC consultation in Section 2.4.1. Indeed, apart from Section 2.4.1, the Agreement makes no other reference to a process for determining whether a Milestone has been achieved. Furthermore, Section 10.6's reference to the JSC cuts both ways because it supports the general proposition that the parties delegated authority to the JSC in matters related to termination.

Finally, Defendants argue that ChemImage's reading of the Agreement constitutes an "absurd and commercially unreasonable interpretation" because requiring JSC determination on

Milestones would "effectively prevent[] Ethicon from ever terminating for cause."  Defs.' Mem. 156.  This response fares no better than the last.  As previously discussed, the Agreement expressly contemplated that a JSC composed of two ChemImage representatives and two Ethicon representatives might become deadlocked and outlined the procedures for resolution of such a deadlock.  These procedures depended on whether the disagreement in question required modification of the Development Plan.  *See* Agreement §§ 2.4.3(a), (b).  The parties disagree about which deadlock procedure applied to their dispute over Milestone 1B, *see* ECF No. 145 ("Pl.'s Response"), at 13-14; ECF No. 144 ("Defs.' Response"), at 36, but the Court need not resolve that disagreement because neither set of procedures would have rendered it impossible for Ethicon to terminate the Agreement for cause.  Indeed, on Defendants' own telling, for-cause termination was inevitable either way.  *See* Defs.' Response 37 (describing the deadlock process as "futile").

According to Defendants, a deadlock over Milestone 1B would have been governed by Section 2.4.3(a) because it would not require Development Plan modification.  *Id.*  Nothing about Section 2.4.3(a), however, makes it impossible for Ethicon to terminate the Agreement.  That provision first requires the JSC to engage in thirty days of good faith discussion to resolve any deadlock about ChemImage's achievement of the VAB component.  In the event these discussions failed, "each Party [would have had] the final decision-making authority with respect to the conduct of specific activities allocated to it under the Development Plan."  *Id.*  And although the Agreement allocates final decision-making authority concerning Milestone determinations to the JSC, the parties do not dispute that Ethicon conducted its own review and approval process for Development Milestones.  *See, e.g.*, Defs.' Response 37; Pl.'s Response 15-16 (acknowledging that Ethicon approved milestones but disputing that Ethicon's authority

superseded the JSC's).  Defendants thus argue that Ethicon possessed final decision-making authority concerning Milestone determinations in the event of an unresolved JSC deadlock and that Ethicon would have inevitably exercised that authority to terminate the Agreement for cause. It follows that there is nothing "absurd and commercially unreasonable" about the Agreement's JSC consultation requirement.  *See also* Pl.'s Response 14 (collecting cases and observing that these procedures are "regularly used and enforced when a contract contemplates joint decision-making").  Defendants' final attempt to read the JSC condition out of the contract thus fails.

Undeterred by the Agreement's plain terms, Defendants press two alternative arguments, neither of which succeeds.  Defendants argue first that Ethicon's unilateral rejection of ChemImage's final VAB report rendered the JSC determination process "futile" because, as just discussed, under the proper deadlock procedures, Ethicon's termination of the Agreement was inevitable.  *See* Defs.' Response 37.  Putting aside that this argument fatally undermines Defendants' assertion about ChemImage's "absurd and commercially unreasonable interpretation" of the Agreement, it also fails on its own terms.  To see why, consider again Defendants' account of the sequence of events that would have followed a formal JSC meeting about the VAB deliverable.  First, upon convening, the JSC would have deadlocked over ChemImage's achievement of the VAB component because the two Ethicon representatives had concluded that the final VAB report was unevaluable.  Second, that deadlock would have triggered the procedures laid out in Section 2.4.3(a), wherein the JSC would have engaged in thirty days of good faith discussion to resolve the deadlock about ChemImage's achievement of the VAB component.  Those good faith discussions, Defendants claim, would have been doomed to fail.  Finally, in the event of an unresolved JSC deadlock, Ethicon would have possessed final

decision-making authority concerning Milestone determinations, and Ethicon would have inevitably exercised that authority to terminate the Agreement for cause.

But in the end, hindsight is 20/20, and Defendants' argument rests on a fiction. In reality, the JSC did not meet, no deadlock was reached, and thirty days of good faith discussion never took place. Under these circumstances, the Court cannot say that undergoing the JSC approval process was so futile that Ethicon was exempted from adhering to the condition precedent altogether. True, under New York law, "[o]nce it becomes clear that one party will not live up to the contract, the aggrieved party is relieved from the performance of futile acts, such as conditions precedent." *Allbrand Discount Liquors, Inc. v. Times Square Stores Corp.*, 60 A.D.2d 568, 568 (N.Y. App. Div. 2d Dep't 1977). But the Second Circuit has instructed that the futility exception to conditions precedent — such as notice and cure requirements — generally comes into play only when "the repudiating party expressly disavowed any further duties under the contract at issue," such that "it would have been futile for the aggrieved parties . . . to provide the breaching parties with opportunities to cure their repudiations." *Bressler*, 977 F.2d at 727-28; *see Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991) (explaining that strict compliance with conditions precedent "is not required where it would amount to a 'useless gesture'" based on "abandonment of the job"); *see also Nimbus Therapeutics, LLC v. Celgene Corp.*, 570 F. Supp. 3d 100, 116 (S.D.N.Y. 2021) (rejecting a futility claim and explaining that "[u]nder New York law, a terminating party's failure to afford contractually-required notice and cure is excusable as futile only in limited circumstances. Among these are where the non-performing party (1) expressly repudiates the parties' contract or (2) abandons performance thereunder."). That plainly did not happen here.

Defendants do not allege, for instance, that ChemImage "expressly disavowed any further duties" under the Agreement such that it would have been futile for the JSC to convene and discuss the final VAB report or to engage in the thirty days of good faith discussion prescribed by Section 2.4.3(a). To the contrary, at the April 7, 2023 meeting between senior Ethicon and ChemImage representatives, ChemImage maintained that it had not breached the Agreement, asked whether the data deficiencies identified were "fixable," and requested that Ethicon provide "cure path guidelines." PX181, at 3. In other words, although ChemImage did not undertake efforts to conduct additional labs, there is no doubt that it was interested in moving forward with Project Erie. What is more, the Court is not persuaded that thirty days of good faith discussion among JSC members as to the VAB deliverable — had they taken place — would have been a "useless gesture." *Wolff & Munier*, 946 F.2d at 1009. As late as December 19, 2023 — three days after ChemImage submitted the final VAB report to Ethicon — Lanier expressed a "[d]esire to keep [Project Erie] moving" to Ethicon and J&J leadership. PX312, at 2. At the very least, good faith discussions would have provided the parties an opportunity to hash out the disagreements aired in this litigation about what was required to satisfy the VAB component under the relevant acceptance criteria — and whether the final VAB report met those requirements. In short, adherence to the conditions precedent at issue — i.e., convening the JSC and undertaking the associated deadlock process — was not necessarily a "futile act[]." *Allbrand Discount Liquors, Inc.*, 60 A.D.2d at 568; *see also Bressler*, 977 F.2d at 728 (finding "non-futility" where a party "attempted to withdraw its alleged repudiation" of the contract).

Lastly, Defendants argue that the JSC allocated final decision-making authority concerning Milestone determinations to Ethicon under the Development Plan. But this argument fails as well. For one thing, the Agreement expressly states that it "may only be amended by a

written document, duly executed on behalf of the respective Parties." Agreement § 12.14. None of the documents cited by Defendants amount to a formal amendment to the Agreement "by a written document, duly executed" by the parties. Instead, Defendants cite a number of slide decks prepared for Project Erie kick-off meetings that purportedly show that the JSC delegated its final approval authority to Ethicon. But even assuming the JSC could delegate its approval authority to Ethicon, the cited slides show no such thing. Defendants cite, for instance, a slide from the January 29-30, 2020 "Erie Program Kickoff Meeting" deck that describes the "Milestone 1A Executive Review" process. DX301, at 113. During that process, ChemImage's "Erie Team prepares a summary of the . . . [critical structure] *in vivo* test results and submits to Ethicon executive leadership for review," and the "Ethicon executive leadership verifies that the test results meet the established milestone success criteria for Milestone 1A" before it "declares that the Milestone has been met and payment to ChemImage can be made." *Id*. The deck describes the same process for Milestone 1B. *See id.* at 213. The problem is this deck neither constitutes a JSC document nor describes the JSC's process for assessing Milestones. *See also* Tr. 153 (Treado testifying that he did not understand the kickoff meeting to have amended the JSC approval process).

Defendants next cite a slide deck from the JSC's June 28, 2022 meeting, which notes an Ethicon "Decision" on a ChemImage "Deliverable[]" (i.e., the VAB report). *See* DX304, at 28. But that same JSC presentation makes clear that the "Approvals" required for a determination on Milestone 1B include both "Internal Ethicon Leadership Review & Approval" *and* "JSC Review and Approval." *Id.* at 21. Similarly, Defendants cite a presentation from the JSC's February 28, 2023 meeting, which stated: "[Ethicon] to review VAB Report and provide feedback or final

approval." DX284, at 11.  But the very same presentation also states that the "Key Agenda Items" at the "[n]ext JSC meeting" include "VAB final report approval."  *Id.* at 4.

Finally, Ethicon cites internal communications of ChemImage to the effect that Ethicon "accepted" Milestone 1A and that Ethicon's JSC members "aligned" on perfusion.  *See* DX141, at 1; DX688, at 1.  To be sure, Ethicon "accepted" ChemImage's Final Reports on Milestone 1A and perfusion, but none of these comments suggest that Ethicon's decision superseded the JSC's authority — which the JSC exercised — to determine whether each Milestone had been achieved.  It is also true that the JSC did not have "a formal voting process" for approving milestone developments.  *See* Tr. 35-36, 42 (Treado testimony).  But neither Ethicon's acceptance of ChemImage's milestone achievements nor the JSC's lack of a formal voting procedure changes the undisputed fact that, prior to the VAB component of Milestone 1B, the JSC exercised its authority to approve the achievement of Milestone 1A and perfusion.  *See id.* 42-43 (Treado testimony describing the JSC's "consensus"-based decision-making process).  On October 30, 2020, the JSC convened and unanimously agreed that ChemImage had achieved Milestone 1A.  *See* PX118, at 3.  And on March 9, 2022, the JSC convened and agreed that ChemImage had achieved the perfusion component of Milestone 1B.  *See* PX356, at 8. Consistent with that practice, one Ethicon JSC member, Paul Ritchie, agreed that "neither party could unilaterally determine whether a milestone was met."  Ritchie Dep. Tr. 42; *see also id.* at 63-64, 67 (describing the JSC's approval of Milestone 1A and perfusion).

In short, Defendants point to no evidence showing that the JSC delegated its final decision-making authority concerning Milestone determinations to Ethicon.  To the contrary, whether formally or informally, the JSC repeatedly exercised that authority throughout the development process.  For these reasons, the Court concludes that Ethicon breached the contract

34

when it terminated the Agreement for cause based on ChemImage's purported failure to achieve

Milestone 1B absent a final determination from the JSC.

### 4. Substantively Defective Termination

That leaves only ChemImage's claim that Ethicon breached the Agreement when it

terminated for cause because the asserted cause for termination was substantively baseless. *See*

Pl.'s Mem. 65-68. As discussed, Ethicon's March 6, 2023 termination letter identified only one

cause for termination: "failure to achieve a Development Milestone, which constitutes a Material

Breach," based on data collection defects that rendered the final VAB report "not evaluable."

Termination Letter 2. It stated that "Ethicon does not believe [ChemImage] has or will be able to

achieve Milestone 1B as outlined in the Agreement and, thus, subject to the cure provisions in

the Agreement, is terminating effective thirty (30) days from the date hereof." *Id.* at 3.

Notably, in their filings and presentations at trial, Defendants put forward two additional

grounds for termination. First, they suggest that the findings contained in the final VAB report

fell short of the 80% sensitivity and specificity detection requirements laid out in the Milestone

Acceptance Protocol. *See* Agreement Ex. B-1, at 8 (Milestone 1B acceptance protocol); *see also*

Tr. 110-11, 192-96 (Treado testimony). Second, they assert that ChemImage's purported

"fail[ure] to satisfy its contractual obligation to use commercially reasonable efforts in

conducting its development activities" supplied an independent ground for termination for cause.

Defs.' Mem. 127. Neither of these purported causes, however, can properly be considered. As

explained, a contract's enumerated procedure for termination requires "strict compliance."

*Brueckner*, 2021 WL 2158733, at *4. Here, the Agreement permitted Ethicon to terminate the

contract for material breach or default in performance of contractual obligations only if "such

breach or default shall have continued for thirty (30) days after a written notice was received by

[ChemImage] from [Ethicon], which notice specifies in reasonable detail the nature of the breach or default." Agreement § 10.3.1. "[S]uch written notice requirements are fully enforceable" under New York law, and their consequence is that "where no notice was given . . . there can be no breach," because the allegedly breaching party "was not afforded the opportunity to cure." *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 181 (S.D.N.Y. 2011) (collecting cases).

Neither of Ethicon's purported additional grounds for termination "for cause" — i.e., the purported failure to satisfy the Acceptance Protocol's sensitivity and specificity requirements and the purported failure to use commercially reasonable efforts in conducting development activities — was mentioned in the March 6, 2023 termination letter.  *See*, *e.g.*, Tr. 573 (Lanier testimony agreeing that Ethicon "d[id] not take the position in [the] Notice of Termination that ChemImage failed to meet the criteria for success for Milestone 1B because they failed to show 80 percent success" and observing that "[a] different position is stated").  Accordingly, with respect to these two asserted grounds for termination, Ethicon failed to provide anything close to "notice [that] specifies in reasonable detail the nature of the breach or default."  Agreement § 10.3.1.  Defendants respond that the termination letter's statement that Ethicon was terminating the Agreement for "failure to achieve a Development Milestone," *see* Termination Letter 2, provided sufficient notice because ChemImage was aware of its obligations under the Agreement and the Acceptance Protocol, *see* Tr. 1066-1069.  But that is not the case.  Put simply, the fact that ChemImage was aware of its obligation to demonstrate feasibility of the VAB component (and Ethicon expressed its view that ChemImage had fallen short of those obligations) did not, on its own, put ChemImage on notice of the specific ways in which it purportedly failed to demonstrate feasibility.  Defendants' belatedly asserted grounds for termination therefore cannot serve as independent bases for Ethicon's for cause termination.

The only cause for termination on the table, then, is ChemImage's alleged use of faulty data collection practices, which, in Ethicon's view, rendered the final VAB report unevaluable. Given the Court's finding that Ethicon breached the Agreement by terminating without a JSC determination as to Milestone 1B, however, it need not and does not resolve whether that basis justified for-cause termination of the Agreement, let alone the complicated technical issue of whether ChemImage actually achieved Milestone 1B.  *See* Pl.'s Mem. 65-68.[5]

*          *          *          *

In sum, for the foregoing reasons, the Court concludes that Ethicon breached the Agreement when it terminated for failure to achieve Milestone 1B without a final JSC determination.  The Court rejects ChemImage's other procedural arguments for breach and does not resolve the question of whether ChemImage actually failed to satisfy Milestone 1B.

---

[5]     In an earlier opinion, the Court acknowledged that if ChemImage "achieved Milestone 1B even before Ethicon's March 6, 2023 termination notice," it might "be entitled to the corresponding milestone payment," ECF No. 64, at 12, but ChemImage has not asserted its entitlement to any such payment and, thus, has forfeited any such claim, *see Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *Ruradan Corp. v. City of New York*, No. 22-CV-3074 (LJL), 2024 WL 1555230, at *5, (S.D.N.Y. Apr. 10, 2024) (collecting cases).  Were that not the case, perhaps the Court would have had to resolve whether ChemImage satisfied Milestone 1B. In the absence of a claim for any milestone payment, however, it suffices for the Court to address ChemImage's procedural arguments alone.  Indeed, addressing ChemImage's alternative substantive argument when doing so is unnecessary is all the more inadvisable given the myriad technical factual disputes that underlie the substantive question.  *See Najjar Grp., LLC v. W. 56th Hotel LLC*, 850 Fed. App'x 69, 75 (2d Cir. 2021) (summary order) ("As a general rule courts are not required to make findings on issues the decision of which is unnecessary to the results they reach." (cleaned up) (quoting *INS v. Bagamasbad*, 429 U.S. 24, 25 (1976))).  That distinguishes the substantive argument from ChemImage's other theories of breach, which the Court reaches in the interests of making a more complete record notwithstanding Ethicon's breach.

37

### B.  Tortious Interference of Contract Against J&J

That leaves only ChemImage's claim against J&J for tortious interference with contract. *See* Compl. ¶¶ 150-59.  Under New York law, a claim for tortious interference with contract requires proof of "[1] the existence of a valid contract between the plaintiff and a third party, [2] defendants' knowledge of that contract, [3] defendant's intentional procurement of the third-party's breach of the contract without justification, [4] actual breach of the contract, and [5] damages resulting therefrom."  *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126-27 (2d Cir. 2019) (internal quotation marks omitted).

When adjudicating this tort, New York courts seek "to strike a balance between two valued interests: protection of enforceable contracts, which lends stability and predictability to parties' dealings, and promotion of free and robust competition in the marketplace."  *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 867 N.E.2d 381, 383 (N.Y. 2007).  To that end, New York courts recognize an "economic interest defense" to claims of tortious interference with contract.  *Id.*  "The defense applies when the defendant 'acted to protect its own legal or financial stake in the breaching party's business.'  Unless there is a showing of malice or illegality, a defendant's economic interest in the breaching party's affairs bars an action for tortious interference with contract."  *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, No. 16-CV-3800 (PAE), 2017 WL 933111, at *11 (S.D.N.Y. Mar. 8, 2017) (citation omitted) (quoting *White Plains Coat & Apron*, 867 N.E.2d at 383).  "In other words, terminating a corporate contract in furtherance of an equally important right to act in its own economic interests justifies what would otherwise be actionable."  *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 63 (2d Cir. 1988).

38

Applying these principles, the Court concludes that ChemImage's tortious interference claim fails for at least two reasons.  First, ChemImage failed to establish that J&J intentionally procured Ethicon's breach of contract — i.e., its termination of the Agreement for cause without a final Milestone determination from the JSC.  To prove intentional procurement, a plaintiff must establish that "the *target* of a defendant's conduct was the third party's contractual arrangements with the plaintiff," *State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 350 (S.D.N.Y. 2020) (quoting *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767-68 (2d Cir. 1995)), and "that the defendant's *objective* was to procure such a breach," *Prospect Funding Holdings, LLC v. Vinson*, 256 F. Supp. 3d 318, 328 (S.D.N.Y. 2017) (internal quotation marks omitted).  In addition, a plaintiff also has to show that "the contract would not have been breached 'but for' the defendant's conduct."  *Rich*, 939 F.3d at 127 (citing *Burrowes v. Combs*, 25 A.D.3d 370, 373 (N.Y. App. Div. 1st Dep't 2006); *see, e.g.*, *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 342 (E.D.N.Y. 2020); *Ferrandino & Son, Inc. v. Wheaton Builders, Inc., LLC*, 82 A.D.3d 1035, 1036 (N.Y. App. Div. 2d Dep't 2011); *TileBar v. Glazzio Tiles*, 723 F. Supp. 3d 164, 201 (E.D.N.Y. 2014).

Here, the record reflects that Ethicon made an independent determination to terminate the Agreement.  At best, J&J was informed of Ethicon's termination decision and agreed with it. *See* Tr. 629 (Lanier testifying that Ethicon "didn't have to seek approval" for termination from the J&J leadership team, but Ethicon "did get their alignment").  But that is not enough to support a tortious interference claim.  *See, e.g.*, *Northern Shipping Funds I, L.L.C. v. Icon Capital Corp.*, No. 12-CV-3584 (JCF), 2013 WL 1500333, at *6 (S.D.N.Y. Apr. 12, 2013) ("When a complaint alleges that the breaching party exhibited a predisposition toward breaching the Agreement independent of the alleged involvement of the Defendants, Plaintiffs cannot

establish 'but for' causation." (cleaned up)) (quoting *RSM Prod. Corp. v. Fridman*, 643 F. Supp.

2d 382, 410 (S.D.N.Y. 2009)); *Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F.Supp.2d 228,

267 (S.D.N.Y. 1999) (dismissing a tortious interference claim because, among others, the

original complaint alleged that the non-party "was predisposed toward breaching its agreements .

. . and would have done so independently of each of the [defendants]'s actions or participation"

(internal quotation marks omitted)).   And even assuming J&J's approval of Ethicon's

termination decision was necessary for Ethicon to withdraw from the Agreement, there is no

evidence that J&J was in any way involved in Ethicon's decision to move forward with for-cause

termination without convening the JSC — i.e., the specific way in which Ethicon breached.  *Cf.*

*Northern Shipping Funds*, 2013 WL 1500333, at *4 (collecting cases for the proposition that, to

prevail on a tortious interference with contract claim, a plaintiff "must allege that . . . the third-

party defendants had knowledge of [the] specific covenants [breached], not just knowledge of the

[] Agreement in general").  ChemImage has thus failed to show that the Agreement would not

have been breached "but for" J&J's conduct.  That alone sinks ChemImage's tortious

interference claim.

Second, and in any event, J&J is shielded from liability by the economic interest defense.

It is well established under New York law that the defense applies "where defendant and the

breaching party had a parent-subsidiary relationship."  *White Plains Coat*, 867 N.E.2d at 383-84

(citing *American Protein Corp.*, 844 F.2d at 63; *WMW Mach. Co. v. Koerber AG.*, 240 A.D.2d

400, 401 (N.Y. App. Div. 2d Dept. 1997); *Koret, Inc. v. Christian Dior, S.A.*, 161 A.D.2d 156,

157 (N.Y. App. Div. 1st Dept. 1990)); *see also American Protein Corp.*, 844 F.2d at 63

(explaining that under the economic interest defense, the "directors of parent companies are

released from liability for the contract's dishonor when it results from an effort to protect

stockholders, absent a malicious motive").  That is the case here.  Ethicon is a wholly owned subsidiary of J&J.  And the evidence ChemImage marshals in support of its tortious interference claim is replete with statements from Ethicon and J&J executives expressing concern about the high financial costs associated with Project Erie.  *See, e.g.*, Pl.'s Mem. 49-51; PX312, at 2 (describing "option[s] for cost-savings" related to Project Erie); PX753 ("We cannot afford ~10MM for [ChemImage] next year."); PX962A at 15 (describing proposals to "mitigate $20MM gap in Advanced Visualization").  That is enough to establish the defense.  *See, e.g.*, *American Protein Corp.*, 844 F.2d at 63 (holding that the "[p]laintiff failed to establish a *prima facie* case of tortious interference with contractual relations because the evidence showed only that [parent company directors] endorsed terminating [the subsidiary's] contract with [the] plaintiff for the legitimate business reason that it was losing money").

ChemImage's response — that the economic interest defense does not protect J&J because J&J acted with malice — is unavailing.  As an initial matter, ChemImage asserts that "New York courts have found tortious interference with a contract where . . . a parent acted maliciously in directing its subsidiary to breach its contract with a third party," Pl.'s Mem. 72, but in the only case it cites for this proposition, the court merely declined to adopt the economic interest defense at the motion to dismiss stage, *see U.S. Fidelity & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*, No. 98-CV-3099 (JGK), 2001 WL 300735, at *24 (S.D.N.Y. Mar. 27, 2001).  In any event, ChemImage's argument lacks support in the record.  ChemImage claims that J&J maliciously "us[ed] the 'for cause' termination to tie up ChemImage's core IP to prevent it from falling into the hands of a competitor" and "to keep ChemImage from partnering with a competitor."  Pl.'s Mem. 72.  There is, however, no evidence of such malice toward ChemImage on the part of J&J.  Indeed, as previously discussed, ChemImage has not even

marshaled evidence that it was J&J's idea to terminate the contract. Instead, ChemImage's claim here rests on a smattering of comments Defendants made about the "internalization" of advanced visualization technology. *See* Pl.'s Mem. 71-72 (citing PX753, at 1; PX754, at 2; PX746, at 5; PX312, at 2; PX748, at 1). The problem is that none of the cited comments expressly contemplated termination of the Agreement. Nor did any of the comments concern tying up ChemImage's IP rights. Instead, "internalizing efforts" are treated generally as "[c]ost saving[]" measures that would shift additional development responsibilities to Defendants. PX748, at 1; *see also* PX312, at 2 (considering a "'back pocket' option for cost-savings"); PX746, at 5 (noting that internalization would help avoid "overhead"); PX745, at 2 (describing internalization as a way to "manage budgets"); PX753, at 1 (exploring internalization because Defendants "cannot afford ~10MM for [ChemImage] next year"). If anything, then, this evidence serves only to bolster J&J's economic interest defense, not to undermine it.

Accordingly, ChemImage's tortious interference with contract claim against J&J fails.

## C. Relief

That leaves the question of what relief ChemImage is entitled to for Ethicon's breach of the Agreement. Under New York law, which applies here, "direct damages" for breach of contract — which is all that the Agreement allows, *see* Agreement § 8.4 — "are usually expectation damages, measured 'by what it would take to put the non-breaching party in the same position that it would be in had the breaching party performed as promised under the contract.'" *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021) (quoting *Latham Land I, LLC v. TGI Friday's, Inc.*, 96 A.D.3d 1327, 1331 (N.Y. App. Div. 3d Dep't 2012)). Applying that rule, the Court previously concluded that ChemImage's damages are limited to "(i) the agreed-upon $40 million termination fee, *plus* (ii) any damages that ChemImages can prove it

would have incurred during the 120-day notice period from March 6 to July 4, 2023."

*Chemimage Corp. v. Johnson & Johnson*, No. 24-CV-2646 (JMF), 2024 WL 3758814, at *6

(S.D.N.Y. Aug. 12, 2024) (ECF No. 64) (emphasis added).  ChemImage seeks to recover (1) the

$40 million termination fee for termination without cause; (2) damages incurred due to IP

impairment; (3) attorneys' fees and expenses; and (4) a declaratory judgment as to Ethicon's

license to ChemImage's IP.[6]  For the reasons discussed below, the Court grants ChemImage's

requested relief in part.

        The Court starts with the low-hanging fruit.  Ethicon does not dispute that ChemImage,

having prevailed on its breach of contract claim, is entitled to the $40 million termination fee

(plus statutory interest), attorneys' fees and expenses, and its requested declaratory judgment.

That is for good reason.  As the Court previously explained, if "Defendants are wrong and

Ethicon was not entitled to terminate for cause under Section 10.3, its notice of termination

would, as ChemImage concedes, amount to a termination without cause."  *Chemimage Corp.*,

2024 WL 3758814, at *5 (emphasis and internal quotations marks omitted).  "In that instance,"

the Court explained, "ChemImage's damages would be limited to the $40 million termination fee

for which it bargained, *see* Agreement § 10.4.1(a), and any direct damages that it would have

incurred in the 120-day period after March 6, 2023."  *Id.*  It follows that ChemImage is entitled

to: (1) the $40 million termination fee for without cause termination plus nine percent

prejudgment interest through the date on which judgment is entered; (2) a declaration that it is

---

[6]        ChemImage's damages expert originally opined that ChemImage was also entitled to a
$2.5 million payment for Milestone 1B and $5 million in wind-down costs, *see* DX591 ¶ 84, but
ChemImage expressly abandoned these requests, *see* Tr. 11 (Plaintiff's counsel confirming that
ChemImage has "abandon[ed] any request to recover the milestone payments themselves or wind
down costs").  Accordingly, the Court need not and does not address them.

entitled to all of the IP that ChemImage developed before or independent of the Agreement with applications directed to surgical detection, visualization, and identification of anatomic structures, as well as tumor detection, *see* Agreement § 10.4.4; and (3) "reasonable attorneys' fees and court costs as determined by the court hearing the Dispute," *id.* Appendix C.

That said, with respect to these three categories of relief, Ethicon raises two discrete objections to ChemImage's calculations. Ethicon argues first that ChemImage miscalculates the statutory interest owed on the termination fee. *See* Defs.' Response 43 n.7. The Court agrees. ChemImage claims that it is entitled to nine percent prejudgment interest from March 6, 2023, through the judgment date. But the Agreement provides that Ethicon is obligated to pay the termination fee within 120 days of a without-cause termination. *See* Agreement § 10.4.1(a). ChemImage is therefore entitled to recover only the $40 million termination fee plus nine percent prejudgment interest calculated from July 4, 2023 (120 days after the termination date).

Second, Ethicon disputes the amount of attorneys' fees and expenses that ChemImage is owed. Specifically, Ethicon objects that ChemImage's use of a lodestar multiplier of three to calculate attorneys' fees is "well beyond levels of reasonableness." Defs.' Response 48. Once again, the Court agrees. "What constitutes a reasonable fee is properly committed to the sound discretion of the district court." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000). "[T]he district court may, in its discretion, increase the lodestar by applying a multiplier based on 'other less objective factors,' such as the risk of the litigation and the performance of the attorneys." *Id.* In this case, ChemImage's counsel certainly provided high-quality

representation, but the Court sees no reason to award more than the fees and costs actually incurred.  Ethicon, however, will have an opportunity to brief the issue more fully.

In the end, the bulk of the parties' disputes over relief concern whether ChemImage is entitled to additional damages for IP impairment totaling $109.47 million (plus statutory interest).  *See* Pl.'s Mem. 76-77.  According to ChemImage, this sum represents "the value" it "could reasonably have expected to realize from an alternative partnership to develop the CI Core IP had Ethicon properly terminated the Agreement without cause."  *Id.* at 77.  To reach that figure, ChemImage's damages expert, David Plastino, calculated the value of "ChemImage's portfolio of assets related to its medical imaging technology, consisting of patents, trademarks, knowhow, business processes, and certain tangible assets[] as of March 6, 2023."  Plastino Aff. ¶ 4.  (Although it "intimate[d] no view" on the question, the Court previously acknowledged that ChemImage "may well be" entitled to damages that exceed the $40 million termination fee given its allegations that, "without the $40 million and unimpeded rights to its core intellectual property, ChemImage lost the full value of its technology and eventually closed its doors."  *Chemimage Corp.*, 2024 WL 3758814, at *6 (cleaned up).  Ethicon opposes any such additional relief on two grounds.  It objects first that damages for IP impairment constitute consequential damages, which are barred by the Agreement.  And second, it argues that ChemImage's asserted impairment damages are unsupported by the record.  The Court addresses each objection in turn.

Ethicon's first objection — that damages for IP impairment are consequential damages — fails to persuade as it is based on a mischaracterization of the relief that ChemImage seeks.  To be sure, the Agreement bars either party from collecting "any special, indirect, incidental, *consequential*, punitive or exemplary damages."  Agreement § 8.4 (emphasis added).  In contrast to "general" damages, which represent "the value of the very performance promised,"

"'consequential' damages . . . seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000). In most cases, consequential damages take the form of a business's lost operating profits. *See id.* In addition to lost profits, however, a defendant's breach of contract may also cause a party to lose "an income-producing asset" that was in its possession prior to the breach and whose fair market value "may be based . . . on a buyer's projections of what income he could derive from the asset in the future." *Id.* The Second Circuit has held that such "hybrid" damages — comprised of "the market value for a lost income-producing asset" — also constitute consequential damages. *Id.* Ethicon's argument here is that the damages ChemImage seeks for IP impairment are "hybrid" damages because it seeks to recover "the alleged impairment in the fair market value of income-producing assets" — namely, the CI Core IP. Defs.' Mem. 166.

This argument has some surface appeal, but it does not survive closer scrutiny. That is because "[l]ost asset damages can be either general or consequential depending on the asset lost." *North America Photon Infotech Ltd. v. ZoomInfo LLC*, No. 20-CV-2180 (JPC), 2021 WL 4482208, at *7 (S.D.N.Y. Sept. 30, 2021). For instance, "if a party breached a contract and the breach incidentally led to the loss of a separate valuable supply agreement, the asset value of the supply agreement would be consequential damages" under the Second Circuit's definition. *Id.* But "[w]hen a plaintiff seeks 'the market value' of 'the very performance promised,' the damages sought are 'general.'" *Id.* (quoting *Schonfeld*, 218 F.3d at 175); *see, e.g., Latham Land I*, 96 A.D.3d at 1332 (concluding that damages for lost asset value were general, not consequential). That is the case here. Put simply, the CI Core IP rights that Ethicon is contractually obligated to return to ChemImage in the event of termination without cause are

"the value of the very performance promised." *Schonfeld*, 218 F.3d at 175. The Agreement defines "CI Core IP" as "all Intellectual Property Controlled by [ChemImage] or its Affiliates . . . including but not limited to the CI Core Know-How, the CI Licensed Patents, and the CI Core Software," where "Know-How" includes, among other things, "discoveries, trade secrets, processes, procedures, techniques, . . . ideas or other proprietary information, . . . specifications, methods of manufacture, methods of service, [and] data processing techniques." Agreement § 1. To calculate the market value of the performance promises, then, Plastino properly considered the value of the patents, trademarks, know how, and business processes associated with the CI Core IP. *See* Plastino Aff. ¶ 4. Accordingly, the damages associated with IP impairment are general, and recovery of such damages is permitted by the Agreement.

Ethicon's second objection — that ChemImage is not entitled to damages for IP impairment because they are overly speculative — is thornier. *See* Defs.' Mem. 166-174. Ethicon contends that ChemImage has not established the amount of damages with "reasonable certainty." *Id.* at 166. As an initial matter, however, Ethicon invokes the wrong legal standard. True, damages "must be not merely speculative, possible, and imaginary, but they must be *reasonably certain* and such only as actually follow or may follow from the breach of the contract." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg. Inc.*, 487 F.3d 89, 110 (2d Cir. 2007). That said, the Second Circuit has explained that "'[c]ertainty,' as it pertains to *general* damages, refers to *the fact* of damages, not *the amount*. For when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the

47

breach." *Id.* (internal quotation marks omitted) (emphases added).[7]  "Where . . . the non-breaching party has proven the *fact* of damages by a preponderance of the evidence, 'the burden of uncertainty as to the *amount* of damage is upon the wrongdoer.'"  *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016) (latter emphasis added) (quoting *Contemporary Mission*, 557 F.2d at 926).

Thus, the non-breaching party "need only show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach."  *Tractabel*, 487 F.3d at 110 (internal quotation marks omitted).  "Establishing a stable foundation for a reasonable estimate requires putting forth a plausible theory that amounts to something more than a speculative measure of damages."  *Venture Grp. Enters., Inc. v. Vonage Bus. Inc.*, No. 20-CV-4095 (RA), 2024 WL 4502995, at *4 (S.D.N.Y. Oct. 16, 2024) (internal quotation marks omitted).  "At that point, the burden of any uncertainty as to the amount of damages is on the breaching party."  *Process America*, 839 F.3d at 141.  Indeed, "New York courts have significant flexibility in estimating general damages once the fact of liability is established."  *Tractebel*, 487 F.3d at 112 (collecting cases).  "Courts in this Circuit have recognized that such an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection."  *N.Y.C. Transit Auth. v. Express Scripts, Inc.*, 588 F. Supp. 3d 424, 442 (S.D.N.Y. 2022) (internal quotation marks omitted).  That is because "[a] person violating his contract should not be permitted entirely to escape liability because the amount of damage which he has caused is

---

[7]    Ethicon also claims that "'new businesses must meet a higher evidentiary burden' to show reasonable certainty," *see* Defs.' Mem. 167 (quoting *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V.*, 28 F. Supp. 2d 126, 131 (S.D.N.Y. 1998)), but that rule is inapposite because it governs only when a party seeks to recover the consequential damages of lost profits. *See Kidder*, 28 F. Supp. 2d at 131; *Washington v. Kellwood Co.*, No. 05-CV-10034 (MHD), 2015 WL 6437456, at *24 (S.D.N.Y. Oct. 14, 2015).  As discussed, that is not the case here.

uncertain." *Tractebel*, 487 F.3d at 110; *see also Contemporary Mission*, 557 F.2d at 928 ("[T]he uncertainty exists, and since it is a product of the defendant's wrongful conduct, he will not be heard to complain of the lack of precision."). "To the extent certain variables must be assumed in order to arrive at a reasonable estimate, the district court may do so, unless evidence is presented that undermines the basis for the assumption." *Tractebel*, 487 F.3d at 112.

Applying these standards, the Court finds first that ChemImage has established the fact of damages for IP impairment with "reasonable certainty." Ethicon agreed to pay tens of millions of dollars for, among other things, access to, and development of, ChemImage's CI Core IP. *See* Agreement §§ 3.1.1, Ex. B at 1-3. And because Ethicon wrongfully terminated the Agreement for cause, the CI Core IP remained subject to an exclusive license to Ethicon, which prevented ChemImage from monetizing its technology and hindered its efforts to engage with other firms to continue its development. *See* Cohen Aff. ¶¶ 59, 63-64.[8] The key question, then, is whether Ethicon has carried its burden to show that ChemImage lacks "a stable foundation for a reasonable estimate of the damage incurred." *Tractabel*, 487 F.3d at 110 (internal quotation marks omitted). Given that ChemImage has established the fact of damages, "the burden of any uncertainty as to the amount of damages" shifts to Ethicon. *Process America, Inc.*, 839 F.3d at 141. The Court will consider each of Ethicon's challenges on that score in turn.

First, Ethicon asserts that Plastino wrongly assumed that ChemImage would have been able to engage a new partner to replace Ethicon in 2023. *See* Defs.' Mem. 167-70. In particular,

---

[8]    To the extent Donohue's objections to ChemImage's valuation challenge the *fact* of damages — and conclude that "the fair market value of the Subject Assets would have been less than zero," Donohue Aff. ¶ 65 — the Court addresses those objections in the discussion that follows. *See also id.* ¶ 8 (claiming that, as a result of all the objections identified, the fair market value of the subject assets would have been negative).

Ethicon faults ChemImage for not identifying a specific market participant to replace Ethicon. The Second Circuit has held, however, that where, as here, there is no "standardized market or exchange" for an asset, lost asset damages "must be determined by using the hypothetical sale construct." *Schonfeld*, 218 F.3d at 179-80. "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973). "[I]n such instance, the determination of a market value involves something of a fiction" because "'market value' becomes an inference as to the action of an *imaginary* purchaser." *Schonfeld*, 218 F.3d at 178 (cleaned up) (emphasis added). To that end, Plastino calculated the fair market value of ChemImage's medical imaging assets as the price at which those assets would be sold in a hypothetical transaction involving a hypothetical buyer and seller. Plastino Aff. ¶ 63-64, 66. To support their claim that ChemImage must identify specific market participants, Defendants cite *Keystone Foods Holdings Ltd. v. Tyson Foods, Inc.*, 2023 WL 3477157, at *2 (2d Cir. May 16, 2023) (summary order), and *Variblend Dual Dispensing Sys. LLC v. Crystal Int'l (Grp.) Inc.*, 18-CV-10758 (ER), 2021 WL 1198834, at *6-7 (S.D.N.Y. Mar. 30, 2021). But these cases are inapposite because they involved claims for consequential damages in the form of lost business opportunities. By contrast, ChemImage seeks to recover the market value of the very performance promised.

And in any event, assuming arguendo that ChemImage is required to identify a specific market participant, it has done just that. In April 2023, a representative of Genesis MedTech — another medical device company — stated that Genesis was "very interested in collaborating with ChemImage on the cancer diagnostics and soft tissue perfusion area" but "would like to understand the IP availability and if any constrain[t]s exist." PX184, at 1. Over time, it became

clear to ChemImage that potential partnership with Genesis, and other potential partners, hinged in part on J&J's control of associated "patents" such as the CI Core IP.  PX882, at 1; *see* Cohen Aff. ¶ 59 ("While I received expressions of interest from numerous partners, including Genesis MedTech, Abbvie, Renovo, and Leica, each of these potential partners ultimately walked away when they discovered that ChemImage did not have clear title to its intellectual property.").  Even James Donohue, Ethicon's damages expert, acknowledged that Ethicon's exclusive retention of the CI Core IP in 2023 made ChemImage "less desirable" to potential partners.  Tr. 685.  ChemImage's inability to secure a new partnership following termination, then, neither defeats nor diminishes the fair market value of the subject assets.

Next, Ethicon argues that Plastino erred when he assumed in his valuation that ChemImage would have entered into a hypothetical alternative agreement with terms similar to its 2019 Agreement with Ethicon.  *See* Defs.' Mem. 170-72; Plastino Aff. ¶ 68.  But that general assumption is sound as well.  Indeed, "it is well-established that a recent sale price for the subject asset, negotiated by parties at arm's length, is the 'best evidence' of its market value." *Schonfeld*, 218 F.3d at 178.  And "[i]f no prior sales history is available, experts may give their opinion of the asset's value; and evidence of sales of comparable assets may be introduced."  *Id.* In this case, the terms of ChemImage's agreement with Ethicon represent the last completed transaction involving the subject assets.  By contrast, the terms offered by Medtronic in 2019 — which Ethicon claims are more instructive — are evidence of Medtronic's interest, but those terms were never accepted by ChemImage.  Plastino was thus well within his rights to consider

"the terms of the Project with Ethicon" — as opposed to Medtronic's proposed 2019 terms, *see* Tr. 688 — in determining asset values. Plastino Aff. ¶ 68.

Moreover, the burden falls on Ethicon "to demonstrate special circumstances which would negate the relevance of a prior arm's-length purchase price." *Schonfeld*, 218 F.3d at 179 (cleaned up). On that score, Ethicon asserts only that the 2019 Agreement is not a reliable indicator of market value in this case given development delays and lack of technological progress in ChemImage's IP between 2019 and 2023. *See* Defs.' Mem. 171-72. That assertion, however, is speculative and misleading. For one thing, Donohue admitted that he "[did] not know one way or another whether the [developmental] delays were primarily caused by ChemImage or . . . Ethicon." Tr. 702. Donohue also admitted that he was not offering "any technical opinions in this case" and lacked a technical understanding of the work necessary to achieve development milestones. *Id.* at 700-01. Moreover, even assuming *arguendo* that ChemImage did not fully achieve the VAB component of Milestone 1B, there is no dispute that ChemImage successfully achieved Milestone 1A and the perfusion component of Milestone 1B. *See, e.g.*, PX814, at 1 (Ethicon official describing perfusion achievement as "a pretty big win" and "equivalent to what [competitors] are putting on the market and acting like they've landed on the moon"). And in September 2022, even after purported delays and increased expenses, Cambridge assessed "alternatives to Erie" and still maintained that "[n]o alternative asset emerged as a highly attractive and good fit offering over Erie, which remains a leading option for Ethicon's ambitious goals in critical structure identification & cancer localization." PX476, at 1, 3. Based on that analysis, Ethicon agreed that Project Erie was "the most attractive technology aligned to our Advanced Imaging goals." *Id.* at 11. Ethicon has thus failed to put forth "special

circumstances which would negate the relevance" of ChemImage's prior contract with Ethicon for purposes of valuation. *Schonfeld*, 218 F.3d at 179 (cleaned up).

That leaves Ethicon's more targeted challenges to Plastino's calculations, beginning with its argument that Plastino's valuation incorporated inflated sales projections of EndoVere units. *See* Donohue Aff. ¶¶ 67-78. Plastino's valuation adopted ChemImage's internal model from September 2019, which projected peak EndoVere worldwide sales of 9,171 units per year and a peak worldwide installed base of approximately 48,000. *Id.* ¶ 68. Donohue objects that Plastino should have taken account of ChemImage's January 2019 model, Trinity Partner's 2019 model, and Ethicon's analyses from 2019 and 2022 — all of which projected lower sales forecasts.[9] *See id.* ¶ 67. The Court disagrees. At the outset, all three of the competing 2019 sale projections pre-dated ChemImage's September 2019 projection by several months. *See* Donohue Aff. ¶¶ 67-72. Thus, it was reasonable for Plastino to opt for ChemImage's updated September 2019 projection, which was closer in time to the December 2019 signing of the Agreement than the other 2019 projections. As for Ethicon's 2022 sales projection, that projection seemingly relates to a proposed amendment to Project Erie that never materialized, *see* Tr. 462; Plastino Aff. ¶ 82 — a characterization Ethicon does not dispute. The Court therefore sees no reason to disturb the assumed sales projection figures.

The rest of Ethicon's more targeted challenges, however, are more compelling. For one thing, in modeling a hypothetical alternative deal, Plastino can and should have accounted for ChemImage's failed partnership with Ethicon. At trial, Plastino agreed that, from the perspective

---

[9] Plastino points out, however, that Trinity Partners provided an upside forecast in its 2019 findings that is consistent with ChemImage's September 2019 projections. *See* Plastino Aff. ¶ 80; *see also* PX467, at 23-24 (Trinity presentation).

of a prospective buyer, the fact that Ethicon terminated its partnership with ChemImage based on a purported failure to achieve Milestone 1B "would result in a discount of the valuation of the subject assets" — regardless of whether ChemImage had in fact achieved Milestone 1B.  *See* Tr. 477; *see also id.* at 485 (agreeing that "the fact that Ethicon had walked away from its partnership with ChemImage after years of investment of time and money" would "certainly inform the conversation between ChemImage and a new partner or between a buyer and seller of subject assets").  He also agreed that, even in the event of termination without cause, prospective buyers would have understood that Ethicon would retain control of "Collaboration IP" developed during Project Erie and possess "a non-exclusive license to the Intangible Know-How from the CI Core IP and the Intangible Know-How from the CI Developed Lightsphere IP" and could have used that intellectual property to develop competing products.  Agreement § 10.4.4(b); *see* Tr. 488-90.  In response to these concerns, Plastino testified that these commercial risks are accounted for in the model's 15% discount rate, *see, e.g.*, Tr. 518-19, 524, but that discount rate is based on the rate employed by ChemImage's September 16, 2019 valuation model.  *See* Plastino Aff. ¶ 70 & n.141.  In other words, Plastino's discount rate could not have accounted for ChemImage's failed partnership with Ethicon because it was based on a rate that predated that termination by several years.  The Court thus agrees that ChemImage's valuation must be adjusted accordingly.

Ethicon's next objection is that Plastino's estimate incorporates an outdated probability of ChemImage's success.  *See* Defs.' Mem. 172-73.  Specifically, Ethicon observes that Plastino's valuation adopted Ethicon's May 2019 estimate that Project Erie had a 52% probability of success, even though Ethicon reduced its estimate in April 2022 to a 28% probability — an estimate that was "*years* closer to his valuation date of March 2023."  Defs.'

Mem. 173; *see* Donohue Aff. ¶¶ 81-85. ChemImage's only response — that the 28% probability "is based upon a different project that never materialized," Pl.'s Response 48 — is unpersuasive. True, Ethicon prepared the updated valuation as part of a series of proposed amendments to Project Erie. *See* DX409, at 25. But the 2022 estimate reflects Project Erie's likelihood of success with respect to the same underlying critical structures, adjusted based on "changes in the expected milestones and better visibility in risk adjustment factor." *Id.* Donohue explains, for instance, that the updated 28% figure was "based on Ethicon's 2022 projections for EndoVere's probability of a successful product launch and its 2022-2035 projected revenues," having "analyzed the different applications of the EndoVere technology separately in 2022" for the five critical structures, perfusion, and cancer localization. Donohue Aff. ¶ 81 n.20. And at trial, Plastino agreed that the updated 28% figure reflected "the same indications that were contemplated for Project Erie under the 2019 Ethicon agreement." Tr. 505. In other words, the 2019 and 2022 estimates tracked the same thing: the likelihood that Project Erie would yield successful product launches of its advanced visualization technologies. The fact that Ethicon updated its probability-of-success estimate to support certain agreement amendments is therefore beside the point. The Court thus agrees that Plastino's decision to assume a 52% probability of success was faulty and lacked "a stable foundation." *Tractabel*, 487 F.3d at 110.[10]

Ethicon's final objection also hits home. It argues that Plastino's valuation also relied on unfounded assumptions about the total royalties ChemImage would have received under an

---

[10]    That said, the fact that Plastino should have incorporated Ethicon's April 2022 probability of success does not mean the valuation should also incorporate other aspects of Ethicon's April 2022 "Agreement Amendment" presentation. *See* DX409. At trial, ChemImage argued in passing that if the valuation of the subject assets is adjusted according to the 28% figure, it should also be adjusted to reflect Ethicon's $205,000 average unit price estimate from the same presentation. *See* ECF No. 195 ("Pl's Closing"), at 161. The April 2022 presentation states that the "Zeus capital ASP" is "$205k, which is in line with competitive benchmarks from

alternative partnership.  *See* Defs.' Mem. 173-75.  Plastino's market valuation assumes that,

under a hypothetical partnership, ChemImage would have earned royalties from the sales of

commercialized devices through 2057.  *See* DX599, at 17-18.  Plastino purports to rely on the

2019 Agreement with Ethicon to support his royalty assumption, *see* DX591 ("Plastino Report")

¶ 67, but that Agreement permitted ChemImage to receive royalties only through the lives of its

patents, which were scheduled to expire in 2039, *see* Agreement § 5.4.1; DX208, at 174 (noting

that the "Lifetime of Licensed IP" will last twenty years — i.e., until 2039).  ChemImage's only

response is that, "unlike the Agreement, Mr. Plastino's royalty calculation is a unit sales royalty

that is untethered to patent life, and his model need not match the Agreement's terms in every

respect."  Pl.'s Response 49.  But without additional support for its deviation from the

Agreement terms in this particular instance, the Court is compelled to agree that Plastino's

assumption that ChemImage would have received royalties until 2057 lacks basis.[11]

    To summarize, the Court concludes that ChemImage is entitled to (1) the $40 million

without-cause termination fee (plus statutory interest calculated from July 4, 2023); (2)

attorneys' fees and costs (both of which are to be determined); and (3) a declaratory judgment as

to Ethicon's license to ChemImage's IP.  As to the additional damages for IP impairment, the

Court adopts ChemImage's adjusted calculation — which accounts for royalties that stop in 2039

and the 28% probability of success — as a starting point.  *See* ECF No. 195, at 161 (calculating

---

leading viz companies."  DX409, at 14.  Without additional detail or support, that is not enough
to warrant further adjustment of Plastino's subject asset valuation.

[11]    Plastino calculated the value of the subject assets as of March 6, 2023.  Plastino Aff. ¶ 4.
But for the reasons discussed above, July 4, 2023, is likely the proper date.  On the present
record, however, there is no reason to believe that using the later date would materially change
the valuation.  Moreover, Ethicon did not raise the point and thus has forfeited it.

damages adjusted for 2039 royalties and the 2022 probability of success at $84,615,461). That estimate, however, must be updated to incorporate a more appropriate discount rate. Although Donohue contends that "Plastino should have increased the discount rate he used," he does not propose an alternative discount rate. Donohue Aff. ¶ 95 & n.23. Accordingly, the parties are directed to confer and, **within two weeks of the date of this ruling**, file a joint letter with (1) an adjusted discount rate that accounts for the termination of Project Erie and (2) an updated calculation of ChemImages IP impairment damages based on that discount rate. If the parties cannot reach agreement as to these matters, they shall, by the same date, file separate letters addressing these matters not to exceed five pages each. *See Energy Capital Corp. v. United States*, 302 F.3d 1314, 1334 (Fed. Cir. 2002) ("In a given case, it is for the fact-finder to determine the method of adjusting for risk which most closely represents the value of damages."); *see also, e.g.*, *In re Chemtura Corp.*, 448 B.R. 635, 677 (Bankr. S.D.N.Y. 2011) (rejecting both parties' proposed discount rates and directing the parties to confer and "attempt to agree upon the appropriate discount rate" and stating that "[i]n the event of an inability to agree, the parties may come back to [the court] for further rulings").

## CONCLUSION

In sum, the Court concludes that Ethicon breached the parties' contract when it decreed — without a determination from the JSC itself — that ChemImage had failed to achieve Milestone 1B. Put simply, having bound itself to follow certain procedures to determine whether ChemImage had met a milestone, Ethicon could not cut corners and terminate on the ground that ChemImage failed to meet a milestone without following those procedures. The Court either rejects or does not reach ChemImage's other claims, including its tortious interference claim against J&J. The Court finds that ChemImage is entitled to:

(1) the $40 million without-cause termination fee plus statutory interest calculated from July 4, 2023;

(2) additional damages for IP impairment in an amount to be determined based on the adjustments discussed above and further briefing regarding the proper discount rate;

(3) attorneys' fees and costs in amounts to be determined; and

(4) a declaratory judgment as to Ethicon's license to ChemImage's IP.

As set forth above, the parties are directed to confer and, **within two weeks of the date of this ruling**, file a joint letter or competing letters regarding the appropriate discount rate and an updated calculation of ChemImages IP impairment damages based on that discount rate.

Further, the parties promptly shall confer in an effort to reach agreement on ChemImage's attorney's fees and costs. Absent agreement, ChemImage shall file a motion to fix those fees and costs, supported by contemporaneous billing records, **within thirty days of the date of this ruling**; any opposition to such a motion shall be filed **within two weeks of the motion**; any reply shall be filed **within one week of the opposition**.

SO ORDERED.

Dated: July 8, 2025
      New York, New York

JESSE M. FURMAN
United States District Judge